NAME **Michael Campbell**

PRISON IDENTIFICATION/BOOKING NO. **C.D.C.R.# BF 6189**

ADDRESS OR PLACE OF CONFINEMENT **Folsom State Prison P.O. Box 950**

**Folsom Ck. 95763**

Note:  It is your responsibility to notify the Clerk of Court in writing of any
change of address. If represented by an attorney, provide his or her
name, address, telephone and facsimile numbers, and e-mail address.

FILED
CLERK, U.S. DISTRICT COURT

FEB 1 4 2020

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

*Fee Due*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**Michael Campbell**

FULL NAME (Include name under which you were convicted)

Petitioner,

v.

**Warden Rick Hill**

NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV **CV20-1530-DSF (SHK)**

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION **Los Angeles, CA.**
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV **BA 442781-01**
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.  To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.  In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.  Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.  Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.  You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.  You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.  When you have completed the form, send the original and two copies to the following address:

    Clerk of the United States District Court for the Central District of California
    United States Courthouse
    ATTN: Intake/Docket Section
    255 East Temple Street, Suite TS-134
    Los Angeles, California 90012

LODGED
CLERK, U.S. DISTRICT COURT

FEB 1 3 2020

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☑ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention _Folsom State Prison, P.O. Box 950, Folsom Ca. 95763_
   b. Place of conviction and sentence _Superior Court of California, Los Angeles Dept. #103_

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).
   a. Nature of offenses involved (*include all counts*): _(1) Count PC 187(a) 2nd Degree Murder (1) Count P.C. 12022 (b)(1) Enhancement_

   b. Penal or other code section or sections: _____

   c. Case number: _BA 442781-01_
   d. Date of conviction: _02-21-2018_
   e. Date of sentence: _02-23-2018_
   f. Length of sentence on each count: _(1) Count PC 187(a) 2nd Degree Murder = 15 years - Life (1) Count P.C. 12022 (b)(1) = 1 year enhancement_
   g. Plea (*check one*):
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial (*check one*):
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?     ☑ Yes  ☐ No
   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):
   a. Case number: _2 Crim. B288428 See Exhibits A-F Petitions/Brief Filed in court._
   b. Grounds raised (*list each*):
      (1) _The Court of Appeal omits material facts from it's statement of the facts._
      (2) _Failure to instruct the jury on sudden quarrel, heat of passion, provocation and voluntary manslaughter requires reversal of Campbells murder conviction._

Instructing the jury it could consider Flight as consciousness of guilt where the
(3) was insufficient evidence lessened burden of proof violating 5th, 6th, 14th Amendments
(4) Counsel ineffective for failure to request "Earwitness Identification" violating 6th Amendment
(5) Prosecutorial misconduct "Sandbagging" during closing arguement denied Campbell his
(6) constitutional rights to due process and a fair trial, counsel ineffective not objecting

c. Date of decision:   7-24-2019

d. Result   The Court of Appeal denied my Petition For Rehearing

---

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?   ☒Yes   ☐No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number:   2 Crim. B288428

b. Grounds raised *(list each)*:   Procedural History And Facts

   (1) Misreading People vs. Moye (2009) 47 Cal. 4th 537. The Court of Appeal created
   (2) a new rule that a trial court need not instruct a jury on sudden quarrel,
   (3) heat of passion, provocation and voluntary manslaughter where a defendant
   (4) testifies he acted in self-defense. Campbells 14th Amendment Right violated.
   (5) Trial counsel ineffective for failure to request Earwitness Identification.
   (6) Insufficient evidence of Flight violated Campbells 5th, 6th, and 14th Amendment Right

c. Date of decision:   9-25-2019

d. Result   The Petition For Review is denied

---

5. If you did not appeal:

a. State your reasons

N/A

b. Did you seek permission to file a late appeal?   ☐Yes   ☒No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

   ☐ Yes   ☐ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court:   N/A

   (2) Case number:

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?   ☐ Yes  ☑ No

b. (1) Name of court: _____

  (2) Case number: _____

  (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

  (4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

  (5) Date of decision: _____

  (6) Result _____

_____

  (7) Was an evidentiary hearing held?   ☐ Yes  ☑ No

c. (1) Name of court: _____

  (2) Case number: _____

  (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

  (4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☒ No

7. Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes  ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

N/A

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

8. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

CAUTION:    *Exhaustion Requirement:* In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a. Ground one: Procedural history and Facts: (See ExhibiT A Petition For Review)

(1) Supporting FACTS: Campbell generally adopts the statements of procedural history and Facts in pages 3-13 of the slip opinion of the Court of Appeal, noting the opinion misstates or misemphasizes certain inculpatory facts while omitting other pertinent facts which make this case much less egregious and Campbell's defense much more substantial. The latter category of facts are in Campbell's Petition For Rehearing (Exhibit B)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☒ Yes  ☐ No

b. Ground two: Misreading People vs. Moye (2009) 47 Cal. 4th 537. The trial court originally agreed to instruct the jury on CALCRIM 570, and The People did not object to it.

(1) Supporting FACTS: The Court of Appeal created a new rule that a trial court need not instruct a jury on sudden quarrel, heat of passion, provocation, and voluntary manslaughter once a defendant testifies he acted in self-defense. Trial court was required to instruct

the jury in the language of CALCRIM 570, whether or not the Defense requested or object to it. As a result Campbell's 14th Amendment Right to due process was violated. The evidence was sufficent to support giving CALCRIM 570 and requires reversal of Campbell's murder conviction

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒Yes  ☐No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒Yes  ☐No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒Yes  ☐No

c.  Ground three: Campbell was deprived of his 6th Amendment Right to the effective assistance of counsel because counsel failed to request an instruction on "Earwitness Identification"

(1) Supporting FACTS: A criminal defendant's constitutional right to the assistance of counsel for his defense includes the right to effective assistance. Trial counsel was ineffective for failing to request a modified version of CALCRIM 315 or other appropriate instruction to assist the jury in evaluating "Earwitness Testimony" to help the jury assess Rose Gibson's testimony that she heard Campbell yelling for her to "call the police". The instruction would not have been duplicative.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒Yes  ☐No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒Yes  ☐No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒Yes  ☐No

d.  Ground four: The trial court erred in giving CALCRIM 372 where the record showed insufficient evidence of flight, and the decision to give CALCRIM 372 was instructional error.

(1) Supporting FACTS: Instructing the jury it could consider Campbell's flight as consciousness of guilt where there was insufficient evidence of flight lessened the prosecution's burden of proof and violated Campbell's 5th, 6th, and 14th Amendment Rights. The permissive inference created by CALCRIM 372 violated Campbell's federal due process rights. (see Exhibit F, Appellant's Opening Brief pages 32-46).

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒Yes  ☐No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒Yes  ☐No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒Yes  ☐No

e.  Ground five: Prosecutorial misconduct during closing argument denied Campbell his constitutional rights to due process and a fair trial. Defense counsel's failure to object proved him ineffective

(1) Supporting FACTS: The prosecutor "sandbagged" the Defense by saving virtually her entire closing argument for rebuttal. The prosecutor gave an artfully slender opening argument that primarily addressed consciousness of guilt evidence, she then gave a full closing argument immune to defense reply. Allowing the prosecutor to "sandbag" the defense without providing Campbell an opportunity to respond to her rebuttal argument accorded the prosecution an undue advantage & prejudiced defense

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒Yes  ☐No

(see Exhibit F, Opening Appellant Brief pages 60-82)

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☑Yes    ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☑Yes    ☐No

9.  If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state
    briefly which grounds were not presented, and give your reasons: _____ N/A _____

    _____

    _____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?
    ☐Yes    ☑No

    If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and
    the rulings on the petitions if available)*:

    a.  (1) Name of court: _____ N/A _____

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____ N/A _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

        (6) Result _____

        (7) Was an evidentiary hearing held?    ☐Yes ☐No

    b.  (1) Name of court: _____ N/A _____

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____ N/A _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes ☑ No

If so, give the following information (and attach a copy of the petition if available):

(1) Name of court: _____

(2) Case number: _____

(3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): _____

(4) Grounds raised (list each):

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes ☑ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on   2-10-2020
                    *Date*

*Michael Campbell (Michael Campbell)*
*Signature of Petitioner*

Petition For Review    (August 1st 2019)

# EXHIBIT A

SUPREME COURT
FILED

Court of Appeal, Second Appellate District, Division Four - No. B288428    SEP 2 5 2019

Jorge Navarrete Clerk

S257230

Deputy

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

THE PEOPLE, Plaintiff and Respondent,

v.

MICHAEL CAMPBELL, Defendant and Appellant.

---

The petition for review is denied.

CANTIL-SAKAUYE

*Chief Justice*

GAIL HARPER
ATTORNEY AT LAW
P.O. BOX 330057
SAN FRANCISCO, CA 94133
(415) 291-8469
FAX (415) 433-2230

October 27, 2019

Michael Campbell  BF6189
Folsom State Prison
P. O. Box 715071
Represa, CA 95671

Re:  People v. Campbell
     B288428

Dear Mr. Campbell:

Enclosed please find a few copies of the California Supreme Court's order denying review, dated September 25, 2019. You will need the order denying review to attach to any pleadings you file in the federal courts to demonstrate that you exhausted your remedies in the California courts.

If you wish to appeal to the United States Supreme Court, you may do so *in pro per*, or hire other counsel to file a petition for certiorari.  You will have 90 days from the date of the filing of the California Supreme Court's order denying review (September 25, 2019) to file a petition for certiorari. You should contact that court at: 1 - 1st Street, NE Washington, DC 20543, tel:  (202) 479-3000.  I suggest that, if you want to file a petition for certiorari, you contact the U.S. Supreme Court clerk's office and obtain a copy of the rules governing actions in that court.

Good luck to you.

Yours very truly,

GAIL HARPER

GH/gh
Encl: Order denying review



IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,   )  No. _____

                          )

      Plaintiff and Respondent,     )  2 Crim. B288428

                          )

      vs.                       )

                          )  Los Angeles County

MICHAEL CAMPBELL,          )  Superior Court

                          )  No. BA442781

      Defendant and Appellant.    )

_____)

## PETITION FOR REVIEW

GAIL HARPER
Attorney at Law
P. O. Box 330057
San Francisco, CA 94133
Telephone: (415) 291-8469
State Bar No. 104510

Attorney for Appellant
by appointment of the Court of
Appeal

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PETITION FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

NECESSITY FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     PROCEDURAL HISTORY AND FACTS . . . . . . . . . . . . . . . . . 3

II.    MISREADING PEOPLE V. MOYE (2009) 47 Cal.4th 537, THE COURT OF APPEAL CREATED A NEW RULE THAT A TRIAL COURT NEED NOT INSTRUCT A JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER WHERE A DEFENDANT TESTIFIES HE ACTED IN SELF-DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Background and the People's Forfeiture Of the Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.     The Evidence Was Sufficient to Support Giving CALCRIM No. 570; The Court of Appeal Applied The Wrong Standards and Misread This Court's Holdings in Moye in Finding the Evidence Insufficient; As a Result, Campbell's Fourteenth Amendment Right to Due Process Was Violated . . . . . . 6

i

# TABLE OF CONTENTS

Page

C.  The Error Deprived Campbell of His Fourteenth
Amendment Right to Due Process . . . . . . . . . . . . . . . . . 16

III.  CAMPBELL WAS DEPRIVED OF HIS SIXTH
AMENDMENT RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL BECAUSE TRIAL
COUNSEL FAILED TO REQUEST AN INSTRUCTION
ON "EARWITNESS" IDENTIFICATION . . . . . . . . . . . . . . . . 21

A.  The Court of Appeal Omitted Material Facts . . . . . . . . 22

B.  Trial Counsel Was Ineffective For Failing to
Request a Modified Version of CALCRIM
No. 315 or Other Appropriate Instruction to
Assist the Jury in Evaluating the "Earwitness"
Testimony Presented by The Prosecutor . . . . . . . . . . . . 24

STATEMENT OF CONSTITUTIONAL ISSUES TO
BE EXHAUSTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

INSTRUCTING THE JURY IT COULD CONSIDER CAMPBELL'S
FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS
INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE
PROSECUTION'S BURDEN OF PROOF AND VIOLATED
CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS . . . . . . . 29

A.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.  CALCRIM 372 Lessened The Prosecution's
Burden Of Proof and Violated Appellant's
6th and 14th Amendment Rights . . . . . . . . . . . . . . . . . 32

ii

# TABLE OF CONTENTS

**Page**

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

iii

# TABLE OF AUTHORITIES

**Pages**

## CONSTITUTIONS

United States Constitution

      Fifth Amendment.........................................................................29, 33

      Sixth Amendment.....................................................21, 24, 29, 33

      Fourteenth Amendment ................................... 6, 16, 24, 29, 32-33

## FEDERAL CASES

*Mullaney v. Wilbur* (1975),
      421 U.S. 684 .........................................................................19

*Strickland v. Washington* (1984),
      466 U.S. 668 ...........................................................................24, 28

## STATE CASES

*Bach v. County of Butte* (1983),
      147 Cal.App.3d 554 .......................................................................6

*People v. Anderson* (2006),
      141 Cal.App.4th 430......................................................................11

*People v. Avila* (2009),
      46 Cal.4th 680 ...............................................................................15

*People v. Barton* (1995),
      12 Cal.4th 186................................................................................14

*People v. Beltran* (2013),
      56 Cal.4th 935................................................................. 11-12

*People v. Breverman* (1998),
    19 Cal.4th 142 ................................................................7-10, 12-13

*People v. Carr* (1972),
    8 Cal.3d 287 ................................................................................6

*People v. Chacon* (1968),
    69 Cal.2d 765 ..............................................................................8

*People v. Elize* (1999),
    71 Cal.App.4th 605 ........................................................................7

*People v. Enraca* (2012),
    53 Cal.4th 735 ............................................................................15

*People v. Felix* (2008),
    160 Cal.App.4th 849 ......................................................................27

*People v. Fenenbock* (1996),
    46 Cal.App.4th 1688 ......................................................................13

*People v. Flannel* (1979),
    25 Cal.3d 668 ........................................................................7, 12

*People v. Fudge* (1994),
    7 Cal.4th 1075 ........................................................................26-27

*People v. Hannon* (1977),
    19 Cal.3d 588 ............................................................................34

*People v. Howard* (1987),
    190 Cal.App.3d 41 ........................................................................24

*People v. Hughes* (2002),
    27 Cal.4th 287 ............................................................................6

*People v. Humphrey* (2013),
     13 Cal.4th 935 ..................................................................10

*People v. Lasko* (2000),
     23 Cal.4th 101 ...................................................................9

*People v. Logan* (1917),
     175 Cal.45 ............................................... 10-11, 17, 21

*People v. Lucas* (1997),
     55 Cal.App.4th 721 ..........................................................15

*People v. Manriquez* (2005),
     37 Cal.4th 547 ..................................................................15

*People v. Martinez* (1998),
     65 Cal.App.4th 1511 ..........................................................5

*People v. McCowan* (1986),
     182 Cal.App.3d 1 .............................................................16

*People v. McDonald* (1984),
     37 Cal.3d 351 ...................................................................26

*People v. Mendoza* (2000),
     24 Cal.4th 130...................................................................33

*People v. Mendoza* (2000),
     23 Cal.4th 896............................................................ 26-27

*People v. Mitchell* (1939),
     14 Cal.2d 237 ...............................................................7, 21

*People v. Mosley* (1977),
     53 Cal.App.4th 489 ............................................................5

*People v. Moye* (2009),
     47 Cal.4th 537.......................................... 2-4, 6-7, 11, 16

*People v. Palmer* (1984),
　　154 Cal.App.3d 79 ................................................................ 26-27

*People v. Rios* (2000),
　　23 Cal.4th 450 ...................................................................... 19

*People v. Saddler* (1979),
　　24 Cal.3d 671 ........................................................................ 26

*People v. Sinclair* (1988),
　　64 Cal.App.4th 1012 ............................................................ 7-8

*People v. Stowell* (2003),
　　31 Cal.4th 1107 ....................................................................... 5

*People v. St. Martin* (1970),
　　1 Cal.3d 524 ............................................................................ 8

*People v. Thomas* (2013),
　　218 Cal.App.4th 630 ........................................................... 14-15

*People v. Turk* (2008),
　　164 Cal.App.4th 1361 ............................................................... 7

*People v. Turner* (2002),
　　96 Cal.App.4th 1409 .............................................................. 5-6

*People v. Valdez* (2004),
　　32 Cal.4th 73 ......................................................................... 34

*People v. Wickersham* (1982),
　　32 Cal.3d 307 .......................................................................... 7

*People v. Wilson* (1967),
　　66 Cal.2d 749 .......................................................................... 7

*People v. Wright* (1988),
    45 Cal.3d 1126 ........................................................................ 26-27

*Pitts v. County of Kern* (1996),
    17 Cal.4th 340 ............................................................................. 6


## STATE STATUTES


California Penal Code section 4500 .......................................................... 8

California Rules of Court

    Rule 8.500 ....................................................................................... 2

    Rule 8.508 ....................................................................................... 2


## MISCELLANEOUS

CALCRIM No. 226 ................................................................................. 27

CALCRIM No. 315 ..................................................................... 21, 24, 27

CALCRIM No. 372............................................................................ 31-33

CALCRIM No. 570.......................................................................... 4-6, 16

1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 511 ............... 21

5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936 ........ 20-21

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) No. _____ |
| | ) |
| Plaintiff and Respondent, | ) 2 Crim. B288428 |
| | ) |
| vs. | ) |
| | ) Los Angeles County |
| MICHAEL CAMPBELL, | ) Superior Court |
| | ) No. BA442781 |
| Defendant and Appellant. | ) |
| | ) |

## PETITION FOR REVIEW

TO THE HONORABLE CHIEF JUSTICE AND THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF CALIFORNIA:

Appellant MICHAEL CAMPBELL, respectfully petitions this Court for review following the order of the Court of Appeal, Second District, Division Four, filed July 3, 2019. A copy of the opinion of the

Court of Appeal is attached hereto as Exhibit A.[1]

## QUESTIONS PRESENTED

1) Did this Court in *People v. Moye* (2009) 47 Cal.4th 537, establish a corroboration requirement as a condition precedent to giving instructions on sudden quarrel or heat of passion where a defendant testifies to acting in self-defense?

2) Are self-defense and heat of passion mutually exclusive defenses?

3) Is defense counsel ineffective under the Sixth Amendment of the United States Constitution where he fails to request an "earwitness" identification jury instruction when the identity of a speaker is a crucial to the defense?

## NECESSITY FOR REVIEW

A grant of review and resolution of the first two issues are necessary to secure uniformity of decision and to settle important questions of law, pursuant to California Rules of Court, rule 8.500, subdivision (b)(1). The third issue is presented to exhaust Campbell's state remedies under Rule 8.508.

Relying upon *People v. Moye, supra,* 47 Cal.4th 537, the Court of Appeal held Campbell was not entitled to a jury instruction on sudden quarrel, heat of passion, provocation or manslaughter because Campbell testified he acted in self-defense, and no other witness corroborated testimony that could have resulted in a

---

[1]Mr. Campbell's petition for rehearing was denied on July 24, 2019.

2

manslaughter conviction. Campbell contends the Court of Appeal's holding is both factually and legally wrong.

## ARGUMENT

### I.    PROCEDURAL HISTORY AND FACTS

In an unpublished opinion filed July 3, 2019, the Court of Appeal affirmed Mr. Campbell's conviction for second degree murder.

For the purpose of this petition for review only, Campbell generally adopts the statements of procedural history and facts in pages 3 through 13 of the slip opinion of the Court of Appeal, noting the opinion misstates or misemphasizes certain inculpatory facts while omitting other pertinent facts which make this case much less egregious and Campbell's defense much more substantial; the latter category of facts are in Campbell's petition for rehearing and detailed throughout the argument section of this petition.

### II.    MISREADING *PEOPLE V. MOYE* (2009) 47 Cal.4th 537, THE COURT OF APPEAL CREATED A NEW RULE THAT A TRIAL COURT NEED NOT INSTRUCT A JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER WHERE A DEFENDANT TESTIFIES HE ACTED IN SELF-DEFENSE

The Court of Appeal held that the trial court did not err by failing to instruct the jury on sudden quarrel, heat of passion, provocation and voluntary manslaughter, and found no prejudice if there was error. (Opinion pp. 13-20.) The Court of Appeal erred.

3

"inconsistent with its actions". Initially the trial court was going to
give the instruction – thus impliedly finding substantial evidence for
the instruction – but then the court referred to an off-the-record
discussion about withdrawing the instruction to justify not giving it.
The Court of Appeal simply ignored the general rule "'that a trial
court is presumed to have been aware of and followed the applicable
law. [Citations.]" (*People v. Mosley* (1997) 53 Cal.App.4th 489,
496–497; see, e.g., *People v. Turner* (2002) 96 Cal.App.4th 1409,
1413–1414, fn. 2; *People v. Martinez* (1998) 65 Cal.App.4th 1511,
1517.)" (*People v. Stowell* (2003) 31 Cal.4th 1107, at p. 1114.) Thus, at
the time the trial court agreed to give the heat of passion instruction,
the trial court was presumed to have followed the law, which
requires the instruction be given only where the evidence
supporting the instruction was substantial. Thus, on this silent
record, because the trial court initially agreed to give CALCRIM No.
570, a reviewing Court must presume the trial court made the
finding that substantial evidence supported giving the sudden
quarrel/heat of passion instruction. (*Ibid.*)

     The Court of Appeal substantially failed to address the fact
that the People forfeited the argument that the evidence was not
substantial enough to support giving CALCRIM No. 570 because the
People did not object to the instruction at trial. (See Opinion p. 19.)
According to this Court, the rules of forfeiture apply to both parties
in criminal cases. Where a district attorney acts as an agent and

## A.    Background and the People's Forfeiture of the Issue

The trial court agreed to instruct the jury in the language of CALCRIM No. 570, and the People did not object to giving that instruction. (4RT 392.) The Court of Appeal agreed that even had defense counsel objected to the court giving CALCRIM No. 570, the trial court was bound, *sua sponte*, to give the instruction if evidence was substantial – in other words, if the evidence was "strong enough to persuade a reasonable jury." (Opinion p. 14, citing *People v. Moye, supra,* 47 Cal.4th 537, 541.)

Despite the fact that the trial court necessarily found there *was* substantial enough evidence of the lesser offense to merit consideration by the jury when the trial court agreed to give CALCRIM No. 570, the Court of Appeal held there was not. (Opinion pp. 15-19.) The Court of Appeal attempted to circumvent the facts (1) that the trial court impliedly found substantial evidence to support the instruction, and (2) the People did not object to the instruction.

Citing no authority the Court of Appeal held: "We will not presume that the trial court made a finding inconsistent with its actions. The court made no finding of substantial evidence, and there was none." (Opinion p. 19.) The Court of Appeal failed to explain how the trial court's finding of substantial evidence for giving the heat of passion instruction in the circumstances of this case was

representative of the state under the authority of the Attorney General, the People are ordinarily bound by any stipulations, concessions or representations, regardless of whether counsel was the Attorney General or the district attorney. (See *Pitts v. County of Kern* (1996) 17 Cal.4th 340, 360; *Bach v. County of Butte* (1983) 147 Cal.App.3d 554, 570.) For example, where a prosecutor failed to object to a trial court's omission of a drug program fee, the appellate Court found he waived the state's claim of error on appeal, and the trial court was presumed, on a silent record, to have made such a finding. (*People v. Turner, supra,* 96 Cal.App.4th 1409, 1413.) The prosecutor did not object on the ground the Court of Appeal relied upon, and the trial court was presumed, on a silent record, to have found substantial evidence to support the instruction. (*Ibid.*) The People, therefore, forfeited this claim on appeal.

**B.    The Evidence Was Sufficient to Support Giving CALCRIM No. 570; The Court of Appeal Applied the Wrong Standards and Misread This Court's Holdings in *Moye* in Finding the Evidence Insufficient; As a Result, Campbell's Fourteenth Amendment Right to Due Process Was Violated**

The Court of Appeal omitted the following rules. Substantial evidence is "evidence from which a jury composed of reasonable [persons] could... conclude []' "that the lesser offense, but not the greater, was committed. (*People v. Carr* (1972) 8 Cal.3d 287, 294; *People v. Hughes* (2002) 27 Cal.4th 287, 365-367.) In determining whether substantial evidence supports a lesser offense, the trial court

6

must leave issues of witness credibility to the jury (*People v. Breverman* (1998) 19 Cal.4th at p. 162; *People v. Elize* (1999) 71 Cal.App.4th 605, 615), and doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of defendant (*People v. Flannel* (1979) 25 Cal.3d 668, 685; *People v. Wilson* (1967) 66 Cal.2d 749, 763). Evidence must be viewed in the light most favorable to defendant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5).

The Court of Appeal adopted the Attorney General's analysis of *People v. Moye, supra,* 47 Cal.4th 537. (Opinion pp. 15-19.) The Court found that here, like the defendant in *Moye,* Campbell "testified that he reacted to successive advances by Denton in a manner reflecting judgment" instead of reacting in a manner that "bypassed his thought process to such an extent that judgment could not and did not intervene," precluding as a matter of law any claim that he acted out of heat of passion. (Opinion pp. 15-16.) The Court of Appeal apparently suggests a new rule that a defendant in a murder prosecution can never present both self-defense and heat of passion defenses to a jury, because they are, according to the Court of Appeal, mutually exclusive. The Court did not address Campbell's argument that such a rule conflicts with long-established precedent. (See, e.g., *People v. Wickersham* (1982) 32 Cal.3d 307, 327-328, and *People v. Flannel* (1979) 25 Cal.3d 668, 677-678; *People v. Mitchell* (1939) 14 Cal.2d 237; *People v. Sinclair* (1988) 64 Cal.App.4th

1012, 1016-1017; *People v. Chacon* (1968) 69 Cal.2d 765 [this Court noted a logical connection between self defense and heat of passion, in a prosecution under Penal Code section 4500, and noted the heat of passion instruction supplemented the self-defense instruction – "Thus, in a prosecution for murder even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute provocation, which would preclude a finding of malice aforethought and reduce the crime to manslaughter."]; *People v. St. Martin* (1970) 1 Cal.3d 524, 529-532 [reversible error for the trial court to fail to instruct on provocation where the appellant had also claimed self-defense].)

The Court of Appeal also ignored the rule that, in a murder prosecution, the duty to instruct includes the obligation to instruct on *every* supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories that have the strongest evidentiary support, or upon which the defendant has openly relied. (*People v. Breverman, supra,* 19 Cal.4th 142, 155.) Rather, the Court of Appeal emphasized – contrary to law – the fact that "the 'thrust' of the defendant's testimony was self-defense" and defense counsel relied solely upon self-defense on closing argument, as justification for finding omission of the heat of passion instruction not to be error in this case. (Opinion pp. 10, 17-19.)

In *Breverman, supra,* 19 Cal.4th 142, this Court made clear that

8

the theories of voluntary manslaughter - imperfect self defense and heat of passion – are not necessarily inconsistent and at times should be given in the same case. (*Id.* at pp. 159-160.) In *Breverman*, the jury was instructed on unreasonable self defense but not on heat of passion. This court found that there was a *sua sponte* duty to instruct on both theories. (*Breverman, supra*, 19 Cal.4th at 148-149.)

The Court of Appeal asserts: "Despite testifying repeatedly that he panicked upon realizing Denton was dead the next morning, [Campbell] never testified he panicked during the fight." (Opinion pp. 16-17.) Panic is not the only emotion that could support the heat of passion instruction. The Court simply ignored the rule that "[n]o specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

The Court of Appeal omitted all of Campbell's testimony that would support a heat of passion defense. Campbell testified that when he fought back against Denton he was "scared" (3RT 341), and that he was "surprised" and "terrified" that Denton was not deterred by his efforts to fight him off. (3RT 334.) Campbell testified that when he hit Denton with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.) By rejecting the two forms of self-defense upon which it was instructed, the jury concluded that Campbell did not have an actual fear that he

9

was in imminent danger of death or great bodily injury. (See *People v. Humphrey* (2013) 13 Cal.4th 935, 1082.) But substantial evidence was presented upon which the jury could nonetheless have found that Campbell was acting under the actual influence of extreme emotion sufficient to reduce his conviction to manslaughter. This evidence included Campbell's testimony that Denton had acted belligerently once Campbell confronted him about his missing cell phones; Campbell's testimony that Denton was the one who escalated the fight and would not let Campbell out of the room; Campbell's testimony that Denton, who was much younger than Campbell, punched him, and when Campbell told him he was going to call the police, he could not get his phone away from Denton. (3RT 328.) After Denton blocked the door and charged Campbell, bear-hugging him and slamming him to the ground, Denton was throwing body punches. (3RT 328-330.) Campbell testified he was surprised and terrified that Denton was not deterred by being stapled. (3RT 334.) Denton repeatedly threatened to kill Campbell. (3RT 334-335.) Although the jury was entitled to disbelieve Campbell's stated reasons for bludgeoning Denton, it was also entitled to rely on the other evidence in the record to find that Campbell killed Denton spontaneously and under the influence of extreme emotion. (*Breverman, supra*, 19 Cal.4th at p. 163, fn. 10.) The Court of Appeal ignored Campbell's citation to *People v. Logan* (1917) 175 Cal. 45, 46–47, 50 [defendant entitled to heat-of-passion

10

instruction where evidence demonstrated victim's "physical superiority" and defendant's "fear that he was about to be subjected to a second humiliating beating" at victim's hands].

The Court of Appeal attempted to distinguish *People v. Anderson* (2006) 141 Cal.App.4th 430, 443, 446–447 [evidence that "fatal chokehold was motivated by rage at the victim's unprovoked attack" sufficient to require heat-of-passion instruction]), based on the fact that "the defendant's own testimony described each of his reactions to the provocation as deliberate acts of self-defense. (Opinion pp. 18-19.) Campbell believes the Court of Appeal misread *Moye* as precluding a heat of passion defense in any case where the defendant testifies to having defended himself against an attack by the deceased.

There was also substantial evidence presented to support the objective component of heat of passion. To satisfy this component, "' "the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Moye, supra,* 47 Cal.4th at p. 549.) The victim must cause the provocation or the defendant must reasonably believe that the victim caused it. (*Id.* at pp. 549–550.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550; see *People v. Beltran* (2013) 56 Cal.4th 935, at p. 949 ["the provocation must be one that would cause an emotion

11

so intense that an ordinary person would simply react, without reflection" (original italics) ].) As this Court has stated, in determining whether the conduct was adequately provocative, the question is whether it would cause an ordinary person of average disposition "to react from passion and not from judgment," not whether it "would cause an ordinary person of average disposition to kill " or attempt to kill. (*Beltran, supra,* at pp. 938–939, original italics.) Campbell described adequate provocation in Denton's conduct toward him, described elsewhere in this petition.

It appears, therefore, that the Court of Appeal incorrectly resolved all doubts in favor of the prosecution, instead of the defense. (*People v. Flannel, supra,* 25 Cal.3d 668, 685.) The Court of Appeal called into question Campbell's credibility, a determination which was the exclusive province of the jury. (*People v. Breverman, supra,* 19 Cal.4th at p. 162.)

The Court of Appeal omitted the rule that the obligation to instruct on lesser included offenses applies regardless of the parties' requests or objections, and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, encourages a verdict no harsher or more lenient than the evidence merits, and protects the jury's truth-ascertainment function. (*People v. Breverman, supra,* 19 Cal.4th 142, 154-155.) "Just as the prosecution has no legitimate interest in obtaining a conviction of a greater offense than that established by

12

the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Breverman, supra,* at p. 155.)

"Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705; see *Beltran, supra,* 56 Cal.4th at pp. 950–951.) While it is true that a court may decide the issue of adequate provocation if "the provocation is so slight ... that reasonable jurors could not differ on the issue of adequacy..." (*Fenenbock, supra,* at p. 1705, 47 Cal.App.4th 1167C), the provocation shown here – when the omitted facts are considered – is not so slight that a reviewing Court can conclude, as a matter of law, that a reasonable jury would have been unable to find that Campbell acted upon a sudden quarrel or in the heat of passion.

The Court of Appeal failed to address Campbell's argument that the jury could have found adequate provocation in several ways. (See AOB pp. 26-31 and reply brief pp. 15-22.) To begin with, the jury could have found it based on the evidence presented of Denton's mistreatment of Campbell. Campbell, Blassingame and Gibson testified that Campbell and Denton had a serious argument, and that someone was yelling for help. According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

13

The jury also could have found adequate provocation based on Denton's belligerent and threatening behavior, including:

- Campbell's testimony that Denton became aggressive when confronted with Campbell's accusation of theft, including engaging in a shouting match with Campbell;

- Campbell's testimony that Denton was the one who escalated the fight;

- Campbell's testimony that Denton was strangling Campbell immediately before Campbell struck him with the fatal blows;

- the neighbors' testimony that they intervened before the argument ended by calling hotel security.

In short, evidence of Denton's menacing behavior was sufficient to permit a jury to conclude that a reasonable person in Campbell's position could have acted in the heat of passion. The Court of Appeal ignored Campbell's citation to cases with similar facts supporting Campbell's position, including *People v. Barton* (1995) 12 Cal.4th 186, 190, 201-202.)

The Court of Appeal attempted to distinguish *People v. Thomas* (2013) 218 Cal.App.4th 630, 633, on the basis that the defendant in that case "testified that he fired at his victim 'because he was afraid, nervous and not thinking clearly'", and that other witnesses testified to the defendant being engaged in a "'pretty heated' argument, cried, called out for his father, paced, and seemed angry." (Opinion p. 18.) The distinction is based upon the Court of Appeal's omission

14

of all of Campbell's testimony to his strong emotions during the fight, described elsewhere in this petition, and the Court's ignoring the testimony of Campbell's neighbors that Campbell was engaged in a violent argument with Denton and called out for them to call the police.

Like this case, prosecution and defense witnesses in *Thomas* agreed that a sudden quarrel preceded the killing, and evidence was presented that the defendant felt both angered and threatened by the victim. And whereas the defendant in *Thomas* had some time to " 'cool off' " while retrieving his gun and speaking with his father (*Beltran, supra*, 56 Cal.4th at p. 951), Campbell killed Denton in the midst of their argument. Thus, the evidence of provocation in this case omitted by the Court of Appeal here is more compelling than it was in *Thomas*.

The circumstances here—Denton's disrespectful treatment of Campbell, the sudden quarrel between the two men, and Denton's threatening behavior during the argument—also distinguish this case from decisions holding that insults alone are insufficient to constitute adequate provocation. (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 743–744, 759 [gang-related insults]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [same]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586 [victim repeatedly called defendant a " 'mother fucker' " and taunted him to use his weapon]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739–740 [smirking, taunting, and name-calling]; but

see *People v. McCowan* (1986) 182 Cal.App.3d 1, 15 [heat-of-passion instruction required where defendant confessed that "he became enraged" when his ex-wife "made [an] obscene gesture at him" as he drove by her home, prompting him to shoot her].) While the conclusion that a jury could have found adequate provocation might be different if Denton had merely cursed or insulted Campbell, Campbell's testimony about Denton's statements to him and Denton's threatening behavior immediately before the killing were sufficient under California law to require the trial court to give a heat-of-passion instruction *sua sponte*. The Court of Appeal ignored this argument and the authorities cited above.

Therefore, the Court of Appeal erred by finding the trial court was not required to instruct the jury *sua sponte* in the language of CALCRIM No. 570 because there was insufficient evidence of heat of passion.

## C.    The Error Deprived Campbell of His Fourteenth Amendment Right to Due Process

The Court of Appeal found no prejudice, based largely on its misreading of *Moye*, claiming it is not reasonably probable the jury would have accepted a heat of passion theory after rejecting Campbell's self-defense theories based on the same evidence. (Opinion pp. 19-20.) The Court of Appeal substantially failed to address Campbell's argument, ignored governing law, and ignored all facts favorable to Campbell's position.

16

In deciding whether the provocation was sufficient, the finder of fact must consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. (CALCRIM No. 570; *People v. Logan, supra*, 175 Cal 45, 49.) Consequently, the objective standard of heat-of-passion voluntary manslaughter compels examination of Campbell's situation.

The evidence indicated that Campbell was under the stress of being attacked suddenly by a person he had thought of as a trusted friend or even a son. (3RT 322-323, 350, 353.) Campbell had invited Denton into his room to lend him some clothes so that they could go out together on New Years Eve. (3RT 321-323.) Campbell believed that while Denton was in Campbell's room he stole two cell phones. (3RT 326-328.) Campbell confronted Denton about taking his phones and demanded them back. (3RT 327-328, 355.) Unexpectedly, Denton charged Campbell and punched him in the forehead, then bear-hugged Campbell and slammed him to the ground, throwing body punches. (3RT 327-330.) Denton was angry, swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.)

Campbell was able to wriggle out from under Denton and get to his feet, but Denton blocked the door, preventing Campbell from leaving the room. (3RT 330-331, 374-375.) Denton charged Campbell again, and Campbell started throwing things at him. (3RT 331-332.) Campbell picked up a closed stapler from the dresser and hit Denton

17

with it, then opened it and stapled Denton's chest over Denton's tank
top, but Denton pulled out a staple, laughed demonically, and said
"Is that all you got old man?" (3RT 332-336, 356.) Campbell was
surprised and terrified that Denton was not deterred. (3RT 334.) By
this point they had been fighting almost continuously for about ten
minutes, while Denton repeatedly threatened to kill Campbell. (3RT
334-335.) According to Campbell and his neighbor Rose, during the
fight Campbell knocked on the wall and screamed for Rose to call
the police. (3RT 291, 338-339; 347.)

Denton rushed Campbell again and put him in a choke hold
from behind, cutting off his air. (3RT 339, 357-358.) Campbell bit
Denton on his arm and elsewhere repeatedly to break his hold. (3RT
340, 358-360.) Denton then picked up a clothing iron from the
dresser, wrapped the cord around Campbell's neck, and choked him
from behind until Campbell was dizzy and breathless. (3RT 340-341,
361-362.)

Campbell had, at most, a few seconds and as little as a fraction
of a second in which to react after Denton started strangling him.
Rose heard what she believed was Campbell's voice coming from his
room, saying, "Call the police," in response to her knocking on their
common wall and asking if he was okay. (2RT 77-78, 81-82, 92.)
Neighbor Wendell heard the sounds of a fight in Campbell's room,
including a "bang" and someone yelling "help", but he could not tell
whose voice it was. (2RT 49-50, 53, 56-57.) Denton's blood alcohol

level was .212 – supporting the inference that Denton was so drunk that his inhibitions were gone and he was out of control.

Finally, where "the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger" the People must also "prove beyond reasonable doubt that [heat of passion and adequate provocation] were lacking in order to establish the murder element of malice. [Citations.]" (*People v. Rios* (2000) 23 Cal.4th 450, applying *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."].) The coroner indicated the bruises and abrasions on Denton's hands and wrists could have been offensive or defensive, and that Denton had a high blood-alcohol level at the time he was killed. (2RT 202-203, 308-309.) Photographs taken of Campbell's body on the day of his arrest showed bruises, scrapes and scratches on his chest, back, arms and knees. (3RT 293-294, 308-309, 365-370.) Defense expert Dr. Ryan O'Connor determined the injuries to Campbell were consistent with injuries that were six days old – suggesting that they resulted from the fight with Denton. (3RT 309.)

Evidence of intent to kill was lacking here. Why would Campbell invite Denton to his residential hotel room with the intention of killing him? There were people all around, just outside

the door and in the adjacent rooms; discovery of the dead body was inevitable; the identity of the person who rented the room was known. <u>What motive did Campbell</u> <u>have to kill Denton</u>? The prosecutor offered nothing but the insinuation that Campbell had a sexual interest in the younger Denton, without any evidence to support it. This was a sudden and unexpected fight, and at least one of the combatants – Denton – was extremely intoxicated

The prosecutor could not have disproved sudden quarrel or heat of passion here. There was evidence that Denton, a much younger man than Campbell, suddenly and violently attacked Campbell in his own home, swearing at him, threatening to kill him, and strangling him to the point of Campbell nearly passing out. Under these circumstances, a reasonable jury could infer that Campbell was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition. A rational jury could also find that the intense and highly wrought emotions aroused by the initial threat had not had time to cool or subside by the time Campbell seized the iron – whose cord Denton was strangling Campbell with – then struck Denton with it until he stopped strangling Campbell. Finally, a jury could disbelieve defendant's self-defense claim, and conclude, from all of the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation – fear and terror at being attacked. [See 5 Witkin &

20

Epstein, Cal. Criminal Law (2d ed. 1989) § 2936; 1 Witkin & Epstein,
Cal. Criminal Law (2d ed. 1988) § 511]; *People v. Mitchell, supra,* 14
Cal.2d 237, 252; *People v. Logan, supra,* 175 Cal.45, 49.)

On these facts, the prosecutor could not prove beyond a
reasonable doubt that Campbell did not act pursuant to a sudden
quarrel or heat of passion. This Court should grant review in order
to settle the issues raised by the Court of Appeal's decision here.

## III.    CAMPBELL WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION

Summarizing an off-the-record discussion regarding jury
instructions, the trial court stated: "315, I indicated I didn't think 315,
the eyewitness identification instruction, was necessary on this case
because there doesn't seem to be any issue about it." (4RT 389.)
Defense counsel said nothing in response to the court's statement,
and did not request modification of the instruction to address
"earwitness" identifications.

The Court of Appeal disagreed that Campbell's counsel was
ineffective for failing to request an instruction on "earwitness"
identification because the Court of Appeal found (1) "[a]n
instruction highlighting the potential unreliability of voice
identifications would have been more likely to hurt the defense than
to help it" – thus, defense counsel had a tactical reason not to request

21

such an instruction, and (2) any such instruction would have been duplicative of the instruction the court gave on how to evaluate the credibility of witness testimonies. (Opinion pp. 26-29.) The Court of Appeal erred.

## A.   The Court of Appeal Omitted Material Facts

The only percipient witnesses to the killing were Campbell's neighbors, Wendell and Rose. They were not eyewitnesses, but "earwitnesses." Both testified to hearing the sounds of a violent fight coming from Campbell's room. (2RT 44-49, 51, 53-55, 75-79, 95-96.) Wendell testified he heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.)

Rose also testified that before the body was identified as Denton, she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him. (2RT 89; 3RT 283.) Rose stated in a recorded police interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 280-282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." She then said she heard Campbell say "No, you let me go."

22

(3RT 280-281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

Campbell testified that he banged on the wall between his unit and Rose's unit and screamed for her to call the police. (3RT 338-339, 347.)

Defense counsel argued to the jury that as Denton was attacking Campbell, Campbell yelled "Call the police" and "help". (4RT 423, 426, 432.) He also argued, "You don't yell for the police when you're murdering someone. You yell for the police when you need help, and it's your life or someone else's, when you need to get out of a situation desperately you will call "Help, call the police." (4RT 437.)

The prosecutor argued Rose believed at the time the police interviewed her that Campbell was dead at the hands of his girlfriend, and that everything Rose said to the police was "filtered through that belief." (4RT 402.) Rose did not hear anyone say "help", but Wendell did. (4RT 403.) The prosecutor emphasized Rose's statement to the police that she heard a female voice saying "Michael, oh, let me go. Let me go," and Campbell say "No, you let me go." (4RT 403.)

**B.    Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by the Prosecutor**

A criminal defendant's constitutional right to the assistance of counsel for his defense includes the right to effective assistance. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. 1, §§ 7, 15; *Strickland v. Washington* (1984) 466 U.S. 668, 685-686; *People v. Cudjo* (1993) 6 Cal.4th 585, 615.)

An appellant's conviction will be reversed for ineffective assistance of counsel when (1) the trial attorney failed to perform in the manner expected of reasonably competent counsel acting as a diligent advocate, and (2) there is a reasonable probability that a more favorable result would have been obtained in the absence of counsel's failure. (*Strickland, supra,* 466 U.S. at p. 687; *Cudjo, supra,* 6 Cal.4th 585, at p. 615; see *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [discussing "reasonable probability" under the *Watson* standard]; *People v. Howard* (1987) 190 Cal.App.3d 41, 47-48 & fn. 4.)

The prosecutor presented two witnesses to the events that transpired in Campbell's room – neighbors Wendell and Rose. Neither saw what happened, but both heard the sounds of a fight and someone in Campbell's room yelling for help and to call the police. They were, in effect, "earwitnesses".

24

Speaker recognition and identification can be faulty because of several factors, such as hearing impairment, sickness, and fatigue; deliberate impersonation; speaker distortions from stress and anxiety; noise; listener expectations; attentional memory deficits; and other factors. (Yarmey, Earwitness Speaker Identification, 1 Psychol. Pub. Pol'y & L. 792, 795 (1995).) It is probable that listeners themselves may be inconsistent in identification as a function of changes in their physiological state, motivation, and training. (Hollien, H., Majewski, W., & Doherty, E. T., Perceptual Identification of Voices Under Normal, Stress and Disguise Speaking Conditions, Journal of Phonetics, 10, 139-148 (1982).) The jury in this case needed instruction on these factors, just as jurors in eyewitness identification cases need instruction on eyewitness factors.

The Court of Appeal omitted the prosecutor's argument to the jury that it was not Campbell who was yelling for help, but Denton, and the prosecutor's suggestion that Campbell had engaged in a species of torture murder. (4RT 450.) The defense used the earwitness testimony to argue in support of self-defense that Campbell was yelling "help" and "call the police" as Denton was attacking him with deadly force. (4RT 423, 426, 432-433, 437.) Thus, the identification of Campbell as the speaker was crucial to the defense case, and the jury needed instructional assistance in making a determination as to what or whom Rose, in particular, heard.

25

There could be no satisfactory explanation for failure to request the instruction, as Rose's identification of Campbell as the one who was yelling "call the police" was at the core of Campbell's defense.

Trial counsel is ineffective when he fails to request necessary jury instructions. (See *People v. Loza* (2012) 207 Cal.App.4th 332, 348.) The court has no *sua sponte* duty to give an instruction on eyewitness testimony. (*People v. Richardson* (1978) 83 Cal.App.3d 853, 863, disapproved on other grounds by *People v. Saddler* (1979) 24 Cal.3d 671, 682.) An instruction relating eyewitness identification to reasonable doubt, including any relevant "pinpoint" factors, must be given by the trial court on request "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143–1144, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110; *People v. Palmer* (1984) 154 Cal.App.3d 79, 89 [error to refuse defendant's requested instruction on eyewitness testimony].)

Where there is earwitness testimony and a conflict as to the identity of the speaker, jurors should be given some guidance on how to determine whether a voice identification is reliable. (See *People v. Wright, supra,* 45 Cal.3d 1126, 1138-1139.) Citing no authority, the Court of Appeal incorrectly asserted an instruction on

earwitness identification factors was unnecessary because CALCRIM No. 226, which sets out the factors jurors should use in evaluating witness credibility, was given. (Opinion pp. 27-28.) Campbell has been unable to find a single case holding that, in the analogous situation of an eyewitness identification instruction, CALCRIM No. 315 would be duplicative of CALCRIM No. 226.

The Court of Appeal failed to address in this context *People v. Felix* (2008) 160 Cal.App.4th 849, 858-859, where the Court found CALCRIM No. 315 and CALCRIM No. 226 enhanced each other, just as an earwitness instruction – or a modified version of CALCRIM No. 315 – would have enhanced CALCRIM No. 226.

The Court of Appeal ignored the obvious, which is the rule that an analogous instruction relating *eyewitness* identification to reasonable doubt (CALCRIM No. 315), including any relevant "pinpoint" factors, *must* be given by the trial court on request "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*People v. Wright, supra*, 45 Cal.3d 1126, 1143–1144; *People v. Fudge, supra*, 7 Cal.4th 1075, 1110; *People v. Palmer, supra*, 154 Cal.App.3d 79, 89.)

Where there is earwitness testimony and a conflict as to the identity of the speaker, jurors should be given some guidance on how to determine whether a voice identification is reliable. (See *People v. Wright, supra*, 45 Cal.3d 1126, 1138-1139.)

27

Campbell was prosecuted for murder based in part on the earwitness identifications made by Wendell and Rose. Because the parties disagreed on the identity of the person yelling "call the police" and "help" during the fight, it follows that Campbell was entitled to an instruction on factors to be considered in evaluating the reliability of earwitness identification testimony, just as he would have been entitled to a jury instruction on eyewitness identification, had this case depended on it. It was trial counsel's duty to request such an instruction, yet he failed to do it. Because an "earwitness" instruction would not have been duplicative and Campbell was entitled to it, trial counsel rendered ineffective assistance. (*Strickland v. Washington, supra,* 466 U.S. 668, 687.)

The Court of Appeal substantially failed to address Campbell's prejudice argument. There is a reasonable probability that a more favorable result would have been obtained in the absence of counsel's failure. (*Strickland, supra,* 466 U.S. 668, 687.)

The evidence shows the killing in this case arose out of a sudden quarrel and violent altercation between two men, which was overheard by two earwitnesses. The prosecutor offered no motive for Campbell to kill Brian. Brian, on the other hand, was extremely intoxicated with alcohol, and may have been high on methamphetamine as well. Even if he was only drunk, he was so drunk (.212 BAC) that his impulse control and judgment must have been severely impaired. It appears that the jury rejected Rose's

28

crucial testimony that Campbell was yelling for her to call the police, because the jury rejected Campbell's self-defense and unreasonable self-defense claims and convicted him of second-degree murder instead.

Had the jurors been instructed on earwitness identification factors, they would, for example, have had some context in which to understand why Rose might have thought she heard a woman's voice (possible speaker distortions from stress and anxiety). Instead, they were left to guess how they should evaluate her testimony.

On these facts there is a reasonable probability that Campbell would have been acquitted or convicted of manslaughter had trial counsel requested an appropriate earwitness identification instruction. This Court should grant review to settle the question whether an "earwitness" identification instruction should be given upon request in a case where key witnesses testified to the identity of a voice they heard.

## STATEMENT OF CONSTITUTIONAL ISSUES TO BE EXHAUSTED

### INSTRUCTING THE JURY IT COULD CONSIDER CAMPBELL'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS

The Court of Appeal disagreed that instructing the jury on flight as consciousness of guilt violated Campbell's federal

constitutional rights. (Opinion pp. 20-25.) This issue presents no grounds for review under Rules of Court, rule 8.500(b). This issue is presented solely to exhaust state remedies for federal habeas corpus purposes, pursuant to Rules of Court, rule 8.508.

## A.    Factual Background

Campbell testified he woke up the morning after the fight and remembered the fight with Brian. (3RT 343.) Thinking Brian was asleep, Campbell called out to him, telling him to wake up and leave. (3RT 343-344.) When Campbell nudged Brian's leg and discovered he was dead, he panicked and left the building. (3RT 344, 364.) Campbell did not wash up or change clothes. (3RT 364.) He could not recall about what he wore, except that he put something on to wear outside because it was raining. (3RT 364.)

Campbell was afraid to call the police, as he was "trying to process" what had happened. (3RT 344-345.) He went to his ex-girlfriend Angel Dorsey's house and told her he had fought with Brian. (3RT 345.) After leaving Dorsey's place, Campbell went out and bought drugs and alcohol. (3RT 345, 352.) Campbell stayed high on meth and drunk continuously for five days until the police picked him up. (3RT 346, 352, 364.)

Video footage confirmed Campbell left his room in the residential hotel at 8:13 a.m.. (2RT 112-115, 128-129.) He appeared to be wearing the same clothing from the night before. (3RT 299.) He was recorded on video leaving through the front door. (2RT 112-

30

115.) He did not return to the hotel. (2RT 115.)

When the police interviewed Dorsey (2RT 136-138, 144-145, 149), she said Campbell visited her apartment early in the morning of January 1, 2016. (2RT 141-142.) Her apartment was located around the corner from Campbell's apartment and directly across the street from the Los Angeles Police Department's Central Police Station. (2RT 141-142.) Campbell seemed "excited" and upset. (2RT 142, 146.) Campbell said Brian was in his apartment and had died during a fight. (2RT 143-145.) Dorsey let Campbell in because he looked like he needed help. (2RT 143-144.) Campbell stayed at Dorsey's place for about four hours. (2RT 146.)

Campbell was arrested on the night of January 6, 2016. (3RT 175-178, 182-183.) At the time of his arrest, Campbell had bags and a backpack with him, but he did not attempt to flee. (3RT 179-180, 182.)

The court instructed the jury regarding flight in the language of CALCRIM No. 372:

> If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself.

(1CT 148; 4RT 477.) Defense counsel did not object to the instruction.

The prosecutor argued Campbell "fled" because he left his room and walked around the corner to Angel Dorsey's residence

instead of walking to the police station to report Denton's death.
(4RT 405.)

### B.    CALCRIM 372 Lessened The Prosecution's Burden Of Proof and Violated Appellant's 6th and 14th Amendment Rights

"The Due Process Clause of the Fourteenth Amendment
denies states the power to deprive the accused of liberty unless the
prosecution proves beyond a reasonable doubt every element of the
charged offense. (*Carella v. California* (1989) 491 U.S. 263, 265, citing,
*In re Winship, supra*, 397 U.S. 358, 364. )

Instructional error which relieves "the prosecution of the
burden of proving beyond a reasonable doubt each element of the
charged offense violates the defendant's rights under both the
United States and California Constitutions." (*People v. Flood* (1998) 18
Cal.4th 470, 479-480; see *Carella v. California, supra*, 491 U.S. at 265.)

"Mandatory presumptions violate the Due Process Clause if
they relieve the State of the burden of persuasion on an element of
the offense." (*Patterson v. New York* (1977) 432 U.S. 197, 215;
*Sandstrom v. Montana* (1978) 442 U.S. 510, 520-524.) By contrast,
permissive inferences generally do not violate due process because
the prosecution still bears the burden of persuading the jury that the
suggested conclusion should be inferred based on the predicate facts
proved. (*Estelle v. McGuire* (1991) 502 U.S. 62, 78-79, citing *Ulster
County Court v. Allen* (1979) 442 U.S. 140, 157-163.)

Nevertheless, a permissive inference violates the Due Process

Clause if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315, citing *Ulster County Court, supra*, 442 U.S., at 157-163.)

The permissive inference created by CALCRIM No. 372 violated Campbell's federal due process rights. The instruction told the jury it could infer from Campbell's departure from his hotel room that he "fled" the scene and demonstrated consciousness of guilt as to the charged offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 179-180.) That inference, which was inappropriate because it was unsupported by the evidence, lessened the prosecution's burden to prove every element of the case beyond a reasonable doubt, and violated appellant's Fifth, Sixth and 14th Amendment rights to trial by jury and due process. (*In re Winship, supra*, 397 U.S. at 364.)

An instruction that creates a "permissive inference," that is, an inference the jury may choose to credit or reject, violates due process where "there is no rational way" the trier of fact could make the "connection permitted by the inference." (*Ulster County Court v. Allen, supra*, 442 U.S. at 157.) Such an instruction unconstitutionally shifts the burden of proof because it cannot be said with "'substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.'" (*Id.* at 166 fn. 28, quoting *Leary v. United States* (1969) 395 U.S. 6, 36.)

33

Specifically, it cannot be said with "substantial assurance" that guilt is more likely than not to flow from flight.

Before the court can instruct a jury it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) When a court fails to make that preliminary factual determination, it errs by passing a question of law to the jury. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.)

Campbell knew he had killed Denton, but he was concerned that he was the only witness to what had happened in his room and that he would be unfairly prosecuted for a crime when the homicide was justifiable. (3RT 129-131.) Therefore, the flight instruction unfairly suggested Campbell knew he was guilty of murder and fled to avoid arrest.

Campbell's failure to notify the police or to advise his girlfriend he intended to call is not evidence of flight. (*Id.* at p. 869.) Campbell's act of locking his door is not evidence of flight or even an attempt to conceal Denton's body; the reasonable inference is that Campbell locked his door out of habit, as most people lock the doors to their homes upon leaving, and it was inevitable that Denton's body would be found because the smell of death would eventually tip off the neighbors. Furthermore, tenants and staff at the hotel knew Campbell lived in room 58, where the body was. (2RT 49, 76, 94.) It was inevitable that Denton's body would be connected to

34

Campbell because the room belonged to Campbell and Campbell's
neighbors heard the altercation between Denton and Campbell. In
short, Campbell had already been "observed" in connection with the
killing, so leaving his apartment with Denton's body in it could not
have been for the purpose of avoiding being observed. Campbell's
panic at realizing Denton was dead and his desire to get away from
the body also does not support an inference that his purpose in
leaving his room was to avoid being observed or arrested. As
explained above, Campbell had already been observed, so leaving
his room would not help him in that regard.

There is also no substantial evidence to support the inference
that Campbell departed his room and the hotel to avoid arrest. The
Court of Appeal failed to address the fact that Campbell walked the
short distance to his ex-girlfriend's residence around the corner from
his place and immediately across the street from a police station.
(2RT 141-142; 3RT 145-146.) Campbell spent the better part of a week
after the killing getting drunk and high, but he did not leave his
neighborhood. (3RT 346, 352, 364.) The Court of Appeal also
omitted the fact that the uniformed arresting officer testified
Campbell "did not attempt to flee" when taken into custody. (3RT
179-180.) Hanging out for five days, drinking and taking drugs in the
immediate vicinity of a police station, in an area where Campbell
presumably was known, and making no attempt to flee when
officers arrested him, does not support an inference that Campbell

35

## PROOF OF ELECTRONIC SERVICE
## AND SERVICE BY MAIL

I am employed in the county of San Francisco, California; I am over the age of eighteen years and not a party of the within entitled cause; my business address is P. O. Box 330057, San Francisco, CA 94133.

Documents submitted electronically are transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies through the mail via the United States Postal Service or a commercial carrier.

On August 2, 2019, I electronically served the attached APPELLANT'S PETITION FOR REVIEW in *People v. Campbell* (B288428) by transmitting a true copy via this Court's TrueFiling system to the Los Angeles County District Attorney; the Department of Justice, Office of the Attorney General; the Court of Appeal, Second District; and California Appellate Project, Los Angeles.

On August 2, 2019, I served the same document by mail on:

Michael Campbell BF6189
Wasco State Prison
P.O. Box 5500 B-5  217-A
Wasco, CA 93280

The Hon. Curtis B. Rappe
c/o Clerk, Superior Court
111 North Hill Street
Los Angeles, CA 90012

Michael Waldinger
Office of the APD
210 W Temple Street
18th Floor
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 2, 2019, at San Francisco, California.

_____

GAIL HARPER

Appellant's Petition For Rehearing (July 18th 2019)

# EXHIBIT B

GAIL HARPER
ATTORNEY AT LAW

Michael Campbell
August 19, 2019
Page 2

The Court of Appeal denied your petition for rehearing. No response to
that petition was filed. Once the Court of Appeal denied rehearing, I filed your
petition for review. The Attorney General will not respond to it unless the
California Supreme Court orders the Attorney General to file a response.  That
rarely happens, and I do not expect it to happen in your case. In the unlikely
event that the California Supreme Court grants review, then both parties will file
briefs in that Court. Again, it is very unlikely the Supreme Court will grant
review.

The fact that the Court of Appeal's decision was not published does not
affect the Supreme Court's ability to grant review. The California Supreme Court
has the final say in your case in California; it can grant or deny review. Most
likely it will simply deny review, and at that point you can file a petition for
certiorari in the United States Supreme Court, and/or you can file a petition for
habeas corpus in the trial court and move up through the California courts and
into the federal courts after you have exhausted your remedies in the state courts.
You may have a problem because you have already filed a petition for writ of
habeas corpus, since you cannot file successive petitions except under very
limited circumstances. You will have to seek legal counsel elsewhere if you need
it.

The official jury instructions given in your case are in the Clerk's
Transcript, and the reporter's transcript contains the part of the proceedings
where the judge read the instructions to the jury. Your marked up instructions
are not a part of the record on appeal.

I do not possess your case file, if by "case file" you mean your trial
attorney's file. You will have to write to him and request your file. He is
obligated to send it to you. If he fails to send it, you can report him to the State
Bar of California.

Certiorari: A writ of Superior Court to call up the records of an inferior
court or body acting in a quasi-judicial capacity... To be informed of:
the use of the word in the writ

7/18/2019

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | 2 Crim. B288428 |
| | ) | |
| vs. | ) | |
| | ) | Los Angeles County |
| MICHAEL CAMPBELL, | ) | Superior Court |
| | ) | No. BA442781 |
| Defendant and Appellant. | ) | |
| | ) | |

APPEAL FROM THE JUDGMENT OF THE
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

HONORABLE CURTIS B. RAPPE, JUDGE

## APPELLANT'S PETITION FOR REHEARING

GAIL HARPER
Attorney at Law
P. O. Box 330057
San Francisco, CA 94133
Telephone: (415) 291-8469
State Bar No. 104510

Attorney for Appellant
by appointment of the Court of
Appeal

# TABLE OF CONTENTS

                                                                    **Page**

PETITION FOR REHEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE COURT OF APPEAL OMITS MATERIAL
      FACTS FROM ITS STATEMENT OF THE FACTS . . . . . . . . . . 2

      A.    PROSECUTION CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            1.    The Killing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            2.    Events Following the Killing . . . . . . . . . . . . . . . . . 5

      B.    DEFENSE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    REBUTTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    CLOSING ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.    The Prosecutor's Opening Argument . . . . . . . . . 13

            2.    Defense Closing Argument . . . . . . . . . . . . . . . . . 14

            3.    The Prosecutor's Rebuttal Argument . . . . . . . . . 17

II.   FAILURE TO INSTRUCT THE JURY ON SUDDEN
      QUARREL, HEAT OF PASSION, PROVOCATION,
      AND VOLUNTARY MANSLAUGHTER REQUIRES
      REVERSAL OF CAMPBELL'S MURDER CONVICTION . . . 21

i

# TABLE OF CONTENTS

Page

B.    The Court of Appeal Fails to Address Campbell's Argument that, by Giving CALCRIM No. 372, the Trial Court Lessened the Prosecution's Burden of Proof and Violated Campbell's 6th and 14th Amendment Rights ............................ 47

C.    The Court of Appeal Substantially Fails to Address Campbell's Prejudice Argument .......... 47

IV.    THE COURT OF APPEAL SUBSTANTIALLY FAILS TO ADDRESS CAMPBELL'S ARGUMENT THAT HE WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION ................ 49

A.    The Court of Appeal Omits the Facts .............. 49

B.    Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by The Prosecutor ........... 51

iii

# TABLE OF CONTENTS

**Page**

A.    The Court of Appeal Omits or Distorts Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    The People Forfeited the Argument That the Evidence Was Not Substantial Enough to Support Giving CALCRIM No. 570 Because The People Did Not Object to the Instruction At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.    The Evidence Was Sufficient to Support Giving the Heat of Passion Instruction; The Court of Appeal Applies the Wrong Standards in Finding the Evidence Insufficient . . . . . . 25

D.    The Error Prejudiced Campbell . . . . . . . . . . . . . . . . . . . 35

III.    INSTRUCTING THE JURY IT COULD CONSIDER APPELLANT'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A.    The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF CONTENTS

**Page**

1.    Trial Counsel Failed to Request a Necessary Earwitness Identification Instruction To Help The Jury Assess Rose's Crucial Testimony That She Heard Campbell Yelling for Her to Call The Police; The Instruction Would Not Have Been Duplicative . . . . . . . . . . . . . . . . . . . . . 51

      (a)    An "Earwitness" Identification Instruction Would Not Be Any More "Duplicative" of CALCRIM No. 226 Than is CALCRIM No. 315 [Eyewitness Identification Factors] . . . . . . 53

      (b)    The Court of Appeal Fails to Address Any of Campbell's Argument as to Why an Earwitness Identification Instruction Was Necessary . . . . . . . . . . . . 55

2.    There is a Reasonable Probability that a More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction . . . . . . . . . . . 55

V.    PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

iv

# TABLE OF CONTENTS

**Page**

A.   The Court of Appeal Omits Some of the
     Relevant Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

     1.   Prosecutor's Opening Argument . . . . . . . . . . . . . 56

     2.   Defense Closing Argument. . . . . . . . . . . . . . . . . . 57

     3.   Prosecutor's Rebuttal Argument . . . . . . . . . . . . . 60

B.   The Prosecutor Sandbagged the Defense By
     Saving Virtually Her Entire Closing Argument For
     Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

     1.   The Court of Appeal Omits Some of the
          Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

     2.   The Prosecutor Improperly Sandbagged
          The Defense in Rebuttal Argument . . . . . . . . . . . 65

C.   Defense Counsel's Failure to Object to the
     Prosecutor's Misconduct Denied Campbell
     His Sixth Amendment Right to Effective
     Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

     1.   Standard For Evaluating Claims of
          Ineffective Assistance of Counsel. . . . . . . . . . . . 69

     2.   Trial Counsel Was Ineffective. . . . . . . . . . . . . . . 69

     3.   The Court of Appeal Substantially Fails to
          Address Campbell's Prejudice Argument. . . . . . 70

v

# TABLE OF CONTENTS

**Page**

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

# TABLE OF AUTHORITIES

Pages

## CONSTITUTIONS

United States Constitution

    Fifth Amendment ...................................................................40

    Sixth Amendment ........................................................40, 49, 69

    Fourteenth Amendment ...........................................40, 47

## FEDERAL CASES

*Berger v. United States* (1934),
    295 U.S. 78 ....................................................................64

*Mullaney v. Wilbur* (1975),
    421 U.S. 684 ...................................................................38

*Strickland v. Washington* (1984),
    466 U.S. 668 ..............................................................54-55

## STATE CASES

*Bach v. County of Butte* (1983),
    147 Cal.App.3d 554 ....................................................24-25

*People v. Anderson* (2006),
    141 Cal.App.4th 430 .......................................................30

*People v. Avila* (2009),
    46 Cal.4th 680 ................................................................34

*People v. Bandhauer* (1967),
    66 Cal.2d 524 .................................................................64

*People v. Barton* (1995),
    12 Cal.4th 186 ................................................................33

*People v. Beltran* (2013),
    56 Cal.4th 935 ................................................................30

*People v. Blakeslee* (1969),
    2 Cal.App.3d 831 ..........................................................42

*People v. Breverman* (1998),
    19 Cal.4th 142 ............................................ 25, 27-29, 31-32

*People v. Carr* (1972),
    8 Cal.3d 287 ..................................................................25

*People v. Carrington* (2009),
    47 Cal.4th 145 ............................................................ 42-43

*People v. Chacon* (1968),
    69 Cal.2d 765 ................................................................26

*In re Christina P.* (1985),
    175 Cal.App.3d 115 ......................................................70

*People v. Crandell* (1988),
    46 Cal.3d 833 ............................................................ 41-43

*People v. Crayton* (2002),
    28 Cal.4th 346 ..............................................................41

*People v. Daggett* (1990),
    225 Cal.App.3d 751 ......................................................64

*People v. Elize* (1999),
    71 Cal.App.4th 605 ......................................................25

*People v. Enraca* (2012),
    53 Cal.4th 735 ..............................................................34

*People v. Felix* (2008),
   160 Cal.App.4th 849 ................................................................53

*People v. Fenenbock* (1996),
   46 Cal.App.4th 1688 ..............................................................32

*People v. Flannel* (1979),
   25 Cal.3d 668 ........................................................................26

*People v. Fremont* (1937),
   22 Cal.App.2d 292 .................................................................45

*People v. Fudge* (1994),
   7 Cal.4th 1075 ..................................................................53-54

*People v. Green* (1980),
   27 Cal.3d 1 ............................................................................46

*People v. Hannon* (1977),
   19 Cal.3d 588 ........................................................................40

*People v. Hill* (1967),
   66 Cal.2d 536 ........................................................................64

*People v. Hill* (1998),
   17 Cal.4th 800 ......................................................................64

*People v. Howard* (2008),
   42 Cal.4th 1000 ....................................................................40

*People v. Hughes* (2002),
   27 Cal.4th 287 ......................................................................25

*People v. Humphrey* (2013),
   13 Cal.4th 935 ......................................................................29

*People v. Jackson* (1986),
   187 Cal.App.3d 499 ..........................................................67-68

*People v. Lasko* (2000),
   23 Cal.4th 101 ................................................................................28

*People v. Lewis* (2001),
   25 Cal.4th 610 ................................................................................53

*People v. Logan* (1917),
   175 Cal.45 .................................................................29, 36, 39

*People v. Lucas* (1997),
   55 Cal.App.4th 721 ........................................................................34

*People v. Manriquez* (2005),
   37 Cal.4th 547 ................................................................................34

*People v. Martinez* (1998),
   65 Cal.App.4th 1511 ......................................................................23

*People v. McCary* (1985),
   166 Cal.App.3d 1 ............................................................................70

*People v. McCowan* (1986),
   182 Cal.App.3d 1 ............................................................................34

*People v. McDonald* (1984),
   37 Cal.3d 351 ................................................................................53

*People v. Mendoza* (2000),
   24 Cal.4th 130 ................................................................................53

*People v. Mendoza* (2000),
   23 Cal.4th 896 ................................................................................54

*People v. Mitchell* (1939),
   14 Cal.2d 237 ...........................................................................26, 39

*People v. Mosley* (1977),
   53 Cal.App.4th 489 ........................................................................23

*People v. Moye* (2009),
      47 Cal.4th 537 ................................................................22, 26, 30, 35

*People v. Nguyen* (1993),
      21 Cal.App.4th 518 ...................................................................... 41-42

*People v. Pensinger* (1991),
      52 Cal.3d 1210 ....................................................................................46

*People v. Pitts* (1990),
      223 Cal.App.3d 606 ...........................................................................64

*People v. Palmer* (1984),
      154 Cal.App.3d 79 .............................................................................54

*People v. Rankin* (1992),
      9 Cal.App.4th 430 ..............................................................................41

*People v. Rios* (2000),
      23 Cal.4th 450 ....................................................................................38

*People v. Robinson* (1995),
      31 Cal.App.4th 494 ........................................................65-66, 68-69

*People v. Saddler* (1979),
      24 Cal.3d 671 .....................................................................................46

*People v. Sinclair* (1988),
      64 Cal.App.4th 1012 .........................................................................26

*People v. Smithey* (1999),
      20 Cal.4th 936 ............................................................................40, 64

*People v. Stowell* (2003),
      31 Cal.4th 1107 ...........................................................................23-24

*People v. Thomas* (2013),
218 Cal.App.4th 630.................................................................... 33-34

*People v. St. Martin* (1970),
1 Cal.3d 524.....................................................................................27

*People v. Turk* (2008),
164 Cal.App.4th 1361....................................................................26

*People v. Turner* (2002),
96 Cal.App.4th 1409.......................................................................23

*People v. Valdez* (2004),
32 Cal.4th 73............................................................................... 40-41

*People v. Watson* (1977),
75 Cal.App.3d 384 .........................................................................45

*People v. Wickersham* (1982),
32 Cal.3d 307..................................................................................26

*People v. Williams* (1988),
44 Cal.3d 1127............................................................................ 41-42

*People v. Wilson* (1967),
66 Cal.2d 749..................................................................................26

*People v. Wright* (1988),
45 Cal.3d 1126............................................................................ 53-54

*People v. Zimmerman* (1980),
102 Cal.App.3d 647........................................................................70

*Pitts v. County of Kern* (1996),
17 Cal.4th 340.................................................................................24

## STATE STATUTES

California Government Code section 68081............................................2

California Penal Code section 4500 ..........................................................27

California Rules of Court, Rule 8.268.......................................................2

## MISCELLANEOUS

CALCRIM No. 226 ........................................................................ 52-53

CALCRIM No. 315 .........................................................................51, 53

CALCRIM No. 372..........................................................................40, 47

CALCRIM No. 570......................................................21-22, 24, 35-36, 40

1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 511 ...............39

5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936..............39

*7/18/2019*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | 2 Crim. B288428 |
| | ) | |
| vs. | ) | |
| | ) | (Los Angeles County |
| MICHAEL CAMPBELL, | ) | Superior Court |
| | ) | No. BA442781) |
| Defendant and Appellant. | ) | |
| | ) | |

APPEAL FROM THE JUDGMENT OF THE
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

## PETITION FOR REHEARING

TO THE HONORABLE PRESIDING JUSTICE AND THE ASSOCIATE
JUSTICES OF THE COURT OF APPEAL, SECOND APPELLATE
DISTRICT, DIVISION FOUR:

Appellant, MICHAEL CAMPBELL, hereby petitions this
Court for rehearing in his case, in which the opinion of this court
was filed July 3, 2019.

This petition for rehearing is made on the grounds that the
Court's opinion substantially fails to address appellant's arguments,

omits or misstates material facts and authority and misapplies the law. (Cal. Rules of Ct. Rule 8.268; Govt. Code section 68081.)

## ARGUMENT

### I.    THE COURT OF APPEAL OMITS MATERIAL FACTS FROM ITS STATEMENT OF THE FACTS

#### A.    PROSECUTION CASE

##### 1.    The Killing

The Court of Appeal omits Wendell's testimony he heard a lot of banging and slamming (2RT 47, 53), and that Wendell's wall and the mirror hanging on it were shaking. (2RT 48, 53.)

The Court of Appeal omits Rose's testimony that she had heard "a bunch of knocking and bammng and fighting" coming from Campbell's room for about 20 minutes. (2RT 48-49, 54-55, 75-79, 95.)

The Court of Appeal omits all of the following testimony.

On January 5, 2016 at 8:24 a.m., hotel security officer Omar Hernandez found Denton's body while conducting a welfare check at Room 58. (2RT 52, 70, 116, 135-136, 144.) Hernandez opened the door with a master key, then closed the door when he saw the body inside. (2RT 65, 68, 65-66, 68, 135-136.) Sometime after 8:24 a.m., the police received a call regarding a suspicious death and went to Campbell's apartment, where officers met with Hernandez. (2RT 59-62.) Initially the officers believed the body on the floor in Campbell's room was Campbell himself. (2RT 62, 66.) The body's face was pale and bloodied, and there were injuries to the face and

head. (2RT 66-67.)

The window in the room was closed, but an officer opened it
and, while waiting for the detectives to arrive, left it open. (2RT
62-64, 69, 71-72.) The room had a small closet filled with clothes.
(2RT 63-64.) There was a lot of debris on the floor and throughout
the room. (2RT 64.)

Denton's body was lying supine on the floor of the ten foot by
twelve foot room that contained a closet, a twin bed, a dresser, two
tables, and a sink. (2RT 62-65, 3RT 329.) The officers did not go
through Denton's pockets or touch the body at all. (2RT 70-71.)
Denton's face and head had multiple obvious blunt force injuries.
(2RT 66.)

Investigators observed blood smears and spatter on the
dresser drawers near Denton's head. (3RT 248.) The rug under
Denton was soaked in blood. (3RT 247-248.) The area of the
bedspread adjacent to Denton's head was also soaked in blood. (3RT
258-259.) A towel and clothing iron with Denton's blood on them
were on the bed among several items of clothing, boxes and
blankets. (3RT 255-256, 260-261, 294-297.) Multiple blood smears
were on the door and on a bag hanging from the interior door
handle. (3RT 258.) Blood smears, spatter, and dried blood drips were
on the side of that same dresser in the area adjacent to the front door.
(3RT 257-258, 270, 272-276.) A blood-soaked white tank top was
wadded up on the floor area under the sink. (3RT 251-252, 254-255,

337.) On top of the dresser was a stapler with Denton's blood on it. (3RT 259, 262-263, 294-298.) There were cigarette butts in the ashtray on a table, one of which had Denton's DNA on it. (3RT 252-253, 264, 295, 297.) Denton's blood alcohol level was later determined to be .212. (3RT 196, 239-240.) Presumptive tests showed the presence of MDMA and methamphetamine in Denton's blood, but confirmatory testing was negative for those drugs. (3RT 195-196.)

Neighbor Rose testified she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him.[1] (2RT 89.) Rose stated in a recorded interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." (3RT 281.) She then said she heard Campbell say "No, you let me go." (3RT 281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

The cause of Denton's death was blunt force trauma; and the manner of death was homicide. (3RT 184, 197, 225.) Fifteen to seventeen of the blows were potentially fatal. (3RT 224.) The coroner found staples and possible bite marks on Denton's body. (3RT 197-201, 205.) There were bruises and abrasions on Denton's wrists

_____

[1]
The prosecutor impeached Rose with her two felony drug convictions. (2RT 91.)

4

and hands, which could have been either defensive or offensive wounds, and abrasions on his flanks. (2RT 202-203, 308-309.) There were at least 22 lacerations to Denton's head and face. (3RT 206-214.) The coroner could not say definitively which of those injuries were inflicted before or after Denton died. (3RT 208-209.) There was a fracture to one of Denton's teeth. (3RT 214.) It was difficult to determine what some of Denton's injuries were, given the level of decomposition. (3RT 213-214.)

Dr. Miller testified that the injuries he detailed were consistent with the shape of the clothing iron found at the scene. He also indicated that all of the injuries suffered by Denton were inflicted before he died, including the staple and bite wounds.

The prosecutor presented no evidence of motive.

## 2. Events Following the Killing

The Court of Appeal omits the fact that, when Campbell left his room at 8:13 a.m. on January 1, 2016, he appeared to be wearing the same clothing from the night before. (2RT 112-115, 128-129; 3RT 299.)

On January 5, 2016, Brian Denton, Sr., reported to the Los Angeles Police that his son was missing. (3RT 279-280.) Based on the senior Denton's description of his son's tattoos, the police realized that the body they had found in Campbell's room was his son. (3RT 280.)

Also on January 5, Detective Pierce conducted a recorded

interview with Rose Gibson, who told him she heard banging
coming from room 58 through their common wall. (3RT 280-281.)
Rose also said she heard a woman's voice saying, "Michael, oh, let
me go. Let me go." (3RT 281.) The woman also said, "Give me some
money," and Campbell said, "I ain't got no goddamn money." (3RT
282.) Rose said that on New Year's Eve she stayed up until midnight
in her room with a friend. (3RT 281-282.) During the course of the
interview, Rose repeatedly said she believed Campbell was dead
and Angel Dorsey killed him. (3RT 283.)

The Court of Appeal omits the fact that Angel Dorsey's
apartment was located around the corner from Campbell's
apartment and directly across the street from the Los Angeles Police
Department's Central Police Station. (2RT 141-142.) The Court omits
Dorsey's testimony that Campbell seemed "excited" and upset, but
did not seem inebriated when he came to her apartment on the
morning of January 1, 2016. (2RT 142, 146.)

The Court of Appeal omits the fact that at the time of his
arrest, Campbell did not attempt to flee. (3RT 179-180, 182.)

Campbell admitted he knew Denton, that he and Denton had
fought and that Denton was dead. (1CT 128-129.) When pressed for
details, he said, "I got to be quiet on that." (3RT 128.) He further
stated, when told he was being arrested for murder, that he was the
only witness, and also stated that his testimony was crucial. (3RT
129-131.)

6

The Court of Appeal omits the facts that Denton's body was lying supine on the floor of the ten foot by twelve foot room that contained a small closet filled with clothes, a twin bed, a dresser, two tables, and a sink. (2RT 62-65, 3RT 329.) The Court of Appeal omits the fact that the blood smear and spatter investigators observed on the dresser was on the drawers near Denton's head. (3RT 248.) The Court of Appeal omits the fact that the area of the bedspread adjacent to Denton's head was also soaked in blood. (3RT 258-259.) The Court of Appeal omits the facts that a bloody towel and the bloody clothing iron were on the bed among several items of clothing, boxes and blankets. (3RT 255-256, 260-261, 294-297.) The Court of Appeal omits the facts that multiple blood smears were on the door and on a bag hanging from the interior door handle. (3RT 258.) The Court of Appeal omits the facts that blood smears, spatter, and dried blood drips were on the side of that same dresser in the area adjacent to the front door. (3RT 257-258, 270, 272-276.) The Court of Appeal omits the fact that the stapler was found on top of the dresser. (3RT 259, 262-263, 294-298.) The Court of Appeal omits the fact that there were cigarette butts in the ashtray on a table, one of which had Denton's DNA on it. (3RT 252-253, 264, 295, 297.)

The Court of Appeal distorts neighbor Rose's testimony she believed the person killed in Campbell's room was Campbell

himself, and that his girlfriend had killed him.[2] (2RT 89.) Rose stated in a recorded interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." (3RT 281.) She then said she heard Campbell say "No, you let me go." (3RT 281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

   The Court of Appeal omits the coroner's testimony that there were bruises and abrasions on Denton's wrists and hands, which could have been either defensive or offensive wounds. (2RT 202-203, 308-309.) The Court of Appeal also omits the coroner's testimony that he could not say definitively which of those injuries were inflicted before or after Denton died. (3RT 208-209.)

   The Court of Appeal omits the fact that Angel Dorsey's apartment is directly across the street from the Los Angeles Police Department's Central Police Station. (2RT 141-142.) The Court of Appeal omits Dorsey's statement to the police that Dorsey let Campbell in because he looked like he needed help. (2RT 143-144.) The Court of Appeal omits Dorsey's statement that she saw an injury to Campbell's forehead. (2RT 147-148.)

   The Court of Appeal omits the fact one of the arresting officers

---

[2]

The prosecutor impeached Rose with her two felony drug convictions. (2RT 91.)

testified that at the time of Campbell's arrest, Campbell did not attempt to flee. (3RT 179-180, 182.)

The Court of Appeal omits the facts that, after receiving his *Miranda* rights, Campbell provided a recorded statement to the police.[3] (1CT 122-134; 3RT 284-289.) Campbell admitted he knew Denton, that he and Denton had fought and that Denton was dead. (1CT 128-129.) When pressed for details, he said, "I got to be quiet on that." (3RT 128.) He further stated, when told he was being arrested for murder, that he was the only witness, and also stated that his testimony was crucial. (3RT 129-131.) The video of the interview was played for the jury. (3RT 287.)

The Court of Appeal omits the fact the prosecutor presented no evidence of motive.

## B.   DEFENSE CASE

The Court of Appeal omits Campbell's testimony that he had planned to go out alone to neighborhood bars on New Years Eve, and that he had been drinking during the day. (3RT 317, 351-352, 372.)

The Court of Appeal omits Campbell's testimony that, after he bought the items for Denton, Campbell started back to his place and Denton asked if he could tag along. (3RT 320-321.) The Court of

---

[3]
The recording was played for the jury but not reported. (3RT 284-289.)

Appeal omits Campbell's testimony that, as he and Denton walked back to his place, Campbell told him to slow down on his drinking. (3RT 323-324.)

The Court of Appeal omits Campbell's testimony he had known Denton for years and had previously loaned him clothing and a DVD player. (3RT 322-323, 350, 353.) Denton never took Campbell's things without permission, and always returned them. (3RT 323.) The two also drank together. (3RT 350.)

The Court of Appeal omits Campbell's testimony that he ordinarily kept his cell phones on top of his dresser or his stereo. (3RT 327.)

The Court of Appeal omits Campbell's testimony that, after Denton punched him and Campbell told him he was going to call the police, he could not get his phone away from Denton. (3RT 328.) The Court of Appeal omits the fact that – after Denton blocked the door and charged Campbell, bear-hugging him and slamming him to the ground – Denton was throwing body punches. (3RT 328-330.) The Court of Appeal omits Campbell's testimony he was surprised and terrified that Denton was not deterred by being stapled. (3RT 334.) The Court of Appeal also omits Campbell's testimony that by this point they had been fighting almost continuously for about ten minutes, while Denton repeatedly threatened to kill Campbell. (3RT 334-335.)

The Court of Appeal omits Campbell's testimony that, before

Denton's tank top ripped and came off in Campbell's hand, Denton
had put on a glove, saying he was going to whoop Campbell's ass
again, and was pounding on the walls and on Campbell with his
fists. (3RT 336.) Campbell was desperate. (3RT 337.)

      The Court of Appeal distorts Campbell's testimony about the
choke hold (opinion pp. 8-9). The Court omits Campbell's testimony
that Denton's choke hold on him made Campbell feel "dizzy" and
was cutting off his air. (3RT 339, 357-358.) The Court omits
Campbell's testimony that he also bit Denton at other times during
the fight, not just while he was being choked, and that he bit Denton
wherever he could, not just in the shoulder and neck area. (3RT
359-360.) The Court omits Campbell's testimony that Denton started
choking him with the cord while Campbell was trying to escape out
the door, and that Campbell became not only dizzy, but breathless.
(3RT 340-341, 361-362.) The Court omits Campbell's testimony that
he was scared at that point because he realized that Denton was
trying to kill him. (3RT 341.) The Court omits Campbell's testimony
that at no time did Campbell strike Denton with the iron while
facing him, nor did he ever kneel over Denton and hit him with the
iron while Denton was lying on his back. (3RT 373-374.) The Court
omits Campbell's testimony that the blood smear by the door
resulted from Denton blocking the door while wearing a bloody
shirt, preventing Campbell from escaping. (3RT 374-375.)

      The Court omits the fact that Campbell crawled to the bed

with the cord still wrapped around his neck, shoved some clothes aside, and passed or blacked out. (3RT 343, 361, 363, 377.) The Court also omits Campbell's testimony that before Campbell passed out, he heard Denton mumbling like a drunk person on the floor. (3RT 343.)

The Court of Appeal omits Campbell's testimony that, when he nudged Denton's leg and discovered he was dead, he panicked and did not wash up or change clothes. (3RT 364.)

The Court of Appeal omits Campbell's denial that he waited for Denton to die before leaving the room, or waiting so that Denton could not get medical treatment. (3RT 376.) Campbell was afraid to call the police, as he was "tying to process" what had happened. (3RT 344-345.)

The Court of Appeal omits Campbell's testimony that during his interview with the police Campbell was not himself. (3RT 346.) He was hallucinating and very upset about Denton attacking him in his home. (3RT 346.) Denton attempted to kill him, and when Denton would not stop attacking him, Campbell tried to get him off of him, tried to get him out of his apartment, and tried to get others to call the police. (3RT 347.) When Campbell hit Denton with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.)

## C.   REBUTTAL

While the Court of Appeal notes that the photographs Detective Sharman took of the bloody tank top found in Campbell's

12

room showed no tears in it (opinion p. 11); the Court omits Sharman's testimony that he did not photograph both sides of the shirt. (3RT 385.)

### D.    CLOSING ARGUMENTS

#### 1.    The Prosecutor's Opening Argument

The Court omits the following from the prosecutor's opening argument. After discussing the law of homicide (4RT 412-416), the prosecutor urged the jury to find first-degree murder because:

- Denton had bite marks on the upper part of his body (4RT 417-418);

- Neighbor Wendell heard noises of a fight going on for 30 minutes, but when security knocked on the door the room was silent (4RT 418)

- When Campbell walked out of the hotel the next morning it did not look as though he had any blood on him, so the prosecutor surmised Campbell had cleaned himself up to hide the killing (4RT 418)

- Campbell locked the door before leaving Denton's body in his room, suggesting consciousness of guilt (4RT 418);

- Campbell never returned to his room after that, also suggesting consciousness of guilt (4RT 418);

- Campbell went to Angel Dorsey's house, suggesting consciousness of guilt (4RT 418);

- Campbell did not report the killing to the police, suggesting

13

consciousness of guilt (4RT 418); and

- Campbell told the police he was the only witness. (4RT 418.)

## 2. Defense Closing Argument

The Court omits the following. Defense counsel argued that Campbell's testimony he invited Denton to go out to the clubs with him for New Year's Eve and went through his closet for some clothes for Denton to wear was supported by the array of clothes found laid out on Campbell's bed. (4RT 421.) When Campbell noticed his cell phones were missing, he confronted Denton, and Denton attacked him. (4RT 422.) Denton picked Campbell up and threw him to the floor. (4RT 422.) Campbell was trapped in his room and tried to reach the door while struggling with Denton, accounting for the blood smear on the door. (4RT 422.)

Campbell grabbed Denton from behind and tried to throw him, ripping Denton's tank top in the process. (4RT 422.) Campbell noted that the tank top itself was not in evidence, and that the prosecutor relied on photographs of the top so the jury could not examine it for the damage Campbell described. (4RT 422.) Photographs of the room indicated Campbell threw everything he had at Denton in a desperate attempt to stop the attack. (4RT 422.)

When Denton got Campbell into a choke hold, Campbell bit him; but Denton taunted him and then strangled him with the cord of an electric iron. (4RT 423.) At that point Campbell yelled for Rose to call the police as he swung wildly at Denton with the iron, killing

14

him. (4RT 423-424.)

After discussing the jury instructions on homicide and burden of proof (4RT 424-430), defense counsel asked the jury to examine the prosecutor's theory that Campbell invited Denton back to his room in order to murder him. (4RT 431.) After 30 minutes of fight noises, someone says, "Call the police," but the prosecutor wanted the jury to ignore the struggle and all of the other sounds Wendell and Rose heard. (4RT 431.) Campbell neither hid the body nor attempted to scrub down his room, but instead went to his girlfriend's house and stayed there for five or six days. (4RT 431.) Defense counsel argued the prosecutor's theory made no sense. (4RT 431.)

Both Wendell and Rose testified they heard a fight. (4RT 432.) After 20 to 25 minutes of fight noises, Rose heard Campbell's voice saying, "Call the police", and she went to Wendell's room and asked him to call. (4RT 432.) The prosecutor wanted the jury to believe that Campbell murdered Denton and then asked Rose to call the police. (4RT 432-433.) Campbell was yelling out of desperation because Denton was attacking him. (4RT 433.)

Defense counsel stated the prosecutor would argue in rebuttal about how Denton lived with his grandmother, but the grandmother was in Ventura and had not heard from Denton in days, but did not file a missing person report. (4RT 433.) Denton went to Los Angeles not just because he wanted to visit his father on skid row, but to

15

"hang out" in the neighborhood. (4RT 433.)

Defense counsel pointed out how sloppy the police were when they entered Campbell's room. (4RT 433-434.)

Defense counsel argued that the wounds on Denton's knuckles were from hitting the walls and hitting Campbell, and that there were no defensive wounds on Denton's forearms. (4RT 434.) Campbell bit Denton in a desperate attempt to fight him off. (4RT 434.)

Defense counsel pointed out that Denton had a blood alcohol level of .212 – three times the legal limit. (4RT 434.) A presumptive test indicated Denton was high on methamphetamine and ecstasy. (4RT 434.) The subsequent test that negated those findings was not produced by the prosecutor. (4RT 434-435.)

Defense counsel referred to Detective Sharman's testimony about the blood in front of the room and argued it was important because it confirmed the fact that Campbell was attempting to get out, or get Denton out of his room. (4RT 435.) Campbell had no other choice than to bite and hit Denton, because Denton was in a rage and was trying to choke him to death. (4RT 436.) The injuries were to the front of Denton's head because he was strangling Campbell and could not block the blows. (4RT 436-437.) Campbell yelled for the police as this was going on. (4RT 437.) If Campbell had been murdering Denton, he would not have asked anyone to summon the police. (4RT 437.)

The coroner indicated that Campbell had injuries that were inflicted six days prior to his arrest. (4RT 437.)

### 3.    The Prosecutor's Rebuttal Argument

The Court of Appeal omits the following details regarding the prosecutor's rebuttal argument.

The prosecutor began with an argument about circumstantial evidence. (4RT 440, 442.) She discussed the jury instruction on credibility of witnesses. (4RT 440-441.)

For the first time, the prosecutor referred to "the physical evidence, the photographic evidence, the video evidence". (4RT 441.) For the first time, the prosecutor called the jury's attention to Campbell's testimony on cross-examination that he did not know where the missing cell phone landed "because the lights were out and we had the stereo lit up...." (4RT 441.) The prosecutor argued:

> That little comment that came out just when he's talking, and the judge asked him a question that threw everything that he said out the window. Never mind how the physical evidence didn't match it, but wait, the lights were out?
>
> You were looking for clothes? For [Denton] to wear in the dark?
>
> The bottom line is the defendant did not tell the truth about that night when he testified. He didn't talk about that night in his interview. He had to be quiet on that.

(4RT 442, 445 ["... the defendant was looking in the closet of the

room that didn't have any lights on for (Denton) to find clothes . . . .],
450 ["We talked already about his odd answer on the stand about it
being dark."].)

The prosecutor returned to her argument about consciousness
of guilt and hiding evidence, making more detailed arguments about
how Campbell must have cleaned himself up before he left the hotel,
and how he left Denton's body to "rot". (4RT 443-444.)

The prosecutor reserved for "rebuttal" argument all of the
details about the injuries Campbell inflicted on Denton. For the first
time, the prosecutor argued:

> . . . I mean, realistically speaking, never mind the
> fact that if you're hitting somebody across the body
> holding an iron you're only going to be able to hit
> certain portions, certainly not the side of the top of the
> head and all the different areas on both sides, and that
> somebody would actually stay there for it when they
> were getting hit like that if they had the ability to move
> away.
>
> And if [Denton] was actually strangling the
> defendant with a cord to the point of dizziness and
> almost passing out, believing his life was going to end,
> How on earth would he be on his side? He would be
> behind him, pulling it tight, and thus not available to be
> struck in such a manner. It just makes sense. There is
> really no other way.

(4RT 443-444.)

During rebuttal the prosecutor argued for the first time

18

regarding timing of the killing. She stated that Denton left the room twice, not once as Campbell had testified. (4RT 446.) She pointed out that Denton went back to Campbell's room the second time at 10:25 p.m., and that Wendell was awakened by the sounds of a fight around 11:30 or 11:40 p.m. – around an hour later – which conflicted with Campbell's testimony that he confronted Denton about the missing cell phones immediately upon Denton's return. (4RT 446.)

The prosecutor also argued for the first time that Campbell's testimony regarding how Denton was dressed during the attack did not add up, in that Denton was wearing a shirt when he walked into Campbell's room the second time, and that suddenly Denton was wearing a tank top during the fight. (4RT 447.) The prosecutor also argued that – contrary to Campbell's testimony – the tank top was not torn, and that she had a photograph to prove it. (4RT 447, 452.)

The prosecutor argued for the first time – referring to the photographs – that the physical evidence found at the scene showed that Denton was not wearing the long-sleeved shirt he had been wearing when he was in the hallway, and that he had a naked chest and bite marks on his arms. (4RT 449.) The prosecutor asked, "If you are choking somebody out and your arm is around [sic], how do you get a bite mark on your hand?" (4RT 449.) The prosecutor also argued for the first time that if Denton had been wearing the tank top, the staples would not have been embedded in his chest. (4RT 449.)

The prosecutor also urged the jury, for the first time, to "[l]ook at the location of the iron blows on [Denton's] head in deciding defendant's story." (4RT 449.) The prosecutor argued:

> All of these pictures are worth thousands of words, but none of those thousands of words were reflected in the defendant's testimony, because none of the evidence was explained appropriately, consistently by the defendant where it would actually match up to the evidence at the scene that was not preserved because he locked the door and left [Denton] to rot.

(4RT 449.)

The prosecutor did not mention the cell phones in her opening argument, but in "rebuttal" she harped on them, asking the jury to consider what happened to the cell phones, referring to Detective Sharman's testimony that no cell phones were found in Campbell's room. (4RT 450.)

The prosecutor did not discuss the physical evidence in her opening argument, but she devoted significant time on "rebuttal" referring to the photographs of the scene. (4RT 450-454.) She talked about blood spatter and smear, and how it did not match up with Campbell's account of the fight. (4RT 451-452.) She addressed the glove on one of Denton's hands, which she never mentioned on opening, and which defense counsel did not address. (4RT 451.)

The prosecutor argued for the first time that Campbell lied about falling asleep immediately after the fight because Denton's

20

blood was on a cigarette Campbell must have smoked before he fell asleep. (4RT 448, 453.)

Other than mentioning voluntary manslaughter in passing (4RT 412), the prosecutor did not address the substance of the manslaughter issue during her opening argument. On rebuttal, she attacked any basis for a voluntary manslaughter conviction based on imperfect self-defense and heat of passion. (4RT 454-456.)

## II. FAILURE TO INSTRUCT THE JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER REQUIRES REVERSAL OF CAMPBELL'S MURDER CONVICTION

The Court of Appeal disagrees that the trial court erred by failing to instruct the jury on sudden quarrel, heat of passion, provocation and voluntary manslaughter, and finds no prejudice if there was error. (Opinion pp. 13-20.)

### A. The Court of Appeal Omits or Distorts Material Facts

The Court of Appeal omits the fact that the trial court agreed to instruct the jury in the language of CALCRIM No. 570. (4RT 392.) Although the Court of Appeal notes that Campbell's "trial counsel informed the court [Campbell] was concerned the court had not read the heat of passion instruction" and that the trial "court responded it believed the court and parties had taken the instruction out" (opinion pp. 12-13), there is no record of any

21

discussion between the parties and the court about removing that
instruction from the jury's consideration. The Court of Appeal
omits the fact that there were no proceedings between February 16
and February 20, which was the period between the discussion on
jury instructions and the memorialization of that discussion on the
record. (1CT 136-137.) ✱

### B. The People Forfeited the Argument That the Evidence Was Not Substantial Enough to Support Giving CALCRIM No. 570 Because the People Did Not Object to the Instruction at Trial

The trial court agreed to instruct the jury in the language of
CALCRIM No. 570 and nobody objected to it. (4RT 392.) The Court
of Appeal agrees that even had defense counsel objected to the
court giving CALCRIM No. 570, the trial court was bound, *sua
sponte*, to give the instruction if evidence was substantial – in other
words, if the evidence was "strong enough to persuade a reasonable
jury." (Opinion p. 14, citing *People v. Moye* (2009) 47 Cal.4th 537,
541.)

Despite the fact that the trial court necessarily found there
*was* substantial enough evidence of the lesser offense to merit
consideration by the jury when the trial court agreed to give
CALCRIM No. 570, the Court of Appeal now holds there was not.
(Opinion pp. 15-19.) Like respondent, the Court of Appeal attempts
to circumvent the facts (1) that the trial court impliedly found
substantial evidence to support the instruction, and (2) the People

22

did not object to the instruction at trial on the basis that there was not substantial evidence to support it; in fact, the People did not object at all.

As to the first point, citing no authority the Court of Appeal holds: "We will not presume that the trial court made a finding inconsistent with its actions. The court made no finding of substantial evidence, and there was none." (Opinion p. 19.) First, the Court of Appeal fails to explain how the trial court's finding of substantial evidence for giving the heat of passion instruction in the circumstances of this case was "inconsistent with its actions". Initially the trial court was going to give the instruction – thus impliedly finding substantial evidence for the instruction – but then the court referred to an off-the-record discussion about withdrawing the instruction to justify not giving it. <u>Second, the Court of Appeal simply ignores the general rule "'that a trial court is presumed to have been aware of and followed the applicable law.</u> [Citations.]" (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496–497; see, e.g., *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413–1414, fn. 2; *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517.)" (*People v. Stowell* (2003) 31 Cal.4th 1107, at p. 1114.) As the California Supreme Court put it:

> This rule derives in part from the presumption of Evidence Code section 664 "that official duty has been regularly performed." Thus, where a statement of reasons is not required and the record is silent, a

> reviewing court will presume the trial court had a
> proper basis for a particular finding or order. (See, e.g.,
> *People v. Henson* (1991) 231 Cal.App.3d 172, 182, 282
> Cal.Rptr. 222 [presuming on a silent record that the trial
> court properly exercised its discretion in imposing AIDS
> education as a condition of probation].)

*People v. Stowell, supra,* at pp. 1114-1115.) <u>Thus, at the time the trial court agreed to give the heat of passion instruction, the trial court was presumed to have followed the law, which requires the instruction be given only where the evidence supporting the instruction was substantial.</u> <u>Thus, on this silent record, this Court must presume the trial court made the finding that substantial evidence supported giving the heat of passion instruction.</u> (*Ibid*.)

The Court of Appeal substantially fails to address the second point – that the People forfeited the argument that the evidence was not substantial enough to support giving CALCRIM No. 570 because the People did not object to the instruction at trial. (See Opinion p. 19.) According to binding California Supreme Court authority – and as stated in Campbell's reply brief – the rules of forfeiture apply to both parties in criminal cases. Where a district attorney acts as an agent and representative of the state under the authority of the Attorney General, the People are ordinarily bound by any stipulations, concessions or representations, regardless of whether counsel was the Attorney General or the district attorney. (See *Pitts v. County of Kern* (1996) 17 Cal.4th 340, at p. 360; *Bach v. County of*

*Butte* (1983) 147 Cal.App.3d 554, 570.) For example, a prosecutor's
failure to object to a trial court's omission of a drug program fee
upon the defendant's conviction of possession for sale of
methamphetamine waived the state's claim of error on appeal,
where the applicable statute contained exception to fee requirement
upon a finding of a defendant's inability to pay, and the trial court
was presumed, on a silent record, to have made such a finding.
(*People v. Turner, supra,* 96 Cal.App.4th 1409, 1413.) The prosecutor
did not object on the ground the Court of Appeal relies upon, and
the trial court was presumed, on a silent record, to have found
substantial evidence to support the instruction. (*Ibid.*) Respondent,
therefore, forfeited this claim on appeal.

### C. The Evidence Was Sufficient to Support Giving the Heat of Passion Instruction; The Court of Appeal Applies the Wrong Standards in Finding the Evidence Insufficient

The Court of Appeal omits the following rules. Substantial
evidence is "evidence from which a jury composed of reasonable
[persons] could... conclude []' "that the lesser offense, but not the
greater, was committed. (*People v. Carr* (1972) 8 Cal.3d 287, 294;
*People v. Hughes* (2002) 27 Cal.4th 287, 365-367.) In determining
whether substantial evidence supports a lesser offense, the trial court
must leave issues of witness credibility to the jury (*People v.
Breverman* (1998) 19 Cal.4th at p. 162; *People v. Elize* (1999) 71
Cal.App.4th 605, 615), and doubts as to the sufficiency of the

25

evidence to warrant instructions should be resolved in favor of defendant (*People v. Flannel* (1979) 25 Cal.3d 668, 685; *People v. Wilson* (1967) 66 Cal.2d 749, 763). Evidence must be viewed in the light most favorable to defendant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5).

Here, the Court of Appeal adopts respondent's analysis of *People v. Moye* (2009) 47 Cal.4th 537. (Opinion pp. 15-19.) The Court finds that here, like the defendant in *Moye*, Campbell "testified that he reacted to successive advances by Denton in a manner reflecting judgment" instead of reacting in a manner that "bypassed his thought process to such an extent that judgment could not and did not intervene," precluding as a matter of law any claim that he acted out of heat of passion. (Opinion pp. 15-16.) The Court of Appeal apparently suggests a new rule that a defendant in a murder prosecution can never present both self-defense and heat of passion defenses to a jury, because they are, according to the Court of Appeal, mutually exclusive. The Court does not address Campbell's argument that such a rule conflicts with long-established precedent. (See Campbell's reply brief, at pp. 11-22.)

In this context, the Court of Appeal fails to address the following cases cited by Campbell: *People v. Wickersham* (1982) 32 Cal.3d 307; *People v. Flannel, supra,* 25 Cal.3d 668; *People v. Mitchell* (1939) 14 Cal.2d 237; *People v. Sinclair* (1988) 64 Cal.App.4th 1012, 1016-1017; *People v. Chacon* (1968) 69 Cal.2d 765 [the Supreme Court

noted a logical connection between self defense and heat of passion, in a prosecution under Penal Code section 4500, and noted the heat of passion instruction supplemented the self-defense instruction – "Thus, in a prosecution for murder even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute provocation, which would preclude a finding of malice aforethought and reduce the crime to manslaughter."]; *People v. St. Martin* (1970) 1 Cal.3d 524, 529-532 [reversible error for the trial court to fail to instruct on provocation where the appellant had also claimed self-defense].

The Court of Appeal also ignores the rule that, in a murder prosecution, the duty to instruct includes the obligation to instruct on *every* supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories that have the strongest evidentiary support, or upon which the defendant has openly relied.  (*People v. Breverman, supra,* 19 Cal.4th 142, 155.) Rather, the Court of Appeal emphasizes – contrary to law – the fact that "the 'thrust' of the defendant's testimony was self-defense" and defense counsel relied solely upon self-defense on closing argument, as justification for finding omission of the heat of passion instruction not to be error in this case. (Opinion pp. 10, 17-19.)

The California Supreme Court in *Breverman, supra,* 19 Cal.4th 142, made clear that the theories of voluntary manslaughter –

27

imperfect self defense and heat of passion – are not necessarily inconsistent and at times should be given in the same case. (*Id.* at pp. 159-160.) In *Breverman*, the jury was instructed on unreasonable self defense but not on heat of passion. This court found that there was a *sua sponte* duty to instruct on both theories. (*Breverman, supra,* 19 Cal.4th at 148-149.)

The Court of Appeal asserts: "Despite testifying repeatedly that he panicked upon realizing Denton was dead the next morning, [Campbell] never testified he panicked during the fight." (Opinion pp. 16-17.) Panic is not the only emotion that could support the heat of passion instruction. The Court simply ignores the rule that "[n]o specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

The Court of Appeal omits all of Campbell's testimony that would support a heat of passion defense. Campbell testified that when he fought back against Denton he was "scared" (3RT 341), and that he was "surprised" and "terrified" that Denton was not deterred by his efforts to fight him off. (3RT 334.) Campbell testified that when he hit Denton with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.) By rejecting the two forms of self-defense upon which it was instructed, the jury concluded that Campbell did not have an actual fear that he

was in imminent danger of death or great bodily injury. (See *People v. Humphrey* (2013) 13 Cal.4th 935, 1082.) <u>But substantial evidence was presented upon which the jury could nonetheless have found that Campbell was acting under the actual influence of extreme emotion sufficient to reduce his conviction to manslaughter</u>. This evidence included Campbell's testimony that Denton had acted belligerently once Campbell confronted him about his missing cell phones; Campbell's testimony that Denton was the one who escalated the fight and would not let Campbell out of the room; Campbell's testimony that Denton, who was much younger than Campbell, punched him, and when Campbell told him he was going to call the police, he could not get his phone away from Denton. (3RT 328.) After Denton blocked the door and charged Campbell, bear-hugging him and slamming him to the ground, Denton was throwing body punches. (3RT 328-330.) Campbell testified he was surprised and terrified that Denton was not deterred by being stapled. (3RT 334.) <u>Denton repeatedly threatened to kill Campbell.</u> (3RT 334-335.) Although the jury was entitled to disbelieve Campbell's stated reasons for bludgeoning Denton, it was also entitled to rely on the other evidence in the record to find that Campbell killed Denton spontaneously and under the influence of extreme emotion. (*Breverman, supra*, 19 Cal.4th at p. 163, fn. 10.) The Court of Appeal ignores Campbell's citation to *People v. Logan* (1917) 175 Cal. 45, 46–47, 50 [defendant entitled to heat-of-passion

instruction where evidence demonstrated victim's "physical superiority" and defendant's "fear that he was about to be subjected to a second humiliating beating" at victim's hands].

The Court of Appeal attempts to distinguish *People v. Anderson* (2006) 141 Cal.App.4th 430, 443, 446–447 [evidence that "fatal chokehold was motivated by rage at the victim's unprovoked attack" sufficient to require heat-of-passion instruction]), based on the fact that "the defendant's own testimony described each of his reactions to the provocation as deliberate acts of self-defense. (Opinion pp. 18-19.) Campbell believes the Court of Appeal misreads *Moye* as precluding a heat of passion defense in any case where the defendant testifies to having defended himself against an attack by the deceased.

<u>There was also substantial evidence presented to support the objective component of heat of passion. To satisfy this component, "' "the accused's heat of passion must be due to 'sufficient provocation.' " ' "</u> (*Moye, supra,* 47 Cal.4th at p. 549.) The victim must cause the provocation or the defendant must reasonably believe that the victim caused it. (*Id.* at pp. 549–550.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550; see *People v. Beltran* (2013) 56 Cal.4th 935, at p. 949 ["the provocation must be one that would cause an emotion

30

so intense that an ordinary person would simply react, without reflection" (original italics) ].) As the California Supreme Court has stated, in determining whether the conduct was adequately provocative, the question is whether it would cause an ordinary person of average disposition "to react from passion and not from judgment," not whether it "would cause an ordinary person of average disposition to kill " or attempt to kill. (*Beltran, supra*, at pp. 938–939, original italics.) Campbell described adequate provocation in Denton's conduct toward him, described elsewhere in this brief.

It appears, therefore, that the Court of Appeal has incorrectly resolved all doubts in favor of the prosecution, instead of the defense. (*People v. Flannel, supra*, 25 Cal.3d 668, 685.) The Court of Appeal calls into question Campbell's credibility, which was the exclusive province of the jury. (*People v. Breverman, supra*, 19 Cal.4th at p. 162.)

The Court of Appeal omits the rule that the obligation to instruct on lesser included offenses applies regardless of the parties' requests or objections, and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, encourages a verdict no harsher or more lenient than the evidence merits, and protects the jury's truth-ascertainment function. (*People v. Breverman, supra*, 19 Cal.4th 142, 154-155.) "Just as the prosecution has no legitimate interest in obtaining a conviction of a greater offense than that established by

31

the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Breverman, supra,* at p. 155.)

"Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705; see *Beltran, supra,* 56 Cal.4th at pp. 950–951.) While it is true that a court may decide the issue of adequate provocation if "the provocation is so slight ... that reasonable jurors could not differ on the issue of adequacy..." (*Fenenbock, supra,* at p. 1705, 47 Cal.App.4th 1167C), the provocation shown here – when the omitted facts are considered – is not so slight that this Court can conclude, as a matter of law, that a reasonable jury would have been unable to find that Campbell acted upon a sudden quarrel or in the heat of passion.

The Court of Appeal fails to address Campbell's argument that the jury could have found adequate provocation in several ways. (See AOB pp. 26-31 and reply brief pp. 15-22.) To begin with, the jury could have found it based on the evidence presented of Denton's mistreatment of Campbell. Campbell, Blassingame and Gibson testified that Campbell and Denton had a serious argument, and that someone was yelling for help. According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

The jury also could have found adequate provocation based

on Denton's belligerent and threatening behavior, including:

- Campbell's testimony that Denton became aggressive when confronted with Campbell's accusation of theft, including engaging in a shouting match with Campbell;

- Campbell's testimony that Denton was the one who escalated the fight;

- Campbell's testimony that Denton was strangling Campbell immediately before Campbell struck him with the fatal blows;

- the neighbors' testimony that they intervened before the argument ended by calling hotel security.

In short, evidence of Denton's menacing behavior was sufficient to permit a jury to conclude that a reasonable person in Campbell's position could have acted in the heat of passion. The Court of Appeal ignores Campbell's citation to cases with similar facts supporting Campbell's position, including *People v. Barton* (1995) 12 Cal.4th 186, 190, 201-202.)

The Court of Appeal attempts to distinguish *People v. Thomas* (2013) 218 Cal.App.4th 630, 633, on the basis that the defendant in that case "testified that he fired at his victim 'because he was afraid, nervous and not thinking clearly'", and that other witnesses testified to the defendant being engaged in a "'pretty heated' argument, cried, called out for his father, paced, and seemed angry." (Opinion p. 18.) The distinction is based upon the Court of Appeal's omission of all of Campbell's testimony to his strong emotions during the

fight, described elsewhere in this petition, and the Court's ignoring the testimony of Campbell's neighbors that Campbell was engaged in a violent argument with Denton and called out for them to call the police.

Like this case, prosecution and defense witnesses in *Thomas* agreed that a sudden quarrel preceded the killing, and evidence was presented that the defendant felt both angered and threatened by the victim. And whereas the defendant in *Thomas* had some time to " 'cool off' " while retrieving his gun and speaking with his father (*Beltran, supra,* 56 Cal.4th at p. 951), Campbell killed Denton in the midst of their argument. Thus, the evidence of provocation in this case omitted by the Court of Appeal here is more compelling than it was in *Thomas.*

The circumstances here—Denton's disrespectful treatment of Campbell, the sudden quarrel between the two men, and Denton's threatening behavior during the argument—also distinguish this case from decisions holding that insults alone are insufficient to constitute adequate provocation. (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 743–744, 759 [gang-related insults]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [same]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586 [victim repeatedly called defendant a " 'mother fucker' " and taunted him to use his weapon]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739–740 [smirking, taunting, and name-calling]; but see *People v. McCowan* (1986) 182 Cal.App.3d 1, 15 [heat-of-passion

instruction required where defendant confessed that "he became enraged" when his ex-wife "made [an] obscene gesture at him" as he drove by her home, prompting him to shoot her].) While the conclusion that a jury could have found adequate provocation might be different if Denton had merely cursed or insulted Campbell, Campbell's testimony about Denton's statements to him and Denton's threatening behavior immediately before the killing were sufficient under California law to require the trial court to give a heat-of-passion instruction *sua sponte*. The Court of Appeal ignores this argument and the authorities cited above.

Therefore, the Court of Appeal errs by finding the trial court was not required to instruct the jury *sua sponte* in the language of CALCRIM No. 570 because there was insufficient evidence of heat of passion.

### D.    The Error Prejudiced Campbell

The Court of Appeal finds no prejudice, based largely on its reading of *Moye*, claiming it is not reasonably probable the jury would have accepted a heat of passion theory after rejecting Campbell's self-defense theories based on the same evidence. (Opinion pp. 19-20.) The Court of Appeal substantially fails to address Campbell's argument, ignores governing law, and ignores all facts favorable to Campbell's position. (See AOB pp. 26-31.)

In deciding whether the provocation was sufficient, the finder of fact must consider whether a person of average disposition, in the

35

same situation and knowing the same facts, would have reacted from passion rather than from judgment. (CALCRIM No. 570; *People v. Logan, supra*, 175 Cal 45, 49.) Consequently, the objective standard of heat-of-passion voluntary manslaughter compels examination of Campbell's situation.

The evidence indicated that Campbell was under the stress of being attacked suddenly by a person he had thought of as a trusted friend or even a son. (3RT 322-323, 350, 353.) Campbell had invited Denton into his room to lend him some clothes so that they could go out together on New Years Eve. (3RT 321-323.) Campbell believed that while Denton was in Campbell's room he stole two cell phones. (3RT 326-328.) Campbell confronted Denton about taking his cell phones and demanded them back. (3RT 327-328, 355.) Unexpectedly, Denton charged him and punched him in the forehead, then bear-hugged Campbell and slammed him to the ground, throwing body punches. (3RT 327-330.) Denton was angry, swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.)

Campbell was able to wriggle out from under Denton and get to his feet, but Denton blocked the door, preventing Campbell from leaving the room. (3RT 330-331, 374-375.) Denton charged Campbell again, and Campbell started throwing things at him. (3RT 331-332.) Campbell picked up a closed stapler from the dresser and hit Denton with it, then opened it and stapled Denton's chest over Denton's tank top, but Denton pulled out a staple, laughed demonically, and said

36

"Is that all you got old man?" (3RT 332-336, 356.) Campbell was surprised and terrified that Denton was not deterred. (3RT 334.) By this point they had been fighting almost continuously for about ten minutes, while Denton repeatedly threatened to kill Campbell. (3RT 334-335.) According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

Denton rushed Campbell again and put him in a choke hold from behind, cutting off his air. (3RT 339, 357-358.) Campbell bit Denton on his arm and elsewhere repeatedly to break his hold. (3RT 340, 358-360.) Denton then picked up a clothing iron from the dresser, wrapped the cord around Campbell's neck, and choked him from behind until Campbell was dizzy and breathless. (3RT 340-341, 361-362.)

Campbell had, at most, a few seconds and as little as a fraction of a second in which to react after Denton started strangling him. Rose heard what she believed was Campbell's voice coming from his room, saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.) Neighbor Wendell heard the sounds of a fight in Campbell's room, including a "bang" and someone yelling "help", but he could not tell whose voice it was. (2RT 49-50, 53, 56-57.) Denton's blood alcohol level was .212 – supporting an argument that Denton was so drunk that his inhibitions were gone and he was out of control.

37

Finally, where "the People's own evidence suggests that the
killing may have been provoked or in honest response to perceived
danger" the People must also "prove beyond reasonable doubt that
[heat of passion and adequate provocation] were lacking in order to
establish the murder element of malice. [Citations.]" (*People v. Rios*
(2000) 23 Cal.4th 450, applying *Mullaney v. Wilbur* (1975) 421 U.S.
684, 704 [Due Process Clause requires the prosecution to prove
beyond a reasonable doubt the absence of the heat of passion on
sudden provocation when the issue is properly presented in a
homicide case."].) The coroner indicated the bruises and abrasions
on Denton's hands and wrists could have been offensive or
defensive, and that Denton had a high blood-alcohol level at the time
he was killed. (2RT 202-203, 308-309.) Photographs taken of
Campbell's body on the day of his arrest showed bruises, scrapes
and scratches on his chest, back, arms and knees. (3RT 293-294, 308-
309, 365-370.) Defense expert Dr. Ryan O'Connor determined the
injuries to Campbell were consistent with injuries that were six days
old – suggesting that they resulted from the fight with Denton. (3RT
309.)

Evidence of intent to kill was lacking here. Why would
Campbell invite Denton to his residential hotel room with the
intention of killing him? There were people all around, just outside
the door and in the adjacent rooms; discovery of the dead body was
inevitable; the identity of the person who rented the room was

38

known. What motive did Campbell have to kill Denton? The prosecutor offered nothing but the insinuation that Campbell had a sexual interest in the younger Denton, without any evidence to support it. This was a sudden and unexpected fight, and at least one of the combatants – Denton – was extremely intoxicated

The prosecutor could not have disproved sudden quarrel or heat of passion here. There was evidence that Denton, a much younger man than Campbell, suddenly and violently attacked Campbell in his own home, swearing at him, threatening to kill him, and strangling him to the point of Campbell nearly passing out. Under these circumstances, a reasonable jury could infer that Campbell was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition. A rational jury could also find that the intense and highly wrought emotions aroused by the initial threat had not had time to cool or subside by the time Campbell seized the iron – whose cord Denton was strangling Campbell with – then struck Denton with it until he stopped strangling Campbell. Finally, a jury could disbelieve defendant's self-defense claim, and conclude, from all of the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation – fear and terror at being attacked. [See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 511]; *People v. Mitchell, supra,* 14

39

Cal.2d 237, 252; *People v. Logan, supra*, 175 Cal.45, 49.)

On these facts, the prosecutor could not prove beyond a reasonable doubt that Campbell did not act pursuant to a sudden quarrel or heat of passion. The failure to instruct on this lesser included offense was thus prejudicial under any standard.

## III.   INSTRUCTING THE JURY IT COULD CONSIDER CAMPBELL'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS

The Court of Appeal disagrees that instructing the jury on flight as consciousness of guilt violated Campbell's federal constitutional rights. (Opinion pp. 20-25.) The Court of Appeal errs.

### A.   The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight

The Court of Appeal omits the rule that, before the court can instruct a jury it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) When a court fails to make that preliminary factual determination, it errs by passing a question of law to the jury.  (*People v. Hannon* (1977) 19 Cal.3d 588, 597.) "Substantial evidence" is required to support a flight instruction. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020;

*People v. Smithey* (1999) 20 Cal.4th 936, 982.) The Court of Appeal fails to address *Valdez* or *Hannon.*

The Court of Appeal conflates "consciousness of guilt" with evidence of flight. They are not the same. According to the California Supreme Court, it was wrong to give a flight instruction where the defendant left the scene of the killings without reporting the deaths and with the purpose of concealing them. (*People v. Crandell* (1988) 46 Cal.3d 833, 869-870 [abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) The *Crandell* Court held "although this conduct supported an inference of consciousness of guilt, his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested." (*People v. Crandell, supra.*) So it was here.

The Court of Appeal takes Campbell's statements out of context, asserting: "Appellant concedes his 'statements indicate he was afraid of being apprehended as a guilty party,' or in other words, afraid of arrest." (Opinion p. 22.) What Campbell actually stated in his opening brief was:

> Campbell's statements indicate he *was* afraid of being apprehended as a guilty party, but the question was what, if any, crime was he guilty of? Fleeing the scene of a crime can be probative of a consciousness of guilt, but cannot prove what crime the person fleeing committed; where, as here, the consciousness of guilt may be of one of several different crimes (first or second degree murder or voluntary manslaughter), it does not provide probative evidence that the accused is guilty of any one

41

specific crime. (*People v. Nguyen* (1993) 21 Cal.App.4th
518, 538-539; see, e.g., *People v. Rankin* (1992) 9
Cal.App.4th 430, 435; *People v. Williams* (1988) 44 Cal.3d
1127, 1143, fn. 9.) Finally, when used to evaluate
whether the record is sufficient to support a conviction,
consciousness of guilt evidence such as flight after crime
cannot substitute for the independent positive proof of
the elements of the offense that the Constitution
requires. (See, e.g., *People v. Blakeslee* (1969) 2 Cal.App.3d
831, 839; *People v. Nguyen, supra,* 21 Cal.App.4th 518,
538-539.) Campbell knew he had killed Denton, but he
was concerned that he was the only witness to what had
happened in his room and that he would be unfairly
prosecuted for a crime when the homicide was
justifiable. (3RT 129-131.) Therefore, the flight
instruction unfairly suggested Campbell knew he was
guilty of murder and fled to avoid arrest.

(AOB pp. 42-43.) The Court of Appeal addresses none of this
argument, and ignores the authorities Campbell cited.

    The Court of Appeal attacks Campbell's argument that flight
is not established here because he did not immediately leave his
apartment after killing Denton, did not run or flee the scene, and did
not leave his neighborhood. (Opinion pp. 23-24.) Campbell has
acknowledged in his briefing that flight does not require the physical
act of running nor the reaching of a far-away haven. (AOB p. 35.)
The question is whether there is evidence from which a jury could
reasonably infer that the defendant left to avoid being observed or
arrested. (*People v. Carrington* (2009) 47 Cal.4th 145, 188 ["An
instruction that permits the jury to draw an inference of guilt from

particular facts is valid only if there is a rational connection between the fact proved and the fact inferred."]; *People v. Crandell, supra,* 46 Cal.3d 833, 869-870.) The Court of Appeal fails to address *Carrington.*

The Court of Appeal attempts to distinguish *Crandell, supra,* on its facts. (Opinion p. 24.) In *Crandell,* says the Court of Appeal, "the Court found the defendant's departure from the crime scene did not show flight, where other evidence established the defendant intended to return to dispose of the victims' bodies." (Opinion p. 24.) What the Supreme Court actually said was:

> Although defendant left the Pruett house without reporting the deaths of Ernest and Edward and with the purpose of concealing their deaths, and although this conduct supported an inference of consciousness of guilt, his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed (his presence at the house on the morning following the murders was already known to Juan Salasar, among others) and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of returning to dispose of the bodies. There is no evidence he ever wavered in this intent; indeed, he was arrested while returning and less than a block from the Pruett house. Accordingly, the instruction on flight should not have been given.

(*Id.* at pp. 869-870.)

The *Crandell* Court held that "[f]light . . . require[s] . . . a purpose to avoid being observed or arrested." (*People v. Crandell, supra,* 46 Cal.3d 833, at p. 869.) As in *Crandell,* Campbell's failure to

notify the police or to advise his girlfriend he intended to call is not evidence of flight. (*Id.* at p. 869.) Campbell's act of locking his door is not evidence of flight or even an attempt to conceal Denton's body; the reasonable inference is that Campbell locked his door out of habit, as most people lock the doors to their homes upon leaving, and it was inevitable that Denton's body would be found because the smell of death would eventually tip off the neighbors. It was also inevitable that Denton's body would be connected to Campbell because the room belonged to Campbell and Campbell's neighbors heard the altercation between Denton and Campbell. In short, Campbell had already been "observed" in connection with the killing, so leaving his apartment with Denton's body in it could not have been for the purpose of avoiding being observed. Campbell's panic at realizing Denton was dead and his desire to get away from the body also does not support an inference that his purpose in leaving his room was to avoid being observed or arrested. As explained above, Campbell had already been observed, so leaving his room would not help him in that regard.

There is also no substantial evidence to support the inference that Campbell departed his room and the hotel to avoid arrest. The Court of Appeal fails to address the fact that Campbell walked the short distance to his ex-girlfriend's residence around the corner from his place and immediately across the street from a police station. (2RT 141-142; 3RT 145-146.) Campbell spent the better part of a week

44

after the killing getting drunk and high, but he did not leave his neighborhood. (3RT 346, 352, 364.) The Court of Appeal also omits the fact that he uniformed arresting officer testified that Campbell "did not attempt to flee"when taken into custody. (3RT 179-180.) Hanging out for five days, drinking and taking drugs in the immediate vicinity of a police station, in an area where Campbell presumably was known, and making no attempt to flee when officers arrested him, does not support an inference that Campbell "fled" to avoid arrest.

The Court of Appeal attempts to distinguish *People v. Watson* (1977) 75 Cal.App.3d 384, which held a flight instruction should not be given where, for example, the evidence merely shows the defendant was arrested some time after the crime and miles away from the scene, since such evidence, standing alone, does not support an inference of guilt. (*Id.* at p. 403; opinion pp. 23-24.) Here, again, the Court of Appeal conflates evidence of consciousness of guilt and evidence of flight as consciousness of guilt. The Court of Appeal asserts *Watson* is distinguishable because "one could reasonably appellant to the crime scene because it was his home." (Opinion pp. 23-24.) As Campbell has previously explained, the evidence here does not support an inference that Campbell "fled" to avoid being observed or arrested.

The Court of Appeal does not address *People v. Fremont* (1937) 22 Cal.App.2d 292, 300, where the Court found error in giving the

45

flight instruction because there was simply no evidence of flight. Campbell cited *Fremont* for the proposition that "[n]o instruction should be given to the jury unless adapted to the evidence and circumstances of the case." (See AOB pp. 39-40.) The problem here is that the flight instruction did not conform to that rule.[4]

For the same reasons, here the flight instruction was given in error because Campbell did not flee. The Court of Appeal disregards the facts that tenants and staff at the hotel knew Campbell lived in room 58, where the body was. (2RT 49, 76, 94.) Campbell did not attempt to flee when uniformed police officers stopped and arrested him. (3RT 179-180, 182.) These acts were insufficient as a matter of law to constitute flight and to support an inference of guilt.

The Court of Appeal fails to mention the trial court's violation of the duty not only to instruct on relevant principles of law, but also must "refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." (*People v. Saddler, supra,* 24 Cal.3d at 681.)

The Court of Appeal attempts to distinguish *People v. Green* (1980) 27 Cal.3d 1 on the basis that "the crime scene was in a 'remote area,' prompting the court to note that 'it can hardly be expected that

---

[4]

The Court of Appeal fails to address *People v. Pensinger* (1991) 52 Cal.3d 1210 (See AOB pp. 36-37), or *People v. Saddler* (1979) 24 Cal.3d 671. (See AOB pp. 38-39.)

defendant would wait in that location. . . ." (Opinion p. 23.) The Court of Appeal contrasts Campbell's behavior: "Here in contrast, one could reasonably expect appellant to return to the crime scene because it was his home." (Opinion p. 23.) As established above, the facts that Campbell left Denton's body in his room and did not contact the police are not evidence of "flight". Campbell was staying across the street from the local police station after leaving his apartment, and the police easily located him following a complaint that he was trespassing. The distinctions the Court of Appeal has drawn are insignificant.

Accordingly, given insufficient evidence of flight, the trial court's decision to give the CALCRIM No. 3.72 instruction was error.

### B. The Court of Appeal Fails to Address Campbell's Argument that, by Giving CALCRIM No. 372, the Trial Court Lessened the Prosecution's Burden Of Proof and Violated Campbell's 6th and 14th Amendment Rights

The Court of Appeal fails to address Campbell's argument that the trial court lessened the prosecutor's burden of proof and violated Campbell's 6th and 14th Amendment rights. Rather than repeat his argument here, Campbell refers this Court to pages 40-44 of his opening brief.

### C. The Court of Appeal Substantially Fails to Address Campbell's Prejudice Argument

The Court of Appeal denies the error was prejudicial,

47

substantially failing to address Campbell's argument. (Opinion pp. 24-25.)

The Court of Appeal again quotes language from Campbell's opening brief out of context, stating: "Appellant himself, despite arguing his conduct was not flight, concedes that his conduct 'might be seen as manifesting consciousness of guilt." (Opinion p. 25.) What Campbell actually said was:

> While Campbell's conduct, though not constituting flight, might be seen as manifesting consciousness of guilt, the nature of the homicide was that it could have been treated as a non-criminal act (self-defense), or as a killing on a spectrum of culpability (murder or manslaughter). The prosecutor overreached by charging Campbell with first degree murder.

(AOB p. 44.)

The Court of Appeal fails to address appellant's argument that Campbell's jury was never instructed it could consider an absence of flight as an indication of innocence. To the contrary, the flight instruction allowed the jury to infer from Campbell's walking away from his residence – an act that was insufficient as a matter of law to constitute flight – that he was conscious of guilt, and therefore was guilty of the charged offense.

The Court of Appeal ignores Campbell's argument it is reasonably probable that absent the improper and unsupported flight instruction, the jury would not have convicted him of murder, as the evidence did not support a finding of malice. (See discussion

at AOB pages 26-31.) The jury acquitted Campbell of first degree murder, but convicted him of second degree murder, where the evidence supported, at most, a manslaughter conviction.

## IV. THE COURT OF APPEAL SUBSTANTIALLY FAILS TO ADDRESS CAMPBELL'S ARGUMENT THAT HE WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION

The Court of Appeal disagrees that Campbell's counsel was ineffective for failing to request an instruction on "earwitness" identification because the Court of Appeal finds (1) "[a]n instruction highlighting the potential unreliability of voice identifications would have been more likely to hurt the defense than to help it" – thus, defense counsel had a tactical reason not to request such an instruction, and (2) any such instruction would have been duplicative of the instruction the court gave on how to evaluate the credibility of witness testimonies. (Opinion pp. 26-29.) The Court of Appeal substantially fails to address Campbell's argument.

### A. The Court of Appeal Omits the Facts

The only percipient witnesses to the killing were Campbell's neighbors, Wendell and Rose. They were not eyewitnesses, but "earwitnesses." Both testified to hearing the sounds of a violent fight coming from Campbell's room. (2RT 44-49, 51, 53-55, 75-79, 95-96.) Wendell testified he heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice

49

yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.)

Rose also testified that before the body was identified as Denton, she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him. (2RT 89; 3RT 283.) Rose stated in a recorded police interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 280-282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." She then said she heard Campbell say "No, you let me go." (3RT 280-281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

Campbell testified that he banged on the wall between his unit and Rose's unit and screamed for her to call the police. (3RT 338-339, 347.)

Defense counsel argued to the jury that as Denton was attacking Campbell, Campbell yelled "Call the police" and "help". (4RT 423, 426, 432.) He also argued, "You don't yell for the police when you're murdering someone. You yell for the police when you need help, and it's your life or someone else's, when you need to get out of a situation desperately you will call "Help, call the police."

(4RT 437.)

The prosecutor argued Rose believed at the time the police interviewed her that Campbell was dead at the hands of his girlfriend, Angel Dorsey, and that everything Rose said to the police was "filtered through that belief." (4RT 402.) Rose did not hear anyone say "help", but Wendell did. (4RT 403.) The prosecutor emphasized Rose's statement to the police that she heard a female voice saying "Michael, oh, let me go. Let me go," and Campbell say "No, you let me go." (4RT 403.)

**B.   Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by The Prosecutor**

**1.   Trial Counsel Failed to Request a Necessary Earwitness Identification Instruction To Help The Jury Assess Rose's Crucial Testimony That She Heard Campbell Yelling for Her to Call The Police; The Instruction Would Not Have Been Duplicative**

The prosecutor presented two witnesses to the events that transpired in Campbell's room – neighbors Wendell and Rose. Neither of them saw what happened, but both of them heard the sounds of a fight and someone in Campbell's room yelling for help and to call the police.  They were, in effect, "earwitnesses".

The Court of Appeal omits the prosecutor's argument to the

51

jury that it was not Campbell who was yelling for help, but Denton, and the prosecutor's suggestion that Campbell had engaged in a species of torture murder:

> By the way, "Call the police."

> There are many different ways that you can surmise what that meant. Was that a taunt from the defendant to [Denton], "call the police", as he laid there disabled?

> The physical evidence would tend to suggest that as the reasonable conclusion.

(4RT 450.)

The defense used the earwitness testimony to argue in support of self-defense that Campbell was yelling "help" and "call the police" as Denton was attacking him with deadly force. (4RT 423, 426, 432-433, 437.) Thus, the identification of Campbell as the speaker was crucial to the defense case, and the jury needed instructional assistance in making a determination as to what or whom Rose, in particular, heard. There could be no satisfactory explanation for failure to request the instruction, as Rose's identification of Campbell as the one who was yelling "call the police" was at the core of Campbell's defense.

### (a)  An "Earwitness" Identification Instruction Would Not Be Any More "Duplicative" of CALCRIM No. 226 Than is CALCRIM No. 315 [Eyewitness Identification Factors]

Citing no authority, the Court of Appeal incorrectly asserts an instruction on earwitness identification factors was not needed because CALCRIM No. 226, which sets out the factors jurors should use in evaluating witness credibility, was given. (Opinion pp. 27-28.) Campbell has been unable to find a single case holding that, in the analogous situation of an eyewitness identification instruction, CALCRIM No. 315 would be duplicative of CALCRIM No. 226.

The Court of Appeal fails to address in this context *People v. Felix* (2008) 160 Cal.App.4th 849, 858-859, citing *People v. Lewis* (2001) 25 Cal.4th 610, 649. The *Felix* Court did not perceive any problem of duplication where a jury is instructed in the language of both CALCRIM No. 315 and CALCRIM No. 226; rather, the Court found the instructions enhanced each other, just as an earwitness instruction – or a modified version of CALCRIM No. 315 – would have enhanced CALCRIM No. 226.

The Court of Appeal ignores the obvious, which is the rule that an analogous instruction relating *eyewitness* identification to reasonable doubt (CALCRIM No. 315), including any relevant "pinpoint" factors, *must* be given by the trial court on request "[w]hen an eyewitness identification of the defendant is a key

53

element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143–1144, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110; *People v. Palmer* (1984) 154 Cal.App.3d 79, 89 [error to refuse defendant's requested instruction on eyewitness testimony].) The Court of Appeal fails to address any of the authorities Campbell cited in connection with eyewitness identifications.

Where there is earwitness testimony and a conflict as to the identity of the speaker, jurors should be given some guidance on how to determine whether a voice identification is reliable. (See *People v. Wright, supra,* 45 Cal.3d 1126, 1138-1139 ["model instruction, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors."].)

Campbell was prosecuted for murder based in part on the earwitness identifications made by Wendell and Rose. Because the parties disagreed on the identity of the person yelling "call the police" and "help" during the fight, it follows that Campbell was entitled to an instruction on factors to be considered in evaluating the reliability of earwitness identification testimony, just as he would have been entitled to a jury instruction on eyewitness identification,

had this case depended on it. It was trial counsel's duty to request such an instruction, yet he failed to do it. Because an "earwitness" instruction would not have been duplicative and Campbell was entitled to it, trial counsel rendered ineffective assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

### (b) The Court of Appeal Fails to Address Any of Campbell's Argument as to Why an Earwitness Identification Instruction Was Necessary

In his opening brief, Campbell offered a discussion of the necessity for instruction on earwitness identification factors. (See AOB pp. 54-58.) The Court of Appeal addresses none of it.

### 2. There is a Reasonable Probability that a More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction

The Court of Appeal substantially fails to address Campbell's prejudice argument. Rather than repeat his argument here, Campbell refers this Court to pages 58 through 59 of his opening brief.

### V. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL

The Court of Appeal disagrees that Campbell was denied his

federal constitutional rights when the prosecutor engaged in misconduct during closing argument and defense counsel failed to object. (Opinion pp. 30-32.) The Court of Appeal errs.

## A. The Court of Appeal Omits Some of the Relevant Proceedings

The Court of Appeal omits some of the relevant proceedings.

### 1. Prosecutor's Opening Argument

The Court of Appeal omits the following details the prosecutor presented in opening argument: Dorsey saw no injuries on Campbell (4RT 407); Campbell showed consciousness of guilt by making false and misleading statements to the police about where he lived (4RT 409-410); and Campbell was guilty because he told the police, when asked what happened to Denton, "I got to be quiet about that" and "I am the only witness." (4RT 410-411.)

The Court of Appeal omits some of the prosecutor's argument as to why the jury should find first-degree murder: (1) Campbell could not give a reasonable explanation for how Denton ended up bare chested (4RT 417); (2) Denton had bite marks on the upper part of his body (4RT 417-418); (3) neighbor Wendell heard noises of a fight going on for 30 minutes, but when security knocked on the door the room was silent (4RT 418); (4) Campbell locked the door before leaving Denton's body in his room, suggesting consciousness of guilt (4RT 418); (7) Campbell never returned to his room after that, also suggesting consciousness of guilt (4RT 418); (8) Campbell went

to Angel Dorsey's house, suggesting consciousness of guilt (4RT 418); (9) Campbell did not report the killing to the police, suggesting consciousness of guilt (4RT 418); and (10) Campbell told the police he was the only witness. (4RT 418.)

## 2.    Defense Closing Argument

The Court of Appeal omits some of the defense closing. Defense counsel argued that Campbell's testimony he invited Denton to go out to the clubs with him for New Year's Eve and went through his closet for some clothes for Denton to wear was supported by the array of clothes found laid out on Campbell's bed. (4RT 421.) When Campbell noticed his cell phones were missing, he confronted Denton, and Denton attacked him. (4RT 422.) Denton picked Campbell up and threw him to the floor. (4RT 422.) Campbell was trapped in his room and tried to reach the door while struggling with Denton, accounting for the blood smear on the door. (4RT 422.)

Campbell grabbed Denton from behind and tried to throw him, ripping Denton's tank top in the process. (4RT 422.) Campbell noted that the tank top itself was not in evidence, and that the prosecutor relied on photographs of the front of the top so the jury could not examine it for the damage Campbell described. (4RT 422.) Photographs of the room indicated Campbell threw everything he had at Denton in a desperate attempt to stop the attack. (4RT 422.)

When Denton got Campbell in a choke hold, Campbell bit him; but Denton taunted him and then strangled him with the cord

of an electric iron. (4RT 423.) At that point Campbell yelled for Rose to call the police as he swung wildly at Denton with the iron, killing him. (4RT 423-424.)

After discussing the jury instructions on homicide and burden of proof (4RT 424-430), defense counsel asked the jury to examine the prosecutor's theory that Campbell invited Denton back to his room in order to murder him. (4RT 431.) After 30 minutes of fight noises, someone said, "Call the police," but the prosecutor wanted the jury to ignore the struggle and all of the other sounds Wendell and Rose heard. (4RT 431.) Campbell neither hid the body nor attempted to scrub down his room, but instead went to his girlfriend's house and stayed there for five or six days. (4RT 431.) Defense counsel argued the prosecutor's theory made no sense. (4RT 431.)

Both Wendell and Rose testified they heard a fight. (4RT 432.) After 20 to 25 minutes of fight noises, Rose heard Campbell's voice saying, "Call the police", and she went to Wendell's room and asked him to call. (4RT 432.) The prosecutor wanted the jury to believe that Campbell murdered Denton and then asked Rose to call the police. (4RT 432-433.) In reality, Campbell was yelling out of desperation because Denton was attacking him. (4RT 433.)

Defense counsel stated the prosecutor would argue in rebuttal about how Denton lived with his grandmother, but the grandmother was in Ventura and had not heard from Denton in days, but did not

file a missing person report. (4RT 433.) Denton went to Los Angeles not just because he wanted to visit his father on skid row, but to "hang out" in the neighborhood. (4RT 433.)

Defense counsel pointed out how sloppy the police were when they entered Campbell's room. (4RT 433-434.)

Defense counsel argued that the wounds on Denton's knuckles were from hitting the walls and hitting Campbell, and that there were no defensive wounds on Denton's forearms. (4RT 434.) Campbell bit Denton in a desperate attempt to fight him off. (4RT 434.)

Defense counsel pointed out that Denton had a blood alcohol level of .212 – three times the legal limit. (4RT 434.) A presumptive test indicated Denton was high on methamphetamine and ecstasy. (4RT 434.) The subsequent test that negating those findings was not produced by the prosecutor. (4RT 434-435.)

Defense counsel referred to Detective Sharman's testimony about the blood in front of the room and argued it was important because it confirmed the fact that Campbell was attempting to get out, or get Denton out of his room. (4RT 435.) Campbell had no other choice than to bite and hit Denton, because Denton was in a rage and was trying to choke him to death. (4RT 436.) The injuries were to the front of Denton's head because he was strangling Campbell and could not block the blows. (4RT 436-437.) Campbell yelled for the police as this was going on. (4RT 437.) If Campbell had been

59

murdering Denton, he would not have asked anyone to summon the police. (4RT 437.)

The coroner indicated that Campbell had injuries that were inflicted six days prior to his arrest. (4RT 437.)

### 3.    Prosecutor's Rebuttal Argument

The Court of Appeal "summarizes" the prosecutor's rebuttal argument, for the most part omitting the details. (Opinion pp. 10-11.)

The prosecutor began with an argument about circumstantial evidence. (4RT 440, 442.) She discussed the jury instruction on credibility of witnesses. (4RT 440-441.)

For the first time on rebuttal, the prosecutor referred to "the physical evidence, the photographic evidence, the video evidence". (4RT 441.) For the first time, the prosecutor called the jury's attention to Campbell's testimony on cross-examination that he did not know where the missing cell phone landed "because the lights were out and we had the stereo lit up...." (4RT 441.) The prosecutor argued:

> That little comment that came out just when he's talking, and the judge asked him a question that threw everything that he said out the window. Never mind how the physical evidence didn't match it, but wait, the lights were out?

> You were looking for clothes? For [Denton] to wear in the dark?

> The bottom line is the defendant did not tell the truth about that night when he testified. He didn't talk about that night in his interview. He had to be quiet on

that.

(4RT 442, 445 ["... the defendant was looking in the closet of the room that didn't have any lights on for (Denton) to find clothes . . ..], 450 ["We talked already about his odd answer on the stand about it being dark."].)

The prosecutor returned to her argument about consciousness of guilt and hiding evidence, making more detailed arguments about how Campbell must have cleaned himself up before he left the hotel, and how he left Denton's body to "rot". (4RT 443-444.)

The prosecutor reserved for "rebuttal" argument all of the details about the injuries Campbell inflicted on Denton. For the first time, the prosecutor argued:

> . . . I mean, realistically speaking, never mind the fact that if you're hitting somebody across the body holding an iron you're only going to be able to hit certain portions, certainly not the side of the top of the head and all the different areas on both sides, and that somebody would actually stay there for it when they were getting hit like that if they had the ability to move away.
>
> And if [Denton] was actually strangling the defendant with a cord to the point of dizziness and almost passing out, believing his life was going to end, How on earth would he be on his side? He would be behind him, pulling it tight, and thus not available to be struck in such a manner. It just makes sense. There is really no other way.

(4RT 443-444.)

During rebuttal the prosecutor argued for the first time regarding timing of the killing. She stated that Denton left the room twice, not once as Campbell had testified. (4RT 446.) She pointed out that Denton went back to Campbell's room the second time at 10:25 p.m., and that Wendell was awakened by the sounds of a fight around 11:30 or 11:40 p.m. – around an hour later – which conflicted with Campbell's testimony that he confronted Denton about the missing cell phones immediately upon Denton's return. (4RT 446.)

The prosecutor also argued for the first time that Campbell's testimony regarding how Denton was dressed during the attack did not add up, in that Denton was wearing a shirt when he walked into Campbell's room the second time, and that suddenly Denton was wearing a tank top during the fight. (4RT 447.) The prosecutor also argued that – contrary to Campbell's testimony – the tank top was not torn, and that she had a photograph to prove it. (4RT 447, 452.)

The prosecutor argued for the first time – referring to the photographs – that the physical evidence found at the scene showed that Denton was not wearing the long-sleeved shirt he had been wearing when he was in the hallway, and that he had a naked chest and bite marks on his arms. (4RT 449.) The prosecutor asked, "If you are choking somebody out and your arm is around [sic], how do you get a bite mark on your hand?" (4RT 449.) The prosecutor also argued for the first time that if Denton had been wearing the tank

top, the staples would not have been embedded in his chest. (4RT 449.)

The prosecutor also urged the jury, for the first time, to "[l]ook at the location of the iron blows on [Denton's] head in deciding defendant's story." (4RT 449.) The prosecutor argued:

> All of these pictures are worth thousands of words, but none of those thousands of words were reflected in the defendant's testimony, because none of the evidence was explained appropriately, consistently by the defendant where it would actually match up to the evidence at the scene that was not preserved because he locked the door and left [Denton] to rot.

(4RT 449.)

The prosecutor did not mention the cell phones in her opening argument, but in "rebuttal" she harped on them, asking the jury to consider what happened to the cell phones, referring to Detective Sharman's testimony that no cell phones were found in Campbell's room. (4RT 450.)

The prosecutor did not discuss the physical evidence in her opening argument, but she devoted significant time on "rebuttal" referring to the photographs of the scene. (4RT 450-454.) She talked about blood spatter and smear, and how it did not match up with Campbell's account of the fight. (4RT 451-452.) She addressed the glove on one of Denton's hands, which she never mentioned on opening, and which defense counsel did not address. (4RT 451.)

The prosecutor argued for the first time that Campbell lied

63

about falling asleep immediately after the fight because Denton's blood was on a cigarette Campbell must have smoked before he fell asleep. (4RT 448, 453.)

Finally, the Court of Appeal omits these critical facts. Other than mentioning voluntary manslaughter in passing (4RT 412), the prosecutor did not address the substance of the manslaughter issue during her opening argument. On rebuttal, she attacked any basis for a voluntary manslaughter conviction based on imperfect self-defense and heat of passion. (4RT 454-456.)

## B. The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal

The Court of Appeal disagrees that the prosecutor sandbagged the defense by saving virtually her entire closing argument for rebuttal. (Opinion pp. 30-32.) Instead, the Court of Appeal finds that, because the prosecutor's rebuttal was shorter than her opening argument and because the prosecutor's argument was responsive to the self-defense theory asserted in defense counsel's closing argument, there was no misconduct. (*Ibid.*)

### 1. The Court of Appeal Omits Some of the Governing Law

The Court of Appeal fails to address *People v. Smithey, supra,* 20 Cal.4th 936, 960; *People v. Pitts* (1990) 223 Cal.App.3d 606, 691, citing *Berger v. United States* (1934) 295 U.S. 78, 88; see *People v. Hill* (1998)

64

17 Cal.4th 800, 820; *People v. Daggett* (1990) 225 Cal.App.3d 751, 759, or *People v. Bandhauer* (1967) 66 Cal.2d 524, 531. Campbell discussed all of these authorities at pages 69 through 71 of his opening brief.

## 2.    The Prosecutor Improperly Sandbagged The Defense in Rebuttal Argument

The Court of Appeal claims the prosecutor's closing argument was merely responsive to the defense closing argument, and it did not constitute "sandbagging" because the rebuttal argument was shorter than the prosecutor's opening argument. (Opinion pp. 30-32.) The Court of Appeal is wrong.

Campbell contends that, even if the length of the prosecutor's rebuttal argument was substantially similar to the length of rebuttal, it was the *substance* of the prosecutor's opening argument that was artfully slender, in that most of it addressed consciousness of guilt evidence, not the physical evidence.  Contrary to the Court of Appeal's findings, on rebuttal the prosecutor gave a full closing argument immune to defense reply in which she covered most of the physical evidence – not just a rebuttal to Campbell's self-defense argument. The effect was the same as the error in *People v. Robinson* (1995) 31 Cal.App.4th 494 – the substance of the prosecutor's case was presented solely on rebuttal, and the defense was deprived of the opportunity to address it.

Again, allowing the prosecutor to give such an opening argument without providing Campbell an opportunity to respond to

her rebuttal argument accorded the prosecution an undue advantage and prejudiced Campbell's defense. Section 1093 does not permit the prosecutor to manipulate the order of argument to the defendant's detriment. This was essentially the type of sandbagging denounced in *Robinson, supra,* even though the length of the opening argument was substantially similar to that of the rebuttal argument. The Court of Appeal ignores the fact that the prosecutor focused nearly exclusively on consciousness of guilt evidence in her opening argument, saving all of her discussion of the physical evidence for rebuttal.

The Court of Appeal fails to address the fact that the defense had no opportunity to address the prosecutor's arguments that:

- Campbell lied when he said he did not know where the cell phone landed after he tossed it because the lights in the room were off (4RT 441);

- Campbell's "story" is exposed as a lie because he said the lights were off when he was looking in the closet for clothes for Denton (4RT 442, 445);

- Campbell could not have hit the side and top of Denton's head with the iron if he was hitting him across his body as Campbell had testified (4RT 443-444);

- Denton would not have stayed in a position to be struck that way had he been able to escape (4RT 443-444);

- If Denton was strangling Campbell with the cord as Campbell

66

described, Denton could not have been in a position to be struck on the side of the head (4RT 443-444);

- Denton left the room twice, not once as Campbell testified (4RT 446);

- According to Wendell, the fight started about an hour after Denton returned to Campbell's room, not immediately after (4RT 446);

- Campbell's testimony about how Denton was dressed did not add up (4RT 447);

- The tank top Denton was wearing was not ripped, as Campbell claimed (4RT 447, 452);

- The physical evidence showed that Denton was not wearing the long-sleeved shirt he had been wearing in the hallway when he was killed, that his chest was bare and he had bite marks on his arms (4RT 449);

- Denton could not have received a bite mark on his hand if he was holding Campbell around the neck and strangling him as Campbell had described (4RT 449);

- Had Denton been wearing the tank top at the time Campbell used the stapler against him, the staples would not have been embedded in his chest (4RT 449);

- The jury should consider the location of the iron strikes in evaluating Campbell's story (4RT 449);

- The photos were "worth thousands of words", but those

67

words were not in Campbell's testimony because Campbell did not explain the evidence adequately, and the evidence was destroyed because Campbell let Denton's body rot in his room (4RT 449);

- The jury should speculate as to what happened to the two cell phones Campbell said Denton had taken, because one of the detectives said no cell phones were found in Campbell's room (4RT 450);

- According to the photographs, blood spatter and smear did not match up with Campbell's account of the fight (4RT 451-452);

- There was no explanation for the glove found on one of Denton's hands (4RT 451);

- Campbell lied about falling asleep immediately after the fight because Denton's DNA was on a cigarette butt in the ash tray (4RT 448, 453);

- There was no basis for a voluntary manslaughter conviction based on imperfect self-defense or heat of passion (4RT 454-456.)

None of the above comments could fairly be characterized as rebuttal to Campbell's closing argument. The prosecutor knew what the evidence was when she offered her opening argument. Nonetheless, she saved all comment on the physical evidence for

"rebuttal" argument. This was misconduct.[5] (*People v. Robinson, supra,* 31 Cal.App.4th 494, 505.)

## C.  Defense Counsel's Failure to Object to the Prosecutor's Misconduct Denied Campbell His Sixth Amendment Right to Effective Assistance of Counsel

Counsel provided ineffective assistance when he failed to make a timely objection to the prosecutor's improper rebuttal argument, or to request an opportunity to respond in surrebuttal, or to move for a mistrial. By failing to do so, he provided ineffective assistance of counsel.

### 1.  Standard For Evaluating Claims of Ineffective Assistance of Counsel

Campbell incorporates by reference his discussion of the law of ineffective assistance of counsel set out in Argument III., section B., at pages 49-51 of his opening brief.

### 2.  Trial Counsel Was Ineffective

The record establishes the error – defense counsel's failure to object to a patently improper tactic, namely, the prosecutor's sandbagging the defense by reserving the bulk of her closing argument for rebuttal and thereby precluding defense response. A

---

[5]

The Court of Appeal holds that "this is not a case of cumulative prosecutorial misconduct". (Opinion p. 31.) Campbell has not argued that it was, so there is no point to the Court of Appeal's statement.

69

reasonably competent attorney would have preserved this meritorious issue for appellate review by making a timely objection on the correct basis. (See *People v. Jackson* (1986) 187 Cal.App.3d 499, 506; *In re Christina P.* (1985) 175 Cal.App.3d 115, 129-130.) By failing to timely object to the unfair argument on the basis it was improper rebuttal, counsel waived a meritorious issue on appeal.

There could be no possible tactical reason for, or advantage to the defense in allowing the prosecution to present opening argument that primarily addressed consciousness of guilt evidence, but not the physical evidence, and to sandbag the defense with rebuttal argument. Counsel must know the law as it relates to the case he is trying. (*People v. Zimmerman* (1980) 102 Cal.App.3d 647, 657; *People v. McCary* (1985) 166 Cal.App.3d 1.) There is no tactical reason in allowing a prosecutor to sandbag the defense as she did here, leaving the jury with damaging suggestions from the prosecutor that the defense had no opportunity to address.

### 3. The Court of Appeal Substantially Fails to Address Campbell's Prejudice Argument

The Court of Appeal fails to address Campbell's prejudice argument. Rather than repeat it here, Campbell refers this Court to pages 77 through 81 of his opening brief.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing.

DATED: July 18, 2019                    Respectfully submitted,


GAIL HARPER
Attorney for Appellant

## CERTIFICATE OF WORD COUNT

I, Gail Harper, counsel for appellant, certify pursuant to the California Rules of Court, that the word count for this document is 16,270 words, excluding the tables, this certificate and any attachments. This document was prepared in WordPerfect X9, and this is the word count generated by the program for this document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on July 18, 2019.

_____
GAIL HARPER
Attorney for Appellant

7/3/2019

Filed 7/3/19  P. v. Campbell CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B288428 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  BA442781) |
| v. | |
| MICHAEL CAMPBELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Charles J. Sarosy, Deputy Attorneys General, for Plaintiff and Respondent.

Exhibit C (Affirmed)

## INTRODUCTION

A jury convicted appellant Michael Campbell of second degree murder of his friend Brian Denton, who was found dead in appellant's apartment, having suffered blunt head trauma resulting in a skull fracture and 22 lacerations. Appellant was the sole eyewitness to the killing, though two neighbors heard sounds of a struggle and cries for help coming from appellant's room. The morning after the killing, appellant left the apartment and neither reported the death nor returned home. When arrested five days later, appellant was carrying bags and a backpack. At trial, appellant testified he killed Denton in self-defense, after Denton repeatedly attacked him. Appellant's counsel argued theories of reasonable and "imperfect" self-defense, which the prosecutor rebutted.

On appeal, appellant contends: (1) the trial court committed instructional error in (a) failing to instruct the jury on the heat of passion theory of voluntary manslaughter, and (b) giving the standard flight instruction; and (2) his trial counsel was ineffective for (a) failing to request a jury instruction on the factors affecting "earwitness" identification, and (b) failing to challenge the prosecutor's conduct in reserving the primary substance of her closing argument for rebuttal. Finding no error, we affirm.

## STATEMENT OF THE CASE

The state charged appellant with Denton's murder. (Pen. Code, § 187, subd. (a).) In an amended information,

Read notes

the state additionally alleged appellant personally used a clothing iron as a deadly and dangerous weapon. (*Id.* § 12022, subd. (b)(1).) A jury convicted appellant of second degree murder and found the deadly weapon allegation true. Appellant timely appealed.

## STATEMENT OF THE FACTS

### A. *The Prosecution Case*

#### 1. *Discovery of Denton's Extensively Damaged Body in Appellant's Room*

In December 2015, appellant was living in a single resident occupancy apartment in the Florence Hotel in Los Angeles. The building manager, Krystal Jones, testified that surveillance video from the evening of December 31 showed appellant and Denton entering appellant's room together at 9:42 p.m. It showed Denton leaving and re-entering the room, entering for the last time at 10:30 p.m. Surveillance footage from the next morning, January 1, 2016, showed appellant emerging from the room and immediately leaving the building. Video surveillance showed no one entering or leaving the room thereafter until the morning of January 5, when a security officer, at Jones's request, entered the room and discovered Denton's body.

Los Angeles Police Department (LAPD) officer Efrain Ochoa testified that he and his partner entered appellant's room in response to the suspicious death call. He observed Denton's bloodied, damaged, and distorted face. He further observed debris throughout the room.

3

LAPD detective Jason Sharman testified that he investigated the room the same day, accompanied by a police officer and a criminalist photographer. Detective Sharman found blood on the door, the carpet, a dresser, and elsewhere, including on a tank top "soaked" in blood. He observed "substantial" injuries to Denton's face and head, including to the back of his head and to the back of one ear. Staples were embedded in Denton's skin. Detective Sharman found a stapler and a clothing iron in the room. Reddish stains on the stapler and clothing iron contained Denton's DNA, according to stipulated testimony from a senior LAPD criminalist.

Matthew Miller, M.D., a deputy medical examiner for the Los Angeles County Department of Medical Examiner-Coroner, testified that he performed an autopsy of Denton's body several days after its discovery. Dr. Miller determined Denton's death was a homicide caused by blunt head trauma. Denton's head had suffered a skull fracture and 22 separate lacerations. Dr. Miller opined fifteen to seventeen of the blows that caused these lacerations were potentially disabling or fatal. He testified that the iron found in appellant's room could have caused Denton's head injuries. Additionally, he observed staples in Denton's skin and scrapes and bruises scattered on it, including a possible bite mark.

4

## 2. *"Earwitness" Testimony Concerning a Struggle in Appellant's Room*

Wendell Blassingame lived in the room across from appellant's. He testified that on the night of the homicide, around 11:35 or 11:40 p.m., he was awakened by sounds of fighting from appellant's room. He could still hear rumbling 20 to 25 minutes later, when a neighbor, Rose Gibson, came to his room and asked him to call the police. He called building security instead. After calling security, Blassingame heard a loud noise and someone screaming for help. Although he had spoken with appellant before, he could not tell whether the person calling for help was appellant. He was not sure whether the person was male or female. Blassingame called security again. The noise from appellant's room stopped. Five to 15 minutes after his second call, he saw two security officers arrive, knock on appellant's door, announce themselves as security, and walk away after no one responded.

Rose Gibson lived in a room adjoining appellant's. She testified that around 11:30 on the night of the homicide, she heard sounds of fighting from appellant's room. The noise continued for about 20 minutes. She knocked on the wall she shared with appellant and asked if he was all right. Gibson heard a voice that sounded like appellant's say, "Call the police." Appellant's room was then silent. Gibson went to Blassingame's room and told him to call building security and the police.

Gibson denied having spoken with LAPD detective Douglas Pierce after the homicide, and denied telling him she had heard a woman's voice coming from appellant's room. She testified that appellant's voice was the only one she heard. Following this testimony, Detective Pierce testified that he interviewed Gibson several days after the homicide. During that interview, Gibson told him she had heard sounds of a struggle and of a woman arguing with appellant. She expressed her belief that appellant's girlfriend had killed him.

### 3. Appellant's Conduct After Denton's Death

Angel Dorsey, appellant's ex-girlfriend, lived a short walking distance from his residence. Dorsey testified that the morning of January 1, 2016, appellant came to her apartment and told her Denton had died in his room after a fight. She saw an injury on appellant's forehead, but he identified no injuries and complained of no pain except a headache. They did not discuss calling the police. Appellant soon left Dorsey's apartment.

Five days later, LAPD officer Jessica Azizi and her partner responded to a report of a trespass at Dorsey's address and arrested appellant there. Officer Azizi testified appellant had bags and a backpack with him.

Detective Pierce testified that he conducted an audio- and video-recorded interview of appellant on the night of his arrest. The recording was played for the jury. After waiving his *Miranda* rights, appellant initially claimed he had been

6

living on the street for about a month. He later acknow-
ledged living at the Florence Hotel but claimed to reside in a
room other than the one where Denton's body was found.
Appellant admitted that Denton died after they fought,
describing their altercation as "detailed" but declining to
discuss any details.

### B. *The Defense Case*

Apart from the stipulated testimony of a medical
doctor, which was read into the record, appellant was the
sole defense witness.[1] He testified that he unexpectedly
encountered Denton, a friend whom he had not seen in about
a year, while visiting a nearby liquor store on the evening of
December 31, 2015. Inviting Denton to join him in visiting
some nearby bars, appellant brought him back to his room to
lend him more suitable clothing. After Denton left the room
temporarily and appellant discovered his two cell phones

---

[1]    Emergency room physician Ryan O'Connor testified by
stipulation that in reviewing photographs of appellant and other
documents, he identified several abrasions or lacerations on
appellant's left forearm of an age consistent with being sustained
on the night of Denton's death. He also identified the following:
(1) a linear mark on appellant's forehead that appeared to be an
old scar; (2) markings on his left flank that could have been
healing abrasions or lacerations or, instead, scratch marks; (3) a
healing abrasion or other type of wound on his right kneecap; and
(4) skin darkening on his knuckles that could have been bruising
or merely a pigment condition.

7

were missing, appellant called Denton back to the room, accused him of stealing the cell phones, and attempted to retrieve the phone that Denton pulled from his pocket.

Denton punched appellant. Appellant told Denton he was going to call the police and again tried to take the phone. Denton charged at appellant, slammed him to the floor, and repeatedly struck him. After sliding out of Denton's grip and again telling Denton he was going to call the police, appellant tried to leave the room.

Denton blocked the door and again charged at appellant. Appellant responded by throwing canned goods and other objects and by grabbing a stapler to use as a weapon. When the closed stapler proved an ineffective weapon, appellant used the open stapler to embed at least one staple in Denton's body.

Denton removed a staple from his body while blocking the door, smearing blood on it from the tank top he was wearing. Grabbing Denton by the tank top and by the back of his pants, appellant attempted to open the door to throw Denton out. In the process, he ripped the tank top off of Denton. Dropping the tank top by his sink, appellant knocked on the wall he shared with Rose Gibson and screamed for her to call the police.

Denton rushed at appellant again. Denton wrapped his arm around appellant's neck, choking him, "numerous" times. Realizing Denton would release his chokeholds when bitten, appellant repeatedly bit him. Rather than bite

8

Denton only on the arm wrapped around his neck, appellant tried to slide down to bite other areas too.

After grabbing a clothing iron, Denton rushed at appellant a final time, wrapping the iron's cord around his neck from behind. Appellant tried to get his fingers between the cord and his neck to ease the tension on the cord. From the corner of his eye, appellant saw the iron swinging by his side. Fearing Denton would kill him, he grabbed the iron and struck Denton's head with it until he felt the tension on the cord ease.

Appellant immediately crawled to his bed and passed out until around 8:00 the next morning. Upon realizing Denton was dead, appellant "panicked" and left the building. He did not call the police because he did not know how to explain what had happened. He briefly visited Dorsey and told her he and Denton had fought. After leaving Dorsey's apartment, he drank alcohol and used drugs for the next five days until his arrest.

## C. *The Prosecution's Rebuttal Witnesses*

Recalled on rebuttal, Detective Sharman testified that the tank top found in appellant's room was not torn. He further testified that no cell phones were found in appellant's room or booked with the property appellant was carrying when arrested.

Denton's grandmother, Donna Villeda, testified that Denton received a cell phone as a Christmas gift shortly before his death on New Year's Eve.

9

## D. *Closing Arguments*

The prosecutor reviewed the surveillance video from the night of the homicide, noting when Denton re-entered the room for the final time and the long-sleeved clothing he was wearing. She summarized Blassingame's and Gibson's testimony about hearing a struggle and calls for help. She argued that appellant had fled, summarizing Dorsey's testimony about his visit and Officer Azizi's account of his arrest. She summarized appellant's post-arrest interview, noting that he had falsely described his residence and arguing that he had said nothing about self-defense. She recounted the evidence from Denton's autopsy, including the number of potentially fatal blows to Denton's head and the location of the resulting injuries. She argued appellant's testimony made no sense with respect to how Denton ended up shirtless, with staples in his chest.

Defense counsel recounted, in detail, appellant's testimony about the fight and what preceded it. He argued the testimony was consistent with Denton's injuries, appellant's own injuries, and the blood in the room. He emphasized Gibson's testimony that she had heard appellant ask her to call the police. In short, he argued self-defense extensively, summarizing as follows: "This case, I have said it over and over again, but it's about self-defense. That's the only thing the evidence supports." He also argued appellant had not tried to hide any evidence.

In rebuttal, the prosecutor argued the physical evidence discredited appellant's self-defense theory. She

urged the jury to reject appellant's claim that Denton initiated the fight immediately after taking appellant's cell phones and re-entering the room, referencing: (1) the hour that passed between Denton's re-entering the room and Blassingame's waking to sounds of a struggle; (2) Villeda's testimony that Denton had recently received a cell phone; (3) Detective Sharman's testimony that the LAPD found no cell phones on appellant or in his room; and (4) appellant's own testimony that the lights were out, even though he was purportedly searching for clothing when Denton took the phones. Similarly, she urged the jury to reject appellant's account of the fight itself, referencing: (1) autopsy evidence of injuries on both sides of Denton's head and a bite mark on Denton's hand; (2) the photograph showing no tears in the tank top despite appellant's claim he ripped it off of Denton, who in any event was shown on video re-entering the room in long-sleeved clothing, not just a tank top; and (3) photographic evidence of the blood in the room, which suggested it was not smeared in the manner appellant claimed and further suggested it was Denton, not appellant, who was trying to escape. The prosecutor also argued appellant had hidden evidence and lied about the homicide.

### E. *Jury Instructions and Verdict*

Before closing arguments, the trial court memorialized an off-the-record discussion of jury instructions. The court noted there had been no objection to instructing the jury on

reducing murder to voluntary manslaughter due to heat of passion (CALCRIM No. 570).

After closing arguments, the court instructed the jury. It instructed the jury on lawful self-defense (CALCRIM No. 505) and on "imperfect" self-defense reducing murder to voluntary manslaughter (CALCRIM No. 571). The court did not instruct the jury on heat of passion.

The court delivered several instructions on consciousness of guilt, instructing the jury that it could infer appellant's awareness of his guilt if it found he had made a false or misleading statement before trial related to the charged crime (CALCRIM No. 362); if it found he had tried to hide evidence (CALCRIM No. 371); or if it found he had fled immediately after the crime (CALCRIM No. 372). The court instructed the jury that none of these findings would be sufficient to prove guilt.

Per CALCRIM No. 226, the court instructed the jury that a factor to consider when evaluating a witness's testimony is how well the witness could hear the things about which the witness testified. Continuing, the court instructed the jury not to "automatically reject testimony just because of inconsistencies or conflicts," explaining that "[p]eople sometimes honestly . . . make mistakes about what they remember," and that "two people may witness the same event[] yet . . . hear it differently."

Almost immediately after the jury began its deliberations, appellant's trial counsel informed the court appellant was concerned the court had not read the heat of

What evidence did I try to hide that The People proved ?

12

passion instruction.  The court responded it believed the court and the parties had taken that instruction out.

The jury convicted appellant of second degree murder and found true the allegation that he used a clothing iron as a deadly weapon.

## DISCUSSION

Appellant identifies four grounds for reversal of his conviction, including two instructional errors by the trial court and two omissions by his trial counsel.  He alleges the trial court erred in (1) failing to instruct the jury on the heat of passion theory of voluntary manslaughter, and (2) giving the standard flight instruction.  He alleges his trial counsel was ineffective for (1) failing to request a jury instruction on the factors affecting "earwitness" identification, and (2) failing to challenge the prosecutor's conduct in reserving the primary substance of her closing argument for rebuttal.  We discern no error.

### A.   *Instructional Error*
#### 1.   *Standard of Review*

We review de novo appellant's claims of instructional error.  (See *People v. Nelson* (2016) 1 Cal.5th 513, 538; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

## 2.  *Omission of Heat of Passion Instruction*
### a.  *Governing Principles*

"In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541 (*Moye*).) Evidence is substantial if strong enough to persuade a reasonable jury. (See *id.* at pp. 662-663.)

"Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Nelson, supra*, 1 Cal.5th at p. 538.) "A heat of passion theory of manslaughter has both an objective and a subjective component." (*Moye, supra*, 47 Cal.4th at p. 549.) To satisfy the objective component, the defendant must have reacted to provocation "'that would cause an emotion so intense that an ordinary person would simply *react*, without reflection.'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225, quoting *People v. Beltran* (2013) 56 Cal.4th 935, 949.) To satisfy the subjective component, the defendant must have experienced emotion "'so strong that the defendant's reaction bypassed his or her thought process to such an extent that judgment could not and did not intervene.'" (*People v. Rangel, supra*, at p. 1225, quoting *People v. Beltran, supra*, at p. 949.)

"In a noncapital case, the trial court's failure to instruct on necessarily included offenses is reviewed for

14

prejudice under the *Watson* standard." (*People v. Hicks* (2017) 4 Cal.5th 203, 215, italics omitted, citing *People v. Breverman* (1998) 19 Cal.4th 142, 164-178 (*Breverman*).)[2] Courts applying the *Watson* standard focus on what a reasonable jury "is *likely* to have done in the absence of the error under consideration," finding prejudice if "it appears 'reasonably probable' the defendant would have obtained a more favorable outcome . . . ." (*Breverman, supra*, at pp. 177-178, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

### b.   *Analysis*

The trial court did not err by omitting an instruction on the heat of passion theory of voluntary manslaughter because no substantial evidence supported that theory. Appellant's testimony -- the only evidence on which he relies to support the subjective element of a heat of passion theory -- did not support a reasonable inference that appellant's reactions "'bypassed his thought process to such an extent that judgment could not and did not intervene.'" (*People v. Rangel, supra*, 62 Cal.4th at p. 1225.)  To the contrary,

---

[2]   Appellant acknowledges that we are bound by our Supreme Court's decision in *Breverman, supra*, 19 Cal.4th 142, to apply the *Watson* prejudice standard. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) Appellant argues a different prejudice standard should apply, but notes he raises the issue only to preserve it for federal review.

appellant testified that he reacted to successive advances by Denton in a manner reflecting judgment. In response to Denton's first "charge," appellant wrested himself from Denton's grip, informed Denton he would call the police, and tried to leave the room. In an effort to halt Denton's second "charge," appellant first threw canned goods and other objects at him, then struck Denton with a closed stapler, and later used the open stapler to embed staples in Denton's flesh. In response to Denton's repeatedly putting him in chokeholds, appellant bit Denton -- deliberately reaching for different areas of his body -- to cause Denton to release him. Finally, in response to Denton's strangling him with the clothing iron's cord, appellant struck Denton with the clothing iron, but only until the tension from the cord eased.

Appellant's testimony suggested that these reactions conformed to his thought processes, rather than bypassed them. He decided to open the stapler and to staple Denton's flesh because he realized that merely hitting him with the closed stapler was ineffective. Similarly, because he realized Denton would release him from a chokehold when bitten, he repeatedly bit Denton and made a conscious effort to bite different areas of Denton's body. Even when Denton was strangling him with the iron's cord, appellant demonstrated the presence of mind to focus on relieving the cord's tension, first by trying to work his fingers under the cord and then by swinging with the iron only until the tension eased. Despite testifying repeatedly that he panicked upon realizing Denton

There continues to be no argument as to the level of impairment he was under (define what effects drugs have on the brain).

was dead the next morning, appellant never testified he panicked during the fight.

The facts here are similar to those in *Moye*, *supra*, 47 Cal.4th 537. There, our Supreme Court held the omission of a heat of passion instruction was neither erroneous nor prejudicial in the prosecution of a defendant convicted of second degree murder for admittedly killing a man with a baseball bat. (*Id.* at pp. 540-541.) The defendant introduced no evidence on the heat of passion theory's subjective element other than his own testimony, which "provided a blow-by-blow recounting of events in which he characterized every swing he took with the bat as a defensive response to each of [the victim's] successive advances." (*Id.* at p. 554.) The defendant testified he had not been in a "'right state of mind,'" but explained that he was referring to his fear of being beaten or killed, which had entangled his thought processes in his effort to defend himself. (*Id.* at pp. 552, 554.) Thus, the "thrust" of the defendant's testimony was self-defense. (*Id.* at p. 554.) The court concluded there was only insubstantial evidence to support the subjective element, rendering the omission of the heat of passion instruction proper. (*Ibid.*)

Like the defendant in *Moye*, appellant identifies no evidence to support the subjective element other than his own testimony. That testimony, however, like the defendant's testimony in *Moye*, provided a blow-by-blow justification of his actions as responses to successive advances by his victim. Describing self-defense as the

"thrust" of appellant's testimony would be an understatement. Indeed, defense counsel's closing argument emphasized "over and over again" that the case was about self-defense and described self-defense as "the only thing the evidence support[ed]."

These facts distinguish this case from those on which appellant relies. In *Breverman*, the court relied on affirmative evidence that the defendant panicked, including the defendant's suggestion in a police statement that he "acted in one continuous, chaotic response . . . ." (*Breverman, supra*, 19 Cal.4th at p. 164; see also *Moye, supra*, 47 Cal.4th at p. 555 [distinguishing *Breverman* on this ground].) Similarly, the defendant in *People v. Thomas* testified that he fired at his victim "because he was afraid, nervous and not thinking clearly." (*People v. Thomas* (2013) 218 Cal.App.4th 630, 645.) Moreover, in both *Thomas* and *Breverman* the courts acknowledged evidence in support of the heat of passion theory beyond the defendant's testimony. (See *id.* at p. 645 [describing testimony from multiple witnesses, including that defendant engaged in a "'pretty heated'" argument, cried, called out for his father, paced, and seemed angry]; *Breverman, supra*, at p. 163 ["Defendant and the other persons in the house all indicated that the number and behavior of the intruders . . . caused immediate fear and panic"].) Finally, although the court in *People v. Anderson* found support for a heat of passion instruction in the defendant's evidence that her codefendant was motivated by rage, the court gave no indication that the codefendant

18

himself testified about his actions or state of mind. (*People
v. Anderson* (2006) 141 Cal.App.4th 430, 435-438, 447.)
Thus, *Anderson* is not instructive on the need for a heat of
passion instruction where, as here and in *Moye* (decided
after *Anderson*), the defendant's own testimony described
each of his reactions to the alleged provocation as deliberate
acts of self-defense.

Appellant argues the trial court presumptively found
substantial evidence to support a heat of passion instruction,
and that by failing to object to that presumed finding, the
prosecutor forfeited the substantial evidence issue on appeal.
We will not presume that the trial court made a finding
inconsistent with its actions. The court made no finding of
substantial evidence, and there was none. The court did not
err by omitting an instruction on heat of passion.

Even had we found error in the trial court's omission of
the heat of passion instruction, we would find no prejudice.
*Moye* is instructive on this issue too. There, our Supreme
Court found it improbable that the jury, having rejected the
factual basis for the defendant's self-defense theories, would
have found the victim provoked the defendant in a manner
satisfying the objective element of the heat of passion theory
even if instructed on it. (*Moye, supra,* 47 Cal.4th at pp. 556-
557.) Moreover, because the defendant had offered no
testimony on the subjective element "unrelated to his
perceived need for self-defense," the court concluded the
jury's rejection of the self-defense theories left "little if any
independent evidence" to support the subjective element.

(*Id.* at p. 557.)  Here, like the defendant in *Moye*, appellant argues the same evidence underlying his self-defense theories might have convinced the jury to accept his heat of passion theory.  Appellant concedes, however, that the jury's rejection of his self-defense theories reflected its conclusion that he "did not have an actual fear that he was in imminent danger of death or great bodily injury."  Accordingly, had we found error, we nevertheless would have found no reasonable probability that the instruction would have led the jury to find either that appellant acted out of fear precluding his judgment (satisfying the subjective element) or that Denton provoked him in a manner sufficient to cause such emotion in an ordinary person (satisfying the objective element).  (See *id.* at pp. 550, 556-557.)

### 3.   *Flight Instruction*

Appellant argues the trial court erred by instructing the jury with CALCRIM No. 372, the standard flight instruction.

### a.   *Governing Principles*

Where the prosecution relies on evidence from which a reasonable jury could find flight reflecting consciousness of guilt, the trial court is statutorily required to give a standard flight instruction.  (See *People v. Howard* (2008) 42 Cal.4th 1000, 1020; *People v. Price* (2017) 8 Cal.App.5th 409, 454-455 (*Price*) [CALCRIM No. 372 is consistent with the statutory

requirement].)³ The prosecution must rely on evidence that the defendant left the crime scene in circumstances suggesting "'a purpose to avoid being observed or arrested.'" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, quoting *People v. Crandell* (1988) 46 Cal.3d 833, 869 (*Crandell*).) "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla, supra,* at p. 328.)

Respondent argues appellant forfeited his contention of error regarding the flight instruction because his trial counsel did not object to it. Where an instructional error affects the defendant's substantial rights, trial counsel's failure to object does not forfeit the contention of error on

---

³    Conceding that he seeks only to preserve them for federal review, appellant raises several challenges to the standard flight instruction that have been rejected in numerous cases. (See *Price, supra,* 8 Cal.App.5th at pp. 454, 456 [CALCRIM No. 372]; *People v. Streeter* (2012) 54 Cal.4th 205, 253-254 (*Streeter*) [CALJIC No. 2.52].) As courts have explained, the standard flight instruction "does not lighten the prosecution's burden of proof to show guilt beyond a reasonable doubt." (*Price, supra,* at p. 456.) It does not create an unconstitutional permissive inference of guilt. (See *id.* at pp. 455-456.) This is true even where "the principal disputed issue is the defendant's mental state at the time of the crime," rather than whether the defendant committed the alleged acts. (*People v. Smithey* (1999) 20 Cal.4th 936, 983.)

appeal. (*People v. Felix* (2008) 160 Cal.App.4th 849, 857,
citing Pen. Code, § 1259.) We apply the *Watson* test for
prejudicial error to determine if an instructional error
affected the defendant's substantial rights. (*People v. Felix,
supra,* at p. 857.)

###   b.    *Analysis*

The trial court properly gave the standard flight
instruction because the prosecution relied on sufficient
evidence of flight to require it. Appellant concedes his
"statements indicate he *was* afraid of being apprehended as
a guilty party," or in other words, afraid of arrest. There
was evidence that this fear motivated his departure from the
crime scene, viz., his residence. Appellant failed to return to
his residence even once in the more than five days between
the homicide and his arrest. (See *Howard, supra,* 42 Cal.4th
at p. 1020 [flight finding permissible where defendant failed
to return home for two nights after victim's body was
discovered in garage across from defendant's room].) Indeed,
appellant was arrested with bags and a backpack, sugges-
ting an intent to remain away from his residence and
perhaps to move farther away. (See *People v. Bradford*
(1997) 14 Cal.4th 1005, 1055 [flight instruction warranted,
despite defendant's failure to leave building where he killed
victim, in part because defendant packed belongings].)
Moreover, appellant never reported Denton's death to the
police or otherwise encouraged prompt investigation of the
dead body in his room. (See *People v. Smithey, supra,* 20

Cal.4th at pp. 982-983 [flight instruction warranted in part because defendant failed to summon help after admittedly killing victim at her home].)  The jury reasonably could have inferred from this evidence that appellant left his home in order to avoid arrest.

Contrary to appellant's contentions, this reasonable inference is not negated by appellant's failure to hide his connection to Denton's body or to flee to a more remote location.  The jury could have found flight despite appellant's expectation that suspicion would focus on him upon the discovery of Denton's body in his room.  (See *Howard, supra,* 42 Cal.4th at p. 1021 [where defendant hid victim's body near his room and remained home until its discovery, jury could find defendant fled after he "concluded that suspicion had focused on him"].)  Similarly, the jury could have found flight despite the fact that Officer Azizi found him near his residence, at his ex-girlfriend's apartment.  (See *ibid.* [flight finding reasonable where defendant was arrested at his aunt's house].)

The flight instruction cases on which appellant relies are distinguishable.  In *People v. Green,* the crime scene was in a "remote area," prompting the court to note that "it can hardly be expected that defendant would wait in that location . . . ."  (*People v. Green* (1980) 27 Cal.3d 1, 36.)  Here, in contrast, one could reasonably expect appellant to return to the crime scene because it was his home.  (Cf. *id.* at p. 37 [defendant returning home from crime scene did not suggest consciousness of guilt].)  This fact also distinguishes *People*

*v. Watson*, in which the crime scene was not the defendant's home, but instead "a railroad siding in an industrial area . . . ." (*People v. Watson* (1977) 75 Cal.App.3d 384, 390.)  The *Watson* court held only that the "mere" fact of the defendant's arrest miles away from the scene, "standing alone," was not evidence of flight. (*Id.* at p. 403.)  Finally, in *Crandell*, the court found the defendant's departure from the crime scene did not show flight, where other evidence established the defendant intended to return to the crime scene to dispose of the victims' bodies. (*Crandell, supra*, 46 Cal.3d at pp. 869-870.)  Here, appellant claimed neither that he intended to return to his residence nor that he expected Denton's body to escape detection.[4]

Even had we found error in giving the flight instructtion, we would find no prejudice.  The instruction did not require the jury to infer consciousness of guilt from flight, or

---

[4]    Finding no error, we necessarily find no error substantially affecting appellant's rights. We therefore conclude appellant forfeited his contention of error on appeal by failing to object to the flight instruction in the trial court. (*People v. Felix, supra*, 160 Cal.App.4th at p. 857.)  Moreover, we reject appellant's contention that his trial counsel was constitutionally ineffective for forfeiting the issue.  Counsel need not object to an unobjectionable instruction. (*People v. Gray* (2005) 37 Cal.4th 168, 201.)

even to find flight in the first instance.[5]  (See *Crandell, supra*, 46 Cal.3d at p. 870 [erroneous flight instruction not prejudicial in part because it left determination of "both the existence and significance of flight" to the jury].)  Moreover, in addition to the flight instruction, the court gave instructions allowing the jury to infer consciousness of guilt if it found appellant had made false statements related to the charge (CALCRIM No. 362) or had tried to hide evidence (CALCRIM No. 371).  The prosecutor argued the evidence supported both of these findings.  Appellant himself, despite arguing his conduct was not flight, concedes that his conduct "might be seen as manifesting consciousness of guilt."  (See *Crandell, supra*, at p. 870 [erroneous flight instruction not prejudicial in part because defendant manifested consciousness of guilt through conduct other than flight].)  In short, we find no reasonable probability that absent the flight instruction, appellant would have obtained a more favorable result.  (See *ibid.*)

---

[5]    Indeed, the instruction cautioned the jury that even if it found flight, it could not infer guilt from flight alone.  Our Supreme Court has recognized that the cautionary aspect of the standard flight instruction may benefit the defense.  (*Streeter, supra*, 54 Cal.4th at p. 254 ["CALJIC No. 2.52 was a cautionary instruction that benefitted the defense by 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory'"], quoting *People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

## B. *Ineffective Assistance of Counsel*

Appellant argues his trial counsel was ineffective for failing to request a jury instruction on the factors affecting "earwitness" identification, and for failing to challenge the prosecutor's conduct in reserving the primary substance of her closing argument for rebuttal.[6]

### 1. *Governing Principles*

To establish ineffective assistance of counsel, appellant "bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) To show deficient performance where the record does not explain why counsel acted or failed to act in the allegedly deficient manner, appellant must show there was "'"no conceivable tactical purpose"'" for counsel's act or

---

[6]    Appellant concedes his counsel's failure to object to the prosecutor's conduct in the trial court forfeited his contention of misconduct on appeal. (*People v. Potts* (2019) 6 Cal.5th 1012, 1020 [to preserve misconduct claim for appeal, defendant must timely object and ask trial court to admonish jury].) We note the term "misconduct" is a misnomer to the extent it erroneously implies a requirement to prove the prosecutor erred with a culpable state of mind. (*Ibid.*) We nevertheless use the term because our Supreme Court frequently uses it when analyzing claims of prosecutorial error. (See e.g., *id.* at pp. 1034-1037.)

omission. (*Id.* at p. 675.) To show prejudice, appellant must show a reasonable probability of a more favorable result but for the act or omission. (*Id.* at p. 676.)

## 2. *Failure to Request Instruction on "Earwitness" Identification*

Appellant argues his trial counsel was constitutionally ineffective for failing to request a jury instruction listing factors affecting the reliability of "earwitness" identification testimony, in the same manner that CALCRIM No. 315 lists factors relevant to eyewitness testimony. Appellant suggests the proposed instruction would have helped the jury understand that Gibson's mistaken identification of a woman speaking during the fight between appellant and Denton resulted from "speaker distortions from stress and anxiety."

An instruction highlighting the potential unreliability of voice identifications would have been more likely to hurt the defense than to help it. Gibson identified appellant, by voice, as the person she heard calling for help. Defense counsel relied on this voice identification to support appellant's self-defense theories. The risk of encouraging the jury to reject this helpful identification provided a tactical reason not to emphasize the unreliability of voice identifications.

Moreover, even without requesting an "earwitness" instruction, defense counsel knew the jury would receive a cautionary instruction relevant to Gibson's mistaken

identification. The court instructed the jury (per CALCRIM No. 226) that a witness's ability to hear the things about which she testified is a factor to consider when evaluating her testimony. The court also cautioned the jury not to "automatically reject testimony just because of inconsistencies or conflicts," explaining that "people sometimes honestly . . . make mistakes about what they remember," and that "two people may witness the same event yet . . . hear it differently." Defense counsel did not render deficient performance by failing to seek additional, potentially harmful emphasis on the unreliability of voice identifications.

Even had we found deficient performance, we would find no prejudice. As noted, an "earwitness" instruction may have encouraged a result *less* favorable to appellant by undermining the jury's confidence in Gibson's identification of appellant as the person calling for help. Even if the instruction's potential effect were somehow limited to Gibson's mistaken identification of a woman, appellant has provided no evidence that the instruction would have had any effect. (See Laub et al., *Can the Courts Tell an Ear from an Eye? Legal Approaches to Voice Identification Evidence* (2013) 37 Law & Psychol. Rev. 119, 152 [reporting absence of research to support conclusion that voice identification instructions would help jurors evaluate testimony

properly].)[7]  The eyewitness instruction cases on which appellant relies are distinguishable, inter alia, because they concern instruction on a different type of testimony.[8]  In sum, appellant has failed to show prejudice.

_____

[7]    This law review article demonstrates familiarity with voice identification research by professors A. Daniel Yarmey and Harry Hollien, on which appellant relies.  (See Laub et al., *supra*, at pp. 120 fn. 5, 125 fns. 41 & 44, 141, 146 fn. 213, 153.)  We cite the article only to emphasize appellant's failure to produce evidence that an "earwitness" instruction would have helped the jury.

[8]    Appellant derives no support from *People v. Palmer*, in which eyewitness identification testimony was the only evidence against the defendant, who disputed only his identity as the robber.  (*People v. Palmer* (1984) 154 Cal.App.3d 79, 83, 89.)  Here, appellant conceded his identity as Denton's killer, and the prosecution relied on abundant evidence other than the "earwitness" testimony.  As noted, that testimony was helpful to the defense with respect to Gibson's identification of appellant.  Moreover, in other eyewitness instruction cases on which appellant relies, our Supreme Court found no prejudice in omitting such an instruction despite the key role of eyewitness identification at trial.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1101, 1110-1112 [eyewitness identification was one of two major types of evidence against defendant]; *People v. Wright* (1988) 45 Cal.3d 1126, 1131-1132 [eyewitness identification was "sole" evidence against defendant].)

### 3.    *Failure to Object to Prosecutor's Rebuttal Argument*

Appellant argues his trial counsel was constitutionally ineffective for failing to challenge alleged prosecutorial misconduct during rebuttal argument in any of three ways: objecting, requesting sur-rebuttal, or moving for a mistrial. Conceding that he alleges no cumulative misconduct, appellant faults the prosecutor only for allegedly reserving the primary substance of her closing argument for rebuttal, purportedly denying him a fair chance to respond.

We find no misconduct. A finding of prosecutorial misconduct "cannot be based on a prosecutor's remarks responsive to defense counsel's argument, as long as those remarks do not go beyond the record." (*People v. Reyes* (2016) 246 Cal.App.4th 62, 74 (*Reyes*), citing *People v. Hill* (1967) 66 Cal.2d 536, 562.) As illustrated by our summary of the closing arguments, the prosecutor presented a substantive initial argument, then focused on rebutting defense counsel's self-defense theory. The prosecutor did not deprive defense counsel of a fair chance to respond merely because she did not, in anticipation of defense counsel's argument, address the evidence discrediting it in the same level of detail in her initial argument as in her rebuttal. (See *Reyes, supra,* at pp. 73-74 [prosecutor did not "blindside" defense counsel, despite referencing victim's sexual orientation for first time on rebuttal, where reference was fair response to defense theory that victim consented to sex acts]; *People v. Fernandez* (2013) 216 Cal.App.4th 540,

560, 563, 564 (*Fernandez*) [defense not "sandbagged" by rebuttal argument on witness credibility where "vast majority" of rebuttal was fair response to defense theory that victims alleged sexual abuse to seek attention].)

Appellant principally relies on *People v. Robinson* (1995) 31 Cal.App.4th 494 (*Robinson*), decided on starkly different facts. There, the Court of Appeal found misconduct during closing arguments because the prosecutor gave a "perfunctory" initial argument (spanning only three-and-a-half reporter transcript pages), followed by a rebuttal argument that was ten times longer (35 pages). (*Id.* at p. 505.) The court reversed an arson conviction not only because the prosecutor used this inappropriate rebuttal tactic, but also because the trial court erroneously excluded defense evidence, the prosecutor withheld evidence, and the prosecutor committed misconduct during cross-examination of a witness. (*Id.* at pp. 504-505.)

Here, in contrast, the prosecutor presented an initial argument that was far from perfunctory, followed by a shorter rebuttal argument responsive to the defense. (See *Reyes*, *supra*, 246 Cal.App.4th at p. 74 [distinguishing *Robinson* on similar grounds]; *Fernandez*, *supra*, 216 Cal.App.4th at pp. 563-564 [same].) Moreover, appellant concedes he has alleged no cumulative misconduct like that on which the *Robinson* court relied. (See *Reyes*, *supra*, at pp. 74-75 [further distinguishing *Robinson* due to absence of cumulative misconduct].) In sum, defense counsel had a

tactical reason not to object to misconduct because there was none. (See *Fernandez, supra,* at p. 565.)

Even had we found counsel's performance deficient, we would find no prejudice. If defense counsel had convinced the trial court that the prosecutor had deprived him of a fair chance to respond, the likely and proper remedy would have been an opportunity for additional response. Yet appellant fails to identify any additional argument his counsel would, should, or could have made, or to explain how additional argument might have affected the outcome in his favor. These failures are fatal to a showing of prejudice.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, P. J.

We concur:



WILLHITE, J.



COLLINS, J.

Appellant's Reply Brief (January 22nd 2019)

# EXHIBIT D

1/22/2019

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | 2 Crim. B288428 |
| | ) | |
| vs. | ) | |
| | ) | Los Angeles County |
| MICHAEL CAMPBELL, | ) | Superior Court |
| | ) | No. BA442781 |
| Defendant and Appellant. | ) | |
| | ) | |

APPEAL FROM THE JUDGMENT OF THE
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

HONORABLE CURTIS B. RAPPE, JUDGE

## APPELLANT'S REPLY BRIEF  (He)

January 22nd 2019
Pages: 1-66

GAIL HARPER
Attorney at Law
P. O. Box 330057
San Francisco, CA 94133
Telephone: (415) 291-8469
State Bar No. 104510

Attorney for Appellant
by appointment of the Court of
Appeal

Exhibit "D"
11

# TABLE OF CONTENTS

                                                                    **Page**

INTRODUCTION............................................... 1

ARGUMENT................................................... 1

I.  RESPONDENT OMITS MATERIAL FACTS FROM ITS
    STATEMENT OF THE FACTS............................... 1

    A.  PROSECUTION CASE............................... 1

        1.  The Killing................................. 1

        2.  Events Following the Killing................ 2

    B.  DEFENSE CASE................................... 4

    C.  REBUTTAL....................................... 7

II. FAILURE TO INSTRUCT THE JURY ON SUDDEN
    QUARREL, HEAT OF PASSION, PROVOCATION,
    AND VOLUNTARY MANSLAUGHTER REQUIRES
    REVERSAL OF CAMPBELL'S MURDER CONVICTION..... 8

    A.  Respondent Omits Material Facts................ 8

    B.  The People Forfeited the Argument That
        The Evidence Was Not Substantial Enough
        To Support Giving CALCRIM No. 570
        Because the People Did Not Object to the
        Instruction at Trial.......................... 8

i

# TABLE OF CONTENTS

                                                        **Page**

C.    As the Trial Court Correctly Found, the
      Evidence Was Sufficient to Support Giving the
      Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

D.    The Error Prejudiced Campbell. . . . . . . . . . . . . . . . . . 22

      1.    Standard for Assessing Prejudice. . . . . . . . . . . . 22

      2.    The Prosecutor's Case for Malice,
            and Therefore For Murder, Was Weak;
            The Defense Case for Sudden Quarrel
            And Heat of Passion Was Strong. . . . . . . . . . . . 23

III.  INSTRUCTING THE JURY IT COULD CONSIDER
      APPELLANT'S FLIGHT AS CONSCIOUSNESS OF
      GUILT WHERE THERE WAS INSUFFICIENT
      EVIDENCE OF FLIGHT LESSENED THE
      PROSECUTION'S BURDEN OF PROOF AND
      VIOLATED CAMPBELL'S 5th, 6th AND 14th
      AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.    The Issue is Not Forfeited on Appeal. . . . . . . . . . . . . . 28

B.    The Trial Court Erred in Giving CALCRIM
      No. 372 Where the Record Showed Insufficient
      Evidence of Flight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.    By Giving CALCRIM 372, the Trial Court
      Lessened The Prosecution's Burden Of Proof and
      Violated Appellant's 6th And 14th Amendment
      Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ii

# TABLE OF CONTENTS

**Page**

D.   Respondent Substantially Fails to Address
Campbell's Prejudice Argument. . . . . . . . . . . . . . . . . . 36

IV.   RESPONDENT SUBSTANTIALLY FAILS TO
ADDRESS CAMPBELL'S ARGUMENT THAT
HE WAS DEPRIVED OF HIS SIXTH AMENDMENT
RIGHT TO THE EFFECTIVE ASSISTANCE OF
COUNSEL BECAUSE TRIAL COUNSEL FAILED TO
REQUEST AN INSTRUCTION ON "EARWITNESS"
IDENTIFICATION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.   Respondent Omits the Facts. . . . . . . . . . . . . . . . . . . . . . 39

B.   Trial Counsel Was Ineffective For Failing to
Request a Modified Version of CALCRIM
No. 315 or Other Appropriate Instruction to
Assist the Jury in Evaluating the "Earwitness"
Testimony Presented by The Prosecutor . . . . . . . . . . . 41

1.   Trial Counsel Failed to Request a
Necessary Earwitness Identification
Instruction To Help The Jury Assess
Rose's Crucial Testimony That She Heard
Campbell Yelling for Her to Call The
Police; The Instruction Would Not Have
Been Duplicative. . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF CONTENTS

**Page**

    (a)    An "Earwitness" Identification Instruction Would Not Be Any More "Duplicative" of CALCRIM No. 226 Than is CALCRIM No. 315 [Eyewitness Identification Factors]. . . . . . . . . . . . . . . . . . . . . 42

    (b)    Respondent Fails to Address Any of Campbell's Argument As to Why an Earwitness Identification Instruction Was Necessary . . . . . . . . . . . . . . . . 46

    2.    There is a Reasonable Probability That a More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . 46

V.    PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . 47

    A.    Respondent Omits Some of the Relevant Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        1.    Prosecutor's Opening Argument.. . . . . . . . . . . . 47

# TABLE OF CONTENTS

**Page**

2.    Defense Closing Argument. . . . . . . . . . . . . . . . . 48

3.    Prosecutor's Rebuttal Argument. . . . . . . . . . . . . 51

B.    Respondent Omits the Standards of Review. . . . . . . . 55

C.    The Issue is Not Forfeited Because Trial Counsel Was Ineffective For Failing to Object. . . . . . . . . . . . . . . 55

D.    The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    1.    Respondent Omits Some of the Governing Law. . . . . . . . . . . . . . . . . . . . . . . . 56

    2.    The Prosecutor Improperly Sandbagged The Defense in Rebuttal Argument. . . . . . . . . . . 56

E.    Defense Counsel's Failure to Object to the Prosecutor's Misconduct Denied Campbell His Sixth Amendment Right to Effective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . 62

    1.    Standard For Evaluating Claims of Ineffective Assistance of Counsel. . . . . . . . . . . . 62

    2.    Trial Counsel Was Ineffective. . . . . . . . . . . . . . . 62

    3.    Respondent Substantially Fails to Address Campbell's Prejudice Argument. . . . . . 64

v

## TABLE OF CONTENTS

**Page**

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF AUTHORITIES

Pages

## CONSTITUTIONS

United States Constitution

      Fifth Amendment.............................................................. 28

      Sixth Amendment. ............................................... 28, 39, 62

      Fourteenth Amendment. ...................................... 28, 36

## FEDERAL CASES

*Berger v. United States* (1934),
      295 U.S. 78. ...................................................................... 56

*Chapman v. California* (1967),
      386 U.S. 18. ............................................................... 22, 36

*Mullaney v. Wilbur* (1975),
      421 U.S. 684. .................................................................. 26

*Strickland v. Washington* (1984),
      466 U.S. 668. ............................................................ 38, 45

## STATE CASES

*Bach v. County of Butte* (1983),
      147 Cal.App.3d 554. ....................................................... 10

*College Hospital, Inc. v. Superior Court* (1994),
      8 Cal.4th 704.................................................................. 38

*People v. Bandhauer* (1967),
      66 Cal.2d 524................................................................... 56

*People v. Barton* (1995),
        12 Cal.4th 186............................................................... 9, 19

*People v. Breverman* (1998),
        19 Cal.4th 142................................... 9-11, 14-16, 22-23

*People v. Canizalez* (2011),
        197 Cal.App. 832. ........................................................ 43

*People v. Carrington* (2009),
        47 Cal.4th 145............................................................... 30

*In re Christina P.* (1985),
        175 Cal.App.3d 115....................................................... 63

*People v. Crandell* (1988),
        46 Cal.3d 833. .......................................................... 30-32

*People v. Crayton* (2002),
        28 Cal.4th 346............................................................... 30

*People v. Daggett* (1990),
        225 Cal.App.3d 751. ..................................................... 56

*People v. Fremont* (1937),
        22 Cal.App.2d 292 . ...................................................... 34

*People v. Fudge* (1994),
        7 Cal.4th 1075............................................................... 44

*People v. Green* (1980),
        27 Cal.3d 1. .................................................................. 35

*People v. Hannon* (1977),
        19 Cal.3d 588. ............................................................... 29

*People v. Hill* (1992),
        3 Cal. 4th 959................................................................. 1

*People v. Hill* (1967),
    66 Cal.2d 536. ................................................................... 59

*People v. Hill* (1998),
    17 Cal.4th 800. ................................................................... 29

*People v. Howard* (2008),
    42 Cal.4th 1000. ................................................................. 29

*People v. Jackson* (1986),
    187 Cal.App.3d 499. .......................................................... 63

*People v. Ledesma* (1987),
    43 Cal.3d 171. ..................................................................... 28

*People v. Logan* (1917),
    175 Cal.45. ......................................................... 16-17, 23, 27

*People v. McCary* (1985),
    166 Cal.App.3d 1. .............................................................. 63

*People v. Mendoza* (2000),
    24 Cal.4th 130. ................................................................... 44

*People v. Mitchell* (1939),
    14 Cal.2d 237. ..................................................................... 12

*People v. Pensinger* (1991),
    52 Cal.3d 1210. ................................................................... 34

*People v. Pitts* (1990),
    223 Cal.App.3d 606. .......................................................... 70

*People v. Palmer* (1984),
    154 Cal.App.3d 79. ............................................................ 44

*People v. Rios* (2000),
23 Cal.4th 450.................................................................. 23, 26

*People v. Robinson* (1995),
31 Cal.App.4th 494............................................................ 57-58, 62

*People v. Saddler* (1979),
24 Cal.3d 671..................................................................... 34

*People v. Smithey* (1999),
20 Cal.4th 936.................................................................. 29-30, 56

*People v. Valdez* (2004),
32 Cal.4th 73.................................................................... 29-30

*People v. Watson* (1956),
46 Cal.2d 818.................................................................... 38

*People v. Watson* (1977),
75 Cal.App.3d 384 ............................................................ 33-34

*People v. Wright* (1988),
45 Cal.3d 1126................................................................... 44

*People v. Zimmerman* (1980),
102 Cal.App.3d 647............................................................ 63

*Pitts v. County of Kern* (1996),
17 Cal.4th 340.................................................................... 10

## STATE STATUTES

California Penal Code

§ 1093. .................................................................................. 58

## **MISCELLANEOUS**

CALCRIM No. 226 ............................................................ 42-44

CALCRIM No. 315 ............................................................ 41-44

CALCRIM No. 372 ............................................................ 22, 36

CALCRIM No. 570 ............................................................ 8-9, 22, 24

# INTRODUCTION

Defendant and appellant Michael Campbell hereby replies to certain points made by respondent. Campbell believes that a further discussion of these points will be helpful to the Court in deciding the issues presented. Campbell's failure to discuss any particular point means only that he has concluded that no further discussion is necessary and should not be misconstrued as an abandonment, waiver, or concession. (*People v. Hill* (1992) 3 Cal.4th 959, 995, footnote 3).

## ARGUMENT

## I.    RESPONDENT OMITS MATERIAL FACTS FROM ITS STATEMENT OF THE FACTS

### A.    PROSECUTION CASE

#### 1.    The Killing

Respondent omits the fact that the Florence Hotel is a single resident occupancy ("SRO") hotel located in the skid row area of downtown Los Angeles. (2RT 44-47, 60, 93-94, 102.)

Respondent distorts Wendell's testimony about what he heard during the incident. (RB 17.) Wendell testified he heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (RB 17; 2RT 49-50, 53, 57.)

Respondent omits Wendell's testimony that he told the

1

security officers he had heard people fighting in Campbell's room. (2RT 56.)

## 2.    Events Following the Killing

Respondent omits the fact that, when Campbell left his room at 8:13 a.m. on January 1, 2016, he appeared to be wearing the same clothing from the night before. (2RT 112-115, 128-129; 3RT 299.)

Respondent omits the facts that Denton's body was lying supine on the floor of the ten foot by twelve foot room that contained a small closet filled with clothes, a twin bed, a dresser, two tables, and a sink. (2RT 62-65, 3RT 329.) Respondent omits the fact that the blood smear and spatter investigators observed on the dresser was on the drawers near Denton's head. (3RT 248.) Respondent omits the fact that the area of the bedspread adjacent to Denton's head was also soaked in blood. (3RT 258-259.) Respondent omits the facts that a bloody towel and the bloody clothing iron were on the bed among several items of clothing, boxes and blankets. (3RT 255-256, 260-261, 294-297.) Respondent omits the facts that multiple blood smears were on the door and on a bag hanging from the interior door handle. (3RT 258.) Respondent omits the facts that blood smears, spatter, and dried blood drips were on the side of that same dresser in the area adjacent to the front door. (3RT 257-258, 270, 272-276.) Respondent omits the fact that the stapler was found on top of the dresser. (3RT 259, 262-263, 294-298.) Respondent omits the fact that there were cigarette butts in the ashtray on a table, one

2

of which had Denton's DNA on it. (3RT 252-253, 264, 295, 297.)

Respondent distorts neighbor Rose's testimony she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him.[1] (2RT 89.) Rose stated in a recorded interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." (3RT 281.) She then said she heard Campbell say "No, you let me go." (3RT 281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

Respondent omits the coroner's testimony that there were bruises and abrasions on Denton's wrists and hands, which could have been either defensive or offensive wounds. (2RT 202-203, 308-309.) Respondent also omits the coroner's testimony that he could not say definitively which of those injuries were inflicted before or after Denton died. (3RT 208-209.)

Respondent omits the fact that Angel Dorsey's apartment is directly across the street from the Los Angeles Police Department's Central Police Station. (2RT 141-142.) Respondent omits Dorsey's statement to the police that Dorsey let Campbell in because he looked like he needed help. (2RT 143-144.) Respondent omits

---

[1] The prosecutor impeached Rose with her two felony drug convictions. (2RT 91.)

3

Dorsey's statement that she saw an injury to Campbell's forehead. (2RT 147-148.)

Respondent omits the fact one of the arresting officers testified that at the time of Campbell's arrest, Campbell did not attempt to flee. (3RT 179-180, 182.)

Respondent omits the facts that, after receiving his *Miranda* rights, Campbell provided a recorded statement to the police.[2] (1CT 122-134; 3RT 284-289.) Campbell admitted he knew Denton, that he and Denton had fought and that Denton was dead. (1CT 128-129.) When pressed for details, he said, "I got to be quiet on that." (3RT 128.) He further stated, when told he was being arrested for murder, that he was the only witness, and also stated that his testimony was crucial. (3RT 129-131.) The video of the interview was played for the jury. (3RT 287.)

Respondent omits the fact the prosecutor presented no evidence of motive.

## B.    DEFENSE CASE

Respondent omits Campbell's testimony that he had planned to go out alone to neighborhood bars on New Years Eve, and that he had been drinking during the day. (3RT 317, 351-352, 372.) Respondent omits Campbell's testimony that, after he bought the

---

2

The recording was played for the jury but not reported. (3RT 284-289.)

items for Denton, Campbell started back to his place and Denton asked if he could tag along. (3RT 320-321.) Respondent omits Campbell's testimony that, as he and Denton walked back to his place, Campbell told him to slow down on his drinking. (3RT 323-324.)

Respondent omits Campbell's testimony he had known Denton for years and had previously loaned him clothing and a DVD player. (3RT 322-323, 350, 353.) Denton never took Campbell's things without permission, and always returned them. (3RT 323.) The two also drank together. (3RT 350.)

Respondent omits Campbell's testimony that he ordinarily kept his cell phones on top of his dresser or his stereo. (3RT 327.) Respondent omits Campbell's testimony that, after Denton punched him and Campbell told him he was going to call the police, he could not get his phone away from Denton. (3RT 328.) Respondent omits the fact that – after Denton blocked the door and charged Campbell, bear-hugging him and slamming him to the ground – Denton was throwing body punches. (3RT 328-330.) Respondent omits Campbell's testimony he was surprised and terrified that Denton was not deterred by being stapled. (3RT 334.) Respondent also omits Campbell's testimony that by this point they had been fighting almost continuously for about ten minutes, while Denton repeatedly threatened to kill Campbell. (3RT 334-335.)

Respondent omits Campbell's testimony that, before Denton's

5

tank top ripped and came off in Campbell's hand, Denton had put on a glove, saying he was going to whoop Campbell's ass again, and was pounding on the walls and on Campbell with his fists. (3RT 336.) Campbell was desperate. (3RT 337.)

Respondent distorts Campbell's testimony about the choke hold (RB 25); respondent asserts the choke hold made Campbell feel "dizzy", but Campbell also testified the choke hold was cutting off his air. (3RT 339, 357-358.) Respondent omits Campbell's testimony that he also bit Denton at other times during the fight, not just while he was being choked, and that he bit Denton wherever he could, not just in the shoulder and neck area. (3RT 359-360.) Respondent omits Campbell's testimony that Denton started choking him with the cord while Campbell was trying to escape out the door, and that Campbell became not only dizzy, but breathless. (3RT 340-341, 361-362.) Respondent omits Campbell's testimony that he was scared at that point because he realized that Denton was trying to kill him (3RT 341), and that Campbell tried to get his fingers under the cord to loosen it. (3RT 341-342.) Respondent omits Campbell's testimony that at no time did Campbell strike Denton with the iron while facing him, nor did he ever kneel over Denton and hit him with the iron while Denton was lying on his back. (3RT 373-374.) Respondent omits Campbell's testimony that the blood smear by the door resulted from Denton blocking the door while wearing a bloody shirt, preventing Campbell from escaping. (3RT 374-375.)

6

Campbell crawled to the bed with the cord still wrapped around his neck, shoved some clothes aside, and passed or blacked out. (3RT 343, 361, 363, 377.) Before Campbell passed out, he heard Denton mumbling like a drunk person on the floor. (3RT 343.)

Respondent omits Campbell's testimony that, when he nudged Denton's leg and discovered he was dead, he panicked (3RT 344, 364), and he did not wash up or change clothes. (3RT 364.)

Respondent omits Campbell's denial that he waited for Denton to die before leaving the room, or waiting so that Denton could not get medical treatment. (3RT 376.) Campbell was afraid to call the police, as he was "tying to process" what had happened. (3RT 344-345.)

Respondent omits Campbell's testimony that during his interview with the police Campbell was not himself. (3RT 346.) He was hallucinating and very upset about Denton attacking him in his home. (3RT 346.) Denton attempted to kill him, and when Denton would not stop attacking him, Campbell tried to get him off of him, tried to get him out of his apartment, and tried to get others to call the police. (3RT 347.) When Campbell hit Denton with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.)

## C.    REBUTTAL

Respondent notes that Detective Sharman photographed the bloody tank top found in Campbell's room, and the top had no tears

7

in it (3RT 383-385); respondent omits Sharman's testimony that he did not photograph both sides of the shirt. (3RT 385.)

## II. FAILURE TO INSTRUCT THE JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER REQUIRES REVERSAL OF CAMPBELL'S MURDER CONVICTION

Respondent disagrees that the trial court erred by failing to instruct the jury on sudden quarrel, heat of passion, provocation and voluntary manslaughter. (RB 28-35.) Respondent argues that even if the trial court erred, no prejudice resulted. (RB 36-40.) Respondent is wrong.

### A. Respondent Omits Material Facts

Respondent omits the fact that there were no proceedings between February 16 and February 20. (1CT 136-137.)

Respondent omits the fact that the trial court agreed to instruct the jury in the language of CALCRIM No. 570 and nobody objected to it. (4RT 392.)

### B. The People Forfeited the Argument That the Evidence Was Not Substantial Enough to Support Giving CALCRIM No. 570 Because the People Did Not Object to the Instruction at Trial

The trial court agreed to instruct the jury in the language of CALCRIM No. 570 and nobody objected to it. (4RT 392.) Respondent agrees that even had defense counsel objected to the court giving CALCRIM No. 570, the trial court was bound, *sua sponte*, to give the

8

instruction, "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (RB 29; *People v. Breverman* (1998) 19 Cal.4th 142, 153 [superseded on another ground by amendment of §189 not relevant here]; *People v. Barton* (1995) 12 Cal.4th 186, 190.)

Despite the fact that the trial court necessarily found there *was* substantial enough evidence of the lesser offense to merit consideration by the jury when the trial court agreed to give CALCRIM No. 570, respondent now argues there was not. (RB 29-35.) Respondent attempts to circumvent the facts (1) that the trial court found substantial evidence to support the instruction, and (2) the People did not object to the instruction at trial on the basis that there was not substantial evidence to support it; in fact, the People did not object at all. Respondent argues:

> Appellant observes that the trial court originally planned to give CALCRIM No. 570, the instruction on sudden quarrel or heat of passion voluntary manslaughter (AOB 20; 4RT 392), but for reasons not indicated in the record the court remarked, "we took that one out." (4RT 499.) Regardless of the rationale for removing the instruction, however, there was no substantial evidence to support it in the first place.

(RB 32.)

The rules of forfeiture apply to both parties in criminal cases. Where a district attorney acts as an agent and representative of the state under the authority of the Attorney General, the People are

ordinarily bound by any stipulations, concessions or representations, regardless of whether counsel was the Attorney General or the district attorney. (See *Pitts v. County of Kern* (1996) 17 Cal.4th 340, at p. 360; *Bach v. County of Butte* (1983) 147 Cal.App.3d 554, 570.) For example, a prosecutor's failure to object to a trial court's omission of a drug program fee upon the defendant's conviction of possession for sale of methamphetamine waived the state's claim of error on appeal, where the applicable statute contained exception to fee requirement upon a finding of a defendant's inability to pay, and the trial court was presumed, on a silent record, to have made such a finding. (*People v. Turner* (2002) 96 Cal.App.4th 1409, 1413.) The prosecutor did not object on the ground respondent raises now, and the trial court was presumed, on a silent record, to have found substantial evidence to support the instruction. (*Ibid.*) Respondent, therefore, has forfeited this claim on appeal.

## C.    As the Trial Court Correctly Found, the Evidence Was Sufficient to Support Giving the Instruction

Respondent omits the rule that the obligation to instruct on lesser included offenses applies regardless of the parties' requests or objections, and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, encourages a verdict no harsher or more lenient than the evidence merits, and protects the jury's truth-ascertainment function. (*People v. Breverman, supra,* 19 Cal.4th

142, 154-155.) "Just as the prosecution has no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Breverman, supra,* at p. 155.)

Respondent also omits the rule that, in a murder prosecution, the duty to instruct includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories that have the strongest evidentiary support, or upon which the defendant has openly relied. (*People v. Breverman, supra,* 19 Cal.4th 142, 155.)

Respondent relies almost exclusively upon *People v. Moye* (2009) 47 Cal.4th 537 [*Moye*], claiming *Moye* is "analagous" to this case. (RB 29-40.) Respondent asserts that here, as in *Moye*, "the defendant's 'blow-by-blow recounting of events' in which he 'took great pains . . . to justify each blow he landed' on the victim as a defensive response to each of the victim's advances showed that he acted with deliberation and reflection, and was 'contrary' to a theory that he 'subjectively killed in the heat of passion.' (*Id.* at p. 554.)" (RB 33.) Respondent claims that Campbell's "own testimony demonstrated that he did not act from passion, but rather in an attempt to defend himself against Denton's alleged attacks," and as a result Campbell cannot claim he acted out of heat of passion. Respondent apparently proposes a new rule that a defendant in a

11

murder prosecution can never present both self-defense and heat of passion defenses to a jury, because they are, according to respondent, mutually exclusive. Such a rule would conflict with long-established precedent.

People v. Wickersham (1982) 32 Cal.3d 307, and People v. Flannel (1979) 25 Cal.3d 668, run contrary to respondent's argument. Both Flannel and Wickersham addressed a sua sponte duty rather than a requested instruction. In Flannel, the Court established that unreasonable self defense could reduce murder to voluntary manslaughter. This was a court-created theory of voluntary manslaughter, in which the court held only that heat of passion and provocation are different ways to negate malice. The Court did not address the question whether they are mutually exclusive. (People v. Flannel, supra, 25 Cal.3d 668, 677-678.)

In Wickersham, the Court addressed a sua sponte duty to instruct on heat of passion where the defense claimed self defense. It noted that there was no evidence of provocation outside of the evidence that met all the requirements of perfect self defense and that sua sponte instruction on heat of passion would have been inappropriate. (Id., at pp. 327-328.) In People v. Mitchell (1939) 14 Cal.2d 237, the defense requested a voluntary manslaughter instruction, but the court held that it was not required because the defendant's testimony did not suggest that he acted in the heat of passion where he claimed that his conduct was an accident. (Id. at p.

12

241.) A similar finding was made in *People v. Sinclair* (1988) 64 Cal.App.4th 1012, where the defendant testified that he did not fire the fatal shot, even where there was evidence of provocation by the victims. (*Id.* at pp. 1016-1017.)

The situation here is more like other cases where the California Supreme Court has recognized a relationship between self defense and heat of passion. In *People v. Chacon* (1968) 69 Cal.2d 765, the court noted a logical connection between self defense and heat of passion, in a prosecution under Penal Code section 4500. The case involved four prisoners involved in a fight on the prison yard. Officers found three defendants stabbing a man while others were holding him down. The defense argued that the victim started the fight and that there was long-standing animosity among them. The fight was set off by the victim's making a sexual advance, and attacking one of the defendants with a knife when he resisted. Only then did the defendants draw their knives. (*Id.*, at 770-771.) The Court held:

> In a prosecution for murder the presence of sufficient provocation or heat of passion negates the existence of the requisite malice aforethought. (*People v. Valentine* (1946) 28 Cal.2d 121, 132.) In the usual case, this instruction supplements the self-defense instruction. Thus, in a prosecution for murder even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute provocation, which would preclude a finding of malice aforethought

13

and reduce the crime to manslaughter.

(*People v. Chacon, supra,* 69 Cal.2d 765, at p. 781.)

The Supreme Court addressed the issue again in *People v. St. Martin* (1970) 1 Cal.3d 524, another section 4500 prosecution. The defendant was found in the cell of the victim and stabbed him when guards tried to intervene. The defense was that when defendant learned that the victim was trying to recruit someone to kill him, he went to his cell to discuss the problem. The victim pulled a knife and attacked him. The defendant claimed that he did not remember what occurred during the fight. (*Id.,* at 529-530.) There was no sua sponte instruction on provocation, an error which this court found required reversal. (*Id.,* at 530-532.) It found the error to be prejudicial for the following reasons:

> Although the jury was instructed on self-defense, the jury's rejection of that defense does not show that it would have also rejected a claim of provocation. The jury was told that the defense of self-defense is not operative in favor of a person attacked who renders his assailant incapable of inflicting further injuries and thereafter inflicts further injury on the attacker. On the basis of Sergeant Wilson's testimony, the jury may have concluded that defendant, although attacked initially, succeeded in rendering Carter incapable of further injuries but that instead of withdrawing he thereafter killed Carter, and such a conclusion, although defeating the claim of self-defense, would not dispose of the claim of provocation.

14

(*People v. St. Martin, supra,* 1 Cal.3d at 532.)

The California Supreme Court in *Breverman, supra,* 19 Cal.4th 142, made clear that the theories of voluntary manslaughter - imperfect self defense and heat of passion – are not necessarily inconsistent and at times should be given in the same case. (*Id.* at pp. 159-160.) In *Breverman,* the jury was instructed on unreasonable self defense but not on heat of passion. This court found that there was a *sua sponte* duty to instruct on both theories. (*Breverman, supra,* 19 Cal.4th at 148-149.)

Manslaughter based on a sudden quarrel or heat of passion has both a subjective and an objective component. (See *People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the subjective component, the defendant must have killed "while under 'the actual influence of a strong passion' induced by [adequate] provocation." (*Id.* at p. 550.) As a result, "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored," malice is not negated. (*People v. Beltran* (2013) 56 Cal.4th 935, at p. 951.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

Campbell testified that when he fought back against Denton he was "scared". (3RT 341.) Campbell testified he was "surprised" and "terrified" that Denton was not deterred by his efforts to fight

15

him off. (3RT 334.) Campbell testified that when he hit Denton with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.) By rejecting the two forms of self-defense upon which it was instructed, the jury concluded that Campbell did not have an actual fear that he was in imminent danger of death or great bodily injury. (See *People v. Humphrey* (2013) 13 Cal.4th 935, 1082.) But substantial evidence was presented upon which the jury could nonetheless have found that Campbell was acting under the actual influence of extreme emotion. This evidence included Campbell's testimony that Denton had acted belligerently once Campbell confronted him about his missing cell phones; Campbell's testimony that Denton was the one who escalated the fight and would not let Campbell out of the room; Campbell's testimony that Denton, who was much younger than Campbell, punched him, and when Campbell told him he was going to call the police, he could not get his phone away from Denton. (3RT 328.) After Denton blocked the door and charged Campbell, bear-hugging him and slamming him to the ground, Denton was throwing body punches. (3RT 328-330.) Campbell testified he was surprised and terrified that Denton was not deterred by being stapled. (3RT 334.) Denton repeatedly threatened to kill Campbell. (3RT 334-335.) Although the jury was entitled to disbelieve Campbell's stated reasons for bludgeoning Denton, it was also entitled to rely on the other evidence in the record to find that Campbell killed Denton spontaneously and under

16

the influence of extreme emotion. (*Breverman, supra*, 19 Cal.4th at p. 163, fn. 10; see, e.g., *People v. Logan* (1917) 175 Cal. 45, 46–47, 50 [defendant entitled to heat-of-passion instruction where evidence demonstrated victim's "physical superiority" and defendant's "fear that he was about to be subjected to a second humiliating beating" at victim's hands]; *People v. Anderson* (2006) 141 Cal.App.4th 430, 443, 446–447 [evidence that "fatal chokehold was motivated by rage at the victim's unprovoked attack" sufficient to require heat-of-passion instruction].)

There was also substantial evidence presented to support the objective component of heat of passion. To satisfy this component, "' "the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Moye, supra*, 47 Cal.4th at p. 549.) The victim must cause the provocation or the defendant must reasonably believe that the victim caused it. (*Id.* at pp. 549–550.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550; see *Beltran, supra*, 56 Cal.4th at p. 949 ["the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection" (original italics) ].) As the California Supreme Court has stated, in determining whether the conduct was adequately provocative, the question is whether it would cause an ordinary person of average

17

disposition "to react from passion and not from judgment," not whether it "would cause an ordinary person of average disposition to kill" or attempt to kill. (*Beltran, supra*, at pp. 938–939, original italics.)

"Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705; see *Beltran, supra*, 56 Cal.4th at pp. 950–951.) While it is true that a court may decide the issue of adequate provocation if "the provocation is so slight ... that reasonable jurors could not differ on the issue of adequacy..." (*Fenenbock, supra*, at p. 1705, 47 Cal.App.4th 1167C), the provocation shown here is not so slight that this Court can conclude, as a matter of law, that a reasonable jury would have been unable to find that Campbell acted upon a sudden quarrel or in the heat of passion.

The jury could have found adequate provocation in several ways. To begin with, the jury could have found it based on the evidence presented of Denton's mistreatment of Campbell. Campbell, Blassingame and Gibson testified that Campbell and Denton had a serious argument, and that someone was yelling for help. According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

The jury also could have found adequate provocation based

18

on Denton's belligerent and threatening behavior. As mentioned above, this evidence included testimony that Denton became aggressive when confronted with Campbell's accusation of theft, including engaging in a shouting match with Campbell; testimony that Denton was the one who escalated the fight with Campbell; testimony that Denton was strangling Campbell immediately before Campbell struck him with the fatal blows; and the neighbors' testimony that they intervened before the argument ended by calling hotel security. In short, evidence of Denton's menacing behavior was sufficient to permit a jury to conclude that a reasonable person in Campbell's position could have acted in the heat of passion.

Decisions in cases with similar facts support the conclusion that sufficient evidence of provocation was presented. In *Barton*, the defendant was convicted of voluntary manslaughter and argued on appeal that the trial court erred by giving a heat-of-passion instruction over his objection. (*Barton, supra*, 12 Cal.4th at pp. 190, 201.) The California Supreme Court disagreed, concluding that "[t]he record contain[ed] substantial evidence, some of it offered by the prosecution and some by the defense," to support a heat-of-passion instruction. (*Id.* at p. 202.) That evidence showed that shortly before the defendant shot the victim, the defendant's daughter had told him that the victim tried to run her car off the road and had spat on her car window. (*Ibid.*) The defendant and his daughter then confronted the victim, at which point the victim called

19

the daughter a " 'bitch' " and acted " 'berserk.' " (*Ibid.*) The
defendant and the victim then confronted each other, with the victim
assuming a " 'fighting stance.' " (*Ibid.*) After the defendant asked his
daughter to call the police, the victim tried to leave in his car and the
defendant asked him where he was going. (*Ibid.*) The victim
"replied, 'none of your fucking business,' and taunted [the]
defendant by saying, 'Do you think you can keep me here?' " (*Ibid.*)
The defendant began "[s]creaming and swearing" and threatened to
shoot if the victim did not drop his knife (although the evidence
conflicted as to whether the victim actually had one). (*Ibid.*) Thus,
testimony was presented that a person close to the defendant was
threatened or disrespected, the defendant and the victim argued,
and the defendant felt threatened when he shot the victim.

    In another case also involving a fight that led to a shooting, the
Court of Appeal reversed a conviction for second degree murder
because the jury was not given a heat-of-passion instruction. (*People
v. Thomas* (2013) 218 Cal.App.4th 630, 633.) In *Thomas*, the defendant
engaged in a " 'pretty heated' " argument with the victim and the
victim's friends after the defendant blocked in the friends' car. (*Id.* at
pp. 634–635, 645.) Witnesses agreed that at least one of the victim's
friends punched and beat the defendant. (*Id.* at pp. 635, 639, 645.)
Witnesses testified that the defendant then went to his car and
retrieved a gun, that the defendant seemed angry, and that the
defendant's father tried to calm him. (*Id.* at p. 645.) According to the

defendant, the victim then approached and "lunged at him," making the defendant believe the victim was trying to get the defendant's gun. (*Ibid.*) The defendant testified that "[h]e fired because he was afraid, nervous and not thinking clearly." (*Ibid.*)

Prosecution and defense witnesses in *Thomas* agreed that a sudden quarrel preceded the shooting, and evidence was presented that the defendant felt both angered and threatened by the victim. And whereas the defendant in *Thomas* had some time to " 'cool off' " while retrieving his gun and speaking with his father (*Beltran, supra,* 56 Cal.4th at p. 951), Campbell killed Denton in the midst of their argument. Thus, the evidence of provocation in this case is more compelling than it was in *Thomas*.

The circumstances here—Denton's disrespectful treatment of Campbell, the sudden quarrel between the two men, and Denton's threatening behavior during the argument—also distinguish this case from decisions holding that insults alone are insufficient to constitute adequate provocation. (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 743–744, 759 [gang-related insults]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [same]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586 [victim repeatedly called defendant a " 'mother fucker' " and taunted him to use his weapon]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739–740 [smirking, taunting, and name-calling]; but see *People v. McCowan* (1986) 182 Cal.App.3d 1, 15 [heat-of-passion instruction required where defendant confessed that "he became

enraged" when his ex-wife "made [an] obscene gesture at him" as he drove by her home, prompting him to shoot her].) <u>While the conclusion that a jury could have found adequate provocation might be different if Denton had merely cursed or insulted Campbell, Campbell's testimony about Denton's statements to him and Denton's threatening behavior immediately before the killing were sufficient under California law to require the trial court to give a heat-of-passion instruction *sua sponte*.</u>

Therefore, the trial court erred by failing to instruct the jury *sua sponte* in the language of CALCRIM No. 570 because there was sufficient evidence of heat of passion.

### D.    The Error Prejudiced Campbell

Respondent disagrees that the error was prejudicial, claiming it is not reasonably probable the jury would have accepted a heat of passion theory after rejecting Campbell's self-defense theories based on the same evidence. (RB 36-40.) Respondent is wrong.

#### 1.    Standard for Assessing Prejudice

Respondent disagrees that the failure to instruct on a lesser included offense should be evaluated under the federal constitutional error standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705. (RB 36-38.) Mr. Campbell understands that the California Supreme Court rejected his position in *Breverman* with one Justice dissenting, and that this Court must abide by that decision (*Auto Equity Sales, Inc. v. Superior Court* (1962)

22

57 Cal.2d 450, 455); however, he has raised the issue here in order to preserve it for federal review.

### 2. The Prosecutor's Case for Malice, and Therefore For Murder, Was Weak; The Defense Case for Sudden Quarrel and Heat of Passion Was Strong

Respondent substantially fails to address Campbell's prejudice argument. (See AOB pp. 26-31.) Instead, respondent again relies exclusively upon *Moye*. (RB 36-40.) Respondent is wrong.

Except in cases governed by the felony murder rule, a homicide is not a murder absent malice aforethought, i.e., "the wanton disregard for human life"])." (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Malice aforethought is negated as a matter of law where the homicide occurred "upon a sudden quarrel or heat of passion" (§192(a)), i.e., "if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " [Citations.] (*People v. Breverman, supra,* 19 Cal. 4th 142, 163.) Heat of passion may result from fear or terror as well as anger or jealousy. (*People v. Mitchell* (1939) 14 Cal.2d 237, 252; *People v. Logan* (1917) 175 Cal.45, 49.)

In deciding whether the provocation was sufficient, the finder of fact must consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted

23

from passion rather than from judgment. (CALCRIM No. 570; *People v. Logan, supra*, 175 Cal 45, 49.) <u>Consequently</u>, <u>the objective standard of heat-of-passion voluntary manslaughter compels examination of Campbell's situation.</u>

The evidence indicated that Campbell was under the stress of being attacked suddenly by a person he had thought of as a trusted friend or even a son. (3RT 322-323, 350, 353.) Campbell had invited Denton into his room to lend him some clothes so that they could go out together on New Years Eve. (3RT 321-323.) Campbell believed that while Denton was in Campbell's room he stole two cell phones. (3RT 326-328.) Campbell confronted Denton about taking his cell phones and demanded them back. (3RT 327-328, 355.) Unexpectedly, Denton charged him and punched him in the forehead, then bear-hugged Campbell and slammed him to the ground, throwing body punches. (3RT 327-330.) Denton was angry, swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.)

Campbell was able to wriggle out from under Denton and get to his feet, but Denton blocked the door, preventing Campbell from leaving the room. (3RT 330-331, 374-375.) Denton charged Campbell again, and Campbell started throwing things at him. (3RT 331-332.) Campbell picked up a closed stapler from the dresser and hit Denton with it, then opened it and stapled Denton's chest over Denton's tank top, but Denton pulled out a staple, laughed demonically, and said "Is that all you got old man?" (3RT 332-336, 356.) Campbell was

24

surprised and terrified that Denton was not deterred. (3RT 334.) By this point they had been fighting almost continuously for about ten minutes, while Denton repeatedly threatened to kill Campbell. (3RT 334-335.) According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

Denton rushed Campbell again and put him in a choke hold from behind, cutting off his air. (3RT 339, 357-358.) Campbell bit Denton on his arm and elsewhere repeatedly to break his hold. (3RT 340, 358-360.) Denton then picked up a clothing iron from the dresser, wrapped the cord around Campbell's neck, and choked him from behind until Campbell was dizzy and breathless. (3RT 340-341, 361-362.)

Campbell had, at most, a few seconds and as little as a fraction of a second in which to react after Denton started strangling him. Rose heard what she believed was Campbell's voice coming from his room, saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.) Neighbor Wendell heard the sounds of a fight in Campbell's room, including a "bang" and someone yelling "help", but he could not tell whose voice it was. (2RT 49-50, 53, 56-57.) Denton's blood alcohol level was .212 – supporting an argument that Denton was so drunk that his inhibitions were gone and he was out of control.

Finally, where "the People's own evidence suggests that the

25

killing may have been provoked or in honest response to perceived danger" the People must also "prove beyond reasonable doubt that [heat of passion and adequate provocation] were lacking in order to establish the murder element of malice. [Citations.]" (*People v. Rios, supra*, applying *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."].) The coroner indicated the bruises and abrasions on Denton's hands and wrists could have been offensive or defensive, and that Denton had a high blood-alcohol level at the time he was killed. (2RT 202-203, 308-309.) Photographs taken of Campbell's body on the day of his arrest showed bruises, scrapes and scratches on his chest, back, arms and knees. (3RT 293-294, 308-309, 365-370.) Defense expert Dr. Ryan O'Connor determined the injuries to Campbell were consistent with injuries that were six days old – suggesting that they resulted from the fight with Denton. (3RT 309.)

Evidence of intent to kill was lacking here. Why would Campbell invite Denton to his residential hotel room with the intention of killing him? There were people all around, just outside the door and in the adjacent rooms; discovery of the dead body was inevitable; the identity of the person who rented the room was known. What motive did Campbell have to kill Denton? The prosecutor offered nothing but the insinuation that Campbell had a

sexual interest in the younger Denton, without any evidence to support it. This was a sudden and unexpected fight, and at least one of the combatants – Denton – was extremely intoxicated

The prosecutor could not have disproved sudden quarrel or heat of passion here. There was evidence that Denton, a much younger man than Campbell, suddenly and violently attacked Campbell in his own home, swearing at him, threatening to kill him, and strangling him to the point of Campbell nearly passing out. Under these circumstances, a reasonable jury could infer that Campbell was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition. A rational jury could also find that the intense and highly wrought emotions aroused by the initial threat had not had time to cool or subside by the time Campbell seized the iron – whose cord Denton was strangling Campbell with – then struck Denton with it until he stopped strangling Campbell. Finally, a jury could disbelieve defendant's self-defense claim, and conclude, from all of the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation – fear and terror at being attacked. [See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 511]; *People v. Mitchell, supra,* 14 Cal.2d 237, 252; *People v. Logan, supra,* 175 Cal.45, 49.)

On these facts, the prosecutor could not prove beyond a

27

reasonable doubt that Campbell did not act pursuant to a sudden quarrel or heat of passion. The failure to instruct on this lesser included offense was thus prejudicial under any standard, and Campbell's conviction must be reversed.

III. **INSTRUCTING THE JURY IT COULD CONSIDER CAMPBELL'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS**

Respondent disagrees that instructing the jury on flight as consciousness of guilt violated Campbell's federal constitutional rights. (RB 40-53.) Respondent is wrong.

A. **The Issue is Not Forfeited on Appeal**

Respondent argues the issue is forfeited for defense counsel's failure to object. (RB 42-43.)

As appellant argued in his opening brief, due process requires that counsel's performance fulfill the right of the accused to "the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; see AOB pp. 33-34.)

Respondent asserts trial counsel's failure to object to the flight instruction was a "tactical decision", but fails to explain how that "decision" was "tactical." (RB 51-52.)

Respondent also urges that the issue of ineffective assistance must be brought by way of a petition for writ of habeas corpus. (RB

52-53.) Not so; respondent admits that if there simply could be no satisfactory explanation for trial counsel's omission, then the error may be raised on direct appeal. (RB 52.)

Respondent argues that it was not error for the trial court to instruct the jury on evidence of flight as consciousness of guilt; therefore, trial counsel could not have rendered ineffective assistance by failing to object to the instruction, as objection would have been futile. (RB 53.) As Campbell has demonstrated in his opening brief and demonstrates below, <u>there was insufficient evidence to support the prejudicial flight instruction,</u> and trial counsel should have objected to the instruction on that ground.

Therefore, this Court should find Campbell's claim of instructional error is not forfeited.

## B. The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight

Before the court can instruct a jury it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) When a court fails to make that preliminary factual determination, it errs by passing a question of law to the jury. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.) "<u>Substantial evidence" is required to support a flight instruction.</u> (*People v. Howard* (2008) 42 Cal.4th 1000, 1020; *People v. Smithey* (1999) 20 Cal.4th 936, 982.)

Respondent fails to address *Valdez, Hannon, Howard* or *Smithey*.

Respondent conflates "consciousness of guilt" with evidence of flight. They are not the same. According to the California Supreme Court, it was wrong to give a flight instruction where the defendant left the scene of the killings without reporting the deaths and with the purpose of concealing them. (*People v. Crandell* (1988) 46 Cal.3d 833, 869-870 [abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) The *Crandell* Court held "although this conduct supported an inference of consciousness of guilt, his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested." (*People v. Crandell, supra.*) So it was here.

Respondent attacks Campbell's argument that flight is not established here because he did not immediately leave his apartment after killing Denton, did not run or flee the scene, and did not leave his neighborhood. (RB 44-45.) Campbell has acknowledged in his briefing that flight does not require the physical act of running nor the reaching of a far-away haven. (AOB p. 35.) The question is whether there is evidence from which a jury could reasonably infer that the defendant left to avoid being observed or arrested. (*People v. Carrington* (2009) 47 Cal.4th 145, 188 ["An instruction that permits the jury to draw an inference of guilt from particular facts is valid only if there is a rational connection between the fact proved and the fact inferred."]; *People v. Crandell, supra,* 46 Cal.3d 833, 869-870.)

30

Respondent attempts to distinguish *Crandell, supra,* on its facts. (RB 46.) In *Crandell,* says respondent, "the Court found error in giving the flight instruction because there was evidence the defendant intended to return to dispose of the bodies and was arrested while returning. (RB 46.) What the Supreme Court actually said was:

> Although defendant left the Pruett house without reporting the deaths of Ernest and Edward and with the purpose of concealing their deaths, and although this conduct supported an inference of consciousness of guilt, his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed (his presence at the house on the morning following the murders was already known to Juan Salasar, among others) and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of returning to dispose of the bodies. There is no evidence he ever wavered in this intent; indeed, he was arrested while returning and less than a block from the Pruett house. Accordingly, the instruction on flight should not have been given.

(*Id.* at pp. 869-870.)

Respondent notes that "video surveillance showed [Campbell] leaving his apartment at 8:14 a.m., soon after he woke up, and walking faster than normal, and that when Campbell left, "he locked his apartment door, thereby preventing someone from finding Denton's body." (RB 45.) Again, mere concealment of a body does not support giving an instruction on flight. (*Crandell, supra,* at p. 869.)

31

Respondent emphasizes Campbell's statements that he "panicked" after discovering Denton was dead on the floor of his apartment and that Campbell "wanted to get out of the apartment" and "was afraid at that moment to call the police." (RB 45.) Respondent also emphasizes the facts that Campbell did not notify the police that Denton was dead in his apartment, and that Campbell did not tell his girlfriend he intended to call the police." (RB 45-46.) Again, these facts are insufficient to support giving the flight instruction.

The *Crandell* Court held that "[f]light . . . require[s] . . . a purpose to avoid being observed or arrested." (*People v. Crandell, supra,* 46 Cal.3d 833, at p. 869.) As in *Crandell,* Campbell's failure to notify the police or to advise his girlfriend he intended to call is not evidence of flight. (*Id.* at p. 869.) Campbell's act of locking his door is not evidence of flight or even an attempt to conceal Denton's body; the reasonable inference is that Campbell locked his door out of habit, as most people lock the doors to their homes upon leaving, and it was inevitable that Denton's body would be found because the smell of death would eventually tip off the neighbors. It was also inevitable that Denton's body would be connected to Campbell because the room belonged to Campbell and Campbell's neighbors heard the altercation between Denton and Campbell. In short, Campbell had already been "observed" in connection with the killing, so leaving his apartment with Denton's body in it could not have been for the purpose of avoiding being observed. Campbell's

panic at realizing Denton was dead and his desire to get away from the body also does not support an inference that his purpose in leaving his room was to avoid being observed or arrested. As explained above, Campbell had already been observed, so leaving his room would not help him in that regard.

There is also no substantial evidence to support the inference that Campbell departed his room and the hotel to avoid arrest. Respondent fails to address the fact that Campbell walked the short distance to his ex-girlfriend's residence around the corner from his place and immediately across the street from a police station. (2RT 141-142; 3RT 145-146.) Campbell spent the better part of a week after the killing getting drunk and high, but he did not leave his neighborhood. (3RT 346, 352, 364.) Respondent also omits the fact that he uniformed arresting officer testified that Campbell "did not attempt to flee" when taken into custody. (3RT 179-180.) Hanging out for five days, drinking and taking drugs in the immediate vicinity of a police station, in an area where Campbell presumably was known, and making no attempt to flee when officers arrested him, does not support an inference that Campbell "fled" to avoid arrest.

Respondent attempts to distinguish *People v. Watson* (1977) 75 Cal.App.3d 384, which held a flight instruction should not be given where, for example, the evidence merely shows the defendant was arrested some time after the crime and miles away from the scene, since such evidence, standing alone, does not support an inference of

33

guilt. (*Id.* at p. 403.) Here, again, respondent conflates evidence of consciousness of guilt and evidence of flight as consciousness of guilt. Respondent asserts *Watson* is distinguishable because the flight instruction in that case was based only on the "mere fact of defendant's arrest nearly two days later and miles away from the crime scene" and there was "far more evidence here showing consciousness of guilt." (RB 47.) As Campbell has previously explained, <u>the evidence here does not support an inference that Campbell "fled" to avoid being observed or arrested.</u>

Respondent also attempts to distinguish *People v. Fremont* (1937) 22 Cal.App.2d 292, 300, where the court found error in giving the flight instruction because there was simply no evidence of flight. (RB 47.) Campbell cited *Fremont* for the proposition that "[n]o instruction should be given to the jury unless adapted to the evidence and circumstances of the case." (See AOB pp. 39-40.) The problem here is that the flight instruction did not conform to that rule.[3]

For the same reasons, <u>here the flight instruction was given in error because Campbell did not flee.</u> Tenants and staff at the hotel knew Campbell lived in room 58, where the body was. (2RT 49, 76, 94.) <u>Campbell did not attempt to flee when uniformed police officers</u>

---

[3]
Respondent fails to address *People v. Pensinger* (1991) 52 Cal.3d 1210 (See AOB pp. 36-37), or *People v. Saddler* (1979) 24 Cal.3d 671. (See AOB pp. 38-39.)

34

stopped and arrested him. (3RT 179-180, 182.) These acts were insufficient as a matter of law to constitute flight and to support an inference of guilt.

Respondent fails to mention the trial court's violation of the duty not only to instruct on relevant principles of law, but also must "refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." (*People v. Saddler, supra,* 24 Cal.3d at 681.)

Respondent attempts to distinguish *People v. Green* (1980) 27 Cal.3d 1 on the basis that "the defendant there committed the murder in a remote area at night, remained in his home surroundings for two weeks after the crime, contacted police about the victim's movements on the day of the murder, and continued to visit with friends as before." (RB 46-47.) Respondent contrasts Campbell's behavior: "appellant left the victim's body in his residence, did not contact police, and disappeared for five days afterward." (RB 47.) As established above, the facts that Campbell left Denton's body in his room and did not contact the police are not evidence of "flight". Respondent misrepresents the facts when stating that Campbell "disappeared for five days" after the killing. Campbell did not "disappear" – he was staying across the street from the local police station during that period, and the police easily located him following a complaint that he was trespassing. The

35

distinctions respondent has drawn are insignificant.

Accordingly, given insufficient evidence of flight, the trial court's decision to give the CALCRIM No. 3.72 instruction was error.

### C. By Giving CALCRIM No. 372, the Trial Court Lessened the Prosecution's Burden Of Proof and Violated Campbell's 6th and 14th Amendment Rights

Respondent denies that the trial court lessened the prosecutor's burden of proof and violated Campbell's 6th and 14th Amendment rights. (RB 49-51.)

Respondent substantially fails to address Campbell's argument, instead dismissing it as an argument previously rejected by the California Supreme Court. (RB 49-51.) Rather than repeat his argument here, Campbell refers this Court to pages 40-44 of his opening brief. Campbell raises the issue here in order to preserve it for federal review.

### D. Respondent Substantially Fails to Address Campbell's Prejudice Argument

Respondent denies the error was prejudicial, substantially failing to address Campbell's argument.[4] (RB 48-49.)

---

[4]

Respondent also argues, "[w]ithout support, and contrary to *Silva*, [Campbell mistakenly asserts that the *Chapman* harmless error standard applies here. (RB 48, fn. 9.) Due process violations are reviewed for prejudice under the harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, citing *People v. Boyette*

Respondent points to the language of the flight instruction itself and the fact that the jury was further instructed that some of the instructions may be inapplicable depending on the jury's factual findings, and to only follow the instructions "that do apply to the facts as you find them." (RB 48-49.)

Respondent ignores the fact that the flight instruction figured in the prosecutor's closing argument. (4RT 405.) Respondent also ignores the fact that, while Campbell's conduct, though not constituting flight, might be seen as manifesting consciousness of guilt, the nature of the homicide was that it could have been treated as a non-criminal act (self-defense), or as a killing on a spectrum of culpability (murder or manslaughter). Respondent also ignores the fact that the prosecutor overreached by charging Campbell with first degree murder. It is reasonably probable a verdict more favorable to defendant would have resulted had the instruction not been given.

Respondent fails to address appellant's argument that Campbell's jury was never instructed it could consider an absence of flight as an indication of innocence. To the contrary, the flight instruction allowed the jury to infer from Campbell's walking away from his residence – an act that was insufficient as a matter of law to constitute flight – that he was conscious of guilt, and therefore was guilty of the charged offense.

---

(2002) 29 Cal .4th 381, 428; see AOB p. 44.)

The judgment must be reversed, even under the "more likely than not" standard for state law error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) This standard requires Campbell to show only that the error committed by the trial court undermines confidence in the verdict. Respondent ignores the Supreme Court's affirmation that a "'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, citing *People v. Watson, supra*, 46 Cal.2d 818, 837, and *Strickland v. Washington* (1984) 466 U.S. 688, 693-694, 697, 698.)

Respondent ignores Campbell's argument it is reasonably probable that absent the improper and unsupported flight instruction, the jury would not have convicted him of murder, as the evidence did not support a finding of malice. (See discussion at AOB pages 26-31.) The jury acquitted Campbell of first degree murder, but convicted him of second degree murder, where the evidence supported, at most, a manslaughter conviction.

Campbell's conviction must be reversed.

38

IV.    **RESPONDENT SUBSTANTIALLY FAILS TO ADDRESS CAMPBELL'S ARGUMENT THAT HE WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION**

Respondent disagrees that Campbell's counsel was ineffective for failing to request an instruction on "earwitness" identification because respondent contends any such instruction would have been duplicative of the instruction the court gave on how to evaluate the credibility of witness testimonies. (RB 54-60.) Respondent is wrong, and substantially fails to address Campbell's argument.

A.    **Respondent Omits the Facts**

The only percipient witnesses to the killing were Campbell's neighbors, Wendell and Rose. They were not eyewitnesses, but "earwitnesses." Both testified to hearing the sounds of a violent fight coming from Campbell's room. (2RT 44-49, 51, 53-55, 75-79, 95-96.) Wendell testified he heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.)

Rose also testified that before the body was identified as Denton, she believed the person killed in Campbell's room was

Campbell himself, and that his girlfriend had killed him. (2RT 89; 3RT 283.) Rose stated in a recorded police interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 280-282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." She then said she heard Campbell say "No, you let me go." (3RT 280-281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

Campbell testified that he banged on the wall between his unit and Rose's unit and screamed for her to call the police. (3RT 338-339, 347.)

Defense counsel argued to the jury that as Denton was attacking Campbell, Campbell yelled "Call the police" and "help". (4RT 423, 426, 432.) He also argued, "You don't yell for the police when you're murdering someone. You yell for the police when you need help, and it's your life or someone else's, when you need to get out of a situation desperately you will call "Help, call the police." (4RT 437.)

The prosecutor argued Rose believed at the time the police interviewed her that Campbell was dead at the hands of his girlfriend, Angel Dorsey, and that everything Rose said to the police was "filtered through that belief." (4RT 402.) Rose did not hear anyone say "help", but Wendell did. (4RT 403.) The prosecutor emphasized Rose's statement to the police that she heard a female

40

voice saying "Michael, oh, let me go. Let me go," and Campbell say "No, you let me go." (4RT 403.)

### B. Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by The Prosecutor

#### 1. Trial Counsel Failed to Request a Necessary Earwitness Identification Instruction To Help The Jury Assess Rose's Crucial Testimony That She Heard Campbell Yelling for Her to Call The Police; The Instruction Would Not Have Been Duplicative

The prosecutor presented two witnesses to the events that transpired in Campbell's room – neighbors Wendell and Rose. Neither of them saw what happened, but both of them heard the sounds of a fight and someone in Campbell's room yelling for help and to call the police. They were, in effect, "earwitnesses".

Respondent omits the prosecutor's argument to the jury that it was not Campbell who was yelling for help, but Denton, and the prosecutor's suggestion that Campbell had engaged in a species of torture murder:

By the way, "Call the police."

There are many different ways that you can surmise what that meant. Was that a taunt from the defendant to [Denton], "call the police", as he laid there disabled?

41

ctorcase Case 2:20-cv-01530-JWH-SHK   Document 1   Filed 02/14/20   Page 232 of 532   Page ID #:232

The physical evidence would tend to suggest that as the reasonable conclusion.

(4RT 450.)

Respondent omits the fact that the defense used the earwitness testimony to argue in support of self-defense that Campbell was yelling "help" and "call the police" as Denton was attacking him with deadly force. (4RT 423, 426, 432-433, 437.) Thus, the identification of Campbell as the speaker was crucial to the defense case, and the jury needed instructional assistance in making a determination as to what or whom Rose, in particular, heard.  There could be no satisfactory explanation for failure to request the instruction, as Rose's identification of Campbell as the one who was yelling "call the police" was at the core of Campbell's defense.

> (a)   An "Earwitness" Identification Instruction Would Not Be Any More "Duplicative" of CALCRIM No. 226 Than is CALCRIM No. 315 [Eyewitness Identification Factors]

Citing no relevant authority, respondent incorrectly asserts an instruction on earwitness identification factors would be duplicative of CALCRIM 226, which sets out the factors jurors should use in evaluating witness credibility, and which was given in this case. (RB 56-59.) Campbell has been unable to find a single case holding that, in the analogous situation of an eyewitness identification instruction,

42

CALCRIM No. 315 would be duplicative of CALCRIM No. 226.[5]

"A trial court is not obliged to condense the required explanation of a legal rule or concept in a single instruction; a charge is not erroneous or prejudicial simply because a required explanation is given in two instructions rather than one. [Citation.]" (*People v. Felix* (2008) 160 Cal.App.4th 849, at p. 858, citing *People v. Lewis* (2001) 25 Cal.4th 610, 649.) The *Felix* Court was not addressing the issue raised here, but in discussing whether CALCRIM No. 315 improperly limited the factors the jury could consider in evaluating eyewitness testimony, that Court pointed out:

> Aside from CALCRIM No. 315, the jury also received CALCRIM No. 226, which states in pertinent part: "In evaluating a witness's testimony, <u>you may consider *anything* that reasonably tends to prove or disprove the truth or accuracy of that testimony.</u>" (Italics added.) Because CALCRIM No. 315 advised the jury to evaluate an eyewitness as it would "any other witness," CALCRIM No. 315 did not oblige the jury to disregard factors not listed in the instruction. Reasonably viewed, CALCRIM No. 315 directed the jurors' attention to the listed factors, but permitted them to consider other factors.

─────────────

[5] Respondent cites *People v. Canizalez* (2011) 197 Cal.App. 832, 857 and *People v. Gonzales* (2011) 54 Cal.4th 1234, 1276, for the proposition that an "earwitness" identification instruction would have been duplicative in this case because the trial court instructed the jury in the language of CALCRIM No. 226. Neither case addresses the question whether an eyewitness or earwitness instruction would be duplicative of CALCRIM No. 226, so they are not instructive here.

43

(*Felix, supra,* at pp. 858-859.) The *Felix* Court did not perceive any problem of duplication where a jury is instructed in the language of both CALCRIM No. 315 and CALCRIM No. 226; rather, the Court found the instructions enhanced each other, just as an earwitness instruction – or a modified version of CALCRIM No. 315 – would have enhanced CALCRIM No. 226.[6]

Respondent ignores the obvious, which is the rule that an analogous instruction relating *eyewitness* identification to reasonable doubt (CALCRIM No. 315), including any relevant "pinpoint" factors, *must* be given by the trial court on request "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143–1144, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110; *People v. Palmer* (1984) 154 Cal.App.3d 79, 89 [error to refuse defendant's requested instruction on eyewitness testimony].) Respondent fails to

_____

[6]

Citing *People v. Harrison* (2005) 35 Cal.4th 208, 253-254, respondent argues "[Campbell] does not contend that CALCRIM No. 226 was inadequate." (RB 58.) This argument makes no sense. The issue here is not the inadequacy of CALCRIM No. 226. The issue is whether Campbell required a pinpoint instruction on earwitness identifications in addition to other instructions given.

address any of the authorities Campbell cited in connection with eyewitness identifications.

Where there is earwitness testimony and a conflict as to the identity of the speaker, jurors should be given some guidance on how to determine whether a voice identification is reliable. (See *People v. Wright, supra,* 45 Cal.3d 1126, 1138-1139 ["model instruction, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors."].)

Campbell was prosecuted for murder based in part on the earwitness identifications made by Wendell and Rose. Because the parties disagreed on the identity of the person yelling "call the police" and "help" during the fight, it follows that Campbell was entitled to an instruction on factors to be considered in evaluating the reliability of earwitness identification testimony, just as he would have been entitled to a jury instruction on eyewitness identification, had this case depended on it. It was trial counsel's duty to request such an instruction, yet he failed to do it. Because an "earwitness" instruction would not have been duplicative and Campbell was entitled to it, trial counsel rendered ineffective assistance. (*Strickland v. Washington, supra,* 466 U.S. 668, 687.)

45

     **(b)**    **Respondent Fails to Address Any of Campbell's Argument as to Why an Earwitness Identification Instruction Was Necessary**

In his opening brief, Campbell offered a discussion of the necessity for instruction on earwitness identification factors. (See AOB pp. 54-58.) Respondent addresses none of it.

Rather than repeat that discussion here, Campbell refers this Court to pages 54-58 of his opening brief.

     **2.**    **There is a Reasonable Probability that a More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction**

Respondent denies there is a reasonable probability that a more favorable result would have been obtained in the absence of counsel's failure.  (RB 59-60.)

Instead of addressing the substance of Campbell's prejudice argument, respondent reiterates its argument that a pinpoint instruction would have been "duplicative" and calls Campbell's argument "speculative". (RB 59.)  Rather than repeat his argument here, Campbell refers this Court to pages 58 through 59 of his opening brief.

46

V.    **PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL**

Respondent disagrees that Campbell was denied his federal constitutional rights when the prosecutor engaged in misconduct during closing argument and defense counsel failed to object. (RB 60-75.) Respondent also argues that the issue is forfeited because trial counsel failed to object. (RB 61, 66-67.) Respondent is wrong.

A.    **Respondent Omits Some of the Relevant Proceedings**

Respondent omits some of the relevant proceedings. (RB 61-66.)

1.    **Prosecutor's Opening Argument**

Respondent omits the following details the prosecutor presented in opening argument: Dorsey saw no injuries on Campbell (4RT 407); Campbell showed consciousness of guilt by making false and misleading statements to the police about where he lived (4RT 409-410); and Campbell was guilty because he told the police, when asked what happened to Denton, "I got to be quiet about that" and "I am the only witness." (4RT 410-411.)

Respondent omits some of the prosecutor's argument as to why the jury should find first-degree murder: (1) Campbell could not give a reasonable explanation for how Denton ended up bare chested (4RT 417); (2) Denton had bite marks on the upper part of

47

his body (4RT 417-418); (3) neighbor Wendell heard noises of a fight going on for 30 minutes, but when security knocked on the door the room was silent (4RT 418); (4) Campbell locked the door before leaving Denton's body in his room, suggesting consciousness of guilt (4RT 418); (7) Campbell never returned to his room after that, also suggesting consciousness of guilt (4RT 418); (8) Campbell went to Angel Dorsey's house, suggesting consciousness of guilt (4RT 418); (9) Campbell did not report the killing to the police, suggesting consciousness of guilt (4RT 418); and (10) Campbell told the police he was the only witness. (4RT 418.)

### 2.    Defense Closing Argument

Respondent omits some of the defense closing. Defense counsel argued that Campbell's testimony he invited Denton to go out to the clubs with him for New Year's Eve and went through his closet for some clothes for Denton to wear was supported by the array of clothes found laid out on Campbell's bed. (4RT 421.) When Campbell noticed his cell phones were missing, he confronted Denton, and Denton attacked him. (4RT 422.) Denton picked Campbell up and threw him to the floor. (4RT 422.) Campbell was trapped in his room and tried to reach the door while struggling with Denton, accounting for the blood smear on the door. (4RT 422.)

Campbell grabbed Denton from behind and tried to throw him, ripping Denton's tank top in the process. (4RT 422.) Campbell noted that the tank top itself was not in evidence, and that the

prosecutor relied on photographs of the front of the top so the jury could not examine it for the damage Campbell described. (4RT 422.) Photographs of the room indicated Campbell threw everything he had at Denton in a desperate attempt to stop the attack. (4RT 422.)

When Denton got Campbell in a choke hold, Campbell bit him; but Denton taunted him and then strangled him with the cord of an electric iron. (4RT 423.) At that point Campbell yelled for Rose to call the police as he swung wildly at Denton with the iron, killing him. (4RT 423-424.)

After discussing the jury instructions on homicide and burden of proof (4RT 424-430), defense counsel asked the jury to examine the prosecutor's theory that Campbell invited Denton back to his room in order to murder him. (4RT 431.) <u>After 30 minutes of fight noises, someone said, "Call the police," but the prosecutor wanted the jury to ignore the struggle and all of the other sounds Wendell and Rose heard.</u> (4RT 431.) Campbell neither hid the body nor attempted to scrub down his room, but instead went to his girlfriend's house and stayed there for five or six days. (4RT 431.) Defense counsel argued the prosecutor's theory made no sense. (4RT 431.)

Both Wendell and Rose testified they heard a fight. (4RT 432.) After 20 to 25 minutes of fight noises, Rose heard Campbell's voice saying, "Call the police", and she went to Wendell's room and asked him to call. (4RT 432.) <u>The prosecutor wanted the jury to believe that</u>

Campbell murdered Denton and then asked Rose to call the police. (4RT 432-433.) In reality, Campbell was yelling out of desperation because Denton was attacking him. (4RT 433.)

Defense counsel stated the prosecutor would argue in rebuttal about how Denton lived with his grandmother, but the grandmother was in Ventura and had not heard from Denton in days, but did not file a missing person report. (4RT 433.) Denton went to Los Angeles not just because he wanted to visit his father on skid row, but to "hang out" in the neighborhood. (4RT 433.)

Defense counsel pointed out how sloppy the police were when they entered Campbell's room. (4RT 433-434.)

Defense counsel argued that the wounds on Denton's knuckles were from hitting the walls and hitting Campbell, and that there were no defensive wounds on Denton's forearms. (4RT 434.) Campbell bit Denton in a desperate attempt to fight him off. (4RT 434.)

Defense counsel pointed out that Denton had a blood alcohol level of .212 – three times the legal limit. (4RT 434.) A presumptive test indicated Denton was high on methamphetamine and ecstasy. (4RT 434.) The subsequent test that negating those findings was not produced by the prosecutor. (4RT 434-435.)

Defense counsel referred to Detective Sharman's testimony about the blood in front of the room and argued it was important because it confirmed the fact that Campbell was attempting to get

50

out, or get Denton out of his room. (4RT 435.) Campbell had no other choice than to bite and hit Denton, because Denton was in a rage and was trying to choke him to death. (4RT 436.) The injuries were to the front of Denton's head because he was strangling Campbell and could not block the blows. (4RT 436-437.) Campbell yelled for the police as this was going on. (4RT 437.) If Campbell had been murdering Denton, he would not have asked anyone to summon the police. (4RT 437.)

The coroner indicated that Campbell had injuries that were inflicted six days prior to his arrest. (4RT 437.)

### 3.    Prosecutor's Rebuttal Argument

Respondent "summarizes" the prosecutor's rebuttal argument, for the most part omitting the details. (RB 64-65.)

The prosecutor began with an argument about circumstantial evidence. (4RT 440, 442.) She discussed the jury instruction on credibility of witnesses. (4RT 440-441.)

For the first time on rebuttal, the prosecutor referred to "the physical evidence, the photographic evidence, the video evidence". (4RT 441.) For the first time, the prosecutor called the jury's attention to Campbell's testimony on cross-examination that he did not know where the missing cell phone landed "because the lights were out and we had the stereo lit up...." (4RT 441.) The prosecutor argued:

> That little comment that came out just when he's talking, and the judge asked him a question that threw everything that he said out the window. Never

mind how the physical evidence didn't match it, but wait, the lights were out?

You were looking for clothes? For [Denton] to wear in the dark?

The bottom line is the defendant did not tell the truth about that night when he testified. He didn't talk about that night in his interview. He had to be quiet on that.

(4RT 442, 445 [". . . the defendant was looking in the closet of the room that didn't have any lights on for (Denton) to find clothes . . ..], 450 ["We talked already about his odd answer on the stand about it being dark."].)

The prosecutor returned to her argument about consciousness of guilt and hiding evidence, making more detailed arguments about how Campbell must have cleaned himself up before he left the hotel, and how he left Denton's body to "rot". (4RT 443-444.)

The prosecutor reserved for "rebuttal" argument all of the details about the injuries Campbell inflicted on Denton. For the first time, the prosecutor argued:

. . . I mean, realistically speaking, never mind the fact that if you're hitting somebody across the body holding an iron you're only going to be able to hit certain portions, certainly not the side of the top of the head and all the different areas on both sides, and that somebody would actually stay there for it when they were getting hit like that if they had the ability to move away.

52

> And if [Denton] was actually strangling the
> defendant with a cord to the point of dizziness and
> almost passing out, believing his life was going to end,
> How on earth would he be on his side? He would be
> behind him, pulling it tight, and thus not available to be
> struck in such a manner. It just makes sense. There is
> really no other way.

(4RT 443-444.)

During rebuttal the prosecutor argued for the first time
regarding timing of the killing. She stated that Denton left the room
twice, not once as Campbell had testified. (4RT 446.) She pointed out
that Denton went back to Campbell's room the second time at 10:25
p.m., and that Wendell was awakened by the sounds of a fight
around 11:30 or 11:40 p.m. – around an hour later – which conflicted
with Campbell's testimony that he confronted Denton about the
missing cell phones immediately upon Denton's return. (4RT 446.)

The prosecutor also argued for the first time that Campbell's
testimony regarding how Denton was dressed during the attack did
not add up, in that Denton was wearing a shirt when he walked into
Campbell's room the second time, and that suddenly Denton was
wearing a tank top during the fight. (4RT 447.) The prosecutor also
argued that – contrary to Campbell's testimony – the tank top was
not torn, and that she had a photograph to prove it. (4RT 447, 452.)

The prosecutor argued for the first time – referring to the
photographs – that the physical evidence found at the scene showed
that Denton was not wearing the long-sleeved shirt he had been

wearing when he was in the hallway, and that he had a naked chest and bite marks on his arms. (4RT 449.) The prosecutor asked, "If you are choking somebody out and your arm is around [sic], how do you get a bite mark on your hand?" (4RT 449.) The prosecutor also argued for the first time that if Denton had been wearing the tank top, the staples would not have been embedded in his chest. (4RT 449.)

The prosecutor also urged the jury, for the first time, to "[l]ook at the location of the iron blows on [Denton's] head in deciding defendant's story." (4RT 449.) The prosecutor argued:

> All of these pictures are worth thousands of words, but none of those thousands of words were reflected in the defendant's testimony, because none of the evidence was explained appropriately, consistently by the defendant where it would actually match up to the evidence at the scene that was not preserved because he locked the door and left [Denton] to rot.

(4RT 449.)

The prosecutor did not mention the cell phones in her opening argument, but in "rebuttal" she harped on them, asking the jury to consider what happened to the cell phones, referring to Detective Sharman's testimony that no cell phones were found in Campbell's room. (4RT 450.)

The prosecutor did not discuss the physical evidence in her opening argument, but she devoted significant time on "rebuttal" referring to the photographs of the scene. (4RT 450-454.) She talked

54

about blood spatter and smear, and how it did not match up with Campbell's account of the fight. (4RT 451-452.) She addressed the glove on one of Denton's hands, which <u>she never mentioned on opening, and which defense counsel did not address.</u> (4RT 451.)

The prosecutor argued for the first time that Campbell lied about falling asleep immediately after the fight because Denton's blood was on a cigarette Campbell must have smoked before he fell asleep. (4RT 448, 453.)

<u>Finally, respondent omits these critical facts. Other than mentioning voluntary manslaughter in passing (4RT 412), the prosecutor did not address the substance of the manslaughter issue during her opening argument. On rebuttal,</u> she attacked any basis <u>for a voluntary manslaughter conviction based on imperfect self-defense and heat of passion.</u> (4RT 454-456.)

## B.    Respondent Omits the Standards of Review

Respondent fails to mention the standards of review. Rather than repeat them here, Campbell refers this Court to pages 68-69 of his opening brief.

## C.    The Issue is Not Forfeited Because Trial Counsel Was Ineffective For Failing to Object

Respondent gloats that Campbell "concedes that defense counsel did not object, yet does not assert that one of these exceptions [to forfeiture] applies." (RB 66.) To the contrary, <u>Campbell has argued</u> that his trial counsel was ineffective for failing

55

to object to the misconduct, and that this Court should, therefore, address the issue on appeal. (See AOB p. 69.)

### D.   The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal

Respondent disagrees that the prosecutor sandbagged the defense by saving virtually her entire closing argument for rebuttal. (RB 67-72.) Instead, respondent claims that, because the prosecutor's rebuttal was shorter than her opening argument and because the prosecutor's argument "was responsive to the self-defense theory asserted in defense counsel's closing argument", there was no misconduct. (*Ibid.*)

### 1.   Respondent Omits Some of the Governing Law

Respondent fails to address *People v. Smithey, supra,* 20 Cal.4th 936, 960; *People v. Pitts* (1990) 223 Cal.App.3d 606, 691, citing *Berger v. United States* (1934) 295 U.S. 78, 88; see *People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Daggett* (1990) 225 Cal.App.3d 751, 759, or *People v. Bandhauer* (1967) 66 Cal.2d 524, 531. Campbell discussed all of these authorities at pages 69 through 71 of his opening brief.

### 2.   The Prosecutor Improperly Sandbagged the Defense in Rebuttal Argument

Respondent claims the prosecutor's closing argument was merely responsive to the defense closing argument, and it did not constitute "sandbagging" because the rebuttal argument was shorter than the prosecutor's opening argument. (RB 68-69.) Respondent

also claims the prosecutor covered certain facts in opening argument that Campbell contends were not covered until rebuttal. (RB 69-72.) Respondent is wrong on all points.

Respondent also cites *People v. Centeno* (2014) 60 Cal.4th 659, 667, and *People v. Frye* (1998) 18 Cal.4th 894, 970, for the proposition that "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, in the context of the whole argument and the instructions, there was a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (RB 67.) This rule cannot apply here, because the issue lies not in the substance of the prosecutor's comments, but in the fact that the defense was deprived of the opportunity to respond to the arguments, since the prosecutor made the remarks for the first time in "rebuttal."

Respondent quibbles about the length of the prosecutor's opening and rebuttal arguments, claiming *People v. Robinson* (1995) 31 Cal.App.4th 494 is distinguishable because in that case "the prosecutor's rebuttal argument was 10 times longer than his initial closing argument, constituting some 35 pages of reporter's transcript as compared to the three-and-one-half page initial closing argument."[7] (RB 68-69.) Campbell contends that, even if the length of

---

[7]

Here respondent misstate's Campbell's argument, claiming that "contrary to [Campbell's] contention (AOB 72 [claiming the initial closing argument was shorter than the rebuttal]), the prosecution's

57

the prosecutor's rebuttal argument was substantially similar to the length of rebuttal, it was the *substance* of the prosecutor's opening argument that was artfully slender, in that most of it addressed consciousness of guilt evidence, not the physical evidence. If this Court examines the record, the Court will see that on rebuttal the prosecutor gave a full closing argument immune to defense reply in which she covered most of the physical evidence – not just a rebuttal to Campbell's self-defense argument. The effect was the same as the error in *Robinson* – the substance of the prosecutor's case was presented solely on rebuttal, and the defense was deprived of the opportunity to address it.

Again, allowing the prosecutor to give such an opening argument without providing Campbell an opportunity to respond to her rebuttal argument accorded the prosecution an undue advantage and prejudiced Campbell's defense. Section 1093 does not permit the prosecutor to manipulate the order of argument to the defendant's detriment. This was essentially the type of sandbagging denounced in *Robinson, supra*, even though the length of the opening argument was substantially similar to that of the rebuttal argument; here, the prosecutor focused nearly exclusively on consciousness of guilt

_____

rebuttal argument (19 transcript pages) was shorter than her initial closing argument (23 transcript pages) by four pages." (RB 69.) The length of the prosecutor's opening and rebuttal arguments is not the issue. It is the sneaky withholding of the substance of the prosecutor's argument until rebuttal that is at issue here.

evidence in her opening argument, saving all of her discussion of the physical evidence for rebuttal.

Citing *People v. Bryden* (1998) 63 Cal.App.4th 159, 184, and *People v. Hill* (1967) 66 Cal.2d 536, respondent argues "*Robinson* error does not occur simply because the prosecutor discussed some pieces of evidence in her rebuttal that she did not mention or equally emphasize in her initial argument." Those cases are specific to their facts, and are not comparable to Campbell's case. In *Bryden*, for example, the issue was regarding the prosecutor's use of one piece of evidence; here, it was most of the evidence supporting the prosecution case that was left for discussion on rebuttal.

More specifically, the defense had no opportunity to address the prosecutor's arguments that:

- Campbell lied when he said he did not know where the cell phone landed after he tossed it because the lights in the room were off (4RT 441);

- Campbell's "story" is exposed as a lie because he said the lights were off when he was looking in the closet for clothes for Denton (4RT 442, 445);

- Campbell could not have hit the side and top of Denton's head with the iron if he was hitting him across his body as Campbell had testified (4RT 443-444);

- Denton would not have stayed in a position to be struck that way had he been able to escape (4RT 443-444);

59

- If Denton was strangling Campbell with the cord as Campbell described, Denton could not have been in a position to be struck on the side of the head (4RT 443-444);

- Denton left the room twice, not once as Campbell testified (4RT 446);

- According to Wendell, the fight started about an hour after Denton returned to Campbell's room, not immediately after (4RT 446);

- Campbell's testimony about how Denton was dressed did not add up (4RT 447);

- The tank top Denton was wearing was not ripped, as Campbell claimed (4RT 447, 452);

- The physical evidence showed that Denton was not wearing the long-sleeved shirt he had been wearing in the hallway when he was killed, that his chest was bare and he had bite marks on his arms (4RT 449);

- Denton could not have received a bite mark on his hand if he was holding Campbell around the neck and strangling him as Campbell had described (4RT 449);

- Had Denton been wearing the tank top at the time Campbell used the stapler against him, the staples would not have been embedded in his chest (4RT 449);

- The jury should consider the location of the iron strikes in evaluating Campbell's story (4RT 449);

- The photos were "worth thousands of words", but those words were not in Campbell's testimony because Campbell did not explain the evidence adequately, and the evidence was destroyed because Campbell let Denton's body rot in his room (4RT 449);

- The jury should speculate as to what happened to the two cell phones Campbell said Denton had taken, because one of the detectives said no cell phones were found in Campbell's room (4RT 450);

- According to the photographs, blood spatter and smear did not match up with Campbell's account of the fight (4RT 451-452);

- There was no explanation for the glove found on one of Denton's hands (4RT 451);

- Campbell lied about falling asleep immediately after the fight because Denton's DNA was on a cigarette butt in the ash tray (4RT 448, 453);

- There was no basis for a voluntary manslaughter conviction based on imperfect self-defense or heat of passion (4RT 454-456.)

None of the above comments could fairly be characterized as rebuttal to Campbell's closing argument. <u>The prosecutor knew what the evidence was when she offered her opening argument.</u> <u>Nonetheless, she saved all comment on the physical evidence for</u>

61

"rebuttal" argument. This was misconduct.[8] (*People v. Robinson,
supra,* 31 Cal.App.4th 494, 505.)

E.    **Defense Counsel's Failure to Object to the
Prosecutor's Misconduct Denied Campbell His Sixth
Amendment Right to Effective Assistance of Counsel**

Counsel provided ineffective assistance when he failed to
make a timely objection to the prosecutor's improper rebuttal
argument, or to request an opportunity to respond in surrebuttal, or
to move for a mistrial. By failing to do so, he provided ineffective
assistance of counsel.

1.    **Standard For Evaluating Claims of Ineffective
Assistance of Counsel**

Campbell incorporates by reference his discussion of the law
of ineffective assistance of counsel set out in Argument III., section
B., at pages 49-51 of his opening brief.

2.    **Trial Counsel Was Ineffective**

The record establishes the error – defense counsel's failure to
object to a patently improper tactic, namely, the prosecutor's
sandbagging the defense by reserving the bulk of her closing
argument for rebuttal and thereby precluding defense response. A
reasonably competent attorney would have preserved this

---

[8]
Respondent argues that "this is not a case of cumulative
prosecutorial misconduct". (RB 71-72.) Campbell has not argued
that it was, so there is no point to respondent's statement.

meritorious issue for appellate review by making a timely objection on the correct basis. (See *People v. Jackson* (1986) 187 Cal.App.3d 499, 506; *In re Christina P.* (1985) 175 Cal.App.3d 115, 129-130.) By failing to timely object to the unfair argument on the basis it was improper rebuttal, counsel waived a meritorious issue on appeal.

There could be no possible tactical reason for, or advantage to the defense in allowing the prosecution to present opening argument that primarily addressed consciousness of guilt evidence, but not the physical evidence, and to sandbag the defense with rebuttal argument. Counsel must know the law as it relates to the case he is trying. (*People v. Zimmerman* (1980) 102 Cal.App.3d 647, 657; *People v. McCary* (1985) 166 Cal.App.3d 1.) Respondent counters that because "defense counsel told the jury that the prosecutor was going to use the rebuttal to address issues he raised during his argument", defense counsel indicated he understood the scope of what the prosecutor could do in the rebuttal, and without any error by the prosecutor in her rebuttal, there was a tactical reason for counsel not to object, seek a sur-rebuttal, or move for a mistrial." (RB 74.) It does not matter what defense counsel told the jury about the nature of rebuttal argument when he had not yet heard that argument. He was still obligated to listen to what the prosecutor said on rebuttal and to object if that argument was improper. There is no tactical reason in allowing a prosecutor to sandbag the defense as she did here, leaving the jury with damaging suggestions from the prosecutor that

63

the defense had no opportunity to address.

### 3. Respondent Substantially Fails to Address Campbell's Prejudice Argument

Respondent fails to address Campbell's prejudice argument. Rather than repeat it here, Campbell refers this Court to pages 77 through 81 of his opening brief.

## CONCLUSION

For the foregoing reasons, Campbell's conviction should be reversed.

DATED: January 22, 2019                 Respectfully submitted,


GAIL HARPER
Attorney for Appellant

## CERTIFICATE OF WORD COUNT

I, Gail Harper, counsel for appellant, certify pursuant to the California Rules of Court, that the word count for this document is 14,679 words, excluding the tables, this certificate and any attachments. This document was prepared in WordPerfect X3, and this is the word count generated by the program for this document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on January 22, 2019.

_____

GAIL HARPER
Attorney for Appellant

65

## PROOF OF ELECTRONIC SERVICE
## AND SERVICE BY MAIL

I am employed in the county of San Francisco, California; I am over the age of eighteen years and not a party of the within entitled cause; my business address is P. O. Box 330057, San Francisco, CA 94133.

Documents submitted electronically are transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies through the mail via the United States Postal Service or a commercial carrier.

On January 22, 2019, I electronically served the attached APPELLANT'S REPLY BRIEF in *People v. Campbell* (B288428) by transmitting a true copy via this Court's TrueFiling system to the Los Angeles County District Attorney; the Department of Justice, Office of the Attorney General; and California Appellate Project, Los Angeles.

On January 22, 2019, I served the same document by mail on:

Michael Campbell BF6189
Wasco State Prison
P.O. Box 5500 B-5  217-A

Wasco, CA 93280

The Hon. Curtis B. Rappe
c/o Clerk, Superior Court
111 North Hill Street

Los Angeles, CA 90012

Michael Waldinger
Office of the APD
210 W Temple Street

18th Floor
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on January 22, 2019, at San Francisco, California.

The End: January 22nd 2019

GAIL HARPER

66

Los Angeles County Superior Court: Honorable Curtis B. Rappe

October 30th 2018            (Affirmed)

# EXHIBIT E

10/30/2018

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL CAMPBELL,<br><br>Defendant and Appellant. | Case No. B288428 |

Los Angeles County Superior Court, Case No. BA442781
The Honorable Curtis B. Rappe, Judge

RESPONDENT'S BRIEF (THEM)

October 30th 2018

Pages 1-77

XAVIER BECERRA
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
LANCE E. WINTERS
Senior Assistant Attorney General
PAUL M. ROADARMEL, JR.
Supervising Deputy Attorney General
CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6356
  Fax: (213) 897-2263
  E-mail: DocketingLAAWT@doj.ca.gov
      Charles.Sarosy@doj.ca.gov
*Attorneys for Respondent*

1

# TABLE OF CONTENTS

Page

Introduction.................................................................12

Statement of the Case .................................................14

Statement of Facts......................................................15

    A.   Prosecution evidence........................................15

        1.   Appellant and the victim, Brian
            Denton, walk into appellant's
            apartment...............................................15

        2.   Appellant's neighbors hear sounds
            of fighting coming from his
            apartment and call building
            security ..................................................16

        3.   The next day, appellant leaves his
            apartment, locks his door, and tells
            his ex-girlfriend that Denton is
            dead in his apartment after they
            fought the night before .........................17

        4.   Denton's body is found in
            appellant's apartment five days
            after appellant left, and appellant
            is arrested the next day.........................19

        5.   An autopsy of Denton reveals a
            skull fracture and 22 lacerations to
            his head and face....................................21

    B.   Defense evidence..............................................22

    C.   Rebuttal evidence..............................................26

Argument.....................................................................26

    I.   The trial court had no duty to instruct, sua
       sponte, on sudden quarrel or heat of passion
       voluntary manslaughter as a lesser included
       offense of murder .......................................26

# TABLE OF CONTENTS
## (continued)

Page

A.   Proceedings below ............................................28

B.   There was no substantial evidence supporting a sudden quarrel or heat of passion voluntary manslaughter instruction .........................................................29

C.   In any event, any error was harmless because it is not reasonably probable the jury would have accepted a heat of passion theory after rejecting appellant's self-defense theories based on the same evidence ...............................................36

II.   Appellant forfeited his claim that the court erred in giving a flight instruction; in any event there was no error and any potential error was harmless; counsel's lack of objection to the instruction did not constitute ineffective assistance ..................................................40

A.   Proceedings below ...........................................41

B.   Appellant forfeited the claim...........................42

C.   It was not error to give the flight instruction when appellant left his apartment the day after killing Denton, locked his door, told his ex-girlfriend that Denton was dead in his apartment, and did not return to his apartment for several days.......................................................43

D.   Any potential error was harmless...................48

E.   The flight instruction did not lessen the prosecutor's burden of proof and thus did not violate appellant's federal constitutional rights .......................................49

3

TABLE OF CONTENTS
(continued)

Page

    F.    Appellant's ineffective assistance of counsel claim fails ............................................. 51

III.  Defense counsel's failure to request an "earwitness" identification instruction was not ineffective because any such instruction would have been duplicative ................................................. 54

    A.    Proceedings below ............................................. 55

    B.    Any "earwitness" identification instruction of the kind appellant now seeks would have been duplicative ................. 55

IV.  Appellant forfeited his prosecutorial error claim; but in any event there was no prosecutorial error during the closing rebuttal argument and any potential error was harmless; and the ineffective assistance claim fails as well ................................................. 60

    A.    Closing arguments ............................................. 61

    B.    Appellant forfeited his prosecutorial error claim ............................................. 66

    C.    The prosecutor's rebuttal argument was shorter than her initial closing argument and was responsive to the self-defense theory asserted in defense counsel's closing argument ............................................. 67

    D.    In any event, any error was harmless ............ 72

    E.    Defense counsel's decision to not object during the rebuttal argument was not ineffective assistance of counsel ....................... 74

Conclusion ................................................................. 76

4

## TABLE OF AUTHORITIES

Page

### CASES

*Beck v. Alabama*
　　(1980) 447 U.S. 625.................................................................. 36, 37

*Chapman v. California*
　　(1967) 386 U.S. 18............................................... 27, 36, 48, 72, 73

*Harris v. Reed*
　　(1989) 489 U.S. 255................................................................43

*Hopkins v. Reeves*
　　(1998) 524 U.S. 88................................................................37

*People v. Abilez*
　　(2007) 41 Cal.4th 472.......................................................... 44, 45

*People v. Arredondo*
　　(1975) 52 Cal.App.3d 973 .................................................. 42, 43

*People v. Avena*
　　(1996) 13 Cal.4th 394................................................................52

*People v. Beltran*
　　(2013) 56 Cal.4th 935.......................................................... 31, 34, 36

*People v. Bolin*
　　(1998) 18 Cal.4th 297................................................................51

*People v. Bonilla*
　　(2007) 41 Cal.4th 313.......................................................... 44, 53

*People v. Bradford*
　　(1997) 14 Cal.4th 1005.................................................. 44, 46, 48

*People v. Breverman*
　　(1998) 19 Cal.4th 142........................... 29, 30, 31, 35, 36, 37, 38

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Brooks*
   (2017) 3 Cal.5th 1, 63.................................................................50

*People v. Brown*
   (2003) 31 Cal.4th 518............................................................66

*People v. Bryden*
   (1998) 63 Cal.App.4th 159 ...................................... 66, 68, 71, 73

*People v. Canizalez*
   (2011) 197 Cal.App.4th 832 ........................................ 56, 58

*People v. Centeno*
   (2014) 60 Cal.4th 659........................................ 60, 67

*People v. Clair*
   (1992) 2 Cal.4th 629.................................................73

*People v. Cook*
   (2006) 39 Cal.4th 556.................................................56

*People v. Crandell*
   (1988) 46 Cal.3d 833 ................................................46

*People v. Crayton*
   (2002) 28 Cal.4th 346................................................46

*People v. Doolin*
   (2009) 45 Cal.4th 390................................................68

*People v. Farley*
   (1996) 45 Cal.App.4th 1697 .......................................49

# TABLE OF AUTHORITIES
## (continued)

Page

*People v. Fernandez*
   (2013) 216 Cal.App.4th 540 ............ 43, 53, 59, 67, 69, 70, 71, 74

*People v. Flood*
   (1998) 18 Cal.4th 470 .................................................................42

*People v. Fremont*
   (1937) 22 Cal.App.2d 292 .........................................................47

*People v. Frye*
   (1998) 18 Cal.4th 894 .................................................................68

*People v. Gionis*
   (1995) 9 Cal.4th 1196 ......................................................... 72, 73

*People v. Gonzales*
   (2011) 54 Cal.4th 1234 ...............................................................58

*People v. Gray*
   (2005) 37 Cal.4th 168 .................................................................52

*People v. Green*
   (1980) 27 Cal.3d 1 ............................................................. 46, 47

*People v. Guiuan*
   (1998) 18 Cal.4th 558 .................................................................44

*People v. Gutierrez*
   (2009) 45 Cal.4th 789 .................................................................56

*People v. Harrison*
   (2005) 35 Cal.4th 208 .................................................................58

TABLE OF AUTHORITIES
(continued)

Page

*People v. Hernández Ríos*
  (2007) 151 Cal.App.4th 1154 .................................................... 50

*People v. Hill*
  (1967) 66 Cal.2d 536 ......................................................... 68, 71

*People v. Katzenberger*
  (2009) 178 Cal.App.4th 1260 ................................................ 72

*People v. Larsen*
  (2012) 205 Cal.App.4th 810 ................................................. 36

*People v. Lucas*
  (1995) 12 Cal.4th 415 ........................................................ 51, 53

*People v. Lucas*
  (2014) 60 Cal.4th 153 ......................................................... 53

*People v. Mackey*
  (2015) 233 Cal.App.4th 32 .................................................. 56

*People v. Martinez*
  (1990) 20 Cal.4th 225 ......................................................... 46

*People v. Mendoza*
  24 Cal.4th 130 ................................................................... 50

*People v. Mendoza Tello*
  (1997) 15 Cal.4th 264 ........................................................ 52

*People v. Milner*
  (1988) 45 Cal.3d 227 ......................................................... 72

TABLE OF AUTHORITIES
(continued)

Page

*People v. Moon*
  (2005) 37 Cal.4th 1.................................................................56

*People v. Moye*
  (2009) 47 Cal.4th 537.......... 29, 30, 31, 32, 33, 34, 35, 38, 39, 40

*People v. Oropeza*
  (2007) 151 Cal.App.4th 73........................................................30

*People v. Panah*
  (2005) 35 Cal.4th 395..............................................................66

*People v. Parson*
  (2008) 44 Cal.4th 332....................................................... 66, 73

*People v. Price*
  (2017) 8 Cal.App.5th 409.................................................. 44, 50

*People v. Reyes*
  (2016) 246 Cal.App.4th 62.......................................................71

*People v. Robinson*
  (1995) 31 Cal.App.4th 494................................ 68, 69, 71, 72, 74

*People v. Romero*
  (2015) 62 Cal.4th 1.................................................................53

*People v. Sakarias*
  (2000) 22 Cal.4th 596..............................................................29

*People v. Sanchez*
  (2016) 63 Cal.4th 665..............................................................72

TABLE OF AUTHORITIES
(continued)

Page

*People v. Silva*
   (1988) 45 Cal.3d 604 ............................................................... 48

*People v. Stowell*
   (2003) 31 Cal.4th 1107 .......................................................... 42

*People v. Thomas*
   (2012) 53 Cal.4th 771 ............................................................ 29

*People v. Thompson*
   (2010) 49 Cal.4th 79 ............................................. 43, 53, 67, 74

*People v. Virgil*
   (2011) 51 Cal.4th 1210 .......................................................... 42

*People v. Waidla*
   (2000) 22 Cal.4th 690 ............................................................ 30

*People v. Watson*
   (1956) 46 Cal.2d 818 .............................. 27, 36, 43, 48, 72, 73

*People v. Watson*
   (1977) 75 Cal.App.3d 384 ...................................................... 47

*Schad v. Arizona*
   (1991) 501 U.S. 624 ............................................................... 37

*Strickland v. Washington*
   (1984) 466 U.S. 668 ................................. 51, 52, 55, 60, 74

TABLE OF AUTHORITIES
(continued)

Page

**STATUTES**

Penal Code
§ 187, subd. (a) ....................................................... 14, 30
§ 192 ........................................................................ 30
§ 192, subd. (a) ....................................................... 30
§ 1093, subd. (e) ..................................................... 68
§ 1127 ...................................................................... 56
§ 1127c .............................................................. 43, 44
§ 1192.7, subd. (c)(23) ........................................... 14
§ 1259 ...................................................................... 42
§ 12022, subd. (b)(1) ............................................... 14

**CONSTITUTIONAL PROVISIONS**

Cal. Const., Article VI, § 13 ........................................ 43

**OTHER AUTHORITIES**

CALCRIM No.
226 ................................................................. 56, 58, 59
315 .......................................................................... 55
372 ................................................................ 40, 41, 50
522 .......................................................................... 28
570 ................................................................ 28, 32, 40
571 .......................................................................... 28
640 .......................................................................... 28

CALJIC No. 2.52 ........................................................ 50

House of Delegates, Resolution 100B (August 9-10, 2010) ............ 60

11

## INTRODUCTION

Late at night, two of appellant's neighbors heard banging and yelling coming from appellant's apartment. The next morning, appellant left his apartment and told his ex-girlfriend that the body of their friend, Brian Denton, was in his apartment and that he died after they fought the night before. Denton died from blunt head trauma, and suffered a skull fracture and multiple lacerations to his head and face. Appellant testified at trial that Denton took his two cellphones and that he killed Denton in self-defense when Denton reacted to the accusation by repeatedly wrestling, punching, and choking him. The jury convicted appellant of second degree murder.

Appellant asserts two instructional errors, three ineffective assistance of claims, and a prosecutorial error claim. All of these claims lack merit. First, appellant asserts the trial court erred in failing to sua sponte instruct the jury on sudden quarrel or heat of passion voluntary manslaughter in addition to reasonable self-defense and imperfect self-defense. However, there was insufficient evidence to support the subjective element for such an instruction, and appellant's testimony negated the substance of the instruction. Also, any potential error was harmless.

Second, appellant contends the trial court erred in giving a flight instruction. The claim is forfeited because defense counsel did not object and, in any event, substantial evidence

demonstrated that appellant left the crime scene once he realized Denton was dead, locked his apartment door, and did not return to his apartment. Any alleged error was harmless, and appellant's ineffective assistance claim fails.

Third, appellant asserts an ineffective assistance of counsel claim based on counsel's failure to request an "earwitness" identification instruction that provided the jury a list of factors to evaluate the testimonies of appellant's two neighbors who heard the fighting. Such an instruction would have been duplicative of an instruction already given by the court; thus, there was a tactical reason for not requesting an "earwitness" instruction. Additionally, no prejudice can be shown.

Fourth, appellant argues the prosecutor "sandbagged" defense counsel by saving her arguments regarding the physical evidence for the rebuttal closing argument, thereby preventing a response from defense counsel. Appellant concedes the claim is forfeited because counsel did not object. There was also no error because the prosecutor's rebuttal was shorter than her initial closing argument, and more importantly, the rebuttal was a fair response to defense counsel's self-defense theory that permeated his closing argument. Any potential error was harmless, and appellant's related ineffective assistance claim also fails. The judgment should therefore be affirmed.

13

## STATEMENT OF THE CASE

In a one-count amended information filed by the Los Angeles County District Attorney's Office, appellant was charged with murder (Pen. Code, § 187, subd. (a)).[1] (1CT 109.) It was further alleged that appellant personally used a deadly and dangerous weapon, a clothing iron (§ 12022, subd. (b)(1)). (1CT 110.) The offense was also alleged to be a serious felony (§ 1192.7, subd. (c)(23)). (1CT 110.)

Appellant pleaded not guilty and denied the special allegations. (1CT 112; 2RT 33.) A jury found appellant not guilty of first degree murder, but found him guilty of second degree murder and found true the deadly and dangerous weapon allegation. (1CT 159-160, 162; 4RT 501-504.)

Appellant was sentenced to an indeterminate term of 16 years to life, comprising 15 years to life, plus a consecutive term of one year for the deadly and dangerous weapon enhancement. (1CT 165; 4RT 525.)

Appellant filed a timely notice of appeal. (1CT 171-172.)

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

14

## STATEMENT OF FACTS

A.   Prosecution evidence

   1.   Appellant and the victim, Brian Denton, walk into appellant's apartment

On December 31, 2015, at 9:41 p.m., appellant and Brian Denton entered the lobby of the Florence Hotel, in Los Angeles. (2RT 93-94, 104-105; 3RT 298; Peo. Exh. 20A.)  The hotel's surveillance video showed appellant and Denton walk from the hotel lobby, up the main staircase to the third floor, and down the third floor hallway to enter appellant's apartment.[2]  (2RT 105-109; 3RT 298; Peo. Exhs. 20B-20E.)  At 9:45 p.m, Denton left appellant's apartment and returned four minutes later.  (2RT 109-111; 3RT 298; Peo. Exhs. 11, 20F-20H.)  At 10:25 p.m., Denton left appellant's apartment again, spoke to another hotel

---

[2] The Florence Hotel had 16 surveillance cameras operating in the building, which covered, among other areas, the main lobby entrance, the staircase from the lobby to the third floor, and the third floor hallway that included appellant's apartment. (2RT 100-101.)  The video surveillance continuously recorded from the night of December 31, 2015 to the morning of January 5, 2016.  (2RT 101.)  Krystal Jones, the Florence Hotel's property manager, met with detectives on January 5, 2016 and reviewed the video surveillance, which had date and time stamps.  (2RT 93-94, 101-102; see Peo. Exh. 11 [a DVD containing the surveillance videos].)  The jury was shown the video surveillance and still photographs of the video.  (2RT 103-117, 120-130; Peo. Exh. 11; Peo. Exhs. 20A-20P [still photographs of video surveillance].)

resident, and returned to appellant's apartment at 10:30 p.m. (2RT 111-112, 124-126; 3RT 299; Peo. Exhs. 11, 20I-20K.)

2. **Appellant's neighbors hear sounds of fighting coming from his apartment and call building security**

Wendell Blassingame lived in an apartment on the third floor that was across from appellant's apartment. (2RT 46.) On December 31, 2015, Blassingame went to sleep at about 8:30 or 9:00 p.m. (2RT 47.) At about 11:35 or 11:40 p.m., he was awakened by "a lot of rumble, a lot of disturbance across the hall," and "a lot of banging, a lot of slamming." (2RT 47-48.) It sounded to Blassingame like people were fighting in appellant's apartment. (2RT 47.) The disturbance caused his wall, the mirror on his wall, and his dresser to shake. (2RT 48, 53.) Rose Gibson, whose apartment was around the corner and shared an adjacent wall with appellant's apartment, also heard "knocking, bamming, and fighting; a bunch of noise," [3] coming from appellant's apartment at about 11:30 p.m. (2RT 48, 76.)

According to Blassingame and Gibson, the sound of fighting started and stopped for about 20 to 25 minutes. (2RT 53-54, 77.) Gibson knocked on the wall that was adjacent to appellant's apartment and asked if he was alright. (2RT 77.) Gibson heard

---

[3] Gibson did not clarify what she meant by "bamming." (2RT 76.)

16

appellant say "call the police." (2RT 77-78; but see 3RT 280-283, 291 [in a January 5, 2016 interview with an investigating officer, Gibson said she heard appellant bang on the wall and tell her to call the police, but she also said she heard a female voice tell appellant to give her money and to let her go, and that she believed the female voice belonged to appellant's girlfriend].)

Gibson then knocked on Blassingame's door. (2RT 48-49, 54.) She asked Blassingame to call the police because her phone was not working. (2RT 48-49, 55.) Blassingame told Gibson that he was going to call building security first, which he did. (2RT 49, 55.) Blassingame heard someone in appellant's apartment, whom he could not identify, scream "help, help." (2RT 49, 57.)

Ten minutes later, security still had not arrived, so Blassingame called them again. (2RT 50, 55.) At the same time, the "rumbling in [appellant's] unit stopped." (2RT 56-57.) About five to 15 minutes after his second call, Blassingame saw two building security guards arrive at appellant's apartment. (2RT 51, 55.) They knocked on appellant's door and, when no one answered the door, the guards walked away. (2RT 50-51.)

3.    The next day, appellant leaves his apartment, locks his door, and tells his ex-girlfriend that Denton is dead in his apartment after they fought the night before

On January 1, 2016, at about 8:13 a.m., video surveillance showed appellant leave his apartment, walk down the main

staircase, and exit the hotel. (2RT 112-115, 121-123, 127-130; 3RT 299; Peo. Exhs. 11, 20L-20N.) According to the hotel's property manager, Krystal Jones, appellant appeared in the video to be "moving a little faster . . . than normal" when leaving the hotel. (2RT 123.)

The same morning, appellant went to the apartment of Angel Dorsey, whom he had been dating for the previous three years until they had recently separated. (2RT 137-138, 143.) Her apartment was about a five-minute walk from appellant's apartment. (3RT 168.) Denton was a friend of both appellant and Dorsey, but appellant was like a "mentor" to Denton. (2RT 140; 3RT 170, 172.)

Appellant knocked on her door, but after Dorsey did not answer, appellant kicked the door and loudly said that Denton was "deceased" at his apartment. (2RT 143.) Dorsey eventually answered the door; appellant appeared "erratic," "pained," and "excited, but not in a good way." (2RT 142, 144.) Appellant did not appear intoxicated from alcohol. (2RT 146.)

Appellant told Dorsey that Denton died after they fought with each other. (2RT 145; but see 3RT 264-266 [in a January 6, 2016 interview with the investigating officers, Dorsey did not say that appellant told her Denton was deceased or that him and Denton were in a fight].) He also told her that he had a headache,

18

but did not mention any other injuries. (2RT 146-147.)
Appellant left Dorsey's apartment four hours later. (2RT 147.)

4.    Denton's body is found in appellant's
apartment five days after appellant left,
and appellant is arrested the next day

According to the video surveillance, after appellant left his
apartment, no one exited or entered his apartment between
January 1 at 8:13 a.m. and January 5 at 8:24 a.m, when Denton's
body was found in the apartment by building security. (2RT 115;
3RT 299.)

On January 5, 2016, Jones requested that security guard
Omar Hernandez conduct a welfare check of appellant's
apartment. (2RT 116.) Hernandez went to appellant's
apartment, unlocked the door, and found Denton's body in the
apartment, but did not know whose body it was at the time. (2RT
116, 135-136.)

Los Angeles Police Officer Efrain Ochoa received a
suspicious death call for the Florence Hotel. (2RT 59-60.) Officer
Ochoa went to the hotel with his partner and entered appellant's
apartment after being escorted there by Hernandez. (2RT 59, 61-
62.) A dead body with a "distorted, damaged," and "bloodied" face
was on the floor of the apartment. (2RT 62, 66.) There was also
"a lot of debris" on the floor and throughout the apartment. (2RT
64.) Officer Ochoa believed the body was that of appellant
because he found appellant's identification in the dresser. (2RT

19

66, 69-70.) After seeing the body, Officer Ochoa opened the window because of the strong odor and ensured no one else entered the apartment until detectives arrived. (2RT 71-73.)

Los Angeles Police Detective Jason Sharman and Officer Brian Putnam arrived and photographed the body and the apartment. (3RT 244-245.) Detective Sharman noticed injuries to the back of the body's head and staples embedded in the chest. (3RT 250, 261-262.) A clothing iron and a stapler were found at the scene, and they had reddish stains later determined to contain Denton's DNA. (3RT 260-262, 296.) There was a "substantial amount of blood" on the carpet and blood spatter on the dresser. (3RT 247-248.) A white tank top "soaked" in blood was found beneath the apartment sink. (3RT 251, 252, 254-255.)

The same day, Denton's father reported Denton as missing, and he later identified the body found in appellant's apartment as Denton. (3RT 279-280.)

On the night of January 6, 2016, Los Angeles Police Officers Jessica Azizi and Jaime Castellon arrested appellant at Dorsey's apartment building after receiving a call for trespassing. (3RT 175, 177-178.) Appellant was wearing a beanie and "long and bulky" clothing, and was carrying bags and a backpack. (3RT 179-180.) At the time of his arrest, appellant was five feet, six inches tall and weighed 170 pounds. (3RT 290.) At no time

prior to his arrest did appellant report to police the fight with Denton or Denton's death. (3RT 267.)

>    5.    An autopsy of Denton reveals a skull fracture and 22 lacerations to his head and face

On January 10, 2016, Los Angeles County Deputy Medical Examiner Dr. Matthew Miller performed an autopsy of Denton's body. (3RT 184, 189; Peo. Exh. 19 [autopsy report].) Denton was five feet, six inches tall and weighed 139 pounds. (3RT 193.)

Dr. Miller concluded Denton's cause of death was "blunt head trauma" and that homicide was the manner of death. (3RT 197.) Denton had a skull fracture. (3RT 218-219.) Dr. Miller counted a total of 22 separate lacerations to Denton's head and face, and they appeared to "be immediately surrounding the time of death." [4] (3RT 214, 239.) There were multiple lacerations across Denton's forehead, lower lip, above and on his left ear, and on the right side of his face and eyebrow. (3RT 206, 209-210.) Any hit that caused one of the lacerations directly over the brain could have been fatal. (3RT 223-224.) Dr. Miller concluded that Denton's injuries "could be consistent with injuries due to impacts from the household iron or clothing iron." (3RT 225-227.)

---

[4] A laceration is "an injury where an object hits the skin and tissue beneath it and it doesn't cut through the tissue, but the impact and the force transmitted to it causes the tissue to split open." (3RT 206.)

Denton's other injuries included: bruises on the left arm, left wrist, and left cheek; staples in the skin of his chest; and a possible bite mark.  (3RT 197-198, 200-203, 209.)

    Toxicology tests initially showed a possible positive finding of methamphetamine and ecstasy, but further tests confirmed a negative finding of such drugs.  (3RT 195-196.)  The alcohol level in Denton's body was 0.212 percent.  (3RT 196, 239.)

    B.   Defense evidence

Appellant presented stipulated testimony of a medical expert and testified in his own behalf.

According to the stipulated testimony of Dr. Ryan O'Connor, an emergency room physician who reviewed documents and photographs of appellant, appellant had on his left forearm and right flank "several linear abrasions/superficial lacerations" demonstrating scab formation.  (3RT 308-309.)  There was also a "healing round wound, likely an abrasion with scab formation" on appellant's right kneecap.  (3RT 309.)  These injuries were "consistent with injuries that are six days old."  (3RT 309.)

Appellant testified that he had been friends with Denton since meeting in 2013, and that he had been a "mentor" to Denton.  (3RT 322, 353.)  Denton was 30 years younger than appellant.  (3RT 350.)  On December 31, 2015, after not having seen Denton for a year, appellant walked to a liquor store to purchase alcohol for the next day and saw Denton standing

outside the store smoking methamphetamine. (3RT 318-319.) Denton asked appellant to buy him something to eat, and appellant agreed so long as Denton stopped smoking methamphetamine. (3RT 319-320.) Denton selected some cups of soup and four cans of Four Locos, an alcoholic drink, for appellant to purchase for him. (3RT 320-321.) Appellant invited Denton to go out with him that night for New Year's Eve, and they both walked to appellant's apartment. (3RT 321.)

Denton drank two cans of Four Locos as they walked to appellant's apartment. (3RT 323-324.) Some time during the night, appellant had a can of beer and a fifth of an alcoholic drink called Alize. (3RT 351-352.) When they arrived at the apartment, appellant looked in his closet for clothes to loan to Denton for that night while music played in the background. (3RT 322-324.) Appellant noticed Denton was no longer in the apartment, and heard Denton in the hallway. (3RT 325-326.)

Appellant decided to look for his two cellphones to call his children, but could not find them. (3RT 326-327.) Suspecting Denton had his phones, appellant called Denton back into his apartment and saw his cellphones "bulging out" of Denton's pocket. (3RT 327-328.) Denton closed the door. (3RT 328.) Appellant confronted Denton about taking his phones. (3RT 328.) In response, Denton punched appellant. (3RT 328.) Appellant said he was going to call the police, but Denton blocked the door,

charged at appellant, grabbed him, and slammed him to the floor. (3RT 328-329.) Denton told appellant that he was going to "kick [appellant's] old ass" as he was on top of and wrestling with appellant. (3RT 330.)

Appellant tried "to wrestle away from" Denton and "managed to slide out of the grip" so he could get to his feet. (3RT 330.) He tried to leave his apartment and told Denton he was going to call the police, but Denton blocked the door and charged at appellant again. (3RT 330-331.) Appellant threw canned goods at Denton to prevent him from charging, "bear-hugging, slamming, and trying to fight with" him. (3RT 332.) Appellant grabbed a closed stapler and hit Denton with it, but when that was ineffective, appellant then opened the stapler and stapled Denton's body. (3RT 332-333.) Denton pulled out the staple, "demonically" laughed at appellant, said he was going to kill appellant, and asked appellant "[i]s that all you got, old man?" (3RT 333-335.)

Denton continued blocking the door, but while he was pounding on the walls appellant grabbed him by the back of the pants and by his white tank top to try to "throw[] him out." (3RT 336-337.) Denton escaped appellant's grip, which caused Denton's tank top to rip. (3RT 337; but see 3RT 375 [appellant agreeing the photo exhibits of the tank top did not show it ripped].) Appellant knocked on his wall adjacent to Gibson's

24

apartment and "scream[ed]" for her to call the police. (3RT 338.)
Fifteen minutes had passed from when they first entered his apartment to when appellant called to Gibson. (3RT 339.)

Denton charged at appellant again and put appellant in a choke hold that caused appellant to feel dizzy. (3RT 339-340.) In response, appellant bit Denton "a lot of times" (3RT 359) "because that was the only way that [he] could ever get [Denton] to let [him] go" (3RT 340). Denton released the choke hold, charged at appellant again, wrestled him to the ground, and wrapped the cord of an iron around appellant's neck while behind him. (3RT 340, 362.) Appellant began getting dizzy from the choking, but grabbed the dangling iron and hit Denton's head with the iron an unknown number of times. (3RT 340-343.) Appellant stopped hitting Denton until the tension of the cord released. (3RT 343.) Appellant crawled to the bed and fell asleep until about 8:00 a.m. the next morning. (3RT 343.)

After waking up, appellant tried to wake up Denton by shaking his legs, but when Denton did not respond, he realized Denton was dead. (3RT 344.) Appellant left the Florence Hotel and went to Dorsey's apartment, but left shortly thereafter. (3RT 344-345.) For the next five days, until he was arrested, appellant consumed alcohol and drugs and did not sleep. (3RT 345-346, 364.) Appellant did not know what happened to the two cellphones that he believed Denton had taken. (3RT 372-373.)

25

C.   Rebuttal evidence

The prosecution called two rebuttal witnesses, Donna Villeda and Detective Sharman. (3RT 377, 380, 383.)

Donna Villeda was Denton's grandmother. (3RT 380.) She testified that Denton received a cellphone as a Christmas gift a couple days before December 25, 2015. (3RT 380.) Denton was living with his grandmother through the end of December 2015, and was visiting his father on December 31, 2015. (3RT 380-381.)

Detective Sharman was recalled as a witness. (3RT 383.) He testified that the white tank top recovered in appellant's apartment was not ripped. (3RT 383.) He also testified that no cellphones were recovered in the apartment and none was booked as defendant's property after his arrest. (3RT 384.)

## ARGUMENT

I.   The trial court had no duty to instruct, sua sponte, on sudden quarrel or heat of passion voluntary manslaughter as a lesser included offense of murder

The trial court instructed the jury on justifiable homicide based on reasonable self-defense and on the lesser included offense of voluntary manslaughter based on unreasonable self-defense. (1CT 149-150.) Despite the fact that the jury convicted appellant of second degree murder, (1CT 162), appellant contends the trial court committed prejudicial error in failing to sua sponte instruct the jury also on the lesser included offense of sudden

26

quarrel or heat of passion voluntary manslaughter. (AOB 19-31.) Appellant asserts there was substantial evidence supporting such an instruction and that the "prosecutor could not prove beyond a reasonable doubt that [appellant] did not act pursuant to a sudden quarrel or heat of passion." (AOB 31.) He further argues that the *Chapman*[5] harmless error standard applies here even though, as appellant concedes, the California Supreme Court has explicitly rejected that argument in favor of applying the *Watson*[6] harmless error standard. (AOB 23-26.)

✳    However, there was no error because there was insufficient evidence supporting an instruction for sudden quarrel or heat of passion voluntary manslaughter. Appellant's own testimony, which was a blow-by-blow recounting of events, demonstrated that his defensive responses to Denton's attacks were done with deliberation and judgment rather than under the influence of passion. The subjective element required to warrant an instruction thus lacked any supporting evidence. In any event, any potential error was harmless because it is not reasonably probable the jury would have accepted a heat of passion theory while simultaneously rejecting appellant's self-defense theories that were all primarily based on the same evidence—appellant's own testimony.

---

[5] *Chapman v. California* (1967) 386 U.S. 18, 24.
[6] *People v. Watson* (1956) 46 Cal.2d 818, 836.

27

## A.  Proceedings below

When discussing the proposed jury instructions with the prosecutor and defense counsel, the trial court listed CALCRIM No. 570 as an instruction it planned to give and noted there were no objections to them: "Then we go to 522, 570, 571, 640. I think there were no objections to any of those." (4RT 392.) When instructing the jury, the court did not give CALCRIM No. 570 (sudden quarrel or heat of passion voluntary manslaughter), but did give, among others, CALCRIM Nos. 522 (provocation to reduce murder from first degree to second degree, or to reduce murder to manslaughter), 571 (imperfect self-defense), and 640 (instructions for completing verdict forms). (1CT 150, 152; 4RT 481-483, 486-489.)

After the jury was instructed and commenced deliberations, defense counsel noted that CALCRIM No. 570 should also have been given:

> [DEFENSE COUNSEL]: Before [the prosecutor] leaves, [appellant] did have a concern. It's his belief that Your Honor did not read jury instruction 571.
>
> THE COURT: I believe we took that out.
>
> [DEFENSE COUNSEL]: I apologize. It was my misunderstanding. His concern was we didn't read 570. I told him we spoke about that yesterday and –
>
> THE COURT: Yeah, I think we took that one out.

28

[DEFENSE COUNSEL]: I apologize, I misunderstood [appellant] on that.

[PROSECUTOR]: I will go get the laptop.

(4RT 499.)

B.    There was no substantial evidence supporting a sudden quarrel or heat of passion voluntary manslaughter instruction

A trial court has a sua sponte duty to instruct a jury on general principles of law relevant to the issues raised by the evidence. (*People v. Moye* (2009) 47 Cal.4th 537, 548, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154.) This includes giving instructions on lesser included offenses, but only "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman, supra*, 19 Cal.4th at p. 162, citations omitted.) In other words, an instruction on a lesser included offense "must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense." (*People v. Thomas* (2012) 53 Cal.4th 771, 813; see also *Moye, supra*, 47 Cal.4th at p. 541.)

The existence of merely "*any* evidence, no matter how weak" is insufficient. (*Moye, supra*, 47 Cal.4th at p. 553, internal quotation marks and citation omitted, italics in original.) Speculation is also not enough. (*People v. Sakarias* (2000) 22

29

Cal.4th 596, 620, internal quotation marks and citation omitted; see also *People v. Waidla* (2000) 22 Cal.4th 690, 735 ["But speculation is not evidence, less still substantial evidence."], internal quotation marks and citation omitted; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 ["The trial court is not required to present theories the jury could not reasonably find to exist."].)

Whether the trial court erred in not instructing the jury on a lesser included offense is determined under the de novo standard of review. (*Waidla, supra,* 22 Cal.4th at p. 733.) But in evaluating whether there is substantial evidence of a lesser included offense, appellate courts "should not evaluate the credibility of witnesses, a task for the jury." (*Breverman, supra,* 19 Cal.4th at p. 162.)

Appellant argues the trial court erred in not sua sponte instructing the jury on the lesser included offense of sudden quarrel or heat of passion voluntary manslaughter. (AOB 19-31.) Not so.

"Murder is the unlawful killing of a human being with malice aforethought," but voluntary manslaughter is the intentional and unlawful killing of another without malice. (*Moye, supra,* 47 Cal.4th at p. 549, quoting § 187, subd. (a) and § 192.) Voluntary manslaughter is limited to when a "defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the

unreasonable but good faith belief in having to act in self-defense. [Citations.]" (*Moye, supra*, 47 Cal.4th at p. 549, quoting *Breverman, supra*, 19 Cal.4th at pp. 153-154.)  Because either form of voluntary manslaughter "reduce[s] an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide," either form is a lesser necessarily included offense of murder.  (*Moye, supra*, 47 Cal.4th at p. 549, citations and italics omitted.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*Moye, supra*, 47 Cal.4th at p. 549.)  The objective component requires that the heat of passion result from "sufficient provocation," which is conduct that "would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at pp. 549-550.)  The subjective component requires a showing that the defendant "killed while under 'the actual influence of a strong passion' induced by such provocation." (*Id.* at p. 550.)  In other words, there must evidence that the "reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." (*Ibid.*, internal quotation marks and citation omitted; see also *People v. Beltran* (2013) 56

31

Cal.4th 935, 950 ["A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment."].)  It cannot be heat of passion voluntary manslaughter when "sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return." (*Moye*, *supra*, 47 Cal.4th at p. 550, internal quotation marks and citations omitted.)

Appellant observes that the trial court originally planned to give CALCRIM No. 570, the instruction on sudden quarrel or heat of passion voluntary manslaughter (AOB 20; 4RT 392), but for reasons not indicated in the record the court remarked, "we took that one out." (4RT 499.)  Regardless of the rationale for removing the instruction, however, there was no substantial evidence to support it in the first place.

This case is analogous to *Moye*, where the California Supreme Court upheld the trial court's denial of a sudden quarrel or heat of passion voluntary manslaughter instruction. (47 Cal.4th at pp. 540-541.)  In *Moye*, the defendant, who bludgeoned his victim to death with a baseball bat, was convicted of second degree murder. (*Id.* at pp. 544-545.)  The jury was instructed on, and rejected, both a justifiable homicide defense based on reasonable self-defense, and unreasonable or imperfect self-defense, which would have supported conviction of the lesser included offense of voluntary manslaughter. (*Id.* at pp. 540-541.)

32

The trial court refused a defense request to further instruct the jury on a sudden quarrel or heat of passion theory of voluntary manslaughter. (*Ibid.*)

In upholding the trial court's decision, the California Supreme Court concluded "substantial evidence was lacking" that the defendant killed while subjectively under the actual influence of a "strong passion aroused by a 'provocation,'" but instead supported the view that he used the bat "defensively to allegedly fend off an attack from the homicide victim." (*Moye, supra,* 47 Cal.4th at p. 541.) The defendant's "blow-by-blow recounting of events" in which he "took great pains . . . to justify each blow he landed" on the victim as a defensive response to each of the victim's advances showed that he acted with deliberation and reflection, and was "contrary" to a theory that he "subjectively killed in the heat of passion." (*Id.* at p. 554.)

The same reasoning applies here. As in *Moye,* "the thrust of defendant's testimony below was self-defense." (47 Cal.4th at p. 554; see 3RT 341 [appellant testifying how he felt when Denton was choking him: "I got really scared . . . because I felt this guy was trying to kill me now."]; 3RT 437 [defense counsel stating in closing argument: "This case, I have said it over and over again, but it's about self-defense. That's the only thing the evidence supports."].) Indeed, as in *Moye,* appellant's testimony was a "blow-by-blow recounting of events" in which he characterized

33

every action he took as a defensive response to one of Denton's attacks. (See 47 Cal.4th at p. 554.)

Specifically, appellant testified that after Denton punched him and slammed him to the floor, he escaped Denton's grip and stood up; appellant then tried to leave his apartment and call the police, and threw canned goods at Denton to stop him from charging again; appellant hit Denton with a closed stapler, and when that was ineffective, opened the stapler and inserted staples into Denton's chest; appellant grabbed Denton's pants and tank top in an unsuccessful attempt to remove him from the apartment; Denton put appellant in a choke hold and, in response, appellant bit him multiple times "because that was the only way that [he] could ever get [Denton] to let [him] go"; Denton wrestled appellant to the ground again and wrapped the cord of an iron around his neck; appellant grabbed the iron and used it to hit Denton in the head until Denton stopped strangling him. (3RT 328-333, 336-337, 339-343, 359, 362.)

Thus, appellant's own testimony demonstrated that he did not act from passion, but rather in an attempt to defend himself against Denton's alleged attacks. (See *Moye, supra*, 47 Cal.4th at pp. 550, 554-555.) As such, there was insufficient evidence appellant had the "extreme intensity of the heat of passion required to reduce a murder to manslaughter." (*Beltran, supra*, 56 Cal.4th at p. 950.) Rather, appellant's testimony supported

only a theory of self-defense, as to which the trial court properly instructed the jury.

This case is distinguishable from *Breverman, supra,* 19 Cal.4th at pp. 163-164, upon which appellant relies. (AOB 21-22.) *Breverman* held the trial court erred in not sua sponte instructing on sudden quarrel or heat of passion voluntary manslaughter. (*Ibid.*) In doing so, the Court concluded that a reasonable jury could find the defendant "was aroused to passion, and his reason was thus obscured" when he shot from inside, and then outside, of his house at a sizeable group of armed men who had trespassed on his driveway and smashed his car multiple times. (*Ibid.*) But such a scenario, where "there was affirmative evidence that the defendant panicked in the face of an attack" (*Moye, supra,* 47 Cal.4th at p. 555 [distinguishing *Breverman*]), differs from the evidence presented here and in *Moye,* where the killer testified as to a deliberate justification for each defensive response. Moreover, *Moye* noted that "[n]othing in *Breverman* suggests an instruction on heat of passion is required in every case in which the only evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life." (*Ibid.*)

In sum, no error can be shown.

35

C.  In any event, any error was harmless because it is not reasonably probable the jury would have accepted a heat of passion theory after rejecting appellant's self-defense theories based on the same evidence

The harmless error standard articulated in *Watson, supra,* 46 Cal.2d at p. 836 applies to instructional error claims; thus, appellant must show that without the error, "it is reasonably probable a more favorable result would have been obtained." (*Beltran, supra,* 56 Cal.4th at p. 955, internal quotation marks and citation omitted; *Breverman, supra,* 19 Cal.4th at pp. 172-174; *People v. Larsen* (2012) 205 Cal.App.4th 810, 829.) Harmless error review under this standard "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman, supra,* 19 Cal.4th at p. 177, italics in original.)

Appellant concedes "[t]he California Supreme Court assesses prejudice resulting from the omission of a heat-of-passion voluntary manslaughter instruction at trial under the *Watson* standard," but still asks this Court to apply the harmless error standard articulated in *Chapman, supra,* 386 U.S. at p. 24. (AOB 23.)  He attempts to support this request by arguing that the United States Supreme Court held in *Beck v. Alabama* (1980) 447 U.S. 625, 634, a capital case, that due process is violated when a trial court fails to instruct on lesser included offenses, and that such a rule should be extended to noncapital cases like

36

the one here.  (AOB 24-25.)  This argument not only mischaracterizes the scope of *Beck*'s holding, but, as appellant concedes, is also an argument the California Supreme Court rejected in *Breverman, supra*, 19 Cal.4th at pp. 166-169.  (AOB 25.)

As *Breverman* explained, *Beck* "stands only for the proposition 'that a State may not erect a capital-specific, artificial barrier to the provision of instructions that actually are lesser included offenses under state law.'"  (19 Cal.4th at p. 168, quoting *Hopkins v. Reeves* (1998) 524 U.S. 88, 97-98.)  It does not stand for the broad proposition asserted by appellant.  (See AOB 24-25.)

*Breverman* additionally noted that the United States Supreme Court subsequently gave *Beck* "a narrow construction." (19 Cal.4th at pp. 167-168, citing *Schad v. Arizona* (1991) 501 U.S. 624, 627 and *Hopkins, supra*, 524 U.S. at pp. 97-98.)  As a result, *Breverman* further reasoned that "the high court's decisions leave substantial doubt that the federal Constitution confers *any* right to lesser included offense instructions in noncapital cases."  (19 Cal.4th at p. 168, italics in original.) *Breverman* thus explicitly rejected the application of *Beck* to noncapital cases, which is what appellant requests here (AOB 25-26):  "we decline to do what the high court has expressly not done—to hold that such an instructional rule is required in noncapital cases by the federal Constitution."  (19 Cal.4th at p.

169.) *Breverman* affirmed that the *Watson* harmless error standard applies for alleged failures to sua sponte instruct on lesser included offenses because the rule for giving such instructions "derives exclusively from California law." (*Id.* at pp. 165, 169.) Since *Breverman*, the California Supreme Court has continued to apply the *Watson* harmless error standard. (See, e.g., *Moye*, *supra*, 47 Cal.4th at p. 556.) Appellant's argument that *Watson* does not apply here is thus contrary to existing law.

Under the applicable *Watson* standard, appellant's prejudice argument fails. Again, *Moye* is instructive here. After finding no error, *Moye* concluded in the alternative that any error was harmless. (47 Cal.4th at pp. 556-558.) Like here, the jury received instructions on reasonable and imperfect self-defense, but rejected both theories in convicting the defendant of second degree murder. (*Id.* at p. 557; see 1CT 149-150 [reasonable and imperfect self-defense jury instructions]; 1CT 162 [verdict].)

Accordingly, *Moye* reasoned that "it is reasonable to assume the jury considered all of the defense evidence bearing on defendant's state of mind and the question whether he harbored malice when it entertained and *rejected* his claims of reasonable and unreasonable (or imperfect) self-defense." (47 Cal.4th at p. 556, italics in original.) Because the evidence supporting the defendant's self-defense theories was nearly identical to any evidence supporting a heat of passion theory, it was not

38

reasonably probable that a jury would reject the self-defense theories and simultaneously accept the heat of passion theory. (*Id.* at p. 557.) If the evidence was insufficient for the jury to accept one of the self-defense theories, it was also insufficient to support the subjective element required for a heat of passion theory. (*Ibid.*)

The same reasoning applies here. It is not reasonably probable the jury would have accepted a heat of passion theory when it also rejected appellant's self-defense theories, and all these theories were based primarily on the same evidence— appellant's testimony. Self-defense was the theme of defense counsel's closing (see, e.g., 4RT 424, 437),[7] but the jury still convicted appellant of second degree murder. "Once the jury rejected [appellant's] claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from [appellant] himself to support an inference that he subjectively harbored such strong passion, or acted rashly or impulsively while under its influence

---

[7] Defense counsel gave his closing argument (4RT 419-439) before the court instructed the jury (4RT 458-495), and thus before it was apparent the court was not going to instruct on sudden quarrel or heat of passion voluntary manslaughter.

for reasons unrelated to his perceived need for self defense." (*Moye, supra,* 47 Cal.4th at p. 557, italics omitted.)

Accordingly, even if the trial court erred in not giving CALCRIM No. 570, any error was harmless. (See *Moye, supra,* 47 Cal.4th at pp. 557-558.)

II.  Appellant forfeited his claim that the court erred in giving a flight instruction; in any event there was no error and any potential error was harmless; counsel's lack of objection to the instruction did not constitute ineffective assistance

Appellant raises several arguments regarding the flight instruction, CALCRIM No. 372, the trial court gave to the jury. (AOB 32-46.) Although defense counsel did not object to the instruction, appellant argues that his claim is not forfeited, and that counsel's failure constitutes ineffective assistance of counsel. (AOB 33-34.) Appellant also asserts that giving the instruction was prejudicial error because appellant "did not run or flee from the scene," but rather "walked to his ex-girlfriend's residence" after leaving the victim's body alone in his apartment. (AOB 36.) Appellant further argues that the flight instruction lessened the prosecutor's burden of proof and violated his federal constitutional rights. (AOB 40-44.)

All of these arguments fail. The claim is forfeited because defense counsel did not object, and the instruction did not affect his substantial rights. Appellant's testimony about what he did

40

and where he went when he awoke and realized he killed Denton constituted strong evidence supporting the flight instruction. Moreover, any potential error from the instruction was harmless because the instruction did not require the jury to find that appellant fled or what to infer from any finding of flight. The ineffective assistance of counsel claim fails for the same reasons. And, appellant's argument about the flight instruction lessening of the burden of proof has been consistently rejected by California courts.

A.    Proceedings below

When discussing the proposed jury instructions with the prosecutor and defense counsel, the trial court mentioned that it intended to give CALCRIM No. 372, the flight instruction, and noted, "I don't think anyone had any issue with" the instruction. (3RT 390.)  Defense counsel did not object.

The court instructed the jury on CALCRIM No. 372 as follows:

> If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot provide guilt by itself.

(4RT 477; 1CT 148.)

41

B.    Appellant forfeited the claim

Anticipating respondent's forfeiture argument, appellant argues this claim is preserved on appeal because (1) he cannot forfeit the claim since it affects his substantive rights; and (2) defense counsel's failure to object constituted ineffective assistance of counsel that warrants reversal because "[i]t is inconceivable that defense counsel believed the instruction could have benefitted appellant in any way." (AOB 33.)  Both arguments fail.

First, the failure to object to an instruction correct in the law forfeits the claim on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)  "Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'" (*Stowell*, *supra*, 31 Cal.4th at p. 1114, citations omitted.)

Nevertheless, "an appellate court may review any instruction given even though no objection was made in the [trial] court if the substantial rights of [appellant] are affected." (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978; see also *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; § 1259.)  For instructional errors, "[t]he cases equate 'substantial rights' with reversible error, i.e., did the error result in a miscarriage of justice?"

42

(*Arredondo, supra,* 52 Cal.App.3d at p. 978; see also Cal. Const., art. VI, § 13; *Watson, supra,* 46 Cal.2d at p. 836.)

Without objecting below, appellant forfeited his claim here.[8] As discussed *post,* in Section II.C, appellant's argument that his rights were substantially affected by the error fails.

Appellant's additional argument to avoid forfeiture, that defense counsel provided ineffective assistance, must also be rejected for the reasons explained *post,* in Section II.F. In short, as described *post,* in Section II.C, there was no error in the court giving the flight instruction, and thus no deficient performance or prejudice. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 565.)

C.    It was not error to give the flight instruction when appellant left his apartment the day after killing Denton, locked his door, told his ex-girlfriend that Denton was dead in his apartment, and did not return to his apartment for several days

A trial court must instruct the jury on flight where evidence of flight "is relied upon as tending to show guilt," (§ 1127c), and such evidence "shows that the defendant departed the crime scene under circumstances suggesting that his

_____

[8] Respondent respectfully requests that this Court rule on the forfeiture argument made herein even if the merits are reached for purposes of potential future federal habeas review. (See *Harris v. Reed* (1989) 489 U.S. 255, 264, fn. 10.)

movement was motivated by a consciousness of guilt." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, internal quotation marks and citations omitted.) Flight requires a "purpose to avoid being observed or arrested," but does not require the "physical act of running nor the reaching of a far-away haven." (*People v. Abilez* (2007) 41 Cal.4th 472, 522, internal quotation marks and citations omitted; see also *People v. Bradford* (1997) 14 Cal.4th 1005, 1054.) "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*Bonilla, supra,* 41 Cal.4th at p. 328.) The flight of a defendant immediately after the commission of a crime, or after the defendant has been accused of a crime, is not sufficient in itself to establish guilt, but is a factor the jury may consider in deciding the defendant's guilt or innocence. (§ 1127c; *People v. Price* (2017) 8 Cal.App.5th 409, 454, 458.)

Instructional errors present questions of law and are reviewed de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569-570.)

Appellant contends the flight instruction was given in error because he did not "immediately" leave his apartment after killing Denton, but left the next day, and when he did leave he "did not run or flee from the scene," but merely went to his ex-

44

girlfriend's nearby apartment, and "did not leave his neighborhood." (AOB 36.) He asserts this all demonstrated that he "did not flee." (AOB 38.)

This argument ignores the applicable standard and the evidence. It is irrelevant whether appellant "ran" away from his apartment, or that he stayed in his neighborhood in the days after the murder. (See *Abilez, supra*, 41 Cal.4th at p. 522.) What matters is whether appellant left the apartment with the "purpose to avoid being observed or arrested." (*Ibid.*) The evidence meets that criterion.

Appellant may not have left his apartment immediately after killing Denton, but that is only because—according to his own testimony—he passed out. (3RT 343.) When appellant realized the next day that Denton was dead, appellant admitted that he "panicked," "wanted to get out of the apartment," and "was afraid at that moment to call the police." (3RT 344-345.) Video surveillance showed appellant leaving his apartment at 8:14 a.m., soon after he woke up, and walking faster than normal. (2RT 112-115, 121-123, 127-130; 3RT 299, 343.) And when appellant left, he locked his apartment door, thereby preventing someone from finding Denton's body. (2RT 135-136.)

Further suggesting consciousness of guilt was appellant's failure to inform the police of what happened. (3RT 267.) Instead, he only told his ex-girlfriend, Dorsey, that Denton died

after they fought and his body was in appellant's apartment. (2RT 145.) Appellant did not tell her he intended to call the police about what happened. (2RT 146.) Moreover, appellant remained away from his apartment, and thus away from the crime scene, while he drank, used drugs, and did not sleep for five days. (2RT 115; 3RT 299, 345-346, 364.) When appellant was arrested, he had bags and backpack (3RT 179-180), thereby suggesting he did not plan to return to his apartment. This all points to consciousness of guilt and supports the giving of a flight instruction. (See *Bradford, supra,* 14 Cal.4th at p. 1055 [flight instruction proper where defendant left the apartment where he killed the victim, went to another apartment, packed his belongings and asked for a ride out of town].)

The cases appellant relies upon are distinguishable. In *People v. Crandell* (1988) 46 Cal.3d 833, 869-870, abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 363-365, the Court found error in giving the flight instruction because there was evidence the defendant intended to return to dispose of the bodies and was arrested while returning; there was no such evidence here. (See AOB 37-38.) Appellant also relies on *People v. Green* (1980) 27 Cal.3d 1, 37, overruled on another ground in *People v. Martinez* (1990) 20 Cal.4th 225, 241, for its "warning of the courts not to confuse a mere departure from the scene of the crime with a deliberate flight from the area." (AOB 39.)

46

Notwithstanding the fact that *Green* affirmed the denial of defendant's request for an instruction on the absence of flight, the defendant there committed the murder in a remote area at night, remained in his home surroundings for two weeks after the crime, contacted police about the victim's movements on the day of the murder, and continued to visit with friends as before. (27 Cal.3d at pp. 36-37.) None of these facts are present here: appellant left the victim's body in his residence, did not contact police, and disappeared for five days afterward. (3RT 299, 345-346, 364.)

*People v. Watson* (1977) 75 Cal.App.3d 384, 402-403, and *People v. Fremont* (1937) 22 Cal.App.2d 292, 300 are also distinguishable. (See AOB 39-40.) The flight instruction in *Watson* was based only on the "mere fact of defendant's arrest nearly two days later and miles away from the crime scene"; for reasons explained previously, there is far more evidence here showing consciousness of guilt. (75 Cal.App.3d at pp. 402-403.) *Fremont* is not relevant because the court there found "[n]o evidence" presented to support a flight instruction in either the defendant's or victim's conflicting testimonies of what occurred (22 Cal.App.2d at p. 300), whereas here there is evidence of flight in both parties' versions of events.

Thus, contrary to appellant's arguments, there was sufficient evidence for the flight instruction and thus no error by the court in giving that instruction.

47

D.   Any potential error was harmless

To the extent there was any error in giving the flight instruction, that error was harmless under the applicable *Watson* standard.  (See *People v. Silva* (1988) 45 Cal.3d 604, 628 [finding harmless error under *Watson* in the trial court's giving of a flight instruction].)[9]  As explained *ante*, in Section I.C, under *Watson* there is error only when it is reasonably probable that a result more favorable to appellant would have been reached absent the error.  (*Watson, supra*, 46 Cal.2d at p. 836.)

Any error here was harmless.  The flight instruction itself merely permitted the jury to infer consciousness of guilt "if" it found appellant fled.  (1CT 148.)  Even then, "the meaning and importance of that conduct" was expressly left to the jury, but it could not be used to "prove guilt by itself."  (1CT 148; see *Bradford, supra*, 14 Cal.4th at p. 1055 "[T]he instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt."].)  The jury was further instructed that some of the instructions may be inapplicable depending on the jury's factual findings, and to only follow the instructions "that do apply to the facts as you find

---

[9] Without support, and contrary to *Silva*, appellant mistakenly asserts that the *Chapman* harmless error standard applies here.  (AOB 44-45.)  This argument should be rejected.

48

them." (1CT 140; *People v. Farley* (1996) 45 Cal.App.4th 1697, 1711 [flight instruction was not prejudicial, in part, because the court instructed the jury that not all instructions may be applicable].)

Moreover, there was substantial evidence supporting the jury's murder verdict. As described in greater detail *ante*, in Section I.B, appellant testified that he killed Denton in self-defense and the jury was instructed on reasonable and imperfect self-defense theories, but the jury's rejection of those theories in finding appellant guilty of second degree murder indicates they did not find him credible. Indeed, the evidence showed Denton suffered a skull fracture, had 22 lacerations to his head and face (15 to 17 of which were each potentially fatal), staples in his chest, and multiple bruises. (3RT 197-198, 200-203, 206, 209-210, 214, 218–219, 223-224, 239.)

Therefore, even in the absence of an instruction regarding flight, it was not reasonably probable appellant would have received a more favorable outcome. (*Watson, supra*, 46 Cal.2d at p. 836.)

E.    The flight instruction did not lessen the prosecutor's burden of proof and thus did not violate appellant's federal constitutional rights

Appellant contends the flight instruction created an "unconstitutional permissive inference[]" because it "unfairly

49

suggested [appellant] knew he was guilty of murder and fled to avoid arrest." (AOB 43.) Yet, appellant admits the California Supreme Court rejected this argument with regard to the predecessor of CALCRIM No. 372, CALJIC No. 2.52. (AOB 44, citing *People v. Mendoza*, 24 Cal.4th 130, 179-180, superseded by statute on another ground as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8.) Appellant does not argue *Mendoza* is bad law or that its reasoning is inapplicable to CALCRIM No. 372, the instruction given here. Even if he did, courts have applied *Mendoza*'s reasoning to CALCRIM No. 372 and rejected identical arguments that it lowers the prosecutor's burden of proof. (See, e.g., *Price, supra*, 8 Cal.App.5th at pp. 456, 458 ["On its face [CALCRIM No. 372] does not lighten the prosecution's burden of proof to show guilt beyond a reasonable doubt."]; *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1158-1159 ["By parity of reasoning to . . . *Mendoza* . . . we reject Ríos's arguments that CALCRIM [No.] 372 impermissibly presumes the existence of his guilt and lowers the prosecution's burden of proof."].) Appellant's argument thus fails in light of *Mendoza* and these subsequent cases.

Appellant's only attempt to distinguish *Mendoza* is to argue "in that case there was some evidence justifying the instruction." (AOB 44.) However, as explained *ante*, in Section II.C, there was sufficient evidence justifying the instruction. Accordingly, the

flight instruction did not lower the prosecutor's burden nor result in a federal constitutional violation.

>    F.    Appellant's ineffective assistance of counsel claim fails

As noted *ante*, in Section II.B, appellant attempts to avoid forfeiture by asserting that his defense counsel's failure to object to the flight instruction constituted ineffective assistance of counsel. (AOB 33-34.) He contends "there was no possible tactical purpose" in failing to object. (AOB 34.) This argument is meritless because there was neither deficient performance nor prejudice in defense counsel's failure to object.

To establish ineffective assistance, appellant "must show that counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688; accord, *People v. Bolin* (1998) 18 Cal.4th 297, 333.) Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts. (*Bolin, supra*, 18 Cal.4th at p. 333; see *People v. Lucas* (1995) 12 Cal.4th 415, 442 ["Reviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions."].) And even if counsel's representation was deficient, relief will be granted only if appellant "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

51

would have been different." (*Strickland, supra*, 466 U.S. at p. 694; *People v. Avena* (1996) 13 Cal.4th 394, 418.)

In evaluating a claim of ineffective assistance, a reviewing court "must be highly deferential" and begin with a "strong presumption" that a defendant received reasonable professional assistance of counsel. (*Strickland, supra*, 466 U.S. at p. 689.) "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Gray* (2005) 37 Cal.4th 168, 207.) "[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, . . . unless there simply could be no satisfactory explanation, the claim on appeal must be rejected." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266, quotation marks and brackets omitted.)

As an initial matter, the claim is improvidently brought in this direct appeal; rather, "the proper way to raise a claim of ineffective assistance of counsel is generally by writ of habeas corpus, not appeal," because the reasons behind counsel's trial strategy are not generally evident in the appellate record.

(*People v. Lucas* (2014) 60 Cal.4th 153, 307, disapproved on another ground in *People v. Romero* (2015) 62 Cal.4th 1.)[10]

To the extent this Court considers the ineffective assistance claim, appellant cannot demonstrate that his defense counsel's performance was either deficient or prejudicial. For the reasons described *ante*, in Section II.C, it was not error for the court to give the flight instruction. There was abundant evidence from which a jury could find appellant's flight from his apartment suggested consciousness of guilt. (See *Bonilla, supra*, 41 Cal.4th at p. 328.) Because there was no error, counsel was not required to interpose a futile objection to avoid a claim of ineffective assistance. (*Thompson, supra*, 49 Cal.4th at p. 122 ["Counsel is not ineffective for failing to make frivolous or futile motions."]; see also *Fernandez, supra*, 216 Cal.App.4th at p. 565 ["Thus, we also conclude on this record that appellant's trial counsel was not ineffective for failing to object, because there was a tactical reason for not doing so. In short, there was no error."], citing *Lucas, supra*, 12 Cal.4th at pp. 436-443.)

And, for the reasons explained *ante*, in Sections I.C and II.D, there was also no prejudice. Appellant's ineffective assistance claim fails.

---

[10] This point is equally applicable to appellant's two other ineffective assistance claims discussed *post*, in Sections III.B and IV.E.

III. Defense counsel's failure to request an "earwitness" identification instruction was not ineffective because any such instruction would have been duplicative

Appellant contends defense counsel provided ineffective assistance by failing to request a jury instruction that outlined factors for how to evaluate the "earwitness" testimonies of Blassingame and Gibson. (AOB 47-59.) Because Blassingame was unsure who yelled for help and Gibson testified that appellant told her to call the police, appellant argues "the identification of [appellant] as the speaker was crucial to the defense case, and the jury needed instructional assistance in making a determination" as to who called for help. (AOB 52.) Accordingly, appellant asserts, "[t]here could be no satisfactory explanation for failure to request the instruction" and that failure prejudiced appellant. (AOB 52.)

However, an "earwitness" identification instruction would have been duplicative of an instruction the trial court gave on how to evaluate the credibility of witness testimonies. There was thus a tactical reason for not objecting, and no deficient performance. There was also no prejudice because it is purely speculative that a duplicative instruction would have led to a different verdict. Bullshit

54

A.    Proceedings below

When discussing the proposed jury instructions with the prosecutor and defense counsel, the court mentioned the instruction for eyewitness identification, CALCRIM No. 315. (3RT 389.)  The court stated:

> I indicated I didn't think 315, the eyewitness identification instruction, was necessary on this case because there doesn't seem to be any issue about it.

(3RT 389.)   Defense counsel did not object.

B.    Any "earwitness" identification instruction of the kind appellant now seeks would have been duplicative

Appellant asserts it was ineffective assistance for defense counsel to not request a modified version of CALCRIM No. 315— the instruction for eyewitness testimony—or to request some other instruction that listed factors for the jury to use in evaluating the testimonies of the two witnesses who heard the crime occur.   (AOB 51-52.)  He contends the jury needed an "analytical framework" to evaluate the testimonies of Blassingame and Gibson and whose voice they heard coming from appellant's apartment making calls for help and to call the police. (AOB 58.)  As described *ante*, in Section II.F, to establish ineffective assistance, appellant must show deficient performance and prejudice.   (*Strickland, supra*, 466 U.S. at p. 688.)  Appellant cannot show either here.

55

As appellant concedes (AOB 52-53), there is no sua sponte duty to give the instruction that appellant asserts was required here. (Cf. *People v. Cook* (2006) 39 Cal.4th 556, 599 [no sua sponte duty to instruct on "factors to consider in proving identity by eyewitness testimony"].) A pinpoint instruction, the type of instruction appellant asserts was required, relates "particular facts to a legal issue in the case or 'pinpoint[s]' the crux of the defendant's case." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "'Either party may present to the court any written charge on the law, *but not with respect to matters of fact*, and request that it be given.'" (*People v. Mackey* (2015) 233 Cal.App.4th 32, 111, quoting § 1127, italics in *Mackey*.) Generally, "'a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.'" (*Ibid.*, quoting *People v. Moon* (2005) 37 Cal.4th 1, 30.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.)

Defense counsel's failure to request an "earwitness" identification instruction was not ineffective assistance because such an instruction would have been duplicative. The trial court gave CALCRIM No. 226, which provided the jury with a list of

factors to consider when evaluating a witness's testimony. (1CT 143; 4RT 467-469.) One the factors listed specifically addressed the kind of instruction appellant now seeks: "How well could the witness see, *hear*, or otherwise perceive the things about which the witness testified?" (1CT 143, italics added.) Other relevant factors the instruction listed included: (1) "How reasonable is the testimony when you consider all the other evidence in the case?"; and (2) "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?" (1CT 144.) The instruction also advised that "two people may witness the same event yet see or *hear* it differently." (1CT 144, italics added.)

This instruction was sufficient to assist the jury in evaluating Blassingame and Gibson's testimonies and to provide helpful context with respect to: (1) Blassingame's testimony that he could not tell whose voice screamed for help when his apartment was across from, but not adjacent to, appellant's apartment (2RT 49, 57); (2) Blassingame's testimony that he knew appellant for about one year (2RT 47); (3) Gibson's testimony that she heard appellant say "call the police," but did not hear a female voice, when her wall was adjacent to appellant's apartment and (2RT 77-78, 82); (4) how much weight to assign Gibson's testimony when her trial testimony somewhat conflicted with her January 5, 2016 statement to investigating

officers that she heard appellant say "call the police," but that she also heard a female voice in the apartment (3RT 280-283, 291); and (5) Gibson's testimony that she was friends with, and had a "longstanding relationship" with, appellant because they were neighbors (2RT 89).

In light of the evidence presented and the fact that the court instructed the jury on relevant factors when evaluating witness testimony, as discussed above, the addition of a specific "earwitness" instruction would have been duplicative. (See *Canizalez, supra*, 197 Cal.App.4th at p. 857 [where given "instructions fully and adequately advise the jury upon a particular issue," additional instruction properly refused]; *People v. Gonzales* (2011) 54 Cal.4th 1234, 1276 [denial of a pinpoint instruction that "a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder" was affirmed as duplicative of the given pattern jury instruction that "[m]ere knowledge that a crime is being committed and a failure to prevent it does not amount to aiding and abetting"].) Moreover, appellant does not contend that CALCRIM No. 226 was inadequate. (See *People v. Harrison* (2005) 35 Cal.4th 208, 253-254 [pinpoint instruction on a witness who testified in hope of leniency was duplicative of the given pattern instructions, of which the defendant cited no authority for the argument that they were inadequate].)

Because an "earwitness" identification instruction would have been duplicative of CALCRIM No. 226, there was a tactical reason for defense counsel to not request the type of "earwitness" identification instruction appellant asserts was necessary. (See *Fernandez*, 216 Cal.App.4th at p. 565.) Accordingly, there was no deficient performance.

There was also no prejudice. The "earwitness" identification instruction appellant contends was necessary merely would have provided the jury with more overlapping factors on how to evaluate Blassingame and Gibson's testimonies about the voice they heard coming from appellant's apartment. (See AOB 55-57 [proposing a list of instructions that could have been given].) But as previously discussed, the jury already had an instruction—CALCRIM No. 226—guiding them in their evaluation of those testimonies.

Without acknowledging this instruction, appellant claims the jury's verdict indicates it rejected Gibson's testimony that she heard appellant tell her to call for police. (AOB 58-59.) He also argues that with the instruction, the jury would have been more likely to believe Gibson. (AOB 58-59.) Both points are speculative. The verdict alone does not indicate whether the jury accepted Gibson's testimony; the jury could have believed her, but not believed appellant's story that he killed Denton only in self-defense. Moreover, there is no concrete basis for the

assertion that a duplicative instruction would have rendered Gibson more credible in the jury's mind.  There is no reasonable probability that the jury would have reached a more favorable verdict if defense counsel had requested an "earwitness" instruction.  (See *Strickland, supra,* 466 U.S. at p. 694.)

Because appellant cannot show prejudicial deficient performance by his defense counsel with regard to an "earwitness" instruction, his second ineffective assistance of counsel claim must be rejected.

IV.  **Appellant forfeited his prosecutorial error claim; but in any event there was no prosecutorial error during the closing rebuttal argument and any potential error was harmless; and the ineffective assistance claim fails as well.**[11]

Appellant argues the prosecutor committed prejudicial error in her closing rebuttal argument, "sandbagging" defense counsel by "sav[ing] all comment on the physical evidence" (AOB 74) for her rebuttal argument that was "immune to defense reply" (AOB 71).  Defense counsel did not object during the prosecutor's rebuttal argument, which appellant admits constitutes forfeiture

---

[11] Prosecutorial "error" is a more apt description of appellant's claim since there is no evidence the prosecutor intentionally or knowingly committed misconduct.  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667; see ABA House of Delegates, Resolution 100B (August 9-10, 2010) [adopting resolution urging appellate courts to distinguish between prosecutorial "error" and "misconduct"].)

of the claim. (AOB 76.) Appellant asserts, however, the lack of an objection constitutes ineffective assistance of counsel. (AOB 76-77.) These arguments are meritless.

Notwithstanding appellant's concession that this claim is forfeited, there was also no error because the prosecutor's rebuttal argument was responsive to defense counsel's reliance on appellant's testimony to bolster the self-defense theory. Contrary to the case appellant primarily relies on, in which the rebuttal argument was 10 times longer than the initial closing argument, the prosecutor's rebuttal here was shorter than the initial closing argument. In any event, any error was harmless because the alleged error was limited to argument, which the court instructed the jury was not evidence. Appellant's ineffective assistance claim also fails because he cannot show deficient performance or prejudice.

A.    Closing arguments

The prosecutor began her closing argument by reviewing the evidence of what happened outside appellant's apartment before, during, and after appellant killed Denton, such as the video surveillance and the testimonies of appellant's neighbors, Blassingame and Gibson. (4RT 397-405.) She then discussed the flight instruction; how appellant left his apartment the morning after killing Denton and visited his ex-girlfriend, Dorsey; and the importance and credibility of Dorsey's testimony. (4RT 405-408.)

The prosecutor recapped how Denton's body was found and how appellant was arrested, and she argued that appellant's failure to mention after his arrest that he acted in self-defense discredited his self-defense theory. (4RT 408-411.) She reiterated the testimony and evidence related to Denton's autopsy, and how 15 to 17 of the 22 blows to Denton's head were potentially fatal. (4RT 411-412.) The prosecutor explained the jury instructions related to the degrees and elements of murder and the instructions related to appellant's self-defense theories. (4RT 412-417.) She argued that appellant was guilty of first degree murder based in part on the following: (1) the duration of the fight; (2) appellant's false testimony that he accidentally ripped off Denton's tank top during the fight, which suggested appellant fabricated the story to explain why Denton's body was found without a shirt and with staples in the chest; (3) video surveillance showing appellant leaving his apartment on January 1, which suggested appellant cleaned himself of the blood from the night before; and (4) the fact that appellant locked his apartment door before leaving. (4RT 417-418.)

Defense counsel retold appellant's version of events, as explained in appellant's testimony, including that Denton was using drugs when appellant saw him outside the liquor store and that the fight between the two started when appellant confronted Denton about the two missing cellphones. (4RT 420-422.)

Counsel gave a blow-by-blow account of how Denton attacked appellant, similar to appellant's testimony, and emphasized that appellant was "throwing everything at this young man who will not stop attacking him" and that he was "struggling to survive." (4RT 422-423.)  He described all of appellant's defensive responses to Denton's advances, including throwing canned goods at Denton, stapling Denton, biting Denton, and hitting Denton's head with an iron. (4RT 422-423.)  Defense counsel then argued appellant committed a justifiable homicide by acting in self-defense because "[t]hat's what all the evidence show[ed]." (4RT 424-425.)  Counsel noted and explained the specific jury instructions related to his self-defense theories, circumstantial evidence, and the prosecutor's burden of proof. (4RT 427-432.)

He then reviewed all the evidence, other than appellant's testimony, that supported appellant's self-defense theories, including: Blassingame and Gibson's testimonies about the voices they heard come from appellant's apartment; Dorsey's testimony about the injury she saw on appellant's head when he visited her; testimony from Officer Ochoa that he looked through a drawer, which counsel characterized as "compromise[ing] the scene"; how Denton's autopsy revealed an initial possible positive test for drugs and a high blood alcohol content level and; and how the blood near the door of the apartment showed appellant was trying to get Denton out of the apartment, not keep him in. (4RT

432-435.)  Defense counsel again reviewed appellant's testimony about why and how he acted in self-defense, and reiterated his argument that appellant acted in self-defense.  (4RT 435-437.) Counsel multiple times described the case as one of self-defense (see, e.g., 4RT 424, 431, 437, 438), and noted it was the prosecutor's burden to prove appellant did not act in self-defense (4RT 437.)  At the end of his argument he noted that the prosecutor would "try to answer any questions that I may have brought up."  (4RT 438.)

In rebuttal, the prosecutor began by informing the jury that her final argument was "in rebuttal to anything that the defense might have brought up that I feel needs addressing."  (4RT 439-440.)  She discussed circumstantial evidence and asserted that she disagreed with defense counsel's interpretation of the evidence as showing appellant acted in self-defense. (4RT 440.)

The prosecutor argued that "nothing" appellant testified to "made any sense relative to the actual evidence that we have in this case; the physical evidence, the photographic evidence, the video evidence." (4RT 441.)  The prosecutor supported this argument by discussing how the evidence was inconsistent with appellant's testimony as to his fight with Denton, including: no one found the two cellphones appellant claimed Denton took; video surveillance showed appellant was not covered in blood when he left his apartment, indicating he cleaned himself some

time after killing Denton; the positioning of appellant and Denton's bodies while Denton purportedly choked him with the iron's cord did not make sense; the secondary drug testing of Denton was negative for methamphetamine; appellant said the lights were off in the apartment, which contradicted his testimony that he was looking for clothes for Denton; appellant's claim that he ripped off Denton's tank top after stapling Denton's chest was inconsistent with the fact that the tank top was not ripped and that the staples were still in Denton's chest when his body was found; appellant's explanation for the blood on the door did not comport with the amount of blood found; and there was no damage to the apartment walls to support appellant's testimony that Denton punched the walls. (4RT 441-452.)

She also noted that appellant's timeline of events was inconsistent with the video surveillance, such as the fact that he said the fight began after Denton reentered the apartment, but the video showed him reentering at 10:30 p.m. and Blassingame did not hear any fighting until an hour after that. (4RT 446, 450.) The prosecutor concluded her rebuttal argument by discussing voluntary manslaughter and arguing that appellant's killing was murder, not manslaughter. (4RT 454-456.) She also twice emphasized that the "physical evidence [was] completely inconsistent with [appellant's] trial testimony." (4RT 454, 456.)

Defense counsel did not object during or after the prosecutor's rebuttal argument.

### B.    Appellant forfeited his prosecutorial error claim

"To preserve a claim of prosecutorial [error] for appeal, [appellant] must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553; *People v. Parson* (2008) 44 Cal.4th 332, 359.)  There are three exceptions to this rule: (1) the objection or request for admonishment would have been futile, (2) the admonishment would be insufficient to cure the error, or (3) the trial court immediately overruled the objection, leaving appellant without an opportunity to request an admonishment.  (*People v. Panah* (2005) 35 Cal.4th 395, 462.)  For one of these exceptions to apply, appellant must show that it is supported by the record.  (*Ibid.*)

Appellant concedes that defense counsel did not object, yet does not assert that one of these exceptions applies.  (AOB 76.)  Thus, as appellant acknowledges, this claim is forfeited.  (AOB 76 ["By failing to timely object to the unfair argument on the basis it was improper rebuttal, counsel waived a meritorious issue on appeal."]; see also *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["[Defendant] acknowledges that his counsel did not object to this rebuttal argument; thus, any argument of prosecutorial misconduct is waived."].)

66

Appellant also maintains that defense counsel's failure to object constituted ineffective assistance of counsel. (AOB 75-76.) but as described *post*, in Section IV.E, this argument also must be rejected. There was no error, and thus there was a tactical reason for not objecting; moreover, no prejudice can be shown. (See *Thompson*, *supra*, 49 Cal.4th at p. 122; *Fernandez*, *supra*, 216 Cal.App.4th at p. 565.)

C.   The prosecutor's rebuttal argument was shorter than her initial closing argument and was responsive to the self-defense theory asserted in defense counsel's closing argument

Appellant argues the prosecutor "sandbagged" defense counsel by giving "an artfully slender opening argument that primarily addressed consciousness of guilt evidence" (AOB 71), and then saved her argument "attack[ing] any basis for a voluntary manslaughter conviction" (AOB 68) until her rebuttal closing argument.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, in the context of the whole argument and the instructions, there was a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Centeno* (2014) 60 Cal.4th 659, 667, citations, quotation marks, and brackets omitted.) "In conducting this inquiry, [the Court] 'do[es] not lightly infer' that the jury drew the most damaging rather than

67

the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, citation omitted, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

With regard to closing arguments in particular, section 1093, subdivision (e), permits the prosecutor and defense counsel, at the close of evidence, to argue the case to the court and jury. The prosecutor has the right to open the argument and to close the argument. (§ 1093, subd. (e).) "Rebuttal argument must permit the prosecutor to fairly respond to arguments by defense counsel." (*Bryden, supra*, 63 Cal.App.4th at p. 184.) A prosecutor thus can make comments in rebuttal that are "fairly responsive to argument of defense counsel and are based on the record." (*People v. Hill* (1967) 66 Cal.2d 536, 560.) What is not allowed, however, is a "perfunctory" initial closing argument followed by a substantially longer rebuttal argument. (See *People v. Robinson* (1995) 31 Cal.App.4th 494, 505.) Such a tactic by a prosecutor "preclude[s] effective defense reply." (*Ibid*.)

For example, in *Robinson*, the prosecutor's rebuttal argument was 10 times longer than his initial closing argument, constituting some 35 pages of reporter's transcript as compared to the three-and-one-half page initial closing argument. (*Robinson, supra*, 31 Cal.App.4th at p. 505.) *Robinson* held that this tactic, in addition to the prosecutor's withholding of

exculpatory evidence and prejudicial questioning of a particular witness, constituted prosecutorial error. (*Id.* at pp. 502-505.)

Appellant relies primarily on *Robinson* for his prosecutorial error claim here. (See, e.g., AOB 71-72.) *Robinson* is distinguishable for several reasons. First, contrary to appellant's contention (AOB 72 [claiming the initial closing argument was shorter than the rebuttal]), the prosecutor's rebuttal argument (19 transcript pages) was *shorter than* her initial closing argument (23 transcript pages) by four pages. (Compare 4RT 396-418 with 4RT 439-457.) This contrasts significantly with *Robinson*, where the rebuttal argument was *10 times longer* than the initial closing argument. (*Robinson, supra*, 31 Cal.App.4th at p. 505; see also *Fernandez, supra*, 216 Cal.App.4th at pp. 563-564 [no *Robinson* error where the prosecutor's rebuttal argument was six pages shorter than the initial closing argument].)

Additionally, appellant overstates any alleged substantive similarities between the prosecutor's arguments here and those in *Robinson*. Appellant contends the prosecutor "for the first time" raised arguments or highlighted evidence in the rebuttal argument, and lists 19 bullet points he claims the prosecutor waited for rebuttal to discuss. (AOB 64-68, 72-74.) Several of these points actually were discussed by the prosecutor in her initial closing argument, such as: the video evidence (compare 4RT 397-405 with AOB 64); the details of Denton's injuries

69

(compare 4RT 411-412 with AOB 65); how Denton's clothing before the fight, as shown by video surveillance, did not comport with appellant's testimony that he ripped off Denton's tank top (compare 4RT 417 with AOB 66); the inconsistency between the staples found in Denton's chest and appellant's claim he ripped the tank top after stapling Denton's chest (compare 4RT 417 with AOB 67, 73); that Denton left appellant's apartment twice before the fight (compare 4RT 399 with AOB 73); and Denton's body was found with bite marks and without a shirt, and with staples in the chest (compare 4RT 417-418 with AOB 73).

To the extent any of the other points appellant highlights were not raised by the prosecutor in her initial closing argument, they were "a fair response to the theory posed in appellant's closing argument." (*Fernandez, supra*, 216 Cal.App.4th at p. 564.) The theme of defense counsel's closing argument was that appellant killed Denton in self-defense. (See, e.g., 4RT 424, 431, 437, 438.) To support that theory, counsel relied primarily on appellant's testimony as to what occurred during the fight with Denton in the apartment, and then argued that the other evidence corroborated appellant's story. (See, e.g., 4RT 422-423, 432-435.) In rebuttal, the prosecutor pointed to various pieces of evidence, all of which were in the record, that showed inconsistencies with appellant's testimony. (See, e.g., 4RT 454 ["The physical evidence [was] completely inconsistent with

[appellant's] trial testimony."].)  In doing so, she used the evidence to try to discredit the primary basis—appellant's testimony—for the self-defense theory asserted in defense counsel's argument.  Attempting to show inconsistencies between the main evidentiary basis of defense counsel's theory and the remainder of the evidence is a permissible and fair response.

Contrary to appellant's assertion (AOB 74), the prosecutor discussed the physical evidence in both her initial and rebuttal closing arguments.  *Robinson* error does not occur simply because the prosecutor discussed some pieces of evidence in her rebuttal that she did not mention or equally emphasize in her initial argument.  Doing so is permissible and necessary so that the prosecutor can fairly respond to defense counsel's closing argument. (See *Fernandez, supra,* 216 Cal.App.4th at p. 564; *Bryden, supra,* 63 Cal.App.4th at p. 184; *Hill, supra,* 66 Cal.2d at p. 560.)  Moreover, both defense counsel and the prosecutor informed the jury that the prosecutor would be responding to new points counsel made in his closing argument.  (4RT 438, 439-440.)

Finally, because this is the only prosecutorial error claim raised by appellant, this is not a case of cumulative prosecutorial error like that in *Robinson,* in which the court found error both before and during trial.  (See *People v. Reyes* (2016) 246 Cal.App.4th 62, 74-75 [finding no cumulative prosecutorial error

and distinguishing *Robinson* because the court there reversed based on multiple instances of prosecutorial error].)

Appellant's reliance on *Robinson* is thus misplaced here, and his prosecutorial error claim lacks merit.

D.   In any event, any error was harmless

Even assuming that the prosecutor's remarks amounted to error, appellant was not prejudiced.  Appellant contends this "was an error of federal constitutional dimension."  (AOB 77.) But prosecutorial error violates the federal Constitution only when it "comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."  (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, internal quotation marks and citation omitted.)  Only under those circumstances is the error prejudicial unless it is harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 24; see *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1269.)

But generally, "[p]rosecutorial misconduct is cause for reversal only when it is reasonably probable that a result more favorable to [appellant] would have occurred had the [prosecutor] refrained from the comment attacked by [appellant]."  (*People v. Milner* (1988) 45 Cal.3d 227, 245, quotation marks and citation omitted, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; see also *Watson, supra*, 46

Cal.2d at p. 836.)  Thus, when the misconduct does not result in a fundamentally unfair trial, the error is one of state law. (*Parson, supra,* 44 Cal.4th at p. 359.)

Here, the *Watson* standard applies because the alleged prosecutorial error did not render the trial "fundamentally unfair." (*Gionis, supra,* 9 Cal.4th at p. 1215.)  The alleged error was limited to the prosecutor's rebuttal closing argument and was not part of pattern of conduct affecting the entire trial.  (See *ibid.*)

Regardless, the alleged error was harmless under either the *Watson* or *Chapman* standard.  The court instructed the jury that what the attorneys said in their closing arguments was not evidence.  (1CT 142; 4RT 463.)  Because jurors are presumed to follow admonitions given to them by the trial court, any prejudice from the prosecutor's comments was offset by this instruction. (*Bryden, supra,* 63 Cal.App.4th at p. 184.)  Indeed, jurors generally treat comments by prosecutors as words of an advocate who attempts to persuade. (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)  Defense counsel and the prosecutor also informed the jury that the prosecutor's rebuttal would include arguments in response to defense counsel's closing argument, thereby making them aware of the purpose of the rebuttal.  (4RT 438, 439-440.) Moreover, as discussed *ante,* in Sections I.C, II.D, and III.B, overwhelming evidence supported the jury's verdict.

Accordingly, appellant cannot show prejudicial error.

E.   Defense counsel's decision to not object during the rebuttal argument was not ineffective assistance of counsel

Appellant additionally contends that defense counsel provided ineffective assistance by not doing one of the following: objecting to the prosecutor's rebuttal argument, requesting a sur-rebuttal argument, or moving for a mistrial. (AOB 75.)  As described *ante*, in Section II.F, to establish ineffective assistance, appellant must show deficient performance and prejudice. (*Strickland, supra*, 466 U.S. at p. 688.)  Appellant cannot show either here.

As discussed *ante*, in Section IV.C, the prosecutor did not commit *Robinson* error because her rebuttal was a fair response to defense counsel's closing argument.  And defense counsel told the jury that the prosecutor was going to use the rebuttal to address issues he raised during his argument.  (4RT 438.) Because defense counsel indicated he understood the scope of what the prosecutor could do in the rebuttal, and without any error by the prosecutor in her rebuttal, there was a tactical reason for counsel not to object, seek a sur-rebuttal, or move for a mistrial.  (See *Fernandez*, 216 Cal.App.4th at p. 565; *Thompson, supra*, 49 Cal.4th at p. 122.)  Thus, there was no deficient performance.

Appellant also cannot show prejudice. He argues that in rebuttal, the prosecutor accused appellant of lying and misstated appellant's testimony, but defense counsel had no opportunity to respond to such accusations. (AOB 79-81.) However, defense counsel did have such an opportunity—his closing argument; and he used his argument to bolster appellant's credibility. He substantially and repeatedly highlighted appellant's testimony during his closing argument. (See, e.g., 4RT 420-425, 435-437.) A sur-rebuttal argument would have simply been repetitive of defense counsel's closing argument, in which he tried using the evidence to corroborate appellant's testimony. Moreover, the inconsistencies between appellant's testimony and the evidence that the prosecutor noted in her rebuttal were all in the record prior to the arguments and thus available for the jury to evaluate without the prosecutor noting them. Even an objection that curtailed the prosecutor's argument would not have prevented the jury from assessing those inconsistencies. There is also no prejudice for the reasons discussed *ante*, in Sections I.C, II.D, III.B, and IV.D.

Without a showing of deficient performance or prejudice, appellant's third and final ineffective assistance of counsel claim fails.

75

## CONCLUSION

For the reasons described above, respondent respectfully requests that the judgment be affirmed.


Dated:  October 30, 2018          Respectfully submitted,

XAVIER BECERRA
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
LANCE E. WINTERS
Senior Assistant Attorney General
PAUL M. ROADARMEL, JR.
Supervising Deputy Attorney General


CHARLES J. SAROSY
Deputy Attorney General
Attorneys for Respondent

LA2018600632
62949429.doc

## DECLARATION OF ELECTRONIC SERVICE AND SERVICE BY U.S. MAIL

Case Name:   **People v. Michael Campbell**  No.:       **B288428**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collecting and processing electronic and physical correspondence. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business. Correspondence that is submitted electronically is transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies of said correspondence through the mail via the United States Postal Service or a commercial carrier.

On <u>October 30, 2018</u>, I electronically served the attached [**RESPONDENT'S BRIEF**] by transmitting a true copy via this Court's TrueFiling system. Because one or more of the participants in this case have not registered with the Court's TrueFiling system or are unable to receive electronic correspondence, on <u>October 30, 2018</u>, I placed a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 300 South Spring Street, Suite 1702, Los Angeles, CA 90013, addressed as follows:

The Hon. Curtis B. Rappe, Judge
Los Angeles County Superior Court
210 West Temple Street
Los Angeles, CA 90012-3210

On October 30, 2018, I served the attached **RESPONDENT'S BRIEF** by transmitting a true copy via electronic mail to:

Gail Harper. Attorney for Appellant; and
Deann Rivard, Deputy District Attorney, Los Angeles County District Attorney's Office

The <u>**one copy**</u> for the California Appellate Project were placed in the box for the daily messenger run system established between this Office and (CAP) in Los Angeles for same day, personal service

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on October 30, 2018, at Los Angeles, California.

| D. Arciniega | */s/ D. Arciniega* |
|---|---|
| Declarant | Signature |

LA2018600632
63012366.docx

# CERTIFICATE OF COMPLIANCE

I certify that the attached RESPONDENT'S BRIEF uses a 13 point Century Schoolbook font and contains 14,091 words.

Dated:  October 30, 2018      XAVIER BECERRA
                              Attorney General of California


                              CHARLES J. SAROSY
                              Deputy Attorney General
                              Attorneys for Respondent


The End
October 30th 2018

Appellant's Opening Brief  (August 1st 2018)

# EXHIBIT  F

8/1/2018

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

PEOPLE OF THE STATE OF CALIFORNIA,      )
                                        )
        Plaintiff and Respondent,       )   2 Crim. B288428
                                        )
        vs.                             )
                                        )
MICHAEL CAMPBELL,                       )   Los Angeles County
                                        )   Superior Court
        Defendant and Appellant.        )   No. BA442781
                                        )
                                        )

APPEAL FROM THE JUDGMENT OF THE
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

HONORABLE CURTIS B. RAPPE, JUDGE

**APPELLANT'S OPENING BRIEF** (HE)

August 1st 2018

GAIL HARPER
Attorney at Law
P. O. Box 330057
San Francisco, CA 94133
Telephone: (415) 291-8469
State Bar No. 104510

Attorney for Appellant
by appointment of the Court of
Appeal

Exhibit "F"

# TABLE OF CONTENTS

**Page**

STATEMENT OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    PROSECUTION CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        The Killing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        Events Following the Killing. . . . . . . . . . . . . . . . . . . . . . 4

    DEFENSE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    REBUTTAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    FAILURE TO INSTRUCT THE JURY ON SUDDEN
     QUARREL, HEAT OF PASSION, PROVOCATION,
     AND VOLUNTARY MANSLAUGHTER REQUIRES
     REVERSAL OF CAMPBELL'S MURDER CONVICTION. . . . 19

    A.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF CONTENTS

Page

C.    The Trial Court Was Required to Instruct the Jury in the Language of CALCRIM No. 570, Whether or Not the Defense Requested or Objected to It. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    The Error Prejudiced Campbell. . . . . . . . . . . . . . . . 23

    1.    Standard for Assessing Prejudice. . . . . . . . . . . . 23

    2.    The Prosecutor's Case for Malice, and Therefore For Murder, Was Weak; The Defense Case for Sudden Quarrel And Heat of Passion Was Strong. . . . . . . . . . . . 26

II.    INSTRUCTING THE JURY IT COULD CONSIDER APPELLANT'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 32

A.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . 32

C.    The Issue is Not Forfeited on Appeal. . . . . . . . . . . . 33

D.    The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight. . . . . . . . . . . . . . . . . . . . . . . . 34

ii

# TABLE OF CONTENTS

**Page**

E.   CALCRIM 372 Lessened The Prosecution's
Burden Of Proof and Violated Appellant's 6th
And 14th Amendment Rights...................... 40

F.   The Error Was Prejudicial. ........................ 44

III.  CAMPBELL WAS DEPRIVED OF HIS SIXTH
AMENDMENT RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL BECAUSE TRIAL
COUNSEL FAILED TO REQUEST AN INSTRUCTION
ON "EARWITNESS" IDENTIFICATION.................. 47

A.   Facts. ......................................... 47

B.   The Law Pertaining to Ineffective Assistance ........ 49

C.   Trial Counsel Was Ineffective For Failing to
Request a Modified Version of CALCRIM
No. 315 or Other Appropriate Instruction to
Assist the Jury in Evaluating the "Earwitness"
Testimony Presented by The Prosecutor............ 51

     1.   Trial Counsel Failed to Request a
Necessary  Earwitness Identification
Instruction To Help The Jury Assess
Rose's Crucial Testimony That She
Heard Campbell Yelling for Her to
Call The Police. ........................... 51

iii

# TABLE OF CONTENTS

**Page**

2.    There is a Reasonable Probability that A More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction.............. 58

IV.    PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL. ............... 60

A.    Relevant Proceedings............................. 60

    1.    Prosecutor's Opening Argument.............. 60

    2.    Defense Closing Argument. .................. 61

    3.    Prosecutor's Rebuttal Argument.............. 64

B.    Standards of Review............................. 68

    1.    Prosecutorial Misconduct.................... 68

    2.    Ineffective Assistance of Counsel. ............ 69

C.    The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal..................................... 69

    1.    Applicable Principles. ...................... 69

iv

8/1/2018

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION FOUR

PEOPLE OF THE STATE OF CALIFORNIA,            )
                                              )
        Plaintiff and Respondent,             )     2 Crim. B288428
                                              )
        vs.                                   )
                                              )
MICHAEL CAMPBELL,                             )     Los Angeles County
                                              )     Superior Court
        Defendant and Appellant.              )     No. BA442781
                                              )
_____      )

APPEAL FROM THE JUDGMENT OF THE
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

HONORABLE CURTIS B. RAPPE, JUDGE

## APPELLANT'S OPENING BRIEF (HC)

                        GAIL HARPER
                        Attorney at Law
                        P. O. Box 330057
August 1st 2018         San Francisco, CA 94133
                        Telephone:  (415) 291-8469
                        State Bar No. 104510


                        Attorney for Appellant
                        by appointment of the Court of
                        Appeal

                              Appendix "E"

# TABLE OF CONTENTS

**Page**

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    PROSECUTION CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        The Killing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        Events Following the Killing . . . . . . . . . . . . . . . . . . . . . . 4

    DEFENSE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    REBUTTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    FAILURE TO INSTRUCT THE JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER REQUIRES REVERSAL OF CAMPBELL'S MURDER CONVICTION . . . . 19

    A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

# TABLE OF CONTENTS

**Page**

C.    The Trial Court Was Required to Instruct the Jury in the Language of CALCRIM No. 570, Whether or Not the Defense Requested or Objected to It. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    The Error Prejudiced Campbell. . . . . . . . . . . . . . . . . . 23

    1.    Standard for Assessing Prejudice. . . . . . . . . . . 23

    2.    The Prosecutor's Case for Malice, and Therefore For Murder, Was Weak; The Defense Case for Sudden Quarrel And Heat of Passion Was Strong. . . . . . . . . . . 26

II.    INSTRUCTING THE JURY IT COULD CONSIDER APPELLANT'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . 32

C.    The Issue is Not Forfeited on Appeal. . . . . . . . . . . . . 33

D.    The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii

# TABLE OF CONTENTS

**Page**

E.    CALCRIM 372 Lessened The Prosecution's Burden Of Proof and Violated Appellant's 6th And 14th Amendment Rights....................... 40

F.    The Error Was Prejudicial. ........................ 44

III.    CAMPBELL WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION................. 47

A.    Facts. ......................................... 47

B.    The Law Pertaining to Ineffective Assistance ........ 49

C.    Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by The Prosecutor............. 51

    1.    Trial Counsel Failed to Request a Necessary Earwitness Identification Instruction To Help The Jury Assess Rose's Crucial Testimony That She Heard Campbell Yelling for Her to Call The Police. .............................. 51

iii

# TABLE OF CONTENTS

Page

2.   There is a Reasonable Probability that A More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction. . . . . . . . . . . . 58

IV.   PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . 60

A.   Relevant Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . 60

1.   Prosecutor's Opening Argument. . . . . . . . . . . . 60

2.   Defense Closing Argument. . . . . . . . . . . . . . . . 61

3.   Prosecutor's Rebuttal Argument. . . . . . . . . . . . 64

B.   Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . 68

1.   Prosecutorial Misconduct. . . . . . . . . . . . . . . . . 68

2.   Ineffective Assistance of Counsel. . . . . . . . . . . 69

C.   The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

1.   Applicable Principles. . . . . . . . . . . . . . . . . . . 69

iv

# TABLE OF CONTENTS

**Page**

2.    The Prosecutor Improperly Sandbagged The Defense in Rebuttal Argument. . . . . . . . . . 71

D.    The Misconduct Was Prejudicial. . . . . . . . . . . . . . . . . 75

E.    Defense Counsel's Failure to Object to the Prosecutor's Misconduct Denied Campbell His Sixth Amendment Right to Effective Assistance of Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . 75

1.    Standard For Evaluating Claims of Ineffective Assistance of Counsel. . . . . . . . . . . 76

2.    Trial Counsel Was Ineffective. . . . . . . . . . . . . . . 76

3.    The Error Was Prejudicial . . . . . . . . . . . . . . . . . . 77

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

v

# TABLE OF AUTHORITIES

Pages

## CONSTITUTIONS

United States Constitution

      Fifth Amendment.................................................... 17, 32, 41, 77-78

      Sixth Amendment. .................... 17-18, 25, 32, 34, 40-41, 47. 75, 77

      Fourteenth Amendment. ........ 17, 20, 25, 32, 34, 40-41, 49, 77-78

California Constitution

      Article I

            section 7. ............................................................... 49

            section 15. ............................................................. 49

## FEDERAL CASES

*Alberty v. United States* (1896),
    162 U.S. 499. ................................................................. 42

*Beck v. Alabama* (1980),
    447 U.S. 625. ................................................................. 25

*Berger v. United States* (1934),
    295 U.S. 78. ................................................................... 70

*Carella v. California* (1989),
    491 U.S. 263. ................................................................. 40

*Chapman v. California* (1967),
    386 U.S. 18. ................................................. 23, 26, 44, 75, 78, 81

*Estelle v. McGuire* (1991),
   502 U.S. 62 ................................................................................ 41

*Herring v. New York* (1975),
   422 U.S. 853. ............................................................................ 78

*Jackson v. Virginia* (1979),
   443 U.S. 307 . ........................................................................... 78

*Keeble v. United States* (1973),
   412 U.S. 205 . ...................................................................... 23-24

*Leary v. United States* (1969),
   395 U.S. 6, 36. .......................................................................... 40

*Mullaney v. Wilbur* (1975),
   421 U.S. 684. ............................................................................ 29

*Ornelas v. United States* (1996),
   517 U.S. 690. ............................................................................ 68

*Patterson v. New York* (1977),
   432 U.S. 197. ............................................................................ 40

*Sandstrom v. Montana* (1978),
   442 U.S. 510 . ........................................................................... 40

*Strickland v. Washington* (1984),
   466 U.S. 668. ....................................................... 46, 49, 58, 77

*Sullivan v. Louisiana* (1993),
   508 U.S. 275... .......................................................................... 25

*Ulster County Court v. Allen* (1979),
   442 U.S. 140. ............................................................................ 41

*Victor v. Nebraska* (1994),
   511 U.S. 1, 15. .......................................................................... 78

*Vujosevic v. Rafferty* (3d Cir. 1988),
    844 F.2d 1023 ........................................................... 25

*Wong Sun v. United States* (1963),
    371 U.S. 471 ............................................................ 42

*In re Winship* (1970),
    397 U.S. 358 ........................................................ 25, 40-41

## STATE CASES

*College Hospital, Inc. v. Superior Court* (1994),
    8 Cal.4th 704 ........................................................... 46

*People v. Adanandus* (2007),
    157 Cal.App.4th 496 .................................................... 75

*People v. Alvarez* (1996),
    14 Cal.14th 155 ................................................ 20, 32, 68

*People v. Anzalone* (2005),
    130 Cal.App.4th 146 ................................................ 33-34

*People v. Bolton* (1979),
    23 Cal.3d 208 ........................................................... 78

*People v. Bandhauer* (1967),
    66 Cal.2d 524 ........................................................... 71

*People v. Barton* (1995),
    12 Cal.4th 186 ...................................................... 20, 22

*People v. Berryman* (1993),
    6 Cal.4th 1048 ...................................................... 20, 32

*People v. Birks* (1998),
    19 Cal.4th 108 ...................................................... 21, 24

*People v. Blakeslee* (1969),
  2 Cal.App.3d 831............................................................................. 43

*People v. Bradford* (1997),
  14 Cal.4th 1005................................................................ 33, 35, 37

*People v. Breverman* (1998),
  19 Cal.4th 142........................................................................ 20-26

*People v. Bunyard* (1988),
  45 Cal.3d 1189............................................................................ 77

*People v. Burnett* (1999),
  71 Cal.App.4th 151...................................................................... 77

*People v. Carrington* (2009),
  47 Cal.4th 145............................................................................ 35

*In re Christina P.* (1985),
  175 Cal.App.3d 115...................................................................... 76

*People v. Crandell* (1988),
  46 Cal.3d 833...................................................................... 35, 37

*People v. Crayton* (2002),
  28 Cal.4th 346............................................................................ 35

*People v. Cromer* (2001),
  24 Cal.4th 889............................................................................ 68

*People v. Cudjo* (1993),
  6 Cal.4th 585....................................................................... 49, 51

*People v. Daggett* (1990),
  225 Cal.App.3d 751...................................................................... 70

*People v. Flood* (1998),
  18 Cal.4th 470............................................................................ 40

*People v. Fosselman* (1983),
    33 Cal.3d 572............................................................... 51

*People v. Foster* (1992),
    6 Cal.App.4th 1............................................................. 49

*People v. Fremont* (1937),
    22 Cal.App.2d 292 ....................................................... 39

*People v. Fudge* (1994),
    7 Cal.4th 1075............................................................. 53

*People v. Geiger* (1984),
    35 Cal.3d 510............................................................ 24, 26

*People v. Gionis* (1995),
    9 Cal.4th 1196........................................................... 75

*People v. Green* (1980),
    27 Cal.3d 1.............................................................. 39

*People v. Guzman* (1975),
    47 Cal.App.3d 380....................................................... 57

*In re Hall* (1981),
    30 Cal.3d 408........................................................... 77

*People v. Hall* (1980),
    28 Cal.3d 143........................................................... 57

*People v. Hannon* (1977),
    19 Cal.3d 588........................................................... 34

*People v. Harris* (1989),
    47 Cal.3d 1047.......................................................... 75

*People v. Hill* (1967),
    66 Cal.2d 536........................................................... 71

*People v. Hill* (1998),
17 Cal.4th 800.................................................................... 70

*People v. Hussain* (2014),
231 Cal.App.4th 261......................................................... 50

*People v. Howard* (1987),
190 Cal.App.3d 41 ............................................................ 49

*People v. Howard* (2008),
42 Cal.4th 1000.................................................................. 37

*People v. Jackson* (1986),
187 Cal.App.3d 499............................................................ 76

*People v. Jurado* (2006),
38 Cal.4th 72...................................................................... 36

*People v. Ledesma* (1987),
43 Cal.3d 171...................................................... 33, 50, 76

*People v. Licas* (2007),
41 Cal.4th 362.................................................................... 20

*People v. Logan* (1917),
175 Cal.45. .......................................................... 26-27, 31

*People v. Loza* (2012),
207 Cal.App.4th 332.......................................................... 50

*In re Marquez* (1992),
1 Cal.4th 584...................................................................... 33

*People v. Martinez* (1999),
20 Cal. 4th 225................................................................... 39

*People v. McCary* (1985),
166 Cal.App.3d 1................................................................ 77

*People v. Mendoza* (2000),
   24 Cal.4th 130................................................... 35-36, 39, 41, 44

*People v. Mitchell* (1939),
   14 Cal.2d 237.................................................... 26, 31

*People v. Newman* (1999),
   21 Cal.4th 413.................................................... 57

*People v. Nguyen* (1993),
   21 Cal.App.4th 518.............................................. 43

*People v. Pensinger* (1991),
   52 Cal.3d 1210................................................... 36

*People v. Pitts* (1990),
   223 Cal.App.3d 606.............................................. 70

*People v. Palmer* (1984),
   154 Cal.App.3d 79............................................... 53

*People v. Pope* (1979),
   23 Cal.3d 412.................................................... 50

*People v. Rankin* (1992),
   9 Cal.App.4th 430 .............................................. 43

*People v. Richardson* (1978),
   83 Cal.App.3d 853.............................................. 53

*People v. Rios* (2000),
   23 Cal.4th 450.................................................. 21, 26, 29

*People v. Robinson* (1995),
   31 Cal.App.4th 494............................................ 71-72, 74-75

*People v. Rodriguez* (1994),
   8 Cal.4th 1060................................................. 34

*People v. Saddler* (1979),
    24 Cal.3d 671.................................................................. 38-39, 53

*People v. Sedeno* (1974),
    10 Cal.3d 703.................................................................. 22

*People v. Smithey* (1999),
    20 Cal.4th 936................................................................. 37, 39, 69

*People v. Valdez* (2004),
    32 Cal.4th 73................................................................... 34, 39

*People v. Waidla* (2000),
    22 Cal.4th 690................................................................. 20, 32

*People v. Watson* (1956),
    46 Cal.2d 818.................................................................. 46, 81

*People v. Watson* (1977),
    75 Cal.App.3d 384 .......................................................... 35, 39, 75

*People v. Williams* (1988),
    44 Cal.3d 1127................................................................. 43

*People v. Wright* (1988),
    45 Cal.3d 1126................................................................. 53

*People v. Zimmerman* (1980),
    102 Cal.App.3d 647.......................................................... 77

## STATE STATUTES

California Penal Code

    § 187. ........................................................................... 20

    § 192. ........................................................................... 20

§ 1093. ................................................................................ 70-71

§ 1127c.................................................................................. 34

## MISCELLANEOUS

CALCRIM No. 315 .................................................................. 51

CALCRIM No. 372. .............................................. 32, 36, 40-41, 43

CALCRIM No. 570. .................................................. 19-20, 22, 26

Yarmey, Earwitness Speaker Identification, 1 Psychol. Pub.
Pol'y & L. 792, 795 (1995)................................................................. 53

Hollien, H., Majewski, W., & Doherty, E. T.. Perceptual
Identification of Voices Under Normal, Stress and Disguise
Speaking Conditions, Journal of Phonetics, 10, 139-148 (1982). ........ 53

1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 511.......... 30-31

5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936............. 30

## STATEMENT OF APPEALABILITY

This appeal is from a final judgment following a jury trial and is authorized by Penal Code[1] section 1237.

## STATEMENT OF THE CASE

On February 9, 2018, the prosecutor filed an amended information charging appellant, Michael Campbell, with one count of murder (§187, subd. (a)) and alleging that Campbell personally used a deadly and dangerous weapon – a clothing iron. (1Clerk's Transcript[2] 109-110.)

Trial commenced on February 7, 2018. (CT 103; 2 Reporter's Transcript[3] 1).

On February 13, 2018, Campbell entered a not guilty plea to the amended information.  (1CT 112.)

On February 21, 2018, a jury acquitted Campbell of first degree murder, convicted him of second-degree murder, and found the weapons use allegation true. (1CT 159-161; 4RT 502-503.)

On February 23, 2018, the court sentenced Campbell to 15

_____

[1] All references will be to the Penal Code unless otherwise indicated.

[2] Hereinafter referred to as "CT".

[3] Hereinafter referred to as "RT".

1

years to life for count one and imposed a year for the personal use allegation, for a total of 16 years to life. (1CT 165, 168; 4RT 525.)

Notice of appeal was timely filed. (1CT 171-172.)

2

# STATEMENT OF THE FACTS

## PROSECUTION CASE

### The Killing

On December 31, 2015, Michael Campbell occupied Room 58 at the Florence Hotel, a single resident occupancy ("SRO") hotel located at 310 E. 5th Street, in the skid row area of downtown Los Angeles. (2RT 44-47, 60, 93-94, 102.) Surveillance video cameras are located throughout the interior of the building. (2RT 100-101.)

The video evidence shows that, at 9:41 p.m. on New Year's Eve 2015, Campbell entered the front lobby entrance of the Florence Hotel, accompanied by Brian Denton. (2RT 103-106.) They were captured on video entering Campbell's third-floor room, Room 58, at 9:42 p.m. (2RT 108-110.) Brian walked out of the room, down the hallway out of sight, and then returned between 9:45 and 9:48 p.m. (2RT 110-111.) Brian again left the room, greeted several residents, stood near a stairwell, and then returned to the room between 10:25 and 10:30 p.m. (2RT 112, 124-125.)

Around 11:35 or 11:40 p.m., Campbell's neighbor across the hall, Wendell, was awakened by a disturbance in Campbell's room. (2RT 44-48, 53, 95-96.) Wendell heard a lot of banging and slamming. (2RT 47, 53.) Wendell's wall and the mirror hanging on it were shaking. (2RT 48, 53.)

About 20 to 25 minutes after the noise woke Wendell, another neighbor, Rose, came to Wendell's door and asked him to call 911

because she had heard "a bunch of knocking and bamming and fighting" coming from Campbell's room for about 20 minutes. (2RT 48-49, 54-55, 75-79, 95.) Wendell decided to call hotel security instead. (2RT 49, 55.) Wendell could still hear "rumbling" or "wrestling" or "fighting" going on in Campbell's room. (2RT 49.) He heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.) Wendell considered what was happening an "extreme emergency" and called hotel security twice. (2RT 50, 55.) After Wendell called the second time, the fighting stopped and Campbell's room was silent again. (2RT 56-57, 79.)

Hotel security arrived and knocked on Campbell's door, announcing themselves as "security", but when nobody answered, the security officers walked away. (2RT 50, 55-56.) When the security officers banged on the door of Campbell's room, it was quiet inside. (2RT 50.) Wendell told the security officers he had heard people fighting in Campbell's room. (2RT 56.)

### Events Following the Killing

Video footage showed Campbell left the room at 8:13 a.m. on January 1, 2016. (2RT 112-115, 128-129.) He appeared to be wearing

4

the same clothing from the night before. (3RT 299.) He was recorded on video leaving through the front door. (2RT 112-115.) He did not return to the hotel. (2RT 115.)

On January 5, 2016 at 8:24 a.m., hotel security officer Omar Hernandez found Brian's body while conducting a welfare check at Room 58. (2RT 52, 70, 116, 135-136, 144.) Hernandez opened the door with a master key, then closed the door when he saw the body inside. (2RT 65, 68, 65-66, 68, 135-136.) Sometime after 8:24 a.m., the police received a call regarding a suspicious death and went to Campbell's apartment, where officers met with Hernandez. (2RT 59-62.) Initially the officers believed the body on the floor in Campbell's room was Campbell himself. (2RT 62, 66.) The body's face was pale and bloodied, and there were injuries to the face and head. (2RT 66-67.)

The window in the room was closed, but an officer opened it and, while waiting for the detectives to arrive, left it open to clear out the odor of the decaying body. (2RT 62-64, 69, 71-72.) The room had a small closet filled with clothes. (2RT 63-64.) There was a lot of debris on the floor and throughout the room. (2RT 64.)

Brian's body was lying supine on the floor of the ten foot by twelve foot room that contained a closet, a twin bed, a dresser, two tables, and a sink. (2RT 62-65, 3RT 329.) The officers did not go through Brian's pockets or touch the body at all. (2RT 70-71.) Brian's face and head had multiple obvious blunt force injuries. (2RT 66.)

5

Investigators observed blood smears and spatter on the dresser drawers near Brian's head. (3RT 248.) The rug under Brian was soaked in blood. (3RT 247-248.) The area of the bedspread adjacent to Brian's head was also soaked in blood. (3RT 258-259.) A bloody towel and bloody clothing iron with Brian's blood on them were on the bed among several items of clothing, boxes and blankets. (3RT 255-256, 260-261, 294-297.) Multiple blood smears were on the door and on a bag hanging from the interior door handle. (3RT 258.) Blood smears, spatter, and dried blood drips were on the side of that same dresser in the area adjacent to the front door. (3RT 257-258, 270, 272-276.) A blood-soaked white tank top was wadded up on the floor area under the sink. (3RT 251-252, 254-255, 337.) On top of the dresser was a stapler with Brian's blood on it. (3RT 259, 262-263, 294-298.) There were cigarette butts in the ashtray on a table, one of which had Brian's DNA on it. (3RT 252-253, 264, 295, 297.) Brian's blood alcohol level was later determined to be .212. (3RT 196, 239-240.) Presumptive tests showed the presence of MDMA and methamphetamine in Brian's blood, but confirmatory testing was negative for those drugs. (3RT 195-196.)

Neighbor Rose testified she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him.[4] (2RT 89.) Rose stated in a recorded interview that she

---

[4]

The prosecutor impeached Rose with her two felony drug

6

heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." (3RT 281.) She then said she heard Campbell say "No, you let me go." (3RT 281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

The cause of Brian's death was blunt force trauma; and the manner of death was homicide. (3RT 184, 197, 225.) Fifteen to seventeen of the blows were potentially fatal. (3RT 224.) The coroner found staples and possible bite marks on Brian's body. (3RT 197-201, 205.) There were bruises and abrasions on Brian's wrists and hands, which could have been either defensive or offensive wounds, and abrasions on his flanks. (2RT 202-203, 308-309.) There were at least 22 lacerations to Brian's head and face. (3RT 206-214.) The coroner could not say definitively which of those injuries were inflicted before or after Brian died. (3RT 208-209.) There was a fracture to one of Brian's teeth. (3RT 214.) It was difficult to determine what some of Brian's injuries were, given the level of decomposition. (3RT 213-214.)

Dr. Miller testified that the injuries he detailed were consistent with the shape of the clothing iron found at the scene. He also indicated that all of the injuries suffered by Brian were inflicted

---

convictions. (2RT 91.)

7

before he died, including the staple and bite wounds.

On January 5, 2016, Brian Denton, Sr., reported to the Los Angeles Police that his son was missing. (3RT 279-280.) Based on Mr. Denton's description of his son's tattoos, the police realized that the body they had found in Campbell's room was his son. (3RT 280.)

Also on January 5, Detective Pierce conducted a recorded interview with Rose Gibson, who told him she heard banging coming from room 58 through their common wall. (3RT 280-281.) Rose also said she heard a woman's voice saying, "Michael, oh, let me go. Let me go." (3RT 281.) The woman also said, "Give me some money," and Campbell said, "I ain't got no goddamn money." (3RT 282.) Rose said that on New Year's Eve she stayed up until midnight in her room with a friend. (3RT 281-282.) During the course of the interview, Rose repeatedly said she believed Campbell was dead and Angel Dorsey killed him. (3RT 283.)

On January 6, 2016, the police interviewed Angel Dorsey, Campbell's ex-girlfriend. (2RT 136-138, 144-145, 149.) She said that on January 1, 2016, early in the morning, Campbell visited her apartment, located around the corner from his apartment and directly across the street from the Los Angeles Police Department's Central Police Station. (2RT 141-142.) Campbell seemed "excited" and upset, but did not seem inebriated. (2RT 142, 146.) Campbell said Brian was dead in his apartment. (2RT 143.) Dorsey thought Campbell was joking and would not open the door, so Campbell

8

started kicking the door, repeating that Brian was at his place and was dead. (2RT 143.) Dorsey let Campbell in because he looked like he needed help. (2RT 143-144.) Campbell told her that Brian died during a fight. (2RT 145.)

Campbell stayed at Dorsey's place for about four hours. (2RT 146.) Dorsey did not observe any injuries to Campbell's person except to his forehead. (2RT 147-148.) Campbell complained of a headache. (2RT 146-147.)

Campbell was arrested on the night of January 6, 2016. (3RT 175-178, 182-183.) At the time of his arrest, Campbell had bags and a backpack with him, but he did not attempt to flee. (3RT 179-180, 182.)

After receiving his *Miranda* rights, Campbell provided a recorded statement to the police.[5]  (1CT 122-134; 3RT 284-289.) Campbell admitted he knew Brian, that he and Brian had fought and that Brian was dead. (1CT 128-129.) When pressed for details, he said, "I got to be quiet on that." (3RT 128.) He further stated, when told he was being arrested for murder, that he was the only witness, and also stated that his testimony was crucial. (3RT 129-131.) The video of the interview was played for the jury. (3RT 287.)

The prosecutor presented no evidence of motive.

---

[5]

The recording was played for the jury but not reported. (3RT 284-289.)

**DEFENSE CASE**

Campbell testified that he had planned to go out alone to neighborhood bars on New Years Eve, and that he had been drinking during the day. (3RT 317, 351-352, 372.) Campbell left his residence to purchase some items – including alcohol to drink before going out to the clubs – and saw his friend Brian outside of a skid row liquor store smoking methamphetamine from a pipe. (3RT 318-320, 349, 351.) Brian said he was hungry and asked Campbell to buy him food and something to drink. (3RT 319.) Campbell agreed, provided Brian put his drug paraphernalia away. (3RT 319-320.) Campbell bought some soup cups and four cans of "Four Locos", a malt-liquor drink, for Brian and started back to his place. (3RT 320.) Brian asked if he could tag along. (3RT 321.) On the walk to Campbell's residence Brian drank two of the four cans of "Four Locos". (3RT 320-321, 324.) Brian always drank really fast, and Campbell told him to slow down. (3RT 323-324.)

Campbell took Brian back to his room so Brian could change out of his "homeless" clothes into some of Campbell's nicer clothing in order to go out to the clubs together. (3RT 321-323.) Campbell had known Brian for years and acted as a mentor or father figure toward him, lending him clothing and a DVD player. (3RT 322-323, 350, 353.) Brian never took Campbell's things without permission, and always returned them. (3RT 323.) The two also drank together. (3RT 350.)

Campbell was looking through his closet for clothes and shoes when he noticed that Brian was no longer in the room. (3RT 324-325, 354.) Campbell could hear Brian out in the hall. (3RT 325.) Campbell paused to look for his cell phone in order to call his children and saw that both of his cell phones were missing. (3RT 326.) Ordinarily Campbell kept his cell phones on top of his dresser or his stereo. (3RT 327.) He knew Brian had taken them.  (3RT 327.)

Campbell opened his door, called to Brian, and Brian returned to his room, closing the door. (3RT 327-328.) Campbell confronted Brian about the cell phones, which he observed bulging out of Brian's front pants pockets, demanding them back. (3RT 327-328, 355.) When Campbell tried to retrieve his phones, Brian charged him and punched him in the forehead. (3RT 328.) After Brian punched him, Campbell told him he was going to call the police, but he could not get his phone away from Brian. (3RT 328.) Brian blocked the door and charged Campbell, then bear-hugged him and slammed him to the ground, throwing body punches. (3RT 328-330.) Brian was swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.) Campbell did not know if Brian was drunk or still high, but Brian was angry, and he was on top of Campbell. (3RT 330.)

Campbell was able to wriggle out from under Brian and get to his feet, but Brian prevented him from leaving the room. (3RT 330, 374-375.) Campbell told Brian he was going to call the police, but

11

Brian blocked the door. (3RT 330-331.) Brian charged Campbell again, and Campbell started throwing cans of food to keep him away. (3RT 331-332, 334.) Campbell picked up a closed stapler from the dresser and hit Brian with it, then opened it and stapled Brian's chest over Brian's tank top, but Brian pulled out a staple, laughed demonically, and said "Is that all you got old man?" (3RT 332-336, 356.) Campbell was surprised and terrified that Brian was not deterred. (3RT 334.) By this point they had been fighting almost continuously for about ten minutes, while Brian repeatedly threatened to kill Campbell. (3RT 334-335.)

While Campbell was trying to get to the door knob so he could throw Brian out of his room, Campbell tried to grab Brian by the back of his pants, seizing him by the tank top instead. (3RT 336.) The tank top ripped and came off in Campbell's hand. (3RT 337-338.) Brian had put on a glove, saying he was going to whoop Campbell's ass again, and was pounding on the walls and on Campbell with his fists. (3RT 336.) Campbell was desperate. (3RT 337.) Campbell tried throwing Brian out, but his tank top came off in Campbell's hand, so Campbell lost his grip. (3RT 337-338.) Campbell dropped the shirt by the sink and knocked on the wall and screamed for his neighbor, Rose, to call the police. (3RT 338-339.) At that point it had been 10 to 15 minutes since Brian had entered Campbell's room. (3RT 339.)

Brian rushed Campbell again and put him in a choke hold from behind with his right arm around Campbell's neck, cutting off

12

his air. (3RT 339, 357-358.) Campbell repeatedly bit Brian on his arm and elsewhere to break his hold.[6] (3RT 340, 358-360.) While Campbell was on the floor, trying to escape out the door, Brian picked up a clothing iron from the dresser, wrapped the cord around Campbell's neck, and choked him from behind until Campbell was dizzy and breathless. (3RT 340-341, 361-362.) Campbell was scared because he realized that Brian was trying to kill him. (3RT 341.) Campbell tried to get his fingers under the cord to loosen it. (3RT 341-342.) Campbell was able to grab the iron dangling at his left side by the handle and repeatedly strike Brian in the head and the left side of his face while Brian was behind him until the tension in the cord eased up. (3RT 341-343, 361, 373-374, 377.) At no time did Campbell strike Brian with the iron while facing him, nor did he ever kneel over Brian and hit him with the iron while Brian was lying on his back. (3RT 373-374.) Campbell testified that the blood smear by the door resulted from Brian blocking the door while wearing a bloody shirt, preventing Campbell from escaping. (3RT 374-375.)

Campbell crawled to the bed with the cord still wrapped around his neck, shoved some clothes aside, and passed or blacked

---

[6]

Campbell testified on cross that he also bit Brian at other times during the fight, not just while he was being choked, and that he bit Brian wherever he could, not just in the shoulder and neck area. (3RT 359-360.)

13

out. (3RT 343, 361, 363, 377.) Before Campbell passed out, he heard Brian mumbling like a drunk person on the floor. (3RT 343.) Campbell slept until 8 a.m. (3RT 343.)

When Campbell woke up he remembered the fight with Brian. (3RT 343.) Thinking Brian was asleep, Campbell called out to him, telling him to wake up and leave. (3RT 343-344.) When Campbell nudged Brian's leg and discovered he was dead, he panicked and left the building. (3RT 344, 364.) Campbell did not wash up or change clothes. (3RT 364.) He could not recall about what he wore, except that he put something on to wear outside because it was raining. (3RT 364.)

Campbell denied waiting for Brian to die before Campbell left the room, or waiting so that Brian could not get medical treatment. (3RT 376.) Campbell was afraid to call the police, as he was "tying to process" what had happened. (3RT 344-345.) He went to Dorsey's house and told her he had fought with Brian. (3RT 345.) After leaving Dorsey's place, Campbell went out and bought drugs and alcohol. (3RT 345, 352.) Campbell stayed high on meth and drunk continuously for five days until the police picked him up. (3RT 346, 352, 364.) Campbell testified he did not know what happened to the two cell phones be believed Brian had stolen, but he thought he left them in his room, or that he might have taken one with him when he left, but he could not remember. (3RT 372-373.)

During his interview with the police Campbell was not

14

himself. (3RT 346.) He was hallucinating and very upset about Brian attacking him in his home. (3RT 346.) Brian attempted to kill him, and when Brian would not stop attacking him, Campbell tried to get him off of him, tried to get him out of his apartment, and tried to get others to call the police. (3RT 347.) When Campbell hit Brian with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.)

Photographs taken of Campbell's body on January 6, 2016, showed bruises, scrapes and scratches on his chest, back, arms and knees. (3RT 293-294, 308-309, 365-370.) Defense expert Dr. Ryan O'Connor determined the injuries to Campbell were consistent with injuries that were six days old – suggesting that they resulted from the fight with Brian. (3RT 309.)

## REBUTTAL

Brian was living with his maternal grandmother at the time he was killed. (3RT 294, 382.) Brian had received a cell phone for Christmas 2015. (3RT 380.) Brian's biological father had come to the grandmother's residence on December 28, 2015 and picked Brian up to visit with him in downtown Los Angeles. (3RT 294.) Grandmother had spoken with both Brian and his father by phone between 11 a.m. - 1 :00 p.m. on New Year's Eve when the two were together. (3RT 380-382.)

Detective Sharman photographed the bloody tank top found in Campbell's room, and the top had no tears in it. (3RT 383-385.) He

15

did not photograph both sides of the shirt. (3RT 385.) No cell phones were found during a search of Campbell's room, and no cell phones were located on Campbell or his property at the time of his arrest. (3RT 384.) From New Year's Eve until January 5, nobody called the police or anyone else to report Brian missing. (3RT 385.)

## INTRODUCTION

In a murder prosecution (Pen. Code, § 187, subd. (a)) resulting from a fight, the trial court prejudicially erred in failing to instruct, *sua sponte*, on voluntary manslaughter based on sudden quarrel or heat of passion as a lesser included uncharged offense of the charged crime (CALCRIM No. 570), since substantial evidence supported such an instruction. The same evidence of threat and fear of harm that supported a claim of unreasonable self-defense also permitted a manslaughter verdict based on sudden quarrel or heat of passion.

The court instructed the jury it could consider Campbell's act of leaving his residence after the killing to be flight showing consciousness of guilt where there was insufficient evidence of flight. The instruction lessened the prosecution's burden of proof and violated Campbell's 5th, 6th and 14th Amendment rights.

Campbell was deprived of his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to request an instruction on "earwitness" identification where the only witnesses to the killing did not see the event, but heard it through the walls of their hotel rooms, and there was a dispute as to who spoke the words at issue and what was said. The jury needed assistance in assessing the variables affecting the reliability of the earwitness identifications and did not get it.

Wishing for a murder conviction, the prosecutor engaged in prejudicial misconduct by sandbagging the defense in closing

17

argument, omitting nearly all reference to the physical evidence until her rebuttal argument and depriving Campbell of the opportunity to address her argument.

Campbell was deprived of his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to the flight instruction, failed to request the earwitness identification instruction, and failed to object to the prosecutor's misconduct.

18

## ARGUMENT

I.   **FAILURE TO INSTRUCT THE JURY ON SUDDEN QUARREL, HEAT OF PASSION, PROVOCATION, AND VOLUNTARY MANSLAUGHTER REQUIRES REVERSAL OF CAMPBELL'S MURDER CONVICTION**

### A.    Factual Background

On the morning of February 16, 2018, outside the jury's presence, the parties and the court memorialized their off-the-record discussion regarding jury instructions. (4RT 388 - 393-394.) At one point the court stated: "Okay. Then we go to 522, 570, 571, 640. I think there were no objections to any of those." (4RT 392.) No objections were stated.

There were no proceedings between February 16 and February 20. (1CT 136-137.)

When the court instructed the jury on February 20, he failed to give CALCRIM No. 570, which informs the jury that the State must disprove heat of passion on adequate provocation.  After the jury was instructed and retired to deliberate, defense counsel advised the court that Campbell believed the court had failed to give CALCRIM No. 571. (4RT 499.) The court stated he believed "we took that out." (4RT 499.) Defense counsel replied, "I apologize. It was my misunderstanding. His concern was we didn't read 570. I told him we spoke about that yesterday and – " (4RT 499.) The court said, "Yeah, I think we took that one out." (4RT 499.) Defense counsel responded, "I apologize. I misunderstood Mr. Campbell on that."

(4RT 499.)

## B.    Standard of Review

Allegations of instructional error involve a trial court's ruling on an issue of law and are therefore reviewed *de novo*. (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Alvarez* (1996) 14 Cal.14th 155, 217; *People v. Berryman* (1993) 6 Cal.4th 1048, 1089.)

## C.    The Trial Court Was Required to Instruct the Jury in the Language of CALCRIM No. 570, Whether or Not the Defense Requested or Objected to It

The trial court agreed to instruct the jury in the language of CALCRIM No. 570 and nobody objected to it. (4RT 392.) Even had defense counsel objected to the court giving CALCRIM No. 570, the trial court was bound, *sua sponte*, to give the instruction. (*People v. Breverman* (1998) 19 Cal.4th 142, 153 [superseded on another ground by amendment of §189 not relevant here]; *People v. Barton* (1995) 12 Cal.4th 186, 190.)

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code section 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. (Pen. Code section 192, subds. (a) and (b); *People v. Breverman, supra,* 19 Cal.4th 142, 153.) Generally, the intent to kill unlawfully constitutes malice; however, a defendant who intentionally and unlawfully kills lacks malice in limited,

20

explicitly defined circumstances: either when the defendant acts in a sudden quarrel or heat of passion, or when the defendant kills in unreasonable self-defense, i.e., the unreasonable but good faith belief in having to act in self-defense. (*People v. Rios* (2000) 23 Cal.4th 450, 459.) Because sudden quarrel, heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide, voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder. (*Id.* at p. 461.) A lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense or the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

The obligation to instruct on lesser included offenses applies regardless of the parties' requests or objections, and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, encourages a verdict no harsher or more lenient than the evidence merits, and protects the jury's truth-ascertainment function. (*People v. Breverman, supra,* 19 Cal.4th 142, 154-155.) "Just as the prosecution has no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an

21

acquittal when that evidence is sufficient to establish a lesser included offense." (*Breverman, supra*, at p. 155.) "In contrast, a trial court has a more limited duty to instruct, *sua sponte*, on particular defenses, arising 'only if it appears that the defendant is relying on such a defense or if there is substantial evidence to support such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton, supra*, at p. 195, citing *People v. Sedeno* (1974)10 Cal.3d 703, at p. 716.)

A trial court has a *sua sponte* duty to instruct on voluntary manslaughter based on sudden quarrel, heat of passion or imperfect self-defense when evidence of either is "substantial enough to merit consideration" by the jury. (*People v. Breverman, supra*, 19 Cal.4th 142, 153–163; *People v. Barton, supra*, 12 Cal.4th 186, 201.) In a murder prosecution, this duty includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories that have the strongest evidentiary support, or on which the defendant has openly relied. (*People v. Breverman, supra*, 19 Cal.4th 142, 155.)

At trial, the court instructed the jury on justifiable homicide ("reasonable" self-defense) [CALCRIM No. 505] and on the lesser necessarily included offense of voluntary manslaughter ("unreasonable" self-defense) [CALCRIM No. 571], but did not instruct on a sudden quarrel, heat of passion theory of voluntary manslaughter [CALCRIM No. 570]. The trial court erred by failing to

22

instruct, *sua sponte*, on a sudden quarrel, heat of passion theory of voluntary manslaughter, which was also supported by the evidence.

## D.    The Error Prejudiced Campbell

### 1.    Standard for Assessing Prejudice

The California Supreme Court assesses prejudice resulting from the omission of a heat-of-passion voluntary manslaughter instruction at trial under the *Watson* standard.  (*People v. Breverman, supra*, 19 Cal.4th 142, 165.)

Campbell submits the failure to instruct on a lesser included offense should be evaluated under the federal constitutional error the prejudice of which is subject to review under the standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705. In *People v. Breverman, supra*, 19 Cal.4th 142, the California Supreme Court stated that the "very purpose of the rule" requiring *sua sponte* instruction on lesser included offenses "is to allow the jurors to convict of either the greater or the lesser offense where the evidence might support either." (*Id.* at 178, fn. 25.) The fact that the evidence may support conviction of the greater does not resolve the question whether a juror would nonetheless have chosen the lesser if given that choice. (*Ibid.*)

As the United States Supreme Court explained in *Keeble v. United States* (1973) 412 U.S. 205 [93 S.Ct. 1993, 36 L.Ed.2d 844]:

> [I]f the prosecution has not established beyond a
> reasonable doubt every element of the offense charged,

23

and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction in this context or any other – precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.

(*Id.* at p. 212.)  The California Supreme Court has offered substantially the same analysis:

Instructions on lesser offenses are required because a procedure which affords the trier of fact no option other than conviction or acquittal when the evidence shows that the defendant is guilty of some crime but not necessarily the one charged, increases the risk that the defendant may be convicted notwithstanding the obligation to acquit if guilt is not proved beyond a reasonable doubt. The pressures which create that risk thus affect the reliability of the fact finding process and thereby undermine the reasonable doubt standard.

(*People v. Geiger* (1984) 35 Cal.3d 510, 520, overruled on other grounds in *People v. Birks, supra,* 19 Cal.4th 108, at p. 136.) The fact that the jury convicted appellant of the greater offense of second degree murder does not resolve the question of whether it was prejudicial error to fail to instruct on the lesser included offense of sudden quarrel, heat of passion manslaughter.

The United States Supreme Court has held, in capital cases,

24

that the failure of a trial court to instruct on lesser included offenses will leave the jury with an unwarranted all-or-nothing choice, violating due process. (*Beck v. Alabama* (1980) 447 U.S. 625, 634, 637-638 [100 S.Ct. 2382, 65 L.Ed.2d 392]; U.S. Const., 14th amend.; see *People v. Breverman, supra,* 19 Cal.4th 142, 166-167 [summarizing *Beck*]. The California Supreme court stated in *Breverman* that "[t]he *Beck* rule has never since been extended beyond the capital context" and that subsequent decisions had construed *Beck* narrowly. (*People v. Breverman, supra,* 19 Cal.4th 142, 167.) *Breverman* concluded that "the high court's decisions leave substantial doubt that the federal Constitution confers any right to lesser included offense instructions in noncapital cases" and that, therefore, "the rule requiring *sua sponte* instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law." (*Id.* at 168-169.)

The rule articulated in *Beck v. Alabama* should apply equally to noncapital cases. (*Vujosevic v. Rafferty* (3d Cir. 1988) 844 F.2d 1023, 1028, fn. 1.) The failure to instruct on necessarily included offenses violates a defendant's Sixth and Fourteenth Amendment rights to have the jury determine all material issues presented by the evidence. (Cf. *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278 [113 S.Ct. 2078, 124 L.Ed.2d 182]; *In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 25 L.Ed.2d 368].) The pressures of an improper all-or-nothing choice "affect the reliability of the fact finding process

25

and thereby undermine the reasonable doubt standard." (*People v. Geiger, supra*, 35 Cal.3d 510 520.)

Because the trial court's failure to instruct on the lesser included offense of sudden quarrel, heat of passion voluntary manslaughter violated appellant's federal constitutional rights to a jury trial and due process, the error should be reviewed under the harmless-error standard of *Chapman v. California, supra*, 386 U.S. 18.

### 2. The Prosecutor's Case for Malice, and Therefore For Murder, Was Weak; The Defense Case for Sudden Quarrel and Heat of Passion Was Strong

Except in cases governed by the felony murder rule, a homicide is not a murder absent malice aforethought, i.e., "the wanton disregard for human life"])." (*People v. Rios, supra*, 23 Cal.4th 450, 460.) Malice aforethought is negated as a matter of law where the homicide occurred "upon a sudden quarrel or heat of passion" (§192(a)), i.e., "if the killer's reason was actually obscured as the result of a strong passion aroused by a `provocation' sufficient to cause an" 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " [Citations.] (*People v. Breverman, supra*, 19 Cal. 4th 142, 163.) Heat of passion may result from fear or terror as well as anger or jealousy. (*People v. Mitchell* (1939) 14 Cal.2d 237, 252; *People v. Logan* (1917) 175 Cal.45, 49.)

26

In deciding whether the provocation was sufficient, the finder of fact must consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. (CALCRIM No. 570; *People v. Logan, supra,* 175 Cal 45, 49.) Consequently, the objective standard of heat-of-passion voluntary manslaughter compels examination of Campbell's situation.

The evidence indicated that Campbell was under the stress of being attacked suddenly by a person he had thought of as a trusted friend or even a son. (3RT 322-323, 350, 353.) Campbell had invited Brian into his room to lend him some clothes so that they could go out together on New Years Eve. (3RT 321-323.) Campbell believed that while Brian was in Campbell's room he stole two cell phones. (3RT 326-328.) Campbell confronted Brian about taking his cell phones and demanded them back. (3RT 327-328, 355.) Unexpectedly, Brian charged him and punched him in the forehead, then bear-hugged Campbell and slammed him to the ground, throwing body punches. (3RT 327-330.) Brian was angry, swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.)

Campbell was able to wriggle out from under Brian and get to his feet, but Brian blocked the door, preventing Campbell from leaving the room. (3RT 330-331, 374-375.) Brian charged Campbell again, and Campbell started throwing things at him. (3RT 331-332.) Campbell picked up a closed stapler from the dresser and hit Brian

27

with it, then opened it and stapled Brian's chest over Brian's tank top, but Brian pulled out a staple, laughed demonically, and said "Is that all you got old man?" (3RT 332-336, 356.) Campbell was surprised and terrified that Brian was not deterred. (3RT 334.) By this point they had been fighting almost continuously for about ten minutes, while Brian repeatedly threatened to kill Campbell. (3RT 334-335.) According to Campbell and his neighbor Rose, during the fight Campbell knocked on the wall and screamed for Rose to call the police. (3RT 291, 338-339; 347.)

Brian rushed Campbell again and put him in a choke hold from behind, cutting off his air. (3RT 339, 357-358.) Campbell bit Brian on his arm and elsewhere repeatedly to break his hold. (3RT 340, 358-360.) Brian then picked up a clothing iron from the dresser, wrapped the cord around Campbell's neck, and choked him from behind until Campbell was dizzy and breathless. (3RT 340-341, 361-362.)

Campbell had, at most, a few seconds and as little as a fraction of a second in which to react after Brian started strangling him.  Rose heard what she believed was Campbell's voice coming from his room, saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.) Neighbor Wendell heard the sounds of a fight in Campbell's room, including a "bang" and someone yelling "help", but he could not tell whose voice it was. (2RT 49-50, 53, 56-57.) Brian's blood alcohol level

28

was .212 – supporting an argument that Brian was so drunk that his inhibitions were gone and he was out of control.

Finally, where "the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger" the People must also "prove beyond reasonable doubt that [heat of passion and adequate provocation] were lacking in order to establish the murder element of malice. [Citations.]" (*People v. Rios, supra,* applying *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."].) The coroner indicated the bruises and abrasions on Brian's hands and wrists could have been offensive or defensive, and that Brian had a high blood-alcohol level at the time he was killed. (2RT 202-203, 308-309.) Photographs taken of Campbell's body on the day of his arrest showed bruises, scrapes and scratches on his chest, back, arms and knees. (3RT 293-294, 308-309, 365-370.) Defense expert Dr. Ryan O'Connor determined the injuries to Campbell were consistent with injuries that were six days old – suggesting that they resulted from the fight with Brian. (3RT 309.)

Evidence of intent to kill was lacking here. Why would Campbell invite Brian to his residential hotel room with the intention of killing him? There were people all around, just outside the door and in the adjacent rooms; discovery of the dead body was

29

inevitable; the identity of the person who rented the room was known. What motive did Campbell have to kill Brian? The prosecutor offered nothing but the insinuation that Campbell had a sexual interest in the younger Brian, without any evidence to support it. This was a sudden and unexpected fight, and at least one of the combatants – Brian – was extremely intoxicated

The prosecutor could not have disproved sudden quarrel or heat of passion here. There was evidence that Brian, a much younger man than Campbell, suddenly and violently attacked Campbell in his own home, swearing at him, threatening to kill him, and strangling him to the point of Campbell nearly passing out. Under these circumstances, a reasonable jury could infer that Campbell was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition. A rational jury could also find that the intense and highly wrought emotions aroused by the initial threat had not had time to cool or subside by the time Campbell seized the iron – whose cord Brian was strangling Campbell with – then struck Brian with it until he stopped strangling Campbell. Finally, a jury could disbelieve defendant's self-defense claim, and conclude, from all of the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation – fear and terror at being attacked. [See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2936; 1 Witkin & Epstein,

30

Cal. Criminal Law (2d ed. 1988) § 511]; *People v. Mitchell, supra,* 14 Cal.2d 237, 252; *People v. Logan, supra,* 175 Cal.45, 49.)

On these facts, the prosecutor could not prove beyond a reasonable doubt that Campbell did not act pursuant to a sudden quarrel or heat of passion. The failure to instruct on this lesser included offense was thus prejudicial under any standard, and Campbell's conviction must be reversed.

31

II.     **INSTRUCTING THE JURY IT COULD CONSIDER APPELLANT'S FLIGHT AS CONSCIOUSNESS OF GUILT WHERE THERE WAS INSUFFICIENT EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED CAMPBELL'S 5th, 6th AND 14th AMENDMENT RIGHTS**

A.     **Facts**

The court instructed the jury regarding flight in the language of CALCRIM No. 372:

> If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself.

(1CT 148; 4RT 477.) Defense counsel did not object to the instruction.

The prosecutor argued Campbell "fled" because he left his room and walked around the corner to Angel Dorsey's residence instead of walking to the police station to report Brian's death. (4RT 405.)

B.     **Standard of Review**

Allegations of instructional error involve a trial court's ruling on an issue of law and are therefore reviewed *de novo.* (*People v. Waidla, supra,* 22 Cal.4th 690, 733; *People v. Alvarez, supra,* 14 Cal.14th 155, 217; *People v. Berryman, supra,* 6 Cal.4th 1048, 1089.)

## C.   The Issue is Not Forfeited on Appeal

The issue is not forfeited because defense counsel failed to object to the giving of the instruction in the trial court. Where trial counsel merely fails to object to the giving of an instruction, the court may review the propriety of the instruction. (See § 1259 ["The appellate court may ... review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

Furthermore, due process requires that counsel's performance fulfill the right of the accused to "the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) Consequently, a failure to object warrants reversal for ineffective assistance of counsel in the case where "the record on appeal affirmatively discloses that counsel had no rational tactical purpose" in not objecting. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1052.)

This is such a case. No particular decision by trial counsel to act or not to act in a particular manner can be regarded as "tactical" or "strategic" unless the decision was both "rational and informed." (*In re Marquez* (1992) 1 Cal.4th 584, 606.) It is inconceivable that defense counsel believed the instruction could have benefitted appellant in any way; therefore, no further inquiry is required before this court can reliably adjudicate this issue. (See *People v. Anzalone*

33

(2005) 130 Cal.App.4th 146, 159 [trial counsel ineffective for failing to object to prosecutor's misstatement of the law]; *People v. Rodriguez* (1994) 8 Cal.4th 1060, 1125-1126 [failure to assign misconduct constituted ineffective assistance of counsel].)

Defense counsel's failure to object to the flight instruction constituted ineffective assistance of counsel under the Sixth and Fourteenth amendments. There could have been no tactical reason for failing to object. The discussion regarding jury instructions occurred outside the jury's presence, so there was no tactical reason based on concerns for the jurors' perceptions of the objection. Therefore, because there was no possible tactical purpose in defense counsel's failure to object to the flight instruction, the issue is not forfeited on appeal.

### D.    The Trial Court Erred in Giving CALCRIM No. 372 Where the Record Showed Insufficient Evidence of Flight

Before the court can instruct a jury it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People v. Valdez* (2004) 32 Cal.4th 73, 137.) When a court fails to make that preliminary factual determination, it errs by passing a question of law to the jury. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.)

Section 1127c purportedly mandates giving a flight instruction where there is evidence of flight the prosecutor relies

34

upon as tending to show guilt. "Flight" exists where there is evidence the defendant "departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People v. Bradford, supra,* 14 Cal.4th 1005, 1055 [Citations and internal quotation marks omitted]; *People v. Mendoza* (2000) 24 Cal.4th 130, 179.) '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " (*People v. Bradford, supra,* 14 Cal.4th 1005, at p. 1055, quoting *People v. Visciotti* (1992) 2 Cal.4th 1, 60.)

It is error to give the flight instruction in the absence of any evidence from which a jury could reasonably infer that the defendant left to avoid being observed or arrested. (*People v. Carrington* (2009) 47 Cal.4th 145, 188 ["An instruction that permits the jury to draw an inference of guilt from particular facts is valid only if there is a rational connection between the fact proved and the fact inferred."]; *People v. Crandell* (1988) 46 Cal.3d 833, 869-870 [abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.)

A flight instruction should not be given where, for example, the evidence merely shows the defendant was arrested some time after the crime and miles away from the scene, since such evidence, standing alone, does not support an inference of guilt. (*People v. Watson* (1977) 75 Cal.App.3d 384, 403.) "Mere return to familiar environs from the scene of an alleged crime does not warrant an

35

inference of consciousness of guilt [citations], but the circumstances of departure from the crime scene may sometimes do so. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 126, italics omitted.)

The uncontroverted evidence in this case established that, after the fight, Campbell did not leave his room immediately, but fell onto his bed and slept all night. (3RT 343, 361, 363, 377.) While Campbell left the apartment at 8:13 the next morning after discovering Brian was dead (2RT 112-115, 128-129), he did not run or flee from the scene; instead, he walked to his ex-girlfriend's residence around the corner from his place and immediately across the street from a police station, and told her that Brian had died during a fight. (2RT 141-142; 3RT 145-146.) He spent the better part of a week after the killing getting drunk and high, but he did not leave his neighborhood. (3RT 346, 352, 364.) The uniformed arresting officer testified that Campbell "did not attempt to flee" when taken into custody. (3RT 179-180.)

Nevertheless the trial court gave CALCRIM No. 372. (2RT 185-176; 1CT 104.) The CALCRIM No. 372 flight instruction is only appropriate when there is actual evidence the defendant fled after the crime was committed. (*People v. Mendoza, supra*, 24 Cal.4th 130, 179 [superseded by statute on other grounds]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1244 [evidence indicating an accused left the scene and went home "is not evidence of flight that necessarily

36

supports an inference of consciousness of guilt. [Citations.]"].)

The instruction on flight should only be given if there is substantial evidence the defendant departed the scene under circumstances suggesting the movement was motivated by a consciousness of guilt. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020; *People v. Smithey* (1999) 20 Cal.4th 936, 982; *People v. Bradford, supra,* 14 Cal.4th 1005, 1055.) In *People v. Crandell, supra,* 46 Cal.3d 833[7], 869, the defendant left a house after homicides were committed "for reasons other than fear of immediate apprehension and with the intention to return to dispose of the bodies." He contended his departure did not, as a matter of law, constitute flight, and did not justify giving the jury a flight instruction. (*Id.* at p. 869.)The California Supreme Court agreed, finding error because the defendant's leaving could not be considered to be flight "in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested." (*Ibid.*) The Court held the defendant's actions did not constitute flight because he "did not leave to avoid being observed (his presence at the house on the morning following the murders was already known to others and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of

---

[7]

Abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364.

37

returning to dispose of the bodies. There is no evidence he ever wavered in this intent; indeed, he was arrested while returning and less than a block from the P. house. Accordingly, the instruction on flight should not have been given." (*Id.* at 869-870.)

For the same reasons, here the flight instruction was given in error because Campbell did not flee. After the fight was over, Campbell fell asleep and slept through the night. (3RT 343, 361, 363, 377.) Upon awakening, he tried to rouse Brian. (3RT 343-344.) When Campbell discovered Brian was dead, he did not leave running; he walked out of his apartment, out of the building, and to his ex-girlfriend's home. (2RT 133.) Her home was around the corner from his place, and across the street from the police station, increasing the likelihood that the police would find him once they inevitably discovered Brian's body. (2RT 133.) Tenants and staff at the hotel knew Campbell lived in room 58, where the body was. (2RT 49, 76, 94.) Campbell did not attempt to flee when uniformed police officers stopped and arrested him. (3RT 179-180, 182.) These acts were insufficient as a matter of law to constitute flight and to support an inference of guilt.

"It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, believed by the jury, will support the suggested inference [citation.]." (*People v. Saddler* (1979) 24 Cal.3d 671, 681; see also *People v. Valdez, supra,* 32 Cal.4th 73, 137.) The trial

38

court has a duty not only to instruct on relevant principles of law, but also must "refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." (*People v. Saddler, supra,* 24 Cal.3d at 681.) Here, the trial court's decision to instruct the jury they could consider appellant's "flight" in deciding his guilt in the absence of sufficient evidence justifying such an inference violated this duty.

Campbell acknowledges flight instructions have generally been upheld in California. (*People v. Mendoza, supra,* 24 Cal.4th 130, 180-181; *People v. Smithey, supra,* 20 Cal.4th at 982-983.) However, a number of cases have found error in giving the flight instruction. For example, in *People v. Green* (1980) 27 Cal.3d 1, 37, overruled on other grounds by *People v. Martinez* (1999) 20 Cal. 4th 225, 241, the court acknowledged prior cases warning courts they should not confuse mere departure from the scene of a crime with deliberate flight from the area.

In *People v. Watson, supra,* 75 Cal.App.3d 384, the only evidence supporting flight was the fact the defendant was arrested two days after the murder and several miles from where the victim's body was discovered. (*Id.* at 403.) In *People v. Fremont* (1937) 22 Cal.App.2d 292, 300, the court found error in giving the flight instruction because there was simply no evidence of flight. The court cautioned "[n]o instruction should be given to the jury unless

39

adapted to the evidence and circumstances of the case."

Here, given insufficient evidence of flight, the trial court's decision to give the CALCRIM No. 3.72 instruction was error.

E.   **CALCRIM 372 Lessened The Prosecution's Burden Of Proof and Violated Appellant's 6th and 14th Amendment Rights**

"The Due Process Clause of the Fourteenth Amendment denies states the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. (*Carella v. California* (1989) 491 U.S. 263, 265, citing, *In re Winship, supra*, 397 U.S. 358, 364. )

Instructional error which relieves "the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480; see *Carella v. California, supra*, 491 U.S. at 265.)

"Mandatory presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of the offense." (*Patterson v. New York* (1977) 432 U.S. 197, 215; *Sandstrom v. Montana* (1978) 442 U.S. 510, 520-524.) By contrast, permissive inferences generally do not violate due process because the prosecution still bears the burden of persuading the jury that the suggested conclusion should be inferred based on the predicate facts proved. (*Estelle v. McGuire* (1991) 502 U.S. 62, 78-79, citing *Ulster*

*County Court v. Allen* (1979) 442 U.S. 140, 157-163.)

Nevertheless, a permissive inference violates the Due Process Clause if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315, citing *Ulster County Court, supra,* 442 U.S., at 157-163.)

The permissive inference created by CALCRIM No. 372 violated Campbell's federal due process rights. The instruction told the jury it could infer from Campbell's departure from his hotel room that he "fled" the scene and demonstrated consciousness of guilt as to the charged offense. (*People v. Mendoza, supra,* 24 Cal.4th 130, 179-180.) That inference, which was inappropriate because it was unsupported by the evidence, lessened the prosecution's burden to prove every element of the case beyond a reasonable doubt, and violated appellant's Fifth, Sixth and 14th Amendment rights to trial by jury and due process. (*In re Winship, supra,* 397 U.S. at 364.)

An instruction that creates a "permissive inference," that is, an inference the jury may choose to credit or reject, violates due process where "there is no rational way" the trier of fact could make the "connection permitted by the inference." (*Ulster County Court v. Allen, supra,* 442 U.S. at 157.) Such an instruction unconstitutionally shifts the burden of proof because it cannot be said with "'substantial assurance that the presumed fact is more likely than

41

not to flow from the proved fact on which it is made to depend.'" (*Id.* at 166 fn. 28, quoting *Leary v. United States* (1969) 395 U.S. 6, 36.) Specifically, it cannot be said with "substantial assurance" that guilt is more likely than not to flow from flight.

As the United States Supreme Court has put it: "[I]t is not universally true that a man who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right, and proper,' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'" (*Alberty v. United States* (1896) 162 U.S. 499, 511; see also, *Wong Sun v. United States* (1963) 371 U.S. 471, 483, fn. 10 [Stating courts have "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."].)

Campbell's statements indicate he *was* afraid of being apprehended as a guilty party, but the question was what, if any, crime was he guilty of? Fleeing the scene of a crime can be probative of a consciousness of guilt, but cannot prove what crime the person fleeing committed; where, as here, the consciousness of guilt may be

42

of one of several different crimes (first or second degree murder or voluntary manslaughter), it does not provide probative evidence that the accused is guilty of any one specific crime. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 538-539; see, e.g., *People v. Rankin* (1992) 9 Cal.App.4th 430, 435; *People v. Williams* (1988) 44 Cal.3d 1127, 1143, fn. 9.) Finally, when used to evaluate whether the record is sufficient to support a conviction, consciousness of guilt evidence such as flight after crime cannot substitute for the independent positive proof of the elements of the offense that the Constitution requires. (See, e.g., *People v. Blakeslee* (1969) 2 Cal.App.3d 831, 839; *People v. Nguyen, supra,* 21 Cal.App.4th 518, 538-539.) Campbell knew he had killed Brian, but he was concerned that he was the only witness to what had happened in his room and that he would be unfairly prosecuted for a crime when the homicide was justifiable. (3RT 129-131.) Therefore, the flight instruction unfairly suggested Campbell knew he was guilty of murder and fled to avoid arrest.

The problems inherent in all flight instructions are impermissibly exacerbated where, as here, those instructions lack evidentiary basis. Instructing the jury with CALCRIM No. 372, in the absence of substantial evidence of flight, falls squarely under the *Ulster* definition of unconstitutional permissive inferences. As the suggested conclusion "was not one that reason and common sense justify in light of the proven facts before the jury," it violated Campbell's right to due process of law. (*Francis v. Franklin, supra,* 471

43

U.S. at 314.)

Campbell acknowledges the California Supreme Court in *People v. Mendoza, supra*, 24 Cal.4th 130, 179, rejected the argument that the former flight instruction CALJIC No. 2.52 unconstitutionally lessened the prosecution's burden of proof. However, *Mendoza* is distinguishable because in that case there was some evidence justifying the instruction. Here there was insufficient evidence of flight and the instruction was not justified by reason and common sense.

**F.    The Error Was Prejudicial**

The error here implicated appellant's federal constitutional rights and must be judged under *Chapman v. California, supra*, 386 U.S. 18, 24. Since it cannot be shown beyond a reasonable doubt that the jury would have voted to convict Campbell in the absence of the erroneous instruction, his conviction must be reversed.

The error was not harmless under any standard. The instruction figured in the prosecutor's closing argument. (4RT 405.) While Campbell's conduct, though not constituting flight, might be seen as manifesting consciousness of guilt, the nature of the homicide was that it could have been treated as a non-criminal act (self-defense), or as a killing on a spectrum of culpability (murder or manslaughter). The prosecutor overreached by charging Campbell with first degree murder. It is reasonably probable a verdict more favorable to defendant would have resulted had the instruction not

44

been given.

The prosecutor argued on closing:

He fled. And where did he go to?

To Angel Dorsey's, right around the corner from him. Coincidentally, she lives -- how many people live there -- she lives right across the street to the police station. Instead of walking across the street to the police station and saying oh, my god. Some guy tried to rob me. I know him. We end up getting into a huge melee. He tried to strangle me. I had to fight for my life. Oh, he is dead in my room, will you go investigate so that you can get the evidence when it's fresh?

What does he do?

Oh, no, no, no, no, no. He goes to Angel Dorsey's and kicks on her door.

(4RT 405.)

It is undisputed that a fight took place in Campbell's room and that Brian was killed during the fight. However, Campbell's jury was never instructed it could consider an absence of flight as an indication of innocence. To the contrary, the flight instruction allowed the jury to infer from appellant's walking away from his residence – an act that was insufficient as a matter of law to constitute flight – that he was conscious of guilt, and therefore was guilty of the charged offense.

The judgment must be reversed, even under the "more likely

45

than not" standard for state law error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) This standard requires appellant to show only that the error committed by the trial court undermines this Court's confidence in the verdict.

Trial error is usually deemed harmless in California unless there is a reasonable probability that it affected the verdict. (*Id.* at 836.) The Supreme Court has also affirmed that a "'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, citing *People v. Watson, supra,* 46 Cal.2d 818, 837, and *Strickland v. Washington* (1984) 466 U.S. 688, 693-694, 697, 698.)

Here, it is reasonably probable that absent the improper and unsupported flight instruction, the jury would not have convicted Campbell of murder, as the evidence did not support a finding of malice. (See discussion at pages 26-31 of this brief, *supra.*) The jury acquitted Campbell of first degree murder, but convicted him of second degree murder, where the evidence supported, at most, a manslaughter conviction. Therefore, Campbell's conviction must be reversed.

46

## III.   CAMPBELL WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION ON "EARWITNESS" IDENTIFICATION

### A.   Facts

Summarizing an off-the-record discussion regarding jury instructions, the court stated: "315, I indicated I didn't think 315, the eyewitness identification instruction, was necessary on this case because there doesn't seem to be any issue about it." (4RT 389.) Defense counsel said nothing in response to the court's statement, and did not request modification of the instruction to address "earwitness" identifications.

The only percipient witnesses to the killing were Campbell's neighbors, Wendell and Rose. They were not eyewitnesses, but "earwitnesses." Both testified to hearing the sounds of a violent fight coming from Campbell's room. (2RT 44-49, 51, 53-55, 75-79, 95-96.) Wendell testified he heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.)

Rose also testified that before the body was identified as Brian,

47

she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him. (2RT 89; 3RT 283.) Rose stated in a recorded police interview that she heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 280-282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." She then said she heard Campbell say "No, you let me go." (3RT 280-281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

Campbell testified that he banged on the wall between his unit and Rose's unit and screamed for her to call the police. (3RT 338-339, 347.)

Defense counsel argued to the jury that as Brian was attacking Campbell, Campbell yelled "Call the police" and "help". (4RT 423, 426, 432.) He also argued, "You don't yell for the police when you're murdering someone. You yell for the police when you need help, and it's your life or someone else's, when you need to get out of a situation desperately you will call "Help, call the police." (4RT 437.)

The prosecutor argued Rose believed at the time the police interviewed her that Campbell was dead at the hands of his girlfriend, Angel Dorsey, and that everything Rose said to the police was "filtered through that belief." (4RT 402.) Rose did not hear anyone say "help", but Wendell did. (4RT 403.) The prosecutor emphasized Rose's statement to the police that she heard a female

48

voice saying "Michael, oh, let me go. Let me go," and Campbell say "No, you let me go."  (4RT 403.)

### B.    The Law Pertaining to Ineffective Assistance

A criminal defendant's constitutional right to the assistance of counsel for his defense includes the right to effective assistance. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. 1, §§ 7, 15; *Strickland v. Washington* (1984) 466 U.S. 668, 685-686; *People v. Cudjo* (1993) 6 Cal.4th 585, 615.)

An appellant's conviction will be reversed for ineffective assistance of counsel when (1) the trial attorney failed to perform in the manner expected of reasonably competent counsel acting as a diligent advocate, and (2) there is a reasonable probability that a more favorable result would have been obtained in the absence of counsel's failure. (*Strickland, supra,* 466 U.S. at p. 687; *Cudjo, supra,* 6 Cal.4th 585, at p. 615; see *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [discussing "reasonable probability" under the *Watson* standard]; *People v. Howard* (1987) 190 Cal.App.3d 41, 47-48 & fn. 4 [*Strickland* standard is more rigorous that *Watson* and lies somewhere between the *Chapman* and *Watson* standards].) Appellant bears the burden of proving ineffective assistance of counsel by a preponderance of the evidence. (*People v. Foster* (1992) 6 Cal.App.4th 1, 11.)

The right to effective assistance of counsel includes the expectation that counsel "will make a rational and informed decision

on strategy and tactics founded on adequate investigation and preparation. [Citations.]" (*People v. Ledesma, supra,* 43 Cal.3d 171, 215.) "Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts." (*Id.* at p. 222; see *People v. Pope* (1979) 23 Cal.3d 412, 425.) The nature of the investigation that must be undertaken depends on the circumstances of each case, but counsel must investigate any available and viable defense. (*People v. Ledesma, supra,* 43 Cal.3d at p. 222; *Strickland, supra,* 466 U.S. at p. 691.)

Trial counsel is ineffective when he fails to request necessary jury instructions. (See *People v. Loza* (2012) 207 Cal.App.4th 332, 348 [counsel rendered ineffective assistance by failing to request modification to aiding and abetting instruction that instructed that aider and abettor is "equally guilty" as perpetrator, and by failing to object to court's referral to same instruction when jury sought clarification; jury's question indicated that it did not understand that prosecutor had to prove defendant's intent as aider or abettor, which was crucial issue]; *People v. Hussain* (2014) 231 Cal.App.4th 261, 270, [in prosecution for grand theft, counsel rendered ineffective assistance by failing to request instruction on claim of right defense; there was no satisfactory explanation for failure to request instruction as claim of right was core of defendant's defense, and jury acquitted defendant of other charges and struggled with intent element before convicting him].)

50

Reversal for inadequate counsel is warranted where there is no rational tactical reason for counsel's act or omission. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) If the record on appeal reveals an explanation for the challenged aspect of the attorney's representation, "the reviewing court must determine whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate." (*People v. Cudjo, supra,* 6 Cal.4th 585, at p. 623 [quotation omitted].) On the other hand, where the record illuminates no explanation for counsel's behavior, the appellate court will reject the ineffective assistance claim "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." (*Ibid.*)

C.   **Trial Counsel Was Ineffective For Failing to Request a Modified Version of CALCRIM No. 315 or Other Appropriate Instruction to Assist the Jury in Evaluating the "Earwitness" Testimony Presented by The Prosecutor**

1.   **Trial Counsel Failed to Request a Necessary Earwitness Identification Instruction To Help The Jury Assess Rose's Crucial Testimony That She Heard Campbell Yelling for Her to Call The Police**

The prosecutor presented two witnesses to the events that transpired in Campbell's room – neighbors Wendell and Rose. Neither of them saw what happened, but both of them heard the

51

sounds of a fight and someone in Campbell's room yelling for help and to call the police. They were, in effect, "earwitnesses". The prosecutor used their testimony to argue that it was not Campbell who was yelling for help, but Brian, and to suggest Campbell had engaged in a species of torture murder:

> By the way, "Call the police."

> There are many different ways that you can surmise what that meant. Was that a taunt from the defendant to [Brian], "call the police", as he laid there disabled?

> The physical evidence would tend to suggest that as the reasonable conclusion.

(4RT 450.)

The defense used the earwitness testimony to argue in support of self-defense that Campbell was yelling "help" and "call the police" as Brian was attacking him with deadly force. (4RT 423, 426, 432-433, 437.) Thus, the identification of Campbell as the speaker was crucial to the defense case, and the jury needed instructional assistance in making a determination as to what or whom Rose, in particular, heard. There could be no satisfactory explanation for failure to request the instruction, as Rose's identification of Campbell as the one who was yelling "call the police" was at the core of Campbell's defense.

The court has no *sua sponte* duty to give an instruction on

52

eyewitness testimony. (*People v. Richardson* (1978) 83 Cal.App.3d 853, 863, disapproved on other grounds by *People v. Saddler, supra,* 24 Cal.3d 671, 682.) An instruction relating eyewitness identification to reasonable doubt, including any relevant "pinpoint" factors, must be given by the trial court on request "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143–1144, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110; *People v. Palmer* (1984) 154 Cal.App.3d 79, 89 [error to refuse defendant's requested instruction on eyewitness testimony].)

Where there is earwitness testimony and a conflict as to the identity of the speaker, jurors should be given some guidance on how to determine whether a voice identification is reliable. (See *People v. Wright, supra,* 45 Cal.3d 1126, 1138-1139 ["model instruction, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors."].)

Campbell was prosecuted for murder based in part on the earwitness identifications made by Wendell and Rose. Because the parties disagreed on the identity of the person yelling "call the police" and "help" during the fight, it follows that Campbell was

entitled to instruction on factors to be considered in evaluating the reliability of earwitness identification testimony, just as he would have been entitled to a jury instruction on eyewitness identification, had this case depended on it. It was trial counsel's duty to request such an instruction, yet he failed to do it.

Speaker recognition and identification can be faulty because of several factors, such as hearing impairment, sickness, and fatigue; deliberate impersonation; speaker distortions from stress and anxiety; noise; listener expectations; attentional memory deficits; and other factors. (Yarmey, Earwitness Speaker Identification, 1 Psychol. Pub. Pol'y & L. 792, 795 (1995).) It is probable that listeners themselves may be inconsistent in identification as a function of changes in their physiological state, motivation, and training. (Hollien, H., Majewski, W., & Doherty, E. T.. Perceptual Identification of Voices Under Normal, Stress and Disguise Speaking Conditions, Journal of Phonetics, 10, 139-148 (1982).)

Hollien's team presented subjects with recordings of familiar and unfamiliar voices and then immediately tested them by asking them whether a series of voices matched the one they had heard. (*Id.* at p. 141.) The study found that when a normal tone of voice was used in the recording (as opposed to a stressed or disguised voice),144 subjects identified familiar voices with 98% accuracy whereas accuracy dropped with unfamiliar voices to only around 40%, even with almost no lapse in time between the initial exposure

54

and the identification. (*Hollien et al., supra*, note 142, at 142.) Contrary to what most people would expect, fewer than half of the subjects were able to identify a previously unfamiliar voice they had heard only a brief time before. These results confirm our intuitions that people are generally good at recognizing familiar voices. (*Ibid.*)

Because voice identification testimony is likely even more problematic than eyewitness testimony, there is no excuse for trial counsel's failure to request an instruction that could have assisted the jurors by giving them a framework for determining how to reconcile the inconsistencies in Rose's statements regarding the voice(s) she heard in Campbell's room. Upon request, the court should have given the jury concrete guidance on the factors they should consider.

An appropriate instruction here might be as follows:

A prosecution witness has identified the voice of the defendant as being the person who said certain things during the killing that resulted in defendant being charged with a crime. Both the prosecution and the defense have relied upon the "earwitness" testimony in support of their respective cases. In deciding whether the voice identifications were accurate, you should ask yourselves the following questions:

How well could the witness hear the speaker? You should consider factors like background noise, the distance between the speaker and the witness, and similar circumstances.

55

Was the witness paying close attention to the voice? Did the witness ever waver or express uncertainty about the identification?

How familiar was the witness with the defendant's voice when asked to identify it?

If the witness was not previously familiar with the voice, how much exposure did the witness have to the voice before being asked to identify it?

On how many occasions was the witness exposed to the voice?

How much time passed between the witness's original exposure to the voice and being asked to identify it?

If the witness gave a description of the speaker's voice, how similar was that description to the voice of the defendant?

Was the witness ever asked to identify the speaker before trial?

Is the witness experienced at identifying voices, or is there other evidence that the witness is particularly good at identifying voices?

Did the speaker have an unusual voice or speech mannerisms that would make his or her speech easier to identify?

Did the speaker try to disguise his or her voice, or was the speaker under stress, making identification more difficult?

56

Was there other evidence, besides the defendant's voice, that suggested that the defendant was the speaker?

Were there any other circumstances that would have made identification more or less accurate?

You must consider all the evidence and be convinced beyond a reasonable doubt that it was the defendant who committed the crime. Otherwise, you must find the defendant not guilty.

The Supreme Court in *People v. Hall* (1980) 28 Cal.3d 143, declared:

Under the case law, it is error to refuse to give an instruction requested by a defendant which 'directs attention to evidence from ... which a reasonable doubt of guilt could be engendered' [citation]. This applies with equal force to a refusal to give a requested instruction which deals with identification in the context of reasonable doubt.

(*People v. Hall, supra,* at pp. 158-159 [citations omitted] (overruled on other grounds in *People v. Newman* (1999) 21 Cal.4th 413.)

If the trial court did not approve of the proposed instruction, the court was obligated to modify it, not to refuse it outright. In *Hall,* the court noted the defendant's proposed instruction was identical to one found too long and argumentative in *People v. Guzman* (1975) 47 Cal.App.3d 380, and further noted "some of the factors highlighted by the instruction have no application to the present case. [Fn. omitted.]" (*People v. Hall, supra,* 28 Cal.3d 143, 159.) However, *Hall* went on: "Although the trial court did not err in refusing to give the

57

instruction as written, it should not have refused to tailor the instruction to the facts of this case." (*Hall, supra,* at p. 159.)

Trial counsel, however, failed to request any instruction on earwitness identification, and the jury was left without an analytical framework for evaluating Rose's testimony. Campbell's trial attorney, therefore, failed to perform in the manner expected of reasonably competent counsel acting as a diligent advocate. (*Strickland v. Washington, supra,* 466 U.S. 668, 687.)

### 2. There is a Reasonable Probability that a More Favorable Result Would Have Been Obtained in The Absence of Counsel's Failure to Request the Instruction

There is a reasonable probability that a more favorable result would have been obtained in the absence of counsel's failure. (*Strickland, supra,* 466 U.S. 668, 687.)

The evidence shows the killing in this case arose out of a sudden quarrel and violent altercation between two men, which was overheard by two earwitnesses. The prosecutor offered no motive for Campbell to kill Brian. Brian, on the other hand, was extremely intoxicated with alcohol, and may have been high on methamphetamine as well. Even if he was only drunk, he was so drunk (.212 BAC) that his impulse control and judgment must have been severely impaired. It appears that the jury rejected Rose's crucial testimony that Campbell was yelling for her to call the police, because the jury rejected Campbell's self-defense and unreasonable

58

self-defense claims and convicted him of second-degree murder instead.

Had the jurors been instructed on earwitness identification factors, they would, for example, have had some context in which to understand why Rose might have thought she heard a woman's voice (possible speaker distortions from stress and anxiety). Instead, they were left to guess how they should evaluate her testimony.

On these facts there is a reasonable probability that Campbell would have been acquitted or convicted of manslaughter had trial counsel requested an appropriate earwitness identification instruction. Campbell's conviction must therefore be reversed.

## IV.   PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DENIED CAMPBELL HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL

### A.   Relevant Proceedings

#### 1.   Prosecutor's Opening Argument

In her opening argument the prosecutor summarized the testimony of the witnesses (4RT 397-404, 408-409), then argued Campbell "fled" his apartment (4RT 405); Dorsey saw no injuries on Campbell (4RT 407); Campbell was tired following his arrest and never said anything about self-defense or a robbery (4RT 409-410); Campbell showed consciousness of guilt by making false and misleading statements to the police about where he lived (4RT 409-410); and that Campbell was guilty because he told the police, when asked what happened to Brian, "I got to be quiet about that" and "I am the only witness." (4RT 410-411.) The prosecutor also emphasized the coroner's report that Campbell struck Brian 22 times with the iron. (4RT 411-412.)

After discussing the law of homicide (4RT 412-416), the prosecutor urged the jury to find first-degree murder because (1) Campbell could not give a reasonable explanation for how Brian ended up bare chested (4RT 417); (2) Brian had staples in his chest (4RT 418); (3) Brian had bite marks on the upper part of his body

60

(4RT 417-418); (4) neighbor Wendell heard noises of a fight going on
for 30 minutes, but when security knocked on the door the room was
silent (4RT 418); (5) when Campbell walked out of the hotel the next
morning it did not look as though he had any blood on him, so the
prosecutor surmised Campbell had cleaned himself up to hide the
killing (4RT 418); (6) Campbell locked the door before leaving
Brian's body in his room, suggesting consciousness of guilt (4RT
418); (7) Campbell never returned to his room after that, also
suggesting consciousness of guilt (4RT 418); (8) Campbell went to
Angel Dorsey's house, suggesting consciousness of guilt (4RT 418);
(9) Campbell did not report the killing to the police, suggesting
consciousness of guilt (4RT 418); and (10) Campbell told the police
he was the only witness. (4RT 418.)

## 2.    Defense Closing Argument

Campbell presented a case for self-defense. (4RT 419-439.)
Defense counsel argued that Campbell's testimony he invited Brian
to go out to the clubs with him for New Year's Eve and went
through his closet for some clothes for Brian to wear was supported
by the array of clothes found laid out on Campbell's bed. (4RT 421.)
When Campbell noticed his cell phones were missing, he confronted
Brian, and Brian attacked him. (4RT 422.) Brian picked Campbell up
and threw him to the floor. (4RT 422.) Campbell was trapped in his
room and tried to reach the door while struggling with Brian,
accounting for the blood smear on the door. (4RT 422.)

61

Campbell grabbed Brian from behind and tried to throw him, ripping Brian's tank top in the process. (4RT 422.) Campbell noted that the tank top itself was not in evidence, and that the prosecutor relied on photographs of the top so the jury could not examine it for the damage Campbell described. (4RT 422.) Photographs of the room indicated Campbell threw everything he had at Brian in a desperate attempt to stop the attack. (4RT 422.)

When Brian got Campbell in a choke hold, Campbell bit him; but Brian taunted him and then strangled him with the cord of an electric iron. (4RT 423.) At that point Campbell yelled for Rose to call the police as he swung wildly at Brian with the iron, killing him. (4RT 423-424.)

After discussing the jury instructions on homicide and burden of proof (4RT 424-430), defense counsel asked the jury to examine the prosecutor's theory that Campbell invited Brian back to his room in order to murder him. (4RT 431.) After 30 minutes of fight noises, someone says, "Call the police," but the prosecutor wanted the jury to ignore the struggle and all of the other sounds Wendell and Rose heard. (4RT 431.) Campbell neither hid the body nor attempted to scrub down his room, but instead went to his girlfriend's house and stayed there for five or six days. (4RT 431.) Defense counsel argued the prosecutor's theory made no sense. (4RT 431.)

Both Wendell and Rose testified they heard a fight. (4RT 432.) After 20 to 25 minutes of fight noises, Rose heard Campbell's voice

62

saying, "Call the police", and she went to Wendell's room and asked him to call. (4RT 432.) The prosecutor wanted the jury to believe that Campbell murdered Brian and then asked Rose to call the police. (4RT 432-433.) In reality, Campbell was yelling out of desperation because Brian was attacking him. (4RT 433.)

Defense counsel stated the prosecutor would argue in rebuttal about how Brian lived with his grandmother, but the grandmother was in Ventura and had not heard from Brian in days, but did not file a missing person report. (4RT 433.) Brian went to Los Angeles not just because he wanted to visit his father on skid row, but to "hang out" in the neighborhood. (4RT 433.)

Defense counsel pointed out how sloppy the police were when they entered Campbell's room. (4RT 433-434.)

Defense counsel argued that the wounds on Brian's knuckles were from hitting the walls and hitting Campbell, and that there were no defensive wounds on Brian's forearms. (4RT 434.) Campbell bit Brian in a desperate attempt to fight him off. (4RT 434.)

Defense counsel pointed out that Brian had a blood alcohol level of .212 – three times the legal limit. (4RT 434.) A presumptive test indicated Brian was high on methamphetamine and ecstasy. (4RT 434.) The subsequent test that negating those findings was not produced by the prosecutor. (4RT 434-435.)

Defense counsel referred to Detective Sharman's testimony about the blood in front of the room and argued it was important

63

because it confirmed the fact that Campbell was attempting to get out, or get Brian out of his room. (4RT 435.) Campbell had no other choice than to bite and hit Brian, because Brian was in a rage and was trying to choke him to death. (4RT 436.) The injuries were to the front of Brian's head because he was strangling Campbell and could not block the blows. (4RT 436-437.) Campbell yelled for the police as this was going on. (4RT 437.) If Campbell had been murdering Brian, he would not have asked anyone to summon the police. (4RT 437.)

The coroner indicated that Campbell had injuries that were inflicted six days prior to his arrest. (4RT 437.)

### 3.    Prosecutor's Rebuttal Argument

The prosecutor began with an argument about circumstantial evidence. (4RT 440, 442.) She discussed the jury instruction on credibility of witnesses. (4RT 440-441.)

For the first time, the prosecutor referred to "the physical evidence, the photographic evidence, the video evidence". (4RT 441.) For the first time, the prosecutor called the jury's attention to Campbell's testimony on cross-examination that he did not know where the missing cell phone landed "because the lights were out and we had the stereo lit up...." (4RT 441.) The prosecutor argued:

> That little comment that came out just when he's talking, and the judge asked him a question that threw everything that he said out the window. Never mind how the physical evidence didn't match it, but wait, the lights were out?

64

You were looking for clothes? For [Brian] to wear in the dark?

The bottom line is the defendant did not tell the truth about that night when he testified. He didn't talk about that night in his interview. He had to be quiet on that.

(4RT 442, 445 [". . . the defendant was looking in the closet of the room that didn't have any lights on for (Brian) to find clothes . . ..], 450 ["We talked already about his odd answer on the stand about it being dark."].)

The prosecutor returned to her argument about consciousness of guilt and hiding evidence, making more detailed arguments about how Campbell must have cleaned himself up before he left the hotel, and how he left Brian's body to "rot". (4RT 443-444.)

The prosecutor reserved for "rebuttal" argument all of the details about the injuries Campbell inflicted on Brian. For the first time, the prosecutor argued:

. . . I mean, realistically speaking, never mind the fact that if you're hitting somebody across the body holding an iron you're only going to be able to hit certain portions, certainly not the side of the top of the head and all the different areas on both sides, and that somebody would actually stay there for it when they were getting hit like that if they had the ability to move away.

And if [Brian] was actually strangling the defendant with a cord to the point of dizziness and

almost passing out, believing his life was going to end, How on earth would he be on his side? He would be behind him, pulling it tight, and thus not available to be struck in such a manner. It just makes sense. There is really no other way.

(4RT 443-444.)

During rebuttal the prosecutor argued for the first time regarding timing of the killing. She stated that Brian left the room twice, not once as Campbell had testified. (4RT 446.) She pointed out that Brian went back to Campbell's room the second time at 10:25 p.m., and that Wendell was awakened by the sounds of a fight around 11:30 or 11:40 p.m. – around an hour later – which conflicted with Campbell's testimony that he confronted Brian about the missing cell phones immediately upon Brian's return. (4RT 446.)

The prosecutor also argued for the first time that Campbell's testimony regarding how Brian was dressed during the attack did not add up, in that Brian was wearing a shirt when he walked into Campbell's room the second time, and that suddenly Brian was wearing a tank top during the fight. (4RT 447.) The prosecutor also argued that – contrary to Campbell's testimony – the tank top was not torn, and that she had a photograph to prove it. (4RT 447, 452.)

The prosecutor argued for the first time – referring to the photographs – that the physical evidence found at the scene showed that Brian was not wearing the long-sleeved shirt he had been wearing when he was in the hallway, and that he had a naked chest

66

and bite marks on his arms. (4RT 449.) The prosecutor asked, "If you are choking somebody out and your arm is around [sic], how do you get a bite mark on your hand?" (4RT 449.) The prosecutor also argued for the first time that if Brian had been wearing the tank top, the staples would not have been embedded in his chest. (4RT 449.)

The prosecutor also urged the jury, for the first time, to "[l]ook at the location of the iron blows on [Brian's] head in deciding defendant's story." (4RT 449.) The prosecutor argued:

> All of these pictures are worth thousands of words, but none of those thousands of words were reflected in the defendant's testimony, because none of the evidence was explained appropriately, consistently by the defendant where it would actually match up to the evidence at the scene that was not preserved because he locked the door and left [Brian] to rot.

(4RT 449.)

The prosecutor did not mention the cell phones in her opening argument, but in "rebuttal" she harped on them, asking the jury to consider what happened to the cell phones, referring to Detective Sharman's testimony that no cell phones were found in Campbell's room. (4RT 450.)

The prosecutor did not discuss the physical evidence in her opening argument, but she devoted significant time on "rebuttal" referring to the photographs of the scene. (4RT 450-454.) She talked about blood spatter and smear, and how it did not match up with Campbell's account of the fight. (4RT 451-452.) She addressed the

67

glove on one of Brian's hands, which she never mentioned on opening, and which defense counsel did not address. (4RT 451.)

The prosecutor argued for the first time that Campbell lied about falling asleep immediately after the fight because Brian's blood was on a cigarette Campbell must have smoked before he fell asleep. (4RT 448, 453.)

Other than mentioning voluntary manslaughter in passing (4RT 412), the prosecutor did not address the substance of the manslaughter issue during her opening argument. On rebuttal, she attacked any basis for a voluntary manslaughter conviction based on imperfect self-defense and heat of passion. (4RT 454-456.)

## B.  Standards of Review

### 1.  Prosecutorial Misconduct

Claims of prosecutorial misconduct are reviewed under an abuse of discretion standard. (*People v. Alvarez, supra,* 14 Cal.4th 155, 213.) However, this case arguably presents a mixed question. Issues presenting pure questions of law or mixed questions of law and fact are reviewed *de novo* by the Court of Appeal. (*People v. Cromer* (2001) 24 Cal.4th 889, 894, 900.) Mixed questions are those in which the " 'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated'. " (*Ornelas v. United States* (1996) 517 U.S. 690, 696-697,

quoting *Pullman-Standard v. Swint* (1982) 456 U.S. 273, 289, fn. 19; see also *Townsend v. Sain* (1963) 372 U.S. 293, 309, fn. 6 [ ["mixed questions of fact and law ... require the application of a legal standard to the historical-fact determinations"].)

### 2.    Ineffective Assistance of Counsel

Campbell incorporates by reference his discussion of the law of ineffective assistance of counsel set out in Argument III., section B., at pages 49-51 of this brief.

### C.    The Prosecutor Sandbagged the Defense By Saving Virtually Her Entire Closing Argument For Rebuttal

### 1.    Applicable Principles

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Smithey, supra,* 20 Cal.4th 936, 960.)

"A prosecutor has a duty to prosecute vigorously. 'But, while

he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 691, citing *Berger v. United States* (1934) 295 U.S. 78, 88; see *People v. Hill* (1998) 17 Cal.4th 800, 820.)

"'It is a prosecutor's duty "to see that those accused of crime are afforded a fair trial." [Citation.] "The role of the prosecution far transcends the objective of high scores of conviction; its function is rather to serve as a public instrument of inquiry and, pursuant to the tenets of the decisions, to expose the facts." [Citation.]' [Citation.]" (*People v. Daggett* (1990) 225 Cal.App.3d 751, 759.)

"As the United States Supreme Court has explained, the prosecutor represents 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' [Citation.]" (*People v. Hill, supra,* 17 Cal.4th at 820, citing *Berger v. United States, supra,* 295 U.S. at 88.)

"When the evidence is concluded," the parties "may argue the case to the court and jury." (§ 1093, subd. (e).) The prosecutor has the right to open the argument and "the right to close." (*Ibid.*) And "a prosecutor is justified in making comments in rebuttal ... which are fairly responsive to argument of defense counsel and are

70

based on the record." (*People v. Hill* (1967) 66 Cal.2d 536, 560.) However, a prosecutor commits misconduct if he "sandbags" the defense by giving a perfunctory initial closing argument followed by a lengthy rebuttal: "Section 1093, subdivision (e) ... does not permit the prosecutor to give a perfunctory (three and one-half reporter transcript pages) opening argument designed to preclude effective defense reply, and then give a 'rebuttal' argument—immune from defense reply—10 times longer (35 reporter transcript pages) than his opening argument. [Citations.]" (*People v. Robinson* (1995) 31 Cal.App.4th 494, 505.)

In death penalty cases, the California Supreme Court has called for "scrupulous regard for complete impartiality and fairness", holding that the prosecution and the defense should each "have an opportunity to rebut the argument of the other." (*People v. Bandhauer* (1967) 66 Cal.2d 524, at p. 531; see also, *People v. Hill, supra*, 66 Cal.2d at 564-565.) While this is not a death penalty case, the principles of fairness to a defendant in a criminal trial still apply.

## 2.   The Prosecutor Improperly Sandbagged the Defense in Rebuttal Argument

Here, the prosecutor gave an artfully slender opening argument that primarily addressed consciousness of guilt evidence. She then gave a full closing argument immune to defense reply.

Allowing the prosecutor to give such an opening argument

71

without providing Campbell an opportunity to respond to her rebuttal argument accorded the prosecution an undue advantage and prejudiced Campbell's defense. Section 1093 does not permit the prosecutor to manipulate the order of argument to the defendant's detriment. This was essentially the type of sandbagging denounced in *Robinson, supra,* even though the length of the opening argument was not much shorter than the rebuttal argument; here, the prosecutor focused nearly exclusively on consciousness of guilt evidence in her opening argument, saving all of her discussion of the physical evidence for rebuttal.

More specifically, the defense had no opportunity to address the prosecutor's arguments that:

- Campbell lied when he said he did not know where the cell phone landed after he tossed it because the lights in the room were off (4RT 441);

- Campbell's "story" is exposed as a lie because he said the lights were off when he was looking in the closet for clothes for Brian (4RT 442, 445);

- Campbell could not have hit the side and top of Brian's head with the iron if he was hitting him across his body as Campbell had testified (4RT 443-444);

- Brian would not have stayed in a position to be struck that way had he been able to escape (4RT 443-444);

- If Brian was strangling Campbell with the cord as Campbell

72

described, Brian could not have been in a position to be struck on the side of the head (4RT 443-444);

- Brian left the room twice, not once as Campbell testified (4RT 446);

- According to Wendell, the fight started about an hour after Brian returned to Campbell's room, not immediately after (4RT 446);

- Campbell's testimony about how Brian was dressed did not add up (4RT 447);

- The tank top Brian was wearing was not ripped, as Campbell claimed (4RT 447, 452);

- The physical evidence showed that Brian was not wearing the long-sleeved shirt he had been wearing in the hallway when he was killed, that his chest was bare and he had bite marks on his arms (4RT 449);

- Brian could not have received a bite mark on his hand if he was holding Campbell around the neck and strangling him as Campbell had described (4RT 449);

- Had Brian been wearing the tank top at the time Campbell used the stapler against him, the staples would not have been embedded in his chest (4RT 449);

- The jury should consider the location of the iron strikes in evaluating Campbell's story (4RT 449);

- The photos were "worth thousands of words", but those

73

words were not in Campbell's testimony because Campbell did not explain the evidence adequately, and the evidence was destroyed because Campbell let Brian's body rot in his room (4RT 449);

- The jury should speculate as to what happened to the two cell phones Campbell said Brian had taken, because one of the detectives said no cell phones were found in Campbell's room (4RT 450);

- According to the photographs, blood spatter and smear did not match up with Campbell's account of the fight (4RT 451-452);

- There was no explanation for the glove found on one of Brian's hands (4RT 451);

- Campbell lied about falling asleep immediately after the fight because Brian's DNA was on a cigarette butt in the ash tray (4RT 448, 453);

- There was no basis for a voluntary manslaughter conviction based on imperfect self-defense or heat of passion (4RT 454-456.)

None of the above comments could fairly be characterized as rebuttal to Campbell's closing argument. The prosecutor knew what the evidence was when she offered her opening argument. Nonetheless, she saved all comment on the physical evidence for "rebuttal" argument. This was misconduct. (*People v. Robinson,*

*supra*, 31 Cal.App.4th 494, 505.)

### D.    The Misconduct Was Prejudicial

Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California, supra*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, to the extent federal constitutional rights are implicated, and *People v. Watson, supra*, 46 Cal.2d 818, if only state law issues were involved. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.) *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214–1216; *People v. Harris* (1989) 47 Cal.3d 1047, 1084.) *Watson* applies where the prosecutor uses " ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Gionis, supra*, at p. 1215.)

### E.    Defense Counsel's Failure to Object to the Prosecutor's Misconduct Denied Campbell His Sixth Amendment Right to Effective Assistance of Counsel

Counsel provided ineffective assistance when he failed to make a timely objection to the prosecutor's improper rebuttal argument, or to request an opportunity to respond in surrebuttal, or to move for a mistrial. By failing to do so, he provided ineffective assistance of counsel.

75

1.    **Standard For Evaluating Claims of Ineffective Assistance of Counsel**

Campbell incorporates by reference his discussion of the law of ineffective assistance of counsel set out in Argument III., section B., at pages 49-51 of this brief.

2.    **Trial Counsel Was Ineffective**

The record establishes the error – defense counsel's failure to object to a patently improper tactic, namely, the prosecutor's sandbagging the defense by reserving the bulk of her closing argument for rebuttal and thereby precluding defense response. A reasonably competent attorney would have preserved this meritorious issue for appellate review by making a timely objection on the correct basis. (See *People v. Jackson* (1986) 187 Cal.App.3d 499, 506; *In re Christina P.* (1985) 175 Cal.App.3d 115, 129-130.) By failing to timely object to the unfair argument on the basis it was improper rebuttal, counsel waived a meritorious issue on appeal.

Campbell acknowledges reviewing courts are generally reluctant to reverse based on a claim of ineffective assistance of counsel on direct appeal because the review of an attorney's choices is deferential. (*People v. Ledesma, supra*, 43 Cal.3d 171, 216.)

If an attorney's claimed deficiency "might be considered sound trial strategy" or might represent an "informed tactical choice", then review on appeal is limited and the conviction may be affirmed despite counsel's choice to waive making a vital objection.

76

(*People v. Burnett* (1999) 71 Cal.App.4th 151, 180; *Strickland v. Washington, supra,* 466 U.S. at 689; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.)

There could be no possible tactical reason for, or advantage to the defense in allowing the prosecution to present opening argument that primarily addressed consciousness of guilt evidence, but not the physical evidence, and to sandbag the defense with rebuttal argument. Counsel must know the law as it relates to the case he is trying. (*People v. Zimmerman* (1980) 102 Cal.App.3d 647, 657; *People v. McCary* (1985) 166 Cal.App.3d 1.)

Attorneys are sometimes reluctant to make objections to prosecutorial misconduct in front of the jury. However, a request to respond to the prosecutor's argument on the basis it was improper rebuttal or a motion for mistrial could have been made at a sidebar outside the hearing of the jury. "Since an objection ... would have been adjudicated outside the presence of the jury, there could be no satisfactory tactical reason for not making a potentially meritorious objection." (*In re Hall* (1981) 30 Cal.3d 408.) Similarly, there was no possible tactical reason here.

### 3.    The Error Was Prejudicial

This was an error of federal constitutional dimension mandating reversal. This error deprived Campbell of his rights to a fair trial, to due process and to a reliable determination of guilt, all in violation of the Fifth, Sixth, and 14th Amendments.

The prosecutor's misconduct barred Campbell from replying to the prosecutor's detailed discussion of the evidence. This dealt a serious blow to the defense. As the United States Supreme Court has noted, argument is the last clear chance to persuade the jury there may be reasonable doubt of the defendant's guilt, and no aspect of defense advocacy could be more important than the opportunity finally to marshal the evidence before submission to the jury. (*Herring v. New York* (1975) 422 U.S. 853, 862.)

The prosecutor's strategic sandbagging severely undermined this aspect of advocacy. The inability of the defense to rebut the prosecution's argument impermissibly tilted what should have been a level playing field. The misconduct thus affected an important strategical aspect of the defense and deprived Campbell of his rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

Since the misconduct involved federal constitutional error, the burden is on the prosecution to prove beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*People v. Bolton* (1979) 23 Cal.3d 208, 214, citing *Chapman v. California, supra,* 386 U.S. 18, 24; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1076-1077.) The "beyond a reasonable doubt" standard is the equivalent of a "subjective state of near certitude." (Cf. *Victor v. Nebraska* (1994) 511 U.S. 1, 15; *Jackson v. Virginia* (1979) 443 U.S. 307, 315.) This heavy burden cannot be met due to the difficulty of

calculating the precise effect of the prosecution's "rebuttal" on the jury.

During rebuttal argument, the prosecutor accused Campbell of lying at least ten times. (4RT 441-442 [". . . the judge asked him a question that threw everything that he said out the window. Never mind how the physical evidence didn't match it, but wait, the lights were out?"], 442 ["The bottom line is the defendant did not tell the truth about that night when he testified. He didn't talk about that night in his interview. He had to be quiet on that."], 443 [Campbell lied about how the injuries were inflicted on Brian], 446 [Campbell lied about confronting Brian immediately upon Brian returning to his room], 447, 449 [Campbell lied about how Brian was dressed], 447, 452 [Campbell lied about ripping the tank top off of Brian], 450 [Campbell lied about the cell phones], 451-452 [Campbell lied about how the fight occurred, as evidenced by the blood smear and spatter], 448, 453 [Campbell lied about falling asleep immediately after the fight because Brian's blood was on a cigarette Campbell must have smoked before falling asleep].

The reference to the lights being out when Campbell tossed the cell phone in the room was particularly sneaky and unfair. The prosecutor had elicited that testimony while cross-examining Campbell about what had happened to his two cell phones after the killing. Campbell testified that he did not know what had happened to them, but he thought he had left them in his room, or that he

might have taken one of them with him when he left. (3RT 372.) The court asked him to repeat his answer. (3RT 372.) Campbell said, "One, I could have possibly taken with me. The other one, I believe was – during the scuffle, I don't know where it landed, because the lights were out, and we had the stereo lit up with – " (3RT 372.) The prosecutor objected that the answer was non-responsive, and the court sustained her objection. (3RT 372-373.) Defense counsel did not clear up the partial answer on redirect, so Campbell never had an opportunity to explain how "the lights were out." The prosecutor saved that incomplete answer for rebuttal argument, urging the jury to find Campbell's entire case to be a lie because he said the lights were out. (4RT 442 [". . .the judge asked him a question that threw everything that he said out the window. Never mind how the physical evidence didn't match it, but what, the lights were out?"].)

Also in rebuttal argument, the prosecutor misstated Campbell's testimony about biting Brian. She argued, referring to the bite marks on Brian's body, "You have the photographs. Up and down his left arm, on his right chest, his hand. His hand. If you are choking somebody out and your arm is around [sic], how do you get a bite mark on your hand?" (4RT 449.) The suggestion was that Campbell only bit Brian while he was being strangled, and he would not have been able to bite him on the hand given the manner in which Campbell said Brian was strangling him. When cross-

examining Campbell regarding the fight, referring to the photos, the prosecutor asked, "And so it's your testimony that he had a choke hod on you at each portion of his arm that was bitten?" (3RT 359.) Campbell responded, consistent with his testimony on direct, that he had bitten Brian "a lot" and that he had also bitten Brian at other points during the fight in an effort to make Brian let him go, not just when Campbell was being choked. (3RT 359.) On rebuttal the prosecutor ignored Campbell's testimony that he had bitten Brian many times at various points during the fight and told the jury that Campbell was lying about the manner in which he had been choked because he could not have bitten Brian's hand if he had been strangled in the manner Campbell described. (4RT 449.) Defense counsel could not address the prosecutor's distortions of Campbell's testimony because the prosecutor did not mention these "facts" until "rebuttal" argument.

The error here deprived defense counsel of the opportunity to rebut the prosecutor's improper bolstering of her case. Therefore, the prosecution cannot prove beyond a reasonable doubt this error did not contribute to the jury's verdict, and reversal of Campbell's conviction is required. (*Chapman v. California*, *supra*, 386 U.S. 18, 24.) However, because there is a reasonable probability this error affected the verdict, reversal is required even under the lesser standard of *People v. Watson*, *supra*, 46 Cal.2d 818, 836.

81

# CONCLUSION

For the foregoing reasons, Campbell's conviction should be reversed.

DATED: July 31, 2018                    Respectfully submitted,


GAIL HARPER
Attorney for Appellant

## CERTIFICATE OF WORD COUNT

I, Gail Harper, counsel for appellant, certify pursuant to the California Rules of Court, that the word count for this document is 18,086 words, excluding the tables, this certificate and any attachments. This document was prepared in WordPerfect X3, and this is the word count generated by the program for this document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Francisco, California, on July 31, 2018.


GAIL HARPER
Attorney for Appellant

## PROOF OF ELECTRONIC SERVICE
## AND SERVICE BY MAIL

I am employed in the county of San Francisco, California; I am over the age of eighteen years and not a party of the within entitled cause; my business address is P. O. Box 330057, San Francisco, CA 94133.

Documents submitted electronically are transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies through the mail via the United States Postal Service or a commercial carrier.

On August 1, 2018, I electronically served the attached APPELLANT'S OPENING BRIEF in *People v. Campbell* (B288428) by transmitting a true copy via this Court's TrueFiling system to the Los Angeles County District Attorney; the Department of Justice, Office of the Attorney General; and California Appellate Project, Los Angeles.

On August 1, 2018, I served the same document by mail on:

| | | |
|---|---|---|
| Michael Campbell BF6189 | The Hon. Curtis B. Rappe | Michael Waldinger |
| Wasco State Prison | c/o Clerk, Superior Court | Office of the APD |
| P.O. Box 5500 B-5  217-A | 111 North Hill Street | 210 W Temple Street |
| | | |
| Wasco, CA 93280 | Los Angeles, CA 90012 | 18th Floor |
| | | Los Angeles, CA 90012 |

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 1, 2018, at San Francisco, California.

_____
GAIL HARPER

Dr. Leevy
Eldorado Community Service Center
3130 South Hill Street
Los Angeles, CA. 90007

Social Security Administration
611 West 6th Street
Los Angeles. CA. 90017

* The above are where my mental health records are located.

\* 1.) Questions For Magistrate Judge: District Courts

\* 2.) Michael Waldinger (Alternate Public Defender)
(No explanation or reply to my request)

3.) Statement Of Appealability

# EXHIBIT G

*[handwritten: Michael Campbell 2·10·2020  x Michael Campbell]*

## Questions

1.) Did this Court in( People v. Moye (2009) 47 Cal.4[th] 537), establish a corroboration requirement as a condition precedent to giving instructions on "Sudden Quarrel or Heat of Passion" where a defendant testifies to acting in Self-Defense?

2.) Are Self-Defense and Heat of Passion mutually exclusive defenses?

3.) Is defense counsel ineffective under the Sixth Amendment of the United States Costititution where he fails to request an "**Ear-Witness Identification**" jury instruction when the identity of a speaker is crucial to the defense?

4.) Initially the trial court was going to give the instruction for **CALCRIM 570, Sudden Quarrel** or **Heat of Passion** thus impliedly finding " **substantial evidence**" for giving the instruction. How then does the trial court conduct an "**off-the-record**" meeting before my arrival to court, and outside the presence of trial court, without notifying the defendant, Michael Campbell, about the withdrawal of these vital instructions and then try and justify not giving them?

5.) Because the trial court initially agreed to give **CALCRIM 570** the Reviewing Court must presume the trial court made the finding that "**substantial evidence**" supported giving the **CALCRIM 570, Sudden quarrel and Heat of Passion** correct?

6.) Is not "**substantial evidence**" defined as evidence from which a jury composed of reasonable (persons) could conclude that the lesser offense ( **CALCRIM 570**), but not the greater (**187(a) Second Degree Murder**) was committed?

7..) Is not trial court bound by law, in determining whether "**substantial evidence**" supports a lesser offense, it is the trial courts duty to leave issues of witness credibility to the jury (People v. Breverman (1998) Cal.4[th] at 162;)( People v. Elize (1997) 71 Cal.App.4[th] 605,615) and doubts as to the sufficiency of the evidence to warrant instructions be resolved in favor of the defendant? (People v. Flannel (1979) 25 Cal.3[rd] 668, 685;) (People v. Wilson (1967) 66 Cal.2[nd] 749, 763.)

8.) Isn't it criminal law, knowledge, and fact that in a prosecution for murder even though the defense of "**Self-Defense**" fails, as it might for excessive retaliation by the defendant, the jury might still find the original attack sufficient to constitute "**provocation**" which would preclude a finding of "**malice aforethought**" and reduce the crime to "**manslaughter?**"

9.) Isn't it the obligation and duty of the trial court to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories that have the strongest evidentiary support, or upon which the defendant has openly relied? (People v. Breverman, supra, 19 Cal.4[th] 142, 155.)

10.) Does not the obligation to instruct on lesser included offenses apply regardless of the parties' request or objections, and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted "**all-or-nothing choice**", encourages a verdict no harsher or more lenient than the evidence merits, and protects the jury's truth-ascertainment function? (People v. Breverman, supra, 19 Cal.4[th] 142, 154-155.)

`11.) Was not the evidence of the victim, Brian Denton's menacing behavior and his attempt at strangling me, his beating and repeated attacks on me slamming to the floor, sufficient enough to permit a jury to conclude that a reasonable person in my position could have reacted to his "**provocation**" during our sudden quarrel/fight over stolen items, and could a reasonable person have reacted out in the "heat of passion?' (People v. Barton (1995) 12 Cal.4[th] 186, 190, 201-202.)

12.) Was not the victim's threating behavior, repeated attacks and treats to kill me immediately before the killing sufficient under California law to require the trial court to give a "Sudden Quarrel and Heat of Passion" instruction sua sponte?

13.) Does not the "**objective**" standard of "Heat of Passion and Sudden Quarrel" or Voluntary Manslaughter compel examination of my case?

14.) Doesn't The People have to "**prove beyond a reasonable doubt**", that "heat of passion and adequate provocation" were lacking in order to establish the murder element of "malice?" (People v.Rios (2000) 23 Cal.4[th] 450, applying ( Mullaney v. Wilbur (1975) 421 U.S. 684,704)

15.) Was not the trial court bound, sua sponte, to give CALCRIM 570 Sudden Quarrel/Heat of Passion if the evidence was substantial, in other words if the evidence was strong enough to persuade a reasonable jury. Opinion p. 14 citing (People v. Moye, supra, 47 Cal.4[th] 537, 541.)

16.) Seeing that my neighbor Rose's identification of me as the one who was yelling through our apartment walls for her to "call the police!!!" was at the core of my defense, was not my trial counsel ineffective for failing to request a modified version of CALCRIM 315 or other appropriate instruction to assist the jury in evaluating the "**Ear- Witness testimony**" presented

by the prosecutor? Isn't trial counsel ineffective when he fails to request necessary jury instructions?

17.) Does not the criminal defendant's constitutional right to the assistance of counsel for his defense include the right to effective assistance?

18.) Why was the prosecution allowed not to present evidence **negating** the findings that the victim had a **(BAC) Blood Alcohol Level** of **.212, three times the legal limit,** and had a **(PP) Presumptive Positive Testing** indicating that the victim was high on Methamphetamine and Ecstasy?

19.) Why weren't the results of my **DNA Analysis** reported to the trial court and why did the prosecution, who requested and provided the testing, hold back the results from the jurors?

20.) Doesn't The People have to furnish or provide all evidence in a trial whether or not it helps or hurts the state's case? This being the results if my **DNA** testing which were negative for any kind of drugs but were never produced during the trial and was withheld from the jury.

21.) Doesn't the prosecutor and The People have to present evidence of a **"motive"** in a murder conviction? What was the **"motive"** in my murder trial? The prosecutor never produced a motive for the killing thus lacking a conviction required to fulfill every **"element"** of the charged crime.

22.) Doesn't the law require that failure to instruct the jury on Sudden Quarrel and Heat Of Passion, Provocation and Voluntary Manslaughter require reversal of my Second Degree Murder conviction?

I

Michael Campbel
CDCR# BF6189
P.O. Box 950
Folsom, CA 95763

08-01-2018

To: Michael Waldinger
(Alternate Public Defender)
(Case # B288428)

I am formally writing you this letter in hopes of obtaining a justifiable response to your representation in The People v. Campbell (B288428). IHLIRIM 570 Manslaughter was included in the original jury instructions that I had recieved from the courts on 2/20/2018. Outside the presence of the jurors, trial court, and especially me, the three of you (D.A. Rivard, Judge Rappe, and yourself) decided to remove IHLIRIM 570 Manslaughter from the final copy of the juror's instructions even though evidence supported that the instruction be giving. To top it off and to make matters worst, you never, not once ever bring brought this to my attention until minutes before the jurors were going to deliberate. I had elbowed you in the ribs during the reading of the final jury instructions and I wrote, "He didn't read this" referring to IHLIRIM 570 I even circled "sudden quarrel". Your reply written in red ink at the top of the page was, "not in his copy, not supported by evidence. This is self-defense not heat of passion. Heat of passion is a situation when you see wife with other man & kill." I've included a copy of our exchange in this letter from that day in court just before the jurors were set to deliberate. There is no record of any discussion between parties and the court about removing IHLIRIM 570 Manslaughter sudden quarrel (which the evidence more than support in my case) heat of passion from the jury's consideration. There were no proceedings between between February 16th and February 20th 2018, which was the period between the discussion on the record.

II

Also at the top of page #15 under CALCRIM 571 on the original copy of the jury instructions I had before me in the courtroom was removed that says, "The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury" you also noted in red ink at the top of the instruction " also not in final copy covered in 571". I firmly expressed to you in court that the copy of jury instructions I had were not the same as the final jury instructions jurors were about to deliberate over in the chambers. Again you stated you agreed to take them out without ever having confided in me to do so.

Fact is, the evidence in my case indeed was sufficent enough to support giving CALCRIM 570 sudden quarrel, heat of passion instructions and the omitted CALCRIM 571 elements, you agreed to have removed leaving me totally blindside and misrepresented. The obligation to instruct on lesser included offenses applies regardless of the parties' request or objections (regardless of your off-the-record discussion without my knowledge) and thus prevents the strategy, ignorance, or mistakes of either party from presenting the jury with an unwarranted all-or-nothing choice, encourages a verdict no harsher or more lenient than the evidence merits, and protects the jurys' truth-ascertainment function. In murder trials both self-defense and heat of passion, sudden quarrel ( as evidenced in my case) can be presented to a jury, they are not exclusive. In a prosecution for murder even though the defense of self-defense fails, as did your representation of me on these grounds, a jury might still find the original attack ( being strangled from behind with the cord from my iron) sufficient to constitute provocation, which would preclude a finding of malice aforethought" and reduce the crime to manslaughter all of which as my attorney you should of learned in law school. I testified under oath that I was scared, terrified, and surprised that the victim not only tried to strangle me but also he tried to kill me inside of my own home the one place I should have felt the safest. Substantial evidence was presented upon which the jury could of nonetheless have found that I was acting under the actual influence of extreme emotion sufficient to reduce my

III

conviction to manslaughter. There was also substantial evidence presented during my trial to support the "objective component" of sudden quarrel or heat of passion. To satisfy this component the accused's heat of passion must be due to sufficient provocation, which would have been the victims attempt to strangle me from behind with the iron cord wrapped around my neck slowly sucking the very life out of me. When the omitted jury instructions are examined in light of the evidence which clearly reflects that they should of remained, as my attorney sworn to act in my best interst, you had no clear tactical reason not to ensure and demand that IALIRIM 570, and the omitted parts of IALIRIM 571 be included inside of the final jury instructions as they were originally. There is a reasonable probibility that a more favorable result would have been obtained in the absence of your failure to request this instruction.

This was a sudden and unexpected fight with the victim losing extremely high and intoxicated. Six days later after the victims body was found he still had a BAI (blood alcohol level) of .242 three times the legal limit. A finding of (PP) Presumptive Positive contained within the autopsy report indicated the victim was high on methamphetamine and MDMA ecstasy which he had been smoking in front of a liquior store on Skid Row on the night I met him. The D.A. stated that the results of the test were inconclusive but she never produced those findings in the record. Also not included in the record were the results of my DNA testing due to the fact that they were negative and would have been favorable to my defense. If you had properly gone through my file you would have come across the results of my test but you were not properly prepared to fully represent me at trial. You never followed through with Noah Fox, my original attorney, and his findings that the crime scene investigators contaminated the crime scene when they mistakingly destroyed (410 Direct Evidence) namely the meth pipe the victim had been smoking on the night I encountered him that he placed inside of his pants pocket. Not only do they break it but they discard it out of the evidence they collected at the crime scene. 410 Direct Evidence (the discarded broken meth pipe) is evidence that directly proves a fact without an inference or presumption, and which in itself, if true,

IV

conclusively establishes that fact. Noah Lox # 213-974-2887 informed me of this discovery on the same day he was removed as my consel counsel for conflict of intrest and you were assigned as my counsel. You never followed up with Mr. Lox on his findings to get an explanation of his findings before we started trial. Had the jury had knowledge of this destroyed evidence, even if they didn't have the physical evidence itself, just their understanding of this crucial fact, I could of had a more favorabl verdict at my trial. This knowledge would of painted a more clear picture of the circumstances I faced that night. A proper investigation of 4 Locos acoholic beverage would have shown and revealed how violent people get tha consume this kind of beverage. It's banned from college campuses because of how violent it was making college students. The victim drank 4 cans in les than 1 hour along with smoking meth, I was fighting against a crazed monster.

    The only percipient witness to the killing were my neighbors Rose Gibson and Wendell Blassingame. They were not "eyewitnesses" but "earwitness" Both testified to hearing the sounds of a violent fight and yelling (again more proff of a sudden quarrel) coming from my apartment. I was frantically screaming in a high pitch shrill, while at the same time being choked, for her to call the police. You failed to request a necessary Earwitness Identification Instruction to help the jury assess Rose Gibson's crucial testimony that she heard me yelling through the walls of our apartments for her to call the police. The right to effective assistance of counsel includes the expectation that counsel will make a rational and informed strategies and tactics, founded on adequate investigation and preparation. Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts. The nature of the investigation that must be undertaking depends on the circumstances of each case, but counsel must investigate any available and viable defense. Trial counsel is ineffective when he fails to request necessary jury instructions. Trial counsel was ineffective by failure to request necessary Earwitness Identification Instruction to help the jury assess both Rose Gibson's and Wendell Blassingame's testimony that they did hear a fight or sudden quarrel and that Rose Gibson heard me yelling through the walls from my apartment for her to call the police.

Lastly you never objected to the prosecutor's skillfully crafted and improperly applied "Sandbagging" the defense during her rebuttal arguement. The prosecutor gave an artfully slender opening argument that primarily addressed consciousness of guilt evidence. She then gave a full closing arguement immune to defense reply. I sat there speechless not knowing that as my attorney you could of asked for a "surrebuttal" which I could of easily gave truthfully honest replies. You failure to recognize this skillfully crafted "Sandbagging" technique allowed the prosecutor to give such an opening argument without providing me an opportunity to respond to her "rebuttal" arguement through "surrebuttal" accorded the prosecution an undue advantage and prejudiced my defense. Section 1093 does not permit the prosecutor to manipulate the order of arguement to the defendant's detriment. Counsel provided ineffective assistance when you failed to make a timely objection to the prosecutor's improper "rebuttal arguement", or to request an opportunity to respond in "surrebuttal", or to move for a "mistrial". By failing to do so, you provided ineffective assistance of counsel. The removal of IALIRIM 570 sudden quarrel and heat of passion, parts of IALIRIM 571 coupled with the "Sandbagging" technique during the prosecutors rebuttal arguement lessened the prosecutions burden of proof and violated my 6th and 14th Amendment Rights. Instructional error which relieves the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violated my rights under the United States and California Constitution which as my counsel you should have been unaware of even if at the time I wasn't. You should have been educated to the fact that in murder trials both "Self-defense" and "sudden quarrel", "heat of passion" (as the details contained from the facts in my case) can be presented to the jury. You should of been knowle informed through your studies of the bar exam that in prosecutions for murder that even though the defense of "self-defense" fails, as it did due to your lack of proper preparation, a jury might still find the original attack (the "sudden quarrel", 20 minute fight, and the victims attempt to strangle me), sufficient to constitute "provocation" which precludes a finding of "malice aforethought" and reduce the crime to "manslaughter". I'd like to know what was your tactical reasons for the omissions charged in this letter? What justifications do you have for your actions?

## STATEMENT OF APPEALABILITY

This appeal is from a final judgment following a jury trial and is authorized by Penal Code[1] section 1237.

### STATEMENT OF THE CASE

On February 9, 2018, the prosecutor filed an amended information charging appellant, Michael Campbell, with one count of murder (§187, subd. (a)) and alleging that Campbell personally used a deadly and dangerous weapon – a clothing iron. (1 Clerk's Transcript[2] 109-110.)

Trial commenced on February 7, 2018. (CT 103; 2 Reporter's Transcript[3] 1).

On February 13, 2018, Campbell entered a not guilty plea to the amended information.  (1CT 112.)

On February 21, 2018, a jury acquitted Campbell of first degree murder, convicted him of second-degree murder, and found the weapons use allegation true. (1CT 159-161; 4RT 502-503.)

On February 23, 2018, the court sentenced Campbell to 15

---

[1] All references will be to the Penal Code unless otherwise indicated.

[2] Hereinafter referred to as "CT".

[3] Hereinafter referred to as "RT".

1

years to life for count one and imposed a year for the personal use allegation, for a total of 16 years to life. (1CT 165, 168; 4RT 525.)

Notice of appeal was timely filed. (1CT 171-172.)

# STATEMENT OF THE FACTS

## PROSECUTION CASE

### The Killing

On December 31, 2015, Michael Campbell occupied Room 58 at the Florence Hotel, a single resident occupancy ("SRO") hotel located at 310 E. 5th Street, in the skid row area of downtown Los Angeles. (2RT 44-47, 60, 93-94, 102.) Surveillance video cameras are located throughout the interior of the building. (2RT 100-101.)

The video evidence shows that, at 9:41 p.m. on New Year's Eve 2015, Campbell entered the front lobby entrance of the Florence Hotel, accompanied by Brian Denton. (2RT 103-106.) They were captured on video entering Campbell's third-floor room, Room 58, at 9:42 p.m. (2RT 108-110.) Brian walked out of the room, down the hallway out of sight, and then returned between 9:45 and 9:48 p.m. (2RT 110-111.) Brian again left the room, greeted several residents, stood near a stairwell, and then returned to the room between 10:25 and 10:30 p.m. (2RT 112, 124-125.)

Around 11:35 or 11:40 p.m., Campbell's neighbor across the hall, Wendell, was awakened by a disturbance in Campbell's room. (2RT 44-48, 53, 95-96.) Wendell heard a lot of banging and slamming. (2RT 47, 53.) Wendell's wall and the mirror hanging on it were shaking. (2RT 48, 53.)

About 20 to 25 minutes after the noise woke Wendell, another neighbor, Rose, came to Wendell's door and asked him to call 911

3

because she had heard "a bunch of knocking and bamming and fighting" coming from Campbell's room for about 20 minutes. (2RT 48-49, 54-55, 75-79, 95.) Wendell decided to call hotel security instead. (2RT 49, 55.) Wendell could still hear "rumbling" or "wrestling" or "fighting" going on in Campbell's room. (2RT 49.) He heard a bang and at the same time someone yelling "help" twice, but he could not tell if it was Campbell's voice yelling for help, or even whether the voice was male or female. (2RT 49-50, 53, 57.) Rose also heard a voice coming from Campbell's room, but she believed it was Campbell's voice saying, "Call the police," in response to her knocking on their common wall and asking if he was okay. (2RT 77-78, 81-82, 92.) Wendell considered what was happening an "extreme emergency" and called hotel security twice. (2RT 50, 55.) After Wendell called the second time, the fighting stopped and Campbell's room was silent again. (2RT 56-57, 79.)

Hotel security arrived and knocked on Campbell's door, announcing themselves as "security", but when nobody answered, the security officers walked away. (2RT 50, 55-56.) When the security officers banged on the door of Campbell's room, it was quiet inside. (2RT 50.) Wendell told the security officers he had heard people fighting in Campbell's room. (2RT 56.)

### Events Following the Killing

Video footage showed Campbell left the room at 8:13 a.m. on January 1, 2016. (2RT 112-115, 128-129.) He appeared to be wearing

4

the same clothing from the night before. (3RT 299.) He was recorded on video leaving through the front door. (2RT 112-115.) He did not return to the hotel. (2RT 115.)

On January 5, 2016 at 8:24 a.m., hotel security officer Omar Hernandez found Brian's body while conducting a welfare check at Room 58. (2RT 52, 70, 116, 135-136, 144.) Hernandez opened the door with a master key, then closed the door when he saw the body inside. (2RT 65, 68, 65-66, 68, 135-136.) Sometime after 8:24 a.m., the police received a call regarding a suspicious death and went to Campbell's apartment, where officers met with Hernandez. (2RT 59-62.) Initially the officers believed the body on the floor in Campbell's room was Campbell himself. (2RT 62, 66.) The body's face was pale and bloodied, and there were injuries to the face and head. (2RT 66-67.)

The window in the room was closed, but an officer opened it and, while waiting for the detectives to arrive, left it open to clear out the odor of the decaying body. (2RT 62-64, 69, 71-72.) The room had a small closet filled with clothes. (2RT 63-64.) There was a lot of debris on the floor and throughout the room. (2RT 64.)

Brian's body was lying supine on the floor of the ten foot by twelve foot room that contained a closet, a twin bed, a dresser, two tables, and a sink. (2RT 62-65, 3RT 329.) The officers did not go through Brian's pockets or touch the body at all. (2RT 70-71.) Brian's face and head had multiple obvious blunt force injuries. (2RT 66.)

5

Investigators observed blood smears and spatter on the dresser drawers near Brian's head. (3RT 248.) The rug under Brian was soaked in blood. (3RT 247-248.) The area of the bedspread adjacent to Brian's head was also soaked in blood. (3RT 258-259.) A bloody towel and bloody clothing iron with Brian's blood on them were on the bed among several items of clothing, boxes and blankets. (3RT 255-256, 260-261, 294-297.) Multiple blood smears were on the door and on a bag hanging from the interior door handle. (3RT 258.) Blood smears, spatter, and dried blood drips were on the side of that same dresser in the area adjacent to the front door. (3RT 257-258, 270, 272-276.) A blood-soaked white tank top was wadded up on the floor area under the sink. (3RT 251-252, 254-255, 337.) On top of the dresser was a stapler with Brian's blood on it. (3RT 259, 262-263, 294-298.) There were cigarette butts in the ashtray on a table, one of which had Brian's DNA on it. (3RT 252-253, 264, 295, 297.) Brian's blood alcohol level was later determined to be .212. (3RT 196, 239-240.) Presumptive tests showed the presence of MDMA and methamphetamine in Brian's blood, but confirmatory testing was negative for those drugs. (3RT 195-196.)

Neighbor Rose testified she believed the person killed in Campbell's room was Campbell himself, and that his girlfriend had killed him.[4] (2RT 89.) Rose stated in a recorded interview that she

---

[4]

The prosecutor impeached Rose with her two felony drug

6

heard a female voice say "Give me some money," and Campbell's voice respond "I ain't got no goddamn money." (3RT 282.) She also reported hearing a female voice saying "Michael, oh, let me go. Let me go." (3RT 281.) She then said she heard Campbell say "No, you let me go." (3RT 281.) She also said she heard Campbell's voice say "Call the police" twice. (3RT 291.)

The cause of Brian's death was blunt force trauma; and the manner of death was homicide. (3RT 184, 197, 225.) Fifteen to seventeen of the blows were potentially fatal. (3RT 224.) The coroner found staples and possible bite marks on Brian's body. (3RT 197-201, 205.) There were bruises and abrasions on Brian's wrists and hands, which could have been either defensive or offensive wounds, and abrasions on his flanks. (2RT 202-203, 308-309.) There were at least 22 lacerations to Brian's head and face. (3RT 206-214.) The coroner could not say definitively which of those injuries were inflicted before or after Brian died. (3RT 208-209.) There was a fracture to one of Brian's teeth. (3RT 214.) It was difficult to determine what some of Brian's injuries were, given the level of decomposition. (3RT 213-214.)

Dr. Miller testified that the injuries he detailed were consistent with the shape of the clothing iron found at the scene. He also indicated that all of the injuries suffered by Brian were inflicted

---------------

convictions. (2RT 91.)

before he died, including the staple and bite wounds.

On January 5, 2016, Brian Denton, Sr., reported to the Los Angeles Police that his son was missing. (3RT 279-280.) Based on Mr. Denton's description of his son's tattoos, the police realized that the body they had found in Campbell's room was his son. (3RT 280.)

Also on January 5, Detective Pierce conducted a recorded interview with Rose Gibson, who told him she heard banging coming from room 58 through their common wall. (3RT 280-281.) Rose also said she heard a woman's voice saying, "Michael, oh, let me go. Let me go." (3RT 281.) The woman also said, "Give me some money," and Campbell said, "I ain't got no goddamn money." (3RT 282.) Rose said that on New Year's Eve she stayed up until midnight in her room with a friend. (3RT 281-282.) During the course of the interview, Rose repeatedly said she believed Campbell was dead and Angel Dorsey killed him. (3RT 283.)

On January 6, 2016, the police interviewed Angel Dorsey, Campbell's ex-girlfriend. (2RT 136-138, 144-145, 149.) She said that on January 1, 2016, early in the morning, Campbell visited her apartment, located around the corner from his apartment and directly across the street from the Los Angeles Police Department's Central Police Station. (2RT 141-142.) Campbell seemed "excited" and upset, but did not seem inebriated. (2RT 142, 146.) Campbell said Brian was dead in his apartment. (2RT 143.) Dorsey thought Campbell was joking and would not open the door, so Campbell

started kicking the door, repeating that Brian was at his place and was dead. (2RT 143.) Dorsey let Campbell in because he looked like he needed help. (2RT 143-144.) Campbell told her that Brian died during a fight. (2RT 145.)

Campbell stayed at Dorsey's place for about four hours. (2RT 146.) Dorsey did not observe any injuries to Campbell's person except to his forehead. (2RT 147-148.) Campbell complained of a headache. (2RT 146-147.)

Campbell was arrested on the night of January 6, 2016. (3RT 175-178, 182-183.) At the time of his arrest, Campbell had bags and a backpack with him, but he did not attempt to flee. (3RT 179-180, 182.)

After receiving his *Miranda* rights, Campbell provided a recorded statement to the police.[5] (1CT 122-134; 3RT 284-289.) Campbell admitted he knew Brian, that he and Brian had fought and that Brian was dead. (1CT 128-129.) When pressed for details, he said, "I got to be quiet on that." (3RT 128.) He further stated, when told he was being arrested for murder, that he was the only witness, and also stated that his testimony was crucial. (3RT 129-131.) The video of the interview was played for the jury. (3RT 287.)

The prosecutor presented no evidence of motive.

---

[5]

The recording was played for the jury but not reported. (3RT 284-289.)

**DEFENSE CASE**

Campbell testified that he had planned to go out alone to neighborhood bars on New Years Eve, and that he had been drinking during the day. (3RT 317, 351-352, 372.) Campbell left his residence to purchase some items – including alcohol to drink before going out to the clubs – and saw his friend Brian outside of a skid row liquor store smoking methamphetamine from a pipe. (3RT 318-320, 349, 351.) Brian said he was hungry and asked Campbell to buy him food and something to drink. (3RT 319.) Campbell agreed, provided Brian put his drug paraphernalia away. (3RT 319-320.) Campbell bought some soup cups and four cans of "Four Locos", a malt-liquor drink, for Brian and started back to his place. (3RT 320.) Brian asked if he could tag along. (3RT 321.) On the walk to Campbell's residence Brian drank two of the four cans of "Four Locos". (3RT 320-321, 324.) Brian always drank really fast, and Campbell told him to slow down. (3RT 323-324.)

Campbell took Brian back to his room so Brian could change out of his "homeless" clothes into some of Campbell's nicer clothing in order to go out to the clubs together. (3RT 321-323.) Campbell had known Brian for years and acted as a mentor or father figure toward him, lending him clothing and a DVD player. (3RT 322-323, 350, 353.) Brian never took Campbell's things without permission, and always returned them. (3RT 323.) The two also drank together. (3RT 350.)

Campbell was looking through his closet for clothes and shoes when he noticed that Brian was no longer in the room. (3RT 324-325, 354.) Campbell could hear Brian out in the hall. (3RT 325.) Campbell paused to look for his cell phone in order to call his children and saw that both of his cell phones were missing. (3RT 326.) Ordinarily Campbell kept his cell phones on top of his dresser or his stereo. (3RT 327.) He knew Brian had taken them. (3RT 327.)

Campbell opened his door, called to Brian, and Brian returned to his room, closing the door. (3RT 327-328.) Campbell confronted Brian about the cell phones, which he observed bulging out of Brian's front pants pockets, demanding them back. (3RT 327-328, 355.) When Campbell tried to retrieve his phones, Brian charged him and punched him in the forehead. (3RT 328.) After Brian punched him, Campbell told him he was going to call the police, but he could not get his phone away from Brian. (3RT 328.) Brian blocked the door and charged Campbell, then bear-hugged him and slammed him to the ground, throwing body punches. (3RT 328-330.) Brian was swearing at Campbell and saying he was going to kick Campbell's "old ass". (3RT 329-330.) Campbell did not know if Brian was drunk or still high, but Brian was angry, and he was on top of Campbell. (3RT 330.)

Campbell was able to wriggle out from under Brian and get to his feet, but Brian prevented him from leaving the room. (3RT 330, 374-375.) Campbell told Brian he was going to call the police, but

11

Brian blocked the door. (3RT 330-331.) Brian charged Campbell again, and Campbell started throwing cans of food to keep him away. (3RT 331-332, 334.) Campbell picked up a closed stapler from the dresser and hit Brian with it, then opened it and stapled Brian's chest over Brian's tank top, but Brian pulled out a staple, laughed demonically, and said "Is that all you got old man?" (3RT 332-336, 356.) Campbell was surprised and terrified that Brian was not deterred. (3RT 334.) By this point they had been fighting almost continuously for about ten minutes, while Brian repeatedly threatened to kill Campbell. (3RT 334-335.)

While Campbell was trying to get to the door knob so he could throw Brian out of his room, Campbell tried to grab Brian by the back of his pants, seizing him by the tank top instead. (3RT 336.) The tank top ripped and came off in Campbell's hand. (3RT 337-338.) Brian had put on a glove, saying he was going to whoop Campbell's ass again, and was pounding on the walls and on Campbell with his fists. (3RT 336.) Campbell was desperate. (3RT 337.) Campbell tried throwing Brian out, but his tank top came off in Campbell's hand, so Campbell lost his grip. (3RT 337-338.) Campbell dropped the shirt by the sink and knocked on the wall and screamed for his neighbor, Rose, to call the police. (3RT 338-339.) At that point it had been 10 to 15 minutes since Brian had entered Campbell's room. (3RT 339.)

Brian rushed Campbell again and put him in a choke hold from behind with his right arm around Campbell's neck, cutting off

12

his air. (3RT 339, 357-358.) Campbell repeatedly bit Brian on his arm and elsewhere to break his hold.[6] (3RT 340, 358-360.) While Campbell was on the floor, trying to escape out the door, Brian picked up a clothing iron from the dresser, wrapped the cord around Campbell's neck, and choked him from behind until Campbell was dizzy and breathless. (3RT 340-341, 361-362.) Campbell was scared because he realized that Brian was trying to kill him. (3RT 341.) Campbell tried to get his fingers under the cord to loosen it. (3RT 341-342.) Campbell was able to grab the iron dangling at his left side by the handle and repeatedly strike Brian in the head and the left side of his face while Brian was behind him until the tension in the cord eased up. (3RT 341-343, 361, 373-374, 377.) At no time did Campbell strike Brian with the iron while facing him, nor did he ever kneel over Brian and hit him with the iron while Brian was lying on his back. (3RT 373-374.) Campbell testified that the blood smear by the door resulted from Brian blocking the door while wearing a bloody shirt, preventing Campbell from escaping. (3RT 374-375.)

Campbell crawled to the bed with the cord still wrapped around his neck, shoved some clothes aside, and passed or blacked

---

[6] Campbell testified on cross that he also bit Brian at other times during the fight, not just while he was being choked, and that he bit Brian wherever he could, not just in the shoulder and neck area. (3RT 359-360.)

out. (3RT 343, 361, 363, 377.) Before Campbell passed out, he heard Brian mumbling like a drunk person on the floor. (3RT 343.) Campbell slept until 8 a.m.  (3RT 343.)

When Campbell woke up he remembered the fight with Brian. (3RT 343.) Thinking Brian was asleep, Campbell called out to him, telling him to wake up and leave. (3RT 343-344.)  When Campbell nudged Brian's leg and discovered he was dead, he panicked and left the building. (3RT 344, 364.) Campbell did not wash up or change clothes. (3RT 364.) He could not recall about what he wore, except that he put something on to wear outside because it was raining. (3RT 364.)

Campbell denied waiting for Brian to die before Campbell left the room, or waiting so that Brian could not get medical treatment. (3RT 376.) Campbell was afraid to call the police, as he was "tying to process" what had happened. (3RT 344-345.) He went to Dorsey's house and told her he had fought with Brian. (3RT 345.) After leaving Dorsey's place, Campbell went out and bought drugs and alcohol. (3RT 345, 352.) Campbell stayed high on meth and drunk continuously for five days until the police picked him up. (3RT 346, 352, 364.) Campbell testified he did not know what happened to the two cell phones be believed Brian had stolen, but he thought he left them in his room, or that he might have taken one with him when he left, but he could not remember. (3RT 372-373.)

During his interview with the police Campbell was not

14

himself. (3RT 346.) He was hallucinating and very upset about Brian attacking him in his home. (3RT 346.) Brian attempted to kill him, and when Brian would not stop attacking him, Campbell tried to get him off of him, tried to get him out of his apartment, and tried to get others to call the police. (3RT 347.) When Campbell hit Brian with the iron, he felt he had no other options because he felt he was about to die. (3RT 347, 376.)

Photographs taken of Campbell's body on January 6, 2016, showed bruises, scrapes and scratches on his chest, back, arms and knees. (3RT 293-294, 308-309, 365-370.) Defense expert Dr. Ryan O'Connor determined the injuries to Campbell were consistent with injuries that were six days old – suggesting that they resulted from the fight with Brian. (3RT 309.)

**REBUTTAL**

Brian was living with his maternal grandmother at the time he was killed. (3RT 294, 382.) Brian had received a cell phone for Christmas 2015. (3RT 380.) Brian's biological father had come to the grandmother's residence on December 28, 2015 and picked Brian up to visit with him in downtown Los Angeles. (3RT 294.) Grandmother had spoken with both Brian and his father by phone between 11 a.m. - 1 :00 p.m. on New Year's Eve when the two were together. (3RT 380-382.)

Detective Sharman photographed the bloody tank top found in Campbell's room, and the top had no tears in it. (3RT 383-385.) He

15

did not photograph both sides of the shirt. (3RT 385.) No cell phones were found during a search of Campbell's room, and no cell phones were located on Campbell or his property at the time of his arrest. (3RT 384.) From New Year's Eve until January 5, nobody called the police or anyone else to report Brian missing. (3RT 385.)

# INTRODUCTION

In a murder prosecution (Pen. Code, § 187, subd. (a)) resulting from a fight, the trial court prejudicially erred in failing to instruct, *sua sponte*, on voluntary manslaughter based on sudden quarrel or heat of passion as a lesser included uncharged offense of the charged crime (CALCRIM No. 570), since substantial evidence supported such an instruction. The same evidence of threat and fear of harm that supported a claim of unreasonable self-defense also permitted a manslaughter verdict based on sudden quarrel or heat of passion.

The court instructed the jury it could consider Campbell's act of leaving his residence after the killing to be flight showing consciousness of guilt where there was insufficient evidence of flight. The instruction lessened the prosecution's burden of proof and violated Campbell's 5th, 6th and 14th Amendment rights.

Campbell was deprived of his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to request an instruction on "earwitness" identification where the only witnesses to the killing did not see the event, but heard it through the walls of their hotel rooms, and there was a dispute as to who spoke the words at issue and what was said. The jury needed assistance in assessing the variables affecting the reliability of the earwitness identifications and did not get it.

Wishing for a murder conviction, the prosecutor engaged in prejudicial misconduct by sandbagging the defense in closing

argument, omitting nearly all reference to the physical evidence until her rebuttal argument and depriving Campbell of the opportunity to address her argument.

Campbell was deprived of his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to the flight instruction, failed to request the earwitness identification instruction, and failed to object to the prosecutor's misconduct.

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | MAR 0 2 2018 |
| | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | NO. BA442781-01 |
| | ) | |
| 01) MICHAEL CAMPBELL, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

HON. CURTIS B. RAPPE, JUDGE PRESIDING

REPORTER'S TRANSCRIPT ON APPEAL

FEBRUARY 16, 20, 21 AND 23, 2018

APPEARANCES:

FOR THE PLAINTIFF-RESPONDENT:   XAVIER BECERRA
                                STATE ATTORNEY GENERAL
                                300 SOUTH SPRING STREET
                                SUITE 1701
                                LOS ANGELES, CA 90013

FOR DEFENDANT-APPELLANT:        IN PROPRIA PERSONA

VOLUME 4 OF 4
PAGES 388 THROUGH 531



MARY LU MURPHY, CSR NO. 5178
OFFICIAL REPORTER

388

```
 1   CASE NUMBER:          BA442781-01
 2   CASE NAME:            PEOPLE VS. MICHAEL CAMPBELL
 3   LOS ANGELES, CA       FEBRUARY 16, 2018
 4   DEPARTMENT 103        HON. CURTIS B. RAPPE, JUDGE
 5   REPORTER:             BROOKE A. BRUBAKER, CSR NO. 9420
 6   TIME:                 A.M. SESSION
 7
 8   APPEARANCES:
 9     DEFENDANT MICHAEL CAMPBELL, PRESENT WITH COUNSEL,
10   MICHAEL WALDINGER, DEPUTY ALTERNATE PUBLIC DEFENDER;
11   DEANN RIVARD, DEPUTY DISTRICT ATTORNEY, REPRESENTING THE
12   PEOPLE OF THE STATE OF CALIFORNIA.
13
14                   (THE FOLLOWING PROCEEDINGS WERE
15                    HELD IN OPEN COURT OUTSIDE THE
16                    PRESENCE OF THE JURORS:)
17
18     MS. RIVARD:  PEOPLE VS. MICHAEL CAMPBELL.
19   BA442781.
20     MR. WALDINGER:  MICHAEL WALDINGER, DEPUTY
21   ALTERNATE PUBLIC DEFENDER, ON BEHALF OF MR. CAMPBELL.
22     MS. RIVARD:  AND DEPUTY DISTRICT ATTORNEY, DEANN
23   RIVARD, FOR THE PEOPLE.
24                 GOOD MORNING, YOUR HONOR.
25     THE COURT:  GOOD MORNING.
26   ███████████████████████████████████████████
27   ███████████████████████████████████████████
28   ███████████████████████████████████████████
     ███████████████████████████████████████████
```

, SEC. 69954(D) CAL GOV CODE

389



1

2

3       I'M JUST GOING TO GO THROUGH THE

4  INSTRUCTIONS AND GIVE YOU THE OPPORTUNITY TO INDICATE IF

5  THERE IS ANYTHING YOU WANT TO PUT ON THE RECORD.

6       ON 200, I ASKED THE DISTRICT ATTORNEY TO

7  TAKE OUT EVERYTHING IN THE FIRST PARAGRAPH, EXCEPT THE

8  FIRST SENTENCE, AND I DON'T BELIEVE ANYBODY HAD AN

9  OBJECTION TO THAT.

10       I THINK 2001, NOBODY HAD AN OBJECTION TO.

11       2002, NO OBJECTION.

12  MS. RIVARD:  YOUR HONOR, I WAS GOING TO CHANGE

13  "HAVE BEEN" TO "WERE," JUST AFTER THE FIRST "YOU."

14  THE COURT:  2007, I DON'T THINK ANYBODY HAD ANY

15  CHANGES.

16       220, NO CHANGES.

17       222, 223, 224, 226, THEY'RE ALL FINE.

18       252, IN THE LAST SENTENCE, MAKE

19  "CONSTRUCTION" PLURAL.  I DON'T THINK ANYONE HAD ANY

20  OTHER CHANGES ON THAT ONE.

21       300, I THINK THAT WAS NO CONTROVERSY.

22       301 AND 302, NO ONE HAD ANY CONTROVERSY

23  ABOUT.

24

25

26

27

28       316, 318, 332, 333, 358, 359,

COPYING RESTRICTED, SEC. 69954(D) CAL GOV CODE

390

1  ███████████████████████████████

2         ██████████████████████████████████████

3          IF ANYONE WANTS TO ARGUE, I HAVE TO

4  ISSUE --

5          MR. WALDINGER:  WHICH ONE?

6          THE COURT:  THAT'S THE FAILURE TO EXPLAIN -- THE

7  DEFENDANT'S FAILURE TO EXPLAIN IN HIS TESTIMONY.

8          THE CASE LAW HAS MADE IT PRETTY CLEAR.  THE

9  FAILURE TO EXPLAIN HAS TO BE EITHER COMPLETE OR ALMOST A

10  RIDICULOUS EXPLANATION.  CERTAINLY, THERE IS A JURY

11  ISSUE THERE, SO I DON'T THINK THERE IS A MATTER THAT,

12  WELL, I SAY IT IS SO RIDICULOUS THAT I CAN TAKE IT AWAY

13  FROM THE JURY.

14          ALSO, 362, 370, 371, 372, I DON'T THINK

15  ANYONE HAD ANY ISSUE WITH.

16          500, I DON'T RECALL ANYONE HAVING ANY ISSUE

17  WITH THAT.

18          505 -- ██████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ?  ████████████████████████████████

23          THE COURT:  JUST TO RECAPITULATE THE DISCUSSION WE

24  HAD, HERE, CERTAINLY IF THE DEFENDANT -- YOUR ARGUMENT

25  IN CHAMBERS WAS THAT YOU FELT THAT THERE WAS AN ESTES

26  ROBBERY.  The victim was in the commission of (459)

27  ?  MR. WALDINGER:  YOUR HONOR, THAT WAS 506. Robbery

28          THE COURT:  OH, WAS THAT 506?  OKAY.

391

1

2

3

4    THE COURT:  OH, YEAH.  I WAS MIXING UP THAT 506

5    DISCUSSION WE HAD.

6           AND I THINK, AGAIN, HERE, YOU HAVE A USE OF

7    DEADLY FORCE, AND I DON'T THINK THAT THE MERE PROTECTION

8    OF PROPERTY ALLOWS THE JURY TO SET UP THEIR OWN

9    REASONABLE FORCE STANDARD, RATHER THAN WHEN YOU CAN USE

10   DEADLY FORCE, WHICH IS COVERED IN THE FIVE SERIES.  SO I

11   WON'T GIVE THAT ONE.

12          BUT YOU HAD AN OBJECTION.  -- OR NO

13   OBJECTION -- 520, I THINK THERE WAS NO OBJECTION TO.

14   OH, WE WERE GOING TO TAKE OUT THE REFERENCE TO "CAL

15   CRIM," EXCEPT FOR THE INSTRUCTION NUMBER 521.

16       MS. RIVARD:  YES, YOUR HONOR.

17       THE COURT:  AND THEN IN 521, THE LAST SENTENCE,

18   WHICH READS, "IF THE PEOPLE HAVE NOT MET THIS BURDEN,

19   YOU MUST FIND THE DEFENDANT NOT GUILTY OF FIRST DEGREE

20   MURDER, AND THE MURDER IS SECOND DEGREE MURDER."  THAT

21   ASSUMES THAT THEY'RE GOING TO FIND HIM GUILTY OF ONE

22   TYPE OF MURDER.  SO I THINK WHAT WE NEED TO DO IS

23   AFTER "IF THE PEOPLE HAVE NOT MET THIS BURDEN," COMMA,

24   "BUT YOU DECIDE THAT THE DEFENDANT COMMITTED MURDER,"

25   COMMA, "IT IS SECOND DEGREE MURDER."  (Not original wording at End of sentence.)

26       MS. RIVARD:  I WILL CHANGE THAT.

27       THE COURT:  OKAY.  AND YOU HAD NO OBJECTION TO

28   THAT, MR. WALDINGER?

COPYING RESTRICTED, SEC. 69954(D) CAL GOV CODE

1 ████████████████

2    THE COURT:  OKAY.  THEN WE GO TO 522, ████████

3 640. ████████████████

4         AND THEN 3145, THE INTRODUCTORY SENTENCE

5 BEFORE THE NUMBERED PARAGRAPHS, TICK OUT THE "OR SHE."

6    MS. RIVARD:  YES, YOUR HONOR.

7    THE COURT:  AND THEN 3550, I THINK THERE WAS NO

8 OBJECTION TO THAT.

9         3570, NO OBJECTION TO THAT.

10         ANYTHING ELSE WE NEED TO DISCUSS ON THE --

11    MS. RIVARD:  AT THE COURT'S REQUEST, I AM GOING TO

12 REMOVE 3590 FROM THE INSTRUCTION BOOKLET.  SO THE COURT

13 CAN JUST READ THAT AFTER ANY VERDICT.

14    THE COURT:  OH, YES.  YES.

15    MS. RIVARD:  I WILL MAKE THOSE CHANGES AND EMAIL

16 THEM DIRECTLY.

17    THE COURT:  JUST A REMINDER, IF ANYBODY'S GOING TO

18 USE POWERPOINT, HAVE A HARD COPY FOR THE CLERK TO MAKE

19 IT AS A COURT EXHIBIT.

20         YOU USE POWERPOINT; RIGHT?

21    MS. RIVARD:  I WILL USE A POWERPOINT IN BOTH MY A

22 AND B ARGUMENT.  I WILL PROVIDE A COPY OF THE POWERPOINT

23 TO MR. WALDINGER ON TUESDAY AND TO THE COURT FOR THE

24 COURT FILE.

25    THE COURT:  AND WE'LL JUST MAKE THOSE COURT

26 EXHIBITS.  AND MELODY IS NOT GOING TO BE HERE NEXT WEEK,

27 SO IF I FORGET, REMIND ME, WHOEVER IS IN HERE TO DO

28 THAT.

393-394

```
 1          MS. RIVARD:  YES, YOUR HONOR.
 2          THE COURT:  ALL RIGHT.  HAVE A GOOD WEEKEND, AND
 3   WE'LL SEE YOU TUESDAY.
 4          MS. RIVARD:  THANK YOU.  YOU, AS WELL, YOUR HONOR.
 5               THANK YOU, EVERYBODY.
 6          THE COURT:  THANK YOU.
 7
 8               (PROCEEDINGS CONCLUDED UNTIL
 9               FEBRUARY 20, 2018.)
10
11               (THE NEXT PAGE IS 394.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

COPYING RESTRICTED, SEC. 69954(D) CAL GOV CODE

Final Redacted Jury Instructions With Critical Omissions

I never seen nor consented to these instructions.

# EXHIBIT 1

**TOP**

**FILED**
Superior Court of California
County of Los Angeles

FEB 20 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
S. Cerda

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Dept. No. 103

No. BA442781

(Space below for filing
Stamp only)

PEOPLE OF THE STATE OF CALIFORNIA

INSTRUCTIONS { GIVEN ✓
~~REFUSED~~
~~WITHDRAWN~~

VS.

Michael Campbell
                                    Defendant.

Curtis B. Rappe -
                                    Judge Presiding.

Consisting of

16

pages herein

CRIM 122 09/05 (Replaces 76C707A)

████████████████████████████████████████ and I had no idea as I
sat in court reading along with Judge Rappe the final copy of jury instructions jurors
were to deliberate over. ███████████████ (all of which the evidence
supported giving) were all omitted, informally inside Judge Rappe's chambers between
the judge, the D.A. Rivard, and Michael Waldinger, my attorney. Based off of the
evidence in this case not only should of ████████████████████████
instruction should of been given but if you were fighting or arguing for a Self-Defense
verdict would you not fight to include ████████████ in defense of person,
property and/or habitation? Even ████████████, when committed by accident &
Misfortune, in the heat of passion, upon any sudden & sufficient provocation, or upon a
sudden combat etc. Because I couldn't afford a private attorney I was giving a Public
Pretender, ill prepared, that seemed to be working with the District Attorney judging by
his actions & his failed tactical approach to my case.

## 200.

Members of the jury, I will now instruct you on the law that applies to this case.

You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial.

Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes, but is not limited to, bias for or against the witnesses, attorneys, defendant or alleged victim, based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status.

You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.

Pay careful attention to all of these instructions and consider them together. If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

## 201.

Do not use the Internet or a dictionary in any way in connection with this case, either on your own or as a group.  Do not investigate the facts or the law or do any research regarding this case, either on your own, or as a group.  Do not conduct any tests or experiments, or visit the scene of any event involved in this case. If you happen to pass by the scene, do not stop or investigate.

## 202.

You were given notebooks and may have taken notes during the trial. You may use your notes during deliberations. Your notes are for your own individual use to help you remember what happened during the trial. Please keep in mind that your notes may be inaccurate or incomplete.

If there is a disagreement about the testimony at trial, you may ask that the court reporter's record be read to you. It is the record that must guide your deliberations, not your notes. You must accept the court reporter's record as accurate.

Please do not remove your notes from the jury room.

At the end of the trial, your notes will be collected and destroyed.

## 207.

It is alleged that the crime occurred on December 31, 2015. The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day.

## 220.

The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

**000142**

## 222.

"Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose.

You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

During the trial, you were told that the People and the defense agreed, or stipulated, to certain facts. This means that they both accept those facts as true. Because there is no dispute about those facts you must also accept them as true.

The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as accurate.

---

## 223.

Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. Circumstantial evidence also may be called indirect evidence. *Circumstantial evidence* does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside.

Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence.

---

## 224.

Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

---

## 226.

You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

- How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

- How well was the witness able to remember and describe what happened?

- What was the witness's behavior while testifying?

- Did the witness understand the questions and answer them directly?

- Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

- What was the witness's attitude about the case or about testifying?

- Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

- How reasonable is the testimony when you consider all the other evidence in the case?

- Did other evidence prove or disprove any fact about which the witness testified?

- Did the witness admit to being untruthful?

- Has the witness been convicted of a felony?

- Has the witness engaged in other conduct that reflects on his or her believability?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

---

## 252.

The crime and other allegation charged in Count 1 require proof of the union, or joint operation, of act and wrongful intent.

The following crime requires general criminal intent: Personal use of a deadly weapon, the enhancement charged as to Count 1. For you to find the allegation to be true, a person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act; however, it is not required that he intend to break the law. The act required is explained in the instruction for that crime.

The following crime requires a specific intent or mental state: Murder, as charged in Count 1. For you to find a person guilty of that crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instructions for that crime or allegation.

**300.**

Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant.

**301.**

The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.

**302.**

If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point.

**316.**

If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable.

## 318.

You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

1.    To evaluate whether the witness's testimony in court is believable;

AND

2.    As evidence that the information in those earlier statements is true.

---

## 332.

Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

---

## 333.

Witnesses, who were not testifying as experts, gave their opinions during the trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

---

## 358.

You have heard evidence that the defendant made an oral or written statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement.

Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded.

---

## 359.

The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed.

That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statement alone.

You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt.

---

## 362.

If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself.

---

## 370.

The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive.

Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty.

---

## 371.

If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.

---

## 372.

If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself.

---

## 500.

Homicide is the killing of one human being by another.  Murder and manslaughter are types of homicide.  The defendant is charged with murder. Manslaughter is a lesser offense to murder.

A homicide can be lawful or unlawful.  If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime.  If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter.  You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed.  I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide.  I will also instruct you on the different types of murder or manslaughter.

---

## 505.

The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if:

1.   The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

2.   The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

AND

3.   The defendant used no more force than was reasonably necessary to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating.

*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter.

## 571.

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

The defendant acted in imperfect self-defense if:

    1.    The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

AND

    2.    The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

BUT

    3.    At least one of those beliefs was unreasonable.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

A danger is *imminent* if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present, so that it must be instantly dealt with. It may not be merely prospective or in the near future.

*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder.

## 520.

The defendant is charged with murder.

To prove that the defendant is guilty of this crime, the People must prove that:

1.    The defendant committed an act that caused the death of another person;

2.    When the defendant acted, he had a state of mind called malice aforethought;

AND

3.    He killed without lawful justification.

There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

The defendant acted with *express malice* if he unlawfully intended to kill.

The defendant acted with *implied malice* if:

1.    He intentionally committed an act;

2.    The natural and probable consequences of the act were dangerous to human life;

3.    At the time he acted, he knew his act was dangerous to human life;

AND

4.    He deliberately acted with conscious disregard for human life.

Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in Instruction No. 521.

---

## 521.

The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.

The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, but you decide that the defendant committed murder, it is second degree murder.

---

### 522.

Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.

If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

---

### 640.

You will be given verdict forms for guilty and not guilty of first degree murder and second degree murder.

You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of *second degree murder* only if all of you have found the defendant not guilty of first degree murder.

 To return a verdict of guilty or not guilty on a count, you must all agree on that decision.

Follow these directions before you give me any completed and signed final verdict form. Return the unused verdict form to me, unsigned.

1. If all of you agree that the People have proved beyond a reasonable doubt that the defendant is guilty of first degree murder, complete and sign that verdict form. Do not complete or sign any other verdict forms.

2. If all of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms.

13

3. If all of you agree that the defendant is not guilty of first degree murder but also agree that the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder. Do not complete or sign any other verdict forms.

4. If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms.

5. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, but also agree that the defendant is guilty of voluntary manslaughter, complete and sign the forms for not guilty of first degree murder and not guilty of second degree murder and the form for guilty of voluntary manslaughter. Do not complete or sign any other verdict forms.

6. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, but cannot agree whether the defendant is guilty of voluntary manslaughter, complete and sign the forms for not guilty of first degree murder and not guilty of second degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms.

7. If all of you agree that the defendant is not guilty of first degree murder, not guilty of second degree murder, and not guilty of voluntary manslaughter, complete and sign the verdict forms for not guilty of each crime. Do not complete or sign any other verdict forms.

---

### 3145.

If you find the defendant guilty of the crime charged in Count 1, or the lesser crime of voluntary manslaughter, you must then decide whether the People have proved the additional allegation that the defendant personally used a deadly weapon in the commission of that crime.

A *deadly weapon* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.

*Great bodily* injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

Someone personally uses a deadly weapon if he intentionally does any of the following:

1.     Displays the weapon in a menacing manner;

14

OR

2.        Hits someone with the weapon.

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

---

### 3550.

When you go to the jury room, the first thing you should do is choose a foreperson.  The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard.

It is your duty to talk with one another and to deliberate in the jury room.  You should try to agree on a verdict if you can.  Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors.  Do not hesitate to change your mind if you become convinced that you are wrong.  But do not change your mind just because other jurors disagree with you.

Keep an open mind and openly exchange your thoughts and ideas about this case.  Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion.  Please treat one another courteously.  Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.

As I told you at the beginning of the trial, do not talk about the case or about any of the people or any subject involved in it with anyone, including, but not limited to, your spouse or other family, or friends, spiritual leaders or advisors, or therapists.  You must discuss the case only in the jury room and only when all jurors are present.  Do not discuss your deliberations with anyone.  Do not communicate using: Facebook, Instagram, Twitter or any other social media during your deliberations.

It is very important that you not use the Internet in any way in connection with this case during your deliberations.

During the trial, several items were received into evidence as exhibits.  You may examine whatever exhibits you think will help you in your deliberations.  These exhibits will be sent into the jury room with you when you begin to deliberate.

If you need to communicate with me while you are deliberating, send a note through the bailiff, signed by the foreperson or by one or more members of the jury.  To have a complete record of this trial, it is important that you not communicate with me except by a written note.  If you have questions, I will talk with the attorneys before I answer so it may take some time.  You should continue your deliberations while you wait for my answer.  I will answer any questions in writing or orally here in open court.

Do not reveal to me or anyone else how the vote stands on the question of guilt unless I ask you to do so.

Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it. Do not reach a decision by the flip of a coin or by any similar act.

It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be.

You must reach your verdict without any consideration of punishment.

You will be given verdict forms. As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict forms and notify the bailiff. Return any unsigned verdict form.

---

### 3577.

To the alternate juror: The jury will soon begin deliberating, but you are still an alternate juror and are bound by my earlier instructions about your conduct.

Do not talk about the case or about any of the people or any subject involved in it with anyone, not even your family or friends. Do not have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express an opinion about the issues in this case, unless you are substituted for one of the deliberating jurors.

---



Original Jury Instructions ███████ Non-Consential Redactions

570 Manslaughter, 347 Reasonable Force, 315 Eyewitness Testimony,

And 361 Defendant Fails To Explain all contained in these

original Instructions.

# EXHIBIT H

Members of the jury, I will now instruct you on the law that applies to this case. I will give you a copy of the instructions to use in the jury room. The instructions that you receive may be printed, typed, or written by hand. Certain sections may have been crossed-out or added. Disregard any deleted sections and do not try to guess what they might have been. Only consider the final version of the instructions in your deliberations.

You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial.

Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes, but is not limited to, bias for or against the witnesses, attorneys, defendant or alleged victim, based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status.

You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.

Pay careful attention to all of these instructions and consider them together. If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

---

**201.**

Do not use the Internet or a dictionary in any way in connection with this case, either on your own or as a group.   Do not investigate the facts or the law or do any research regarding this case, either on your own, or as a group.   Do not conduct any tests or experiments, or visit the scene of any event involved in this case. If you happen to pass by the scene, do not stop or investigate.



---

1

This is a copy of the jury instructions I had before me just before jurors were set to deliberate. 570 Manslaughter is clearly contained with no parts scratched out. 315, 361, and 347 are scratched out. I never was informed of these omissions and was never given a copy of the final jury instructions.

Defendant Exhibit

BA442781   2/19/18

Judge Curtis B. Rappe

**202.**

You ~~have been~~ were given notebooks and may have taken notes during the trial. You may use your notes during deliberations. Your notes are for your own individual use to help you remember what happened during the trial. Please keep in mind that your notes may be inaccurate or incomplete.

If there is a disagreement about the testimony at trial, you may ask that the court reporter's record be read to you. It is the record that must guide your deliberations, not your notes. You must accept the court reporter's record as accurate.

Please do not remove your notes from the jury room.

At the end of the trial, your notes will be collected and destroyed.

---

**207.**

It is alleged that the crime occurred on December 31, 2015. The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day.

---

**220.**

The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

---

## 222.

"Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose.

You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

During the trial, you were told that the People and the defense agreed, or stipulated, to certain facts. This means that they both accept those facts as true. Because there is no dispute about those facts you must also accept them as true.

The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as accurate.

---

## 223.

Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. Circumstantial evidence also may be called indirect evidence. *Circumstantial evidence* does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside.

Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence.

**224.**

Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

**226.**

You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

- How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

- How well was the witness able to remember and describe what happened?

- What was the witness's behavior while testifying?

- Did the witness understand the questions and answer them directly?

- Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

- What was the witness's attitude about the case or about testifying?

- Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

- How reasonable is the testimony when you consider all the other evidence in the case?

- Did other evidence prove or disprove any fact about which the witness testified?

- Did the witness admit to being untruthful?

- Has the witness been convicted of a felony?

- Has the witness engaged in other conduct that reflects on his or her believability?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

---

## 252.

The crime and other allegation charged in Count 1 require proof of the union, or joint operation, of act and wrongful intent.

The following crime requires general criminal intent: Personal use of a deadly weapon, the enhancement charged as to Count 1. For you to find the allegation to be true, a person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act; however, it is not required that he intend to break the law. The act required is explained in the instruction for that crime.

The following crime requires a specific intent or mental state: Murder, as charged in Count 1. For you to find a person guilty of that crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instructions for that crime or allegation.

**300.**

Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant.

**301.**

The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.

**302.**

If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point.

**315.**

You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

In evaluating identification testimony, consider the following questions:

• Did the witness know or have contact with the defendant before the event?

• How well could the witness see the perpetrator?

• What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

• How closely was the witness paying attention?

- Was the witness under stress when he or she made the observation?

- Did the witness give a description and how does that description compare to the defendant?

- How much time passed between the event and the time when the witness identified the defendant?

- Was the witness asked to pick the perpetrator out of a group?

- Did the witness ever fail to identify the defendant?

- Did the witness ever change his or her mind about the identification?

- How certain was the witness when he or she made an identification?

- Are the witness and the defendant of different races?

- Was the witness able to identify the defendant in a photographic or physical lineup?

- Were there any other circumstances affecting the witness's ability to make an accurate identification?

The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.

**316.**

If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable.

**318.**

You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

1.    To evaluate whether the witness's testimony in court is believable;

AND

2.    As evidence that the information in those earlier statements is true.

7

## 332.

Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

## 333.

Witnesses, who were not testifying as experts, gave their opinions during the trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

## 358.

You have heard evidence that the defendant made an oral or written statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement.

Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded.

**359.**

The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed.

That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statement alone.

You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt.

---

**361.**

If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.

If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure.

---

**362.**

If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself.

---

**370.**

The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive.

Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty.

---

**371.**

If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.

---

**372.**

If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself.

---

**500.**

Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. The defendant is charged with murder. Manslaughter is a lesser offense to murder.

A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide. I will also instruct you on the different types of murder or manslaughter.

---

**505.**

The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense.  The defendant acted in lawful self-defense if:

    1.    The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

    2.    The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

    AND

    3.    The defendant used no more force than was reasonably necessary to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to himself.  Defendant's belief must have been reasonable and he must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

A defendant is not required to retreat.  He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed.  This is so even if safety could have been achieved by retreating.

*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter.

347

The owner of personal property may use reasonable force to protect that property from imminent harm.

*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm.

When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter.

---

### 520.

The defendant is charged with murder.

To prove that the defendant is guilty of this crime, the People must prove that:

    1.      The defendant committed an act that caused the death of another person;

    2.      When the defendant acted, he had a state of mind called <u>malice aforethought;</u>

    AND

    3.      He killed without lawful justification.

There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

<u>The defendant acted with *express malice* if he unlawfully intended to kill.</u>

The defendant acted with *implied malice* if:

(Lacking reasonable proof)

    1.      <u>He intentionally committed an act;</u>

    2.      <u>The natural and probable consequences of the act were dangerous to human life;</u>

    3.      <u>At the time he acted, he knew his act was dangerous to human life;</u>

12

AND

4.    He deliberately acted with conscious disregard for human life.

Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in ~~CALCRIM~~ No. 521. *instruction*

---

### 521.

The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.

The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

The People have the burden of proving beyond a reasonable doubt that the killing was first *but you decide* degree murder rather than a lesser crime. If the People have not met this burden, you must find *def committed* ~~the defendant not guilty of first degree murder and~~ the murder is second degree murder. *Murder*

---

### 522.

Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.

If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

*[handwritten: not in his copy + led by + not supported by evidence.]*
*[handwritten: He didn't read this. This is self def not heat of]*

## 570.

*[handwritten: passion]*

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

*[handwritten: Heat of Passion is a situation]*

The defendant killed someone because of a (sudden quarrel) or in the heat of passion if:

*[handwritten: when see wife with other man + kill.]*

1.    The defendant was provoked;

2.    As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

AND

3.    The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

## 571.

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

14

*Skipped Also not in Final Copy covered in 59X*

The defendant acted in imperfect self-defense if:

1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

AND

2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

BUT

3. At least one of those beliefs was unreasonable.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

A danger is *imminent* if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present, so that it must be instantly dealt with. It may not be merely prospective or in the near future.

*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder.

---

## 640.

You will be given verdict forms for guilty and not guilty of first degree murder and second degree murder.

You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of *second degree murder* only if all of you have found the defendant not guilty of first degree murder.

To return a verdict of guilty or not guilty on a count, you must all agree on that decision.

Follow these directions before you give me any completed and signed final verdict form. Return the unused verdict form to me, unsigned.

1. If all of you agree that the People have proved beyond a reasonable doubt that the defendant is

guilty of first degree murder, complete and sign that verdict form. Do not complete or sign any other verdict forms.

2. If all of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms.

3. If all of you agree that the defendant is not guilty of first degree murder but also agree that the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder. Do not complete or sign any other verdict forms.

4. If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms.

5. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, but also agree that the defendant is guilty of voluntary manslaughter, complete and sign the forms for not guilty of first degree murder and not guilty of second degree murder and the form for guilty of voluntary manslaughter. Do not complete or sign any other verdict forms.

6. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, but cannot agree whether the defendant is guilty of voluntary manslaughter, complete and sign the forms for not guilty of first degree murder and not guilty of second degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms.

7. If all of you agree that the defendant is not guilty of first degree murder, not guilty of second degree murder, and not guilty of voluntary manslaughter, complete and sign the verdict forms for not guilty of each crime. Do not complete or sign any other verdict forms.

---

## 3145.

If you find the defendant guilty of the crime charged in Count 1, or the lesser crime of voluntary manslaughter, you must then decide whether the People have proved the additional allegation that the defendant personally used a deadly weapon in the commission of that crime.

A *deadly weapon* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.

*Great bodily* injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

Someone personally uses a deadly weapon if he ~~or she~~ intentionally does any of the following:

1.    Displays the weapon in a menacing manner;

OR

2.    Hits someone with the weapon.

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

---

### 3550.

When you go to the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard.

It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you.

Keep an open mind and openly exchange your thoughts and ideas about this case. Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.

As I told you at the beginning of the trial, do not talk about the case or about any of the people or any subject involved in it with anyone, including, but not limited to, your spouse or other family, or friends, spiritual leaders or advisors, or therapists. You must discuss the case only in the jury room and only when all jurors are present. Do not discuss your deliberations with anyone. Do not communicate using: Facebook, Instagram, Twitter or any other social media during your deliberations.

It is very important that you not use the Internet in any way in connection with this case during your deliberations.

During the trial, several items were received into evidence as exhibits. You may examine whatever exhibits you think will help you in your deliberations. These exhibits will be sent into the jury room with you when you begin to deliberate.

If you need to communicate with me while you are deliberating, send a note through the bailiff,

signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by a written note. If you have questions, I will talk with the attorneys before I answer so it may take some time. You should continue your deliberations while you wait for my answer. I will answer any questions in writing or orally here in open court.

Do not reveal to me or anyone else how the vote stands on the question of guilt unless I ask you to do so.

Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it. Do not reach a decision by the flip of a coin or by any similar act.

It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be.

You must reach your verdict without any consideration of punishment.

You will be given verdict forms. As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict forms and notify the bailiff. Return any unsigned verdict form.

---

### 3577.

To the alternate juror: The jury will soon begin deliberating, but you are still an alternate juror and are bound by my earlier instructions about your conduct.

Do not talk about the case or about any of the people or any subject involved in it with anyone, not even your family or friends. Do not have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express an opinion about the issues in this case, unless you are substituted for one of the deliberating jurors.

---

Trial Courts AcknowledgmenT Of Informal Meeting In

Chambers, Before My Arrival To CourT, To Remove

570 Manslaughter, 347 Reasonable Force, 315 Eyewitness Testimony,

And Instruction 361 ...

# EXHIBIT I

## PROOF OF ELECTRONIC SERVICE
## AND SERVICE BY MAIL

I am employed in the county of San Francisco, California; I am over the age of eighteen years and not a party of the within entitled cause; my business address is P. O. Box 330057, San Francisco, CA 94133.

Documents submitted electronically are transmitted using the TrueFiling electronic filing system. Participants who are registered with TrueFiling will be served electronically. Participants in this case who are not registered with TrueFiling will receive hard copies through the mail via the United States Postal Service or a commercial carrier.

On July 18, 2019, I electronically served the attached APPELLANT'S PETITION FOR REHEARING in *People v. Campbell* (B288428) by transmitting a true copy via this Court's TrueFiling system to the Los Angeles County District Attorney; the Department of Justice, Office of the Attorney General; and California Appellate Project, Los Angeles.

On July 18, 2019, I served the same document by mail on:

Michael Campbell BF6189
Wasco State Prison
P.O. Box 5500 B-5  217-A

Wasco, CA 93280

The Hon. Curtis B. Rappe
c/o Clerk, Superior Court
111 North Hill Street

Los Angeles, CA 90012

Michael Waldinger
Office of the APD
210 W Temple Street

18th Floor
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on July 18, 2019, at San Francisco, California.

_____

GAIL HARPER

Court Of Appeal Decision (July 3rd 2019)

Affirmed

# EXHIBIT C

GAIL HARPER
ATTORNEY AT LAW
P.O. BOX 330057
SAN FRANCISCO, CA 94133
(415) 291-8469
FAX (415) 433-2230

July 18, 2019

Michael Campbell BF6189
P.O. Box 715071
Represa, CA 95671

Re:    People v. Michael Campbell
       Court of Appeal No. B288428

Dear Mr. Campbell:

The Court of Appeal has affirmed your conviction. I have enclosed copies of the Court's opinion and your petition for rehearing.

I will prepare a petition for review for you.

Yours very truly,

GAIL HARPER

GH/gh
Encls: As described

"fled" to avoid arrest. These acts were insufficient as a matter of law to constitute flight and to support an inference of guilt.

As established above, the facts that Campbell left Denton's body in his room and did not contact the police are not evidence of "flight". Campbell was staying across the street from the local police station after leaving his apartment, and the police easily located him following a complaint that he was trespassing. The distinctions the Court of Appeal drew are insignificant.

Accordingly, given insufficient evidence of flight, the trial court's decision to give the CALCRIM No. 3.72 instruction was federal Constitutional error. It is reasonably probable that absent the improper and unsupported flight instruction, the jury would not have convicted him of murder, as the evidence did not support a finding of malice. (AOB pages 26-31.) The jury acquitted Campbell of first degree murder, but convicted him of second degree murder, where the evidence supported, at most, a manslaughter conviction.

## CONCLUSION

For the foregoing reasons, appellant respectfully requests that this Court grant review.

DATED: August 1, 2019                        Respectfully submitted,


                                             GAIL HARPER
                                             Attorney for Appellant

36

# EXHIBIT A

Michael Campbell
_____
Petitioner

(Warden)
Rick Hill (Folsom State Prison)
_____
Respondent(s)

**DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
IN FORMA PAUPERIS**

I, Michael Campbell _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?  ☐ Yes  ☑ No

   a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. ___ N/A ___

   b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. Upon incarceration I was recieving S.S.I. Benifits (2015)

2.  Have you received, within the past twelve months, any money from any of the following sources?

   a.  Business, profession or form of self-employment?  ☐ Yes  ☑ No

   b.  Rent payments, interest or dividends?  ☐ Yes  ☑ No

   c.  Pensions, annuities or life insurance payments?  ☐ Yes  ☑ No

   d.  Gifts or inheritances?  ☐ Yes  ☑ No

   e.  Any other sources?  ☐ Yes  ☑ No

If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: ___ N/A ___

3.  Do you own any cash, or do you have money in a checking or savings account?  *(Include any funds in prison accounts)*
☐ Yes  ☑ No

If the answer is yes, state the total value of the items owned:

_____    _____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)*  ☐ Yes  ☒ No

If the answer is yes, describe the property and state its approximate value:

_____    _____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support:  N/A

_____    _____

_____    _____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  2-10-2020
             *Date*

*Michael Campbell ( Michael Campbell )*
             *Signature of Petitioner*
                          2-10-2020

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $ 0-15 _____ on account to his credit

at the  FOLSOM STATE PRISON _____ institution where he is

confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said

institution: _____

_____    _____

_____    _____

1-6-2020
*Date*

T. Naanthanan / Accounting officer (spc
*Authorized Officer of Institution/Title of Officer*

Michael Campbell
_____
Petitioner

Warden Rick Hill (Folsom State Prison)
_____
Respondent(s)

DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
*IN FORMA PAUPERIS*

I, Michael Campbell _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed? ☐ Yes  ☒ No

    a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. _____ N/A _____

    b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. Was recieving S.S.I. Disability (2015)

2.  Have you received, within the past twelve months, any money from any of the following sources?

    a.  Business, profession or form of self-employment?   ☐ Yes  ☒ No
    b.  Rent payments, interest or dividends?   ☐ Yes  ☒ No
    c.  Pensions, annuities or life insurance payments?   ☐ Yes  ☒ No
    d.  Gifts or inheritances?   ☐ Yes  ☒ No
    e.  Any other sources?   ☐ Yes  ☒ No

    If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: _____

    _____ N/A _____

3.  Do you own any cash, or do you have money in a checking or savings account?  *(Include any funds in prison accounts)*

    ☐ Yes  ☒ No

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes ☒ No

If the answer is yes, describe the property and state its approximate value: _N/A_

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: _N/A_

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _2-10-2020_
_____Date_____

_Michael Campbell (Michael Campbell)_
_Signature of Petitioner_
_2-10-2020_

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $ _0.15_ on account to his credit

at the _FOLSOM STATE PRISON_ institution where he is

confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution:

_1-6-2020_
_____Date_____

_T. Neatherton / Accounting Officer (spe)_
_Authorized Officer of Institution/Title of Officer_

Date\Time: 1/6/2020 12:42:14 PM

Institution: FSP

Verified: _Michael Campbell_

2·1.7·20

CDCR

## Inmate Statement Report

| Start Date: | 7/5/2019 | Revalidation Cycle: | All |
|---|---|---|---|
| End Date: | 1/6/2020 | Housing Unit: | All |
| Inmate/Group#: | BF6189 | | |

THE WITHIN INSTRUMENT IS A CORRECT

1-6-2020

BY  T. Noodham
TRUST OFFICE

1

Date\Time: 1/6/2020 12:42:14 PM

Institution: FSP

Verified: _Michael Campbell_

2-10-20

## Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| BF6189 | CAMPBELL, MICHAEL | FSP | A  003A4 | 006001 |

Current Available Balance:        $0.15

### Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| **No information was found for the given criteria.** | | | | | | |

### Encumbrance List

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|
| **No information was found for the given criteria.** | | |

### Obligation List

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|
| **No information was found for the given criteria.** | | | | |

### Restitution List

| Restitution | Court Case# | Status | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|---|---|
| RESTITUTION FINE | BA442781 | Active | $400.00 | $0.00 | $0.00 | $400.00 |
| DIRECT ORDER | BA442781 | Active | $10,086.74 | $0.00 | $0.00 | $9,821.78 |

THE WITHIN INSTRUMENT IS A CORRECT

1-6-2020

T. Nandhanan
TRUST OFFICE

2

## PROOF OF SERVICE BY MAIL

I, ___Michael Campbell___, AM A RESIDENT OF FOLSOM STATE PRISON IN THE COUNTY OF SACRAMENTO, STATE OF CALIFORNIA. I AM OVER THE AGE OF 18 YEARS, AND (I AM) AM NOT A PARTY TO THIS ACTION.

MY PRISON NUMBER IS: ___BF-6189___.

MY PRISON ADDRESS IS: **P.O. BOX 950, Folsom, CA 95763.**

ON ___February 10th___, 20_20_ I SERVED A COPY OF THE FOLLOWING DOCUMENT:

FEDERAL WRIT OF HABEAS CORPUS

ON THE FOLLOWING PARTIES BY PLACING THE DOCUMENTS INTO A SEALED ENVELOPE WITH POSTAGE FULLY PAID, INTO THE UNITED STATES MAIL IN A DEPOSIT BOX SO PROVIDED AT FOLSOM STATE PRISON (MAILBOX RULE), REPRESA, CALIFORNIA, AND ADDRESSED AS FOLLOWS:

UNITED STATE DISTRICT COURT
     OFFICE OF THE CLERK
U.S. COURTHOUSE ~~████~~ 255 East Temple St., Suite TS-134
LOS ANGELES, CA 90012

THERE IS DELIVERY SERVICE BY THE UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ___February 10th___, 20_20_, AT REPRESA, CALIFORNIA.

_Michael Campbell_
Signature

## PROOF OF SERVICE BY MAIL

I, _Michael Campbell_____, AM A RESIDENT OF FOLSOM STATE PRISON IN THE COUNTY OF SACRAMENTO, STATE OF CALIFORNIA. I AM OVER THE AGE OF 18 YEARS, AND I AM/AM NOT A PARTY TO THIS ACTION.

MY PRISON NUMBER IS: _BF-6189_____.

MY PRISON ADDRESS IS: P.O. BOX 950, Folsom, CA 95763.

ON _February 10th_____, 20_20 I SERVED A COPY OF THE FOLLOWING DOCUMENT:

FEDERAL WRIT OF HABEAS CORPUS

ON THE FOLLOWING PARTIES BY PLACING THE DOCUMENTS INTO A SEALED ENVELOPE WITH POSTAGE FULLY PAID, INTO THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT FOLSOM STATE PRISON (MAILBOX RULE), REPRESA, CALIFORNIA, AND ADDRESSED AS FOLLOWS:

UNITED STATE DISTRICT COURT
    OFFICE OF THE CLERK
U.S. COURTHOUSE ▮▮▮▮ 255 East Temple St. Suite TS-134
LOS ANGELES, CA 90012

THERE IS DELIVERY SERVICE BY THE UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED _February 10th_____, 20_20, AT REPRESA, CALIFORNIA.

_Michael Campbell_
Signature
by Michael Campbell



